Sean A. Woods (Arizona Bar #028930)
Robert T. Mills (Arizona Bar #018853)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.5169
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Kashane Kirk, as Personal Representative and on behalf of the Estate of Leontae Kirk; Sharon Roberts, individually; Brittnie Turner, on behalf of and as legal guardian and parent of her minor child, MC, | Case No: CV-23-00836-PHX-MTL (CDB) |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| vs. | (JURY TRIAL DEMANDED) |
| City of Phoenix, a governmental entity; Michael Sullivan, Chief of the Phoenix Police Department; Autumn Ladines and John Doe Ladines, husband and wife; Officer Antonio Garza and Jane Doe Garza, husband and wife; Sergeant Eric Roy and Jane Doe Roy, husband and wife; Jaclyn Ravelo and John Doe Ravelo, husband and wife; Steven Ramirez and Jane Doe Ramirez, husband and wife; Jonathan Howard and Jane Doe Howard, husband and wife; | (Assigned to the Honorable Michael T. Liburdi and referred to the Honorable Camille D. Bibles) |
| Defendants |  |

Plaintiffs, by and through their attorneys, Mills + Woods Law, PLLC, for their Complaint against the CITY OF PHOENIX, a governmental entity; MICHAEL SULLIVAN, Chief of the Phoenix Police Department; AUTUMN LADINES AND JOHN

DOE LADINES, husband and wife; OFFICER GARZA AND JANE DOE GARZA, husband and wife; SERGEANT ROY AND JANE DOE ROY, husband and wife; JACLYN RAVELO AND JOHN DOE RAVELO, husband and wife; STEVEN RAMIREZ AND JANE DOE RAMIREZ, husband and wife; JONATHAN HOWARD AND JANE DOE HOWARD, husband and wife; (collectively "Defendants"), hereby allege as follows:

## **INTRODUCTION**

This case arises out of the unlawful and wrongful use of deadly force by the Phoenix Police Department through the City of Phoenix and the officers listed as defendants. The individual defendants' actions are a direct result of the long standing and sustained practices of the City and the Phoenix Police Department violative of the United States Constitution.

Leontae was a loving father and was a musician who loved his craft. Kashane Kirk, Leontae's brother describes Leontae:

> He was never a trouble maker, he said when we were kids he always wanted to be a music artist and have fun doing it and to put a smile on peoples' faces. He was a selfless and giving person who only wanted to look out for his family. He promised that if he ever made it in the music industry and received a good income from it, he would take care of his family so they would not have to struggle in life.

> He was full of love and forgiveness when others would do him wrong in life, he would be the type to be the bigger person in a situation. I can say no matter how hard life got, he always tried to keep a smile on his face through all the pain and struggles we would go through growing up. He would try to stay busy with doing side jobs as much as possible as he got older and he worked on doing music as well to stay busy. He wanted to be someone that others look up to and would love to motivate kids to do good in life.

> He was a loving father to his child, and he doted on her and pushed himself to be that father figure as much as possible. He wanted the best for his child and wanted her to see how much he loved her. He would be there for her for special occasions and when his daughter had sporting events at school, he would put forward the effort to go out of his way to see her and to cheer her up to let her know that her father was there watching her.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

## JURISDICTION AND VENUE

1.      Pursuant to 42 U.S.C. §1983 *et seq.*, Plaintiffs bring this action for violations of the United States Constitution, including without limitation the Eighth and Fourteenth Amendments and Arizona common and statutory laws, including A.R.S. §12-611, *et seq.*

2.      The amount in controversy exceeds the minimal jurisdictional limits of this Court.

3.      Jurisdiction is proper pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1367(a).

4.      To the extent applicable, and without conceding that said statute applies, Plaintiffs have served their Notice of Claim upon Defendants in compliance with A.R.S. §12-611, *et seq.* More than sixty (60) days have expired since Plaintiffs served their Notice of Claim and Defendants have not responded in any manner to said Notice of Claim.

5.      Pursuant to Article 6, Section 14 of the Arizona Constitution, this court has original subject matter jurisdiction in this Complaint because the claims relate to causes of action, the underlying acts and/or omissions for which, at all times relevant, have caused the events alleged herein to occur with primary effect in Maricopa County, Arizona.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b) and in that the specific acts giving rise to the causes of action alleged herein occurred with primary effect in Maricopa County, Arizona.

## PARTIES

7.      At all relevant times until his death on November 2, 2022 at the age of twenty-nine (29), Leontae Kirk ("Leontae") was an individual residing in Maricopa County, Arizona.

8.      At all relevant times, Plaintiff Sharon Roberts ("Roberts") was an individual residing in Maricopa County, Arizona, and is the natural mother of Leontae.

9.      At all relevant times, Plaintiff Kashane Kirk ("Kashane") as personal representative of the Estate of Leontae Kirk (the "Estate") was an individual residing in Maricopa County, Arizona.

10.     On May 10, 2023 the Superior Court, Maricopa County, Arizona, appointed

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Kashane Kirk as Personal Representative of the Estate.

11. At all relevant times, Plaintiff Brittnie Turner on behalf of and as legal guardian of MC, a minor child, was an individual residing in Maricopa County, Arizona, and is the natural mother of minor child MC. At all relevant times, MC was an individual residing in Maricopa County, Arizona. MC is the natural child of Leontae Kirk.

12. On November 5, 2011, Leontae Kirk and Brittnie Turner gave birth to MC, a minor child.

13. Defendant CITY OF PHOENIX is a governmental entity that acts by and through its officials, employees, and agents, including without limitation the Phoenix Police Department, and each of the other Defendants in this action except for Defendants Humberto Gonzalez-Rios and Jane Doe Gonzalez-Rios.

14. Defendant MICHAEL SULLIVAN is the Chief of the Phoenix Police Department and is sued in his official and individual capacity. He is tasked with oversight of the Phoenix Police Department and is responsible for all policies and procedures promulgated by the Phoenix Police Department. He is an agent of the City of Phoenix and the Phoenix Police Department, operating in his official and individual capacity in Maricopa County, Arizona.

15. Defendant AUTUMN LADINES is a Police Officer, employed by and is an agent of the City of Phoenix and the Phoenix Police Department, operating in her official and individual capacity in Maricopa County, Arizona.

16. Defendant OFFICER ANTONIO GARZA is a Police Officer, employed by and is an agent of the City of Phoenix and the Phoenix Police Department, operating in her official and individual capacity in Maricopa County, Arizona.

17. SERGEANT ERIC ROY is a Police Officer, employed by and is an agent of the City of Phoenix and the Phoenix Police Department, operating in her official and individual capacity in Maricopa County, Arizona. a Police Officer, employed by and is an agent of the City of Phoenix and the Phoenix Police Department, operating in her official and individual capacity in Maricopa County, Arizona.

18. JACLYN RAVELO is a Police Officer, employed by and is an agent of the

4

City of Phoenix and the Phoenix Police Department, operating in her official and individual capacity in Maricopa County, Arizona.

19.     STEVEN RAMIREZ is a Police Officer, employed by and is an agent of the City of Phoenix and the Phoenix Police Department, operating in her official and individual capacity in Maricopa County, Arizona.

20.     JONATHAN HOWARD is a Police Officer, employed by and is an agent of the City of Phoenix and the Phoenix Police Department, operating in her official and individual capacity in Maricopa County, Arizona.

21.     Defendants Roy, Ladines, Garza, , Ravelo, Ramirez, and Howard , for brevity's sake will be collectively referred to as "Phoenix Defendants" unless otherwise necessary to list them individually.

22.     Defendants JOHN DOE LADINES; JANE DOE GARZA; JANE DOE ROY; JOHN DOE RAVELO; and JANE DOE RAMIREZ are included as Defendants because the Phoenix Defendants were acting for the benefit of their respective marital communities, if any, and therefore the respective marital communities, if any, are liable for their actions as set forth herein.

23.     The City of Phoenix is vicariously liable under the principle of *respondeat superior* for the actions and inactions of the employees of the Phoenix Police Department (the "City") and any private contractors including those employees or contractors named as defendants in this action, as to any claims that are asserted by Plaintiff as a result of violations of the Arizona Constitution and Arizona common law because, at all relevant times, Defendants were acting within the course and scope of their employment or contract with Phoenix - or entities privately contracted with Phoenix.

24.     For purposes of Plaintiffs' claims arising under Federal law, including without limitation the United States Constitution and 42 U.S.C. §1983 *et seq*., and as may be relevant to Plaintiff's state law claims, at all relevant times described herein, Defendants were acting under color of state law.

25.     Each of the Defendants failed to do what is minimally required of them by the United States Constitution, and the laws of the State of Arizona, relative to the care,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

custody and control of Leontae Kirk.

26.     By failing in these obligations, Defendants were deliberately indifferent to Leontae's rights guaranteed him by the United States Constitution and the State of Arizona.

27.     As a result of Defendants' deliberate indifference and as a result of intentional acts and omissions to act that fell below the proscribed standard of care – through failures to properly supervise; properly carry out their job duties; and to properly administer medical attention –  Kirk died at the age of twenty-nine (29).

## **BACKGROUND**

### **UNITED STATES DEPARTMENT OF JUSTICE ANNOUNCES INVESTIGATION INTO THE PHOENIX POLICE DEPARTMENT**

28.     The United States Department of Justice ("USDOJ") announced on August 5, 2021 that they were investigating the Phoenix Police Department. A portion of the text of the announcement follows:

> Attorney General Merrick B. Garland and Assistant Attorney General Kristen Clarke for the Civil Rights Division announced today that the Justice Department has opened a pattern or practice investigation into the City of Phoenix and the Phoenix Police Department (PhxPD).
>
> This investigation will assess all types of use of force by PhxPD officers, including deadly force. The investigation will also seek to determine whether PhxPD engages in retaliatory activity against people for conduct protected by the First Amendment; whether PhxPD engages in discriminatory policing; and whether PhxPD unlawfully seizes or disposes of the belongings of individuals experiencing homelessness. In addition, the investigation will assess the City and PhxPD's systems and practices for responding to people with disabilities. The investigation will include a comprehensive review of PhxPD policies, training, supervision, and force investigations, as well as PhxPD's systems of accountability, including misconduct complaint intake, investigation, review, disposition, and discipline.
>
> ***
>
> The investigation is being conducted pursuant to the Violent Crime Control and Law Enforcement Act of 1994, which prohibits state and local governments from engaging in a pattern or practice of conduct by law enforcement officers that deprives individuals of rights protected by the Constitution or federal law. The statute allows the Department of Justice to

remedy such misconduct through civil litigation. This is the seventy-third investigation of a law enforcement agency conducted pursuant to this statute since it was enacted in 1994. The department will be assessing law enforcement practices under the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as under the Safe Streets Act of 1968; Title VI of the Civil Rights Act of 1964; and Title II of the Americans with Disabilities Act.

*Retrieved February 2, 2023* from https://www.justice.gov/opa/pr/justice-department-announces-investigation-city-phoenix-and-phoenix-police-department

29.      As a result of the investigation, the City and the Phoenix Police Department received suggestions to increase the usage of de-escalation techniques and decrease the employment of unwarranted deadly force.

30.      Based on the foregoing, it is unquestionable that there is a systemic failure within the City to train, supervise, and regulate the Phoenix Police Department and its agents. The policies and procedures in place have established a police force that acts with blatant disregard for Arizona citizens' constitutional rights and extreme indifference to the value of human life.

### PHOENIX POLICE NEW USE OF FORCE POLICY

31.      In order to properly establish the basis for the claims included herein, it is important to outline the longstanding history of the Phoenix Police Department, and its agents, systemic use of excessive force and unlawful use of deadly force against the citizens of Phoenix, Arizona. This pattern of unlawful policing has been overseen, managed, and sustained by the City.

32.      For decades, the City of Phoenix has established and implemented policies and procedures that have consequently generated a police force that consistently acts with wanton disregard for the constitutional rights of individuals and the sanctity of human life.

33.      Despite the evidence to the contrary, the Phoenix Police Department alleges that their Officers receive Operations Orders that can guide their actions, but the patterns and practices of the City and the Phoenix Police Department have been violative of Arizona citizens' rights for years.

34.      It should be noted that the Phoenix Police Department's Use of Force Policy

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

7

("Force Policy") was updated in January 2023. The Phoenix Police Department – as discussed herein – has been the subject of a USDOJ investigation due to their violent, racially-motivated tactics.

35.     The Phoenix Police and City's policies, patterns, and practices regarding use of force and "active shooters" has been woefully deficient for years.

36.     Upon information and belief, Phoenix Police Chief Michael Sullivan was hired in September 2022 specifically to help the department address the wide-ranging and ongoing probe by the USDOJ.

37.     A major component of the USDOJ's investigation is into the use of force of Phoenix Police officers. The Phoenix Police Department is no stranger to civil wrongful death lawsuits and years of protests. It is an institutional problem and the City, the Police, and the Phoenix Defendants are all actors in the shameful display of policing and failure to take accountability, including misconduct complaint intake, investigation, review, disposition, and discipline that has occurred throughout the years – culminating in the horrific, violent, take no prisoners approach the Offenders used on November 2, 2022 to murder Leontae Kirk.

38.     In response, Sullivan implemented a new Use of Force Policy ("Force Policy") that applies to all Phoenix Police Officers. Operations Order 1.5 details the Force Policy.

39.     According to the Force Policy, the purpose is:

[T]o establish what constitutes a permissible use of force by an employee, and the employee's duties before, during, and after using force. The goal of every encounter is to resolve it without resorting to force, and using force in any case must be based on a careful assessment of the situation, including the threats, options, and risks faced by the employee.

*Phoenix Police Department Use of Force Policy Rev. 01/23* retrieved from https://www.phoenix.gov/policesite/Documents/1.5%20Use%20of%20Force%202023.pdf on February 2, 2023.

40.     The Force Policy further states that "The standards established by this Department policy are deliberately stricter than the Constitutional and legal minimums

established by the Courts. These more rigorous standards for use of force must be complied with." *Id.*

41. The Core Principles in the new Force Policy are:

A. Sanctity of Human Life – Employees shall make every effort to preserve human life in all situations.

B. Value and Worth of All Persons – Employees shall respect and uphold the value, rights, liberty, and dignity of all persons at all times.

C. Use of Force: Reasonable, Necessary, and Proportional – Employees shall use only the force that is reasonable, necessary, and proportional to effectively and safely resolve an incident. The employee will immediately reduce the level of force as the threat or resistance diminishes.

D. De-Escalation – Employees shall use de-escalation techniques and tactics when feasible to attempt to reduce any threat or gain compliance with lawful commands without the use of force. If that is not possible, the employee must reduce or eliminate the threat using the lowest level of force possible. Employees shall avoid action or language that escalates an encounter unless necessary to achieve a lawful purpose.

E. Continuous Assessment – Employees shall continuously assess each situation and modify their response as the circumstances change—before, during, and after an employee uses force. Employees may be justified in using force at a particular moment but not justified in using force when circumstances change.

F. Reporting Use of Force – Each employee who uses force, or observes another employee or employees use force, shall notify their supervisor as soon as practical, and will accurately complete the required Incident Report and/or any supplements by the end of their shift.

G. Duty to Intervene – All employees shall intervene, with no fear of retaliation, when they know or should know another employee is using unreasonable force or is otherwise engaging in abusive behavior or misconduct.

H. Duty to Provide Medical Assistance – As soon as practical after any Use of Force incident, employees are responsible for requesting medical treatment for injured subjects and rendering aid consistent with the employee's training.

I. Accountability – Employees shall be held accountable for uses of force that violate law or policy. Employees have an absolute duty to report all misconduct, including but not limited to, the use of excessive force.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

J. Retaliatory Force – Employees shall not use force against persons to punish them for fleeing, resisting arrest, assaulting an employee, or for any other reason. *Id*.

42.    Use of Force is defined as:

(1) Sworn and civilian employees acting in an enforcement capacity have the authority to use Reasonable, Necessary, and Proportional force when necessary to accomplish lawful objectives.

(a) This authority is limited by the United States Constitution, federal law, laws of the State of Arizona, and the provisions of this policy.

(b) Employees must conform their actions to the requirements of these sources of lawful authority.

(c) When employees use force, they shall exercise the utmost restraint.

(d) Employees should announce that force will be utilized prior to the application of such force unless it is impractical to do so.

(2) Employees shall prevent or stop the illegal, inappropriate, or excessive Use of Force by other employees. Failure to intervene may subject an employee to disciplinary action.

(3) Only Department-issued or approved weapons, equipment, and irritants are authorized.

*Id*.

43.    The Force Policy defines the Use of Deadly Force as:

(1) The use of Deadly Force shall always be the last resort.
(2) Employees shall not use Deadly Force unless:

• They have exhausted De-escalation and Less-Lethal Force options;

• These alternatives have been tried and failed; or

• These alternatives are not safe based on the Totality of Circumstances.

(3) Employees may use Deadly Force when they reasonably believe such action is immediately Necessary to protect an employee or another person from an Imminent Threat of death or Serious Physical Injury.

(4) Prior to the decision to employ Deadly Force, employees shall consider environmental considerations such as field of fire, backdrop, bystanders, potential

10

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

for ricochet, possibility of over- penetration, and other risks to life.

(5) Where safety permits, employees should identify themselves as a law enforcement officer and state their intention to use Deadly Force before using a firearm or employing Deadly Force.

(6) An employee may use Deadly Force to prevent the escape of a fleeing person if force is authorized and no reasonable force alternative exists, provided that:

> • There is probable cause to believe that the person has committed or is in the process of committing a felony involving the infliction or threatened infliction of Serious Physical Injury or death, and

> • The escape of the person would pose an Imminent Threat of death or Serious Physical Injury to the employee or another unless the person is apprehended without delay, and

> • If time, safety, and circumstances permit, employees have identified themselves as law enforcement officers, have stated their intention to use Deadly Force, and have given the person a reasonable opportunity to comply voluntarily.

*Id.*

44.     The Force Policy defines the following duties:

A. Duty to Intervene

> (1) Employees shall intervene to stop any employee from using excessive force and/or engaging in abusive behavior or other forms of misconduct; intervention may be verbal and/or physical.

B. Duty to Provide Medical Assistance

> (1) As soon as practical, when there is a visible injury, complaint of injury, signs of medical distress, or when medical attention is requested by any person, employees shall render aid consistent with their training.

>> (a) When safe to do so, the employee shall promptly request that medical personnel respond to the scene.

>> (b) The employee shall then notify their supervisor.

> (2) If a person has been subjected to impact by any type of Less-Lethal Force, including CEW, impact weapons, or impact projectiles, the person will be provided with medical treatment.

11

*Id.*

45.     The updates to the Use of Force Policy show that the policies and procedures in place at the time of Leontae's death failed to protect members of the public.

46.     Even if the Force Policy as it exists now had been in place on November 2, 2022, it still proves that the force used by the Phoenix Defendants was unnecessary, extreme, reckless, grossly negligent, and shows that the Offenders did nothing to verify the situation, use less lethal methodologies, or use plain common sense. The Phoenix Defendants – each and every one of them – had a duty to intervene.

**The City of Phoenix' Patterns, Policies, and Practice are Violative of the Rights Protected by the Constitution and Federal Law**

47.     Since 2015, there have been at minimum eighty-eight (88) officer involved shootings that resulted in the fatalities of the suspect. Fifty-three (53) of those fatalities were black individuals.

48.     Chief Sullivan has even recognized that the City has failed to properly train or implement constitutionally sound policies to prevent fatal Phoenix Police shootings.

49.     On November 21, 2022 – just nineteen (19) days after the fatal shooting of Leontae, Chief Sullivan presented a four-pronged plan to fix the failings of his predecessors and the City's woefully deficient policies and training programs regarding the use of force, including deadly force.

50.     These include:

- Reinforce patrol briefing training on time, distance, and cover;

- Implement scenario-based training on de-escalation;

- Review the agency's use-of-force policies; and,

- Expand the training on less-lethal tools.

https://www.phoenix.gov/newsroom/police/2573

51.     According to the Chief:

The initial few moments after officers arrive on a scene are critical. "The decisions and actions of law enforcement officers are critically important and can change the course of lives in a matter of seconds. That responsibility forces us to constantly look at ways to get better and do better," said Chief Sullivan.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

*Id.*

52.     The Chief also writes:

An expansion of the Department's less lethal program is underway. Starting this week, and for the following four weeks, 12 officers per week will be trained on less lethal tools, specifically the PepperBall. This tool allows law enforcement the ability to disable or deter threats, resolve situations without lethal force, and accomplish missions while preserving life. The goal is to equip an additional 400 officers with less lethal options before the end of 2023, 200 PepperBall devices and 200 40mm impact launchers.

"This plan revolves around the concept that preservation of life is at the core of policing," said Sullivan. "Becoming a self-correcting organization fosters continuous improvement which allows us to refocus on that core ideal which is more important now than ever."

*Id.*

53.     In late November 2022 – after the death of Leontae Kirk – Sullivan is quoted as saying: "The desire is for more training... I think the years of the pandemic where we didn't get to do in-person scenario training, . . . [t]hat training was very successful previously and I look forward to bringing in a national group and really enhancing the scenario-based training that we've had in the past."

54.     The City has engaged in a pattern or practice of conduct by law enforcement officers that deprives individuals of rights protected by the Constitution or federal law.

55.     These new measures are a step forward, but the pattern and practice of the City depriving individuals of rights protected by the Constitution or federal law lead directly to Leontae's death.

56.     The City of Phoenix continues to knowingly authorize policies and procedures that result in the wrongful death of Arizona citizens.

## USDOJ FINDINGS

57.     On June 13, 2024, The USDOJ Civil Rights Division issued a 126-page report titled "Investigation of the City of Phoenix and the Phoenix Police Department" (the "Report").[1]

58.     The Report's Executive Summary states:

---

[1] Retrieved October 4, 2024 from https://www.justice.gov/crt/media/1355866/dl?inline

13

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

On August 5, 2021, the Department of Justice opened a pattern or practice investigation of the Phoenix Police Department (PhxPD) and the City of Phoenix ("the City" or "Phoenix"). Our investigation revealed systemic problems within PhxPD that deprive people of their rights under the Constitution and federal law. ***We found pervasive failings in PhxPD's policies, training, supervision, and accountability systems that have disguised and perpetuated these violations for years.***
(emphasis added)

59.     On the USDOJ website and in the Report, it is explicitly stated that "the Department finds that: PhxPD uses excessive force, including unjustified deadly force and other types of force."[2]

60.     Chief Sullivan was appointed interim Chief in July 2022.

61.     According to the Report, Chief Sullivan has started implementing certain reforms, including updates to PhxPD's use-of-force policy and training. "I saw some uses of force that made me think that we need to do something different," he told Justice Department investigators.

62.     To determine the pattern and practice analysis, the Report cites to 34 U.S.C. § 12601; *see also* 42 U.S.C. § 12101 et seq. A pattern or practice exists where violations are repeated rather than isolated. *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 336 n.16 (1977). A pattern or practice does not require the existence of an official policy or custom. *United States v. Colorado City*, 935 F.3d 804, 810 (9th Cir. 2019).

63.     The report also found that Phoenix Police's training and weak oversight contribute to the pattern of excessive force, specifically finding that "PhxPD training has mischaracterized the law and encouraged immediate and indiscriminate force, which predictably results in excessive force. Many of the problematic practices we saw originated with PhxPD training. Despite systems for oversight and review, PhxPD's chain of command approved nearly all use-of-force incidents, including those described above."

64.     The report found that:

PhxPD also has trained officers to use serious force to respond to hypothetical, not actual, danger. For example, in a training for all supervisors at a station,

---

[2] Retrieved October 4, 2024 from https://www.justice.gov/opa/pr/justice-department-finds-civil-rights-violations-phoenix-police-department-and-city-phoenix

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

PhxPD showed a video of an incident in which an officer shot a man carrying a knife with a 40mm round. Although the man was on a deserted street in downtown Phoenix at 2:45 a.m., trainers said the force was reasonable because there "was an element of jeopardy." The jail was across the street and people "could be" released at any time. Trainers have also taught officers to fire Tasers and 40mm projectiles against a person in a behavioral health crisis if the person does not comply with commands, whether or not the person presents a threat. The mindset that a theoretically possible future threat, however unlikely, justifies immediate force violates the Fourth Amendment.

65.     The USDOJ report continues:

Phoenix has trained its officers that all force—even deadly force—is de-escalation. This attitude runs contrary to the basic principles of de-escalation, which offers strategies, such as time, distance, cover, and verbal persuasion, to help a person voluntarily comply with officers without the need to use force or to lessen the force needed. 34 PhxPD officers have been trained to "use escalation to de-escalate the situation" as quickly as possible. One trainer suggested immediate force stops a situation "before you really have to hurt someone," and explained that "de-escalation, like talking nice, will get someone killed." In practice, this translates to quickly using unreasonable force, often without considering whether any force is necessary at all.

Indeed, in some trainings we observed, trainers encouraged officers to use force without warning or just seconds after arriving at a scene, regardless of whether the person presented an apparent risk to officers or others.

66.     The USDOJ report details more training that is unconstitutional:

Similarly, PhxPD has taught officers that it is appropriate to fire projectiles at people who are not following commands but pose no threat. Indeed, 40mm operators have been trained they can fire when faced with "passive resistance," such as when a person is defiant in response to commands, but not aggressive. For example, in a role-playing training we observed, officers stopped a driver on suspicion of assault. The actor got out of his car with his hands up but did not follow the trainee's directions and was moving around and yelling. Eventually, the trainee shot the actor with a 40mm round. During the debrief, instructors told the trainee that he should have taken more decisive action and fired the moment the actor did not comply with a command.

67.     The Report found that there are several patterns that Phoenix Police use that violate constitutional rights:

PhxPD uses unconstitutional deadly force. We identified several patterns:

15

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

•    First, officers violate the Constitution when they fire their weapons at people who present no immediate threat of harm, and they continue to shoot at people after they are no longer a threat.

•    Second, officers shoot when their own actions have created or greatly magnified the risk they face. We identified unconstitutional shootings that likely could have been avoided absent officers' reckless tactics.

•    Third, officers unreasonably delay rendering aid to people they have shot, and at times use significant, unreasonable force against people who are already incapacitated, sometimes even unconscious, as the result of police gunfire.

68.    The Report further found that "[f]or big city police departments, PhxPD has one of the highest rates of fatal shootings in the country per year. PhxPD typically reports more than 20 police shootings each year and sometimes significantly exceeds that number."

69.    The Report, under a heading entitled "PhxPD Officers Fire Their Guns at People Who Present No Immediate Threat" found that:

> PhxPD officers fail to properly assess whether to shoot once they see a person holding a weapon, even when the person presents no immediate threat.
>
> * * *
>
> At times, officers continue to shoot after any threat has ended. Under the Fourth Amendment, justification for deadly force, or any force, may end after the first gunshot. "[T]erminating a threat doesn't necessarily mean terminating the suspect. If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting" *Zion v. Cty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017).

Report at 16

70.    Furthermore, another individual died at the hands of Phoenix Police a little less than two (2) months preceding Leontae's death.

71.    The individual was shot and killed because he was throwing rocks at the police.

72.    The City of Phoenix settled that case and paid the family five million five

16

hundred thousand dollars ($5,500,000).

73. The City of Phoenix Mayor, Kate Gallego, approved the settlement, stating that "It (the settlement) does not bring him back, but that lesson learned will save lives to come,"

74. She further stated that "The problem was at a policy level. We did not have the right policies guiding how to respond, so we have dramatically changed what we would do today."

75. The Phoenix Police Department and the City authorized customs, policies, patterns and practices that are unconstitutional.

76. These customs, policies, patterns and practices were utilized in the Phoenix Defendants' response to Leontae Kirk.

77. The three patterns the USDOJ found above are exactly the patterns that were used against Leontae.

78. For example, Leontae presented no immediate threat of harm, but the Phoenix Defendants opened fire and utilized deadly force as their first resort/response.

79. Additionally, the Phoenix Defendants continued to shoot at Leontae even though he was never a threat and was already incapacitated.

80. The Phoenix Defendants recklessly approached the scene – they ignored the other person, Humberto, that had pulled a weapon on Leontae – and they ignored the facts in front of them – that Leontae was not a threat.

81. Additionally, the Phoenix Defendants unreasonably delayed rendering aid to Leontae after they shot him 19 times.

82. They also used additional unreasonable force **after** shooting Leontae 19 times.

83. They fired 40mm canisters into Leontae's body to ostensibly see if he would react.

84. They then continued to delay medical attention for somewhere between six (6) and (10) minutes.

85. Each of those practices fell exactly in line with the patterns of

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

unconstitutional behavior that the USDOJ found.

**FACTUAL ALLEGATIONS**

86.     On November 2, 2022, Leontae was walking to a convenience store to purchase a can of beer for $3.00.

87.     Upon information and belief, along the way, he encountered multiple people with whom he had conversations.

88.     Leontae continued on his way and arrived at the convenience store.

89.     In video, you can clearly see Leontae interact with multiple people. With the exception of one person, Leontae's interactions were mostly jovial and ended with handshakes.

90.     Unbeknownst to Leontae, a Hispanic individual - Humberto Gonzalez-Rios – followed him to the convenience store at 3710 W. McDowell Road.

91.     Humberto then followed Leontae into the convenience store.

92.     No physical altercation between the two occurred in the convenience store.

93.     Humberto exited the convenience store before Leontae did.

94.     Humberto went to "his" motorcycle and retrieved a gun.

95.     He then sat on "his" motorcycle with his gun and waited for Leontae to exit the store.

96.     On video – while Humberto was lying in wait – a man pushing a stroller with his child is seen.

97.     When Leontae exited the store, his back was to Humberto.

98.     He turned around and saw Humberto sitting on "his" motorcycle with a gun pointed at Leontae.

99.     Leontae ran.

100.    Leontae pulled his weapon out as a show of defense.

101.    In some circumstances, Arizona state law explicitly allows the "defensive display of a firearm." A.R.S. § 13-421 ("The defensive display of a firearm by a person against another is justified when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the use or attempted use

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

of unlawful physical force or deadly physical force.").

102.    This was a clear defensive display of a firearm by Leontae because he reasonably believed he was going to be harmed or be subjected to deadly force at the hands of Humberto.

103.    Leontae never fired his weapon.

104.    Leontae never pointed his weapon at officers, nor did he threaten to shoot anyone – including the Phoenix Defendants.

105.    Police investigations confirmed through ballistics or otherwise that Leontae never fired his weapon.

### The Helicopter Officers

106.    At this point, a Phoenix Police Helicopter was above the scene.

107.    Incredibly, the "Helicopter Officers" – Howard, who was the pilot, and Ramirez, the spotter with the primary job of relaying accurate information – claimed that they saw Leontae and Humberto actively firing their weapons.

108.    Dispatch audio announced inaccurately that there was an "ACTIVE SHOOTER" situation.

109.    The Helicopter Officers had binoculars. They had visual line of sight on Leontae.

110.    Yet, they failed in the simplest of tasks, Observation.

111.    The Helicopter Officers recklessly and wrongfully reported false information that Leontae was firing his weapon.

112.    The Helicopter Officers have one overriding job: to observe.

113.    They then report what they see. Mistakes cannot happen – they are life and death decisions.

114.    The Helicopter Officers reported that there was an active shooter – when there clearly was not.

115.    Because of The Helicopter Officers' complete dereliction of their duties, they doomed Leontae to death by police.

116.    The Helicopter Officers failed not only at their jobs and their duties, but they

provided false information to their colleagues.

117. The Helicopter Officers kicked off the fracas through their complete ineptitude or wanton disregard of their duties to protect the public from personal injury or harm to property.

118. At any point during their constant observation, they could have relayed updated information – that Leontae was not in fact firing a weapon.

119. They did not.

120. They are as responsible for the killing of Leontae as the Defendants who actually shot him.

## False and Deadly Information

121. The Helicopter Officers' bad information does not excuse the subsequent actions by the Defendants.

122. 911 callers and witnesses give inherently skewed and flawed information.

123. This is well known in the policing community.

124. This is why it is of dire importance to have officers on foot verify information before charging in with their guns blazing.

125. A witness provided the following information "WHILE WALKING EASTBOUND ON THE SOUTHSIDE OF MCDOWELL ROAD SHE OBSERVED WHAT SHE DESCRIBED AS A HISPANIC MALE IN HIS 20'S OR 30'S WEARING A YELLOW JACKET, RED SHORTS AND BLACK SLIPPERS WAS POINTING A GUN AND HER AND HER FRIENDS FROM THE NORTHSIDE OF MCDOWELL AND TOLD THEM TO BE QUIET."

126. Any report claiming that Leontae fired his weapon was obviously one hundred percent false.

127. Leontae never fired a weapon.

128. The report regarding a yellow jacket and red shorts was inaccurate.

129. No witness could A) accurately describe what they saw; or, B) saw a completely different person than Leontae pointing a gun at people.

130. The Defendants instead ignored what their eyes could plainly see – that upon

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

their arrival, Leontae was in a surrendering position with his hands up and had no weapon in his hands.

131.     While Leontae was running away from his aggressor, he managed to pull his own gun out of his pocket in defense.

132.     Video footage proves this.

133.     Leontae ran away and lawfully waved his gun up in the air as a show of defense while frantically searching for cover.

### Humberto Gonzalez-Rios

134.     Humberto Gonzalez-Rios was the aggressor, but he wasn't even given a second thought by the Defendants.

135.     To date, upon information and belief, shockingly, Humberto has not been charged with a crime, despite the fact that he committed clear assault and instigated everything that followed.

136.     Despite knowing that two individuals were brandishing weapons (not firing weapons), the Phoenix Defendants seized upon the opportunity to target the only black man.

137.     Defendants focused on Leontae, a black man, who was doing nothing but scrambling for safety.

138.     Video shows that the Phoenix Defendants did not even look Humberto's way. They just let him run from the scene while unloading their lethal weapons at Leontae.

139.     In Officer Thomas Cuthbertson's Report, he noted that he interviewed Humberto.

140.     The following is what Officer Cuthbertson reported about the interview:

HUMBERTO WANTED TO KNOW WHY WE ARRESTED HIM. I ADVISED HUMBERTO WE HAD NOT ARRESTED HIM, BUT HE HAD BEEN DETAINED. I TOLD HUMBERTO I DID NOT THINK HE WOULD BE ARRESTED, BUT I DID NOT KNOW WHAT HAPPENED AND NEEDED TO FIND OUT FROM HIM WHAT HAPPENED. I ASKED HUMBERTO WHY HE WAS AT THIS LOCATION. HUMBERTO WAS THERE TO PURCHASE BEERS FOR A FRIEND OF HIS. HUMBERTO LIVED NEAR BY, BUT DID NOT KNOW THE ADDRESS. HUMBERTO NOTED HE LIVED AT NORTH 37TH

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

AVENUE AND WEST GRANADA.

HUMBERTO WORKED AS A CARPENTER FOR AN INDIVIDUAL NAMED "JOSE. I ASKED HUMBERTO ABOUT THE MOTORCYCLE. HUMBERTO WAS IN THE PROCESS OF REPAIRING THE MOTORCYCLE FOR A FRIEND NAMED "GUERO" WHO LIVED IN THE AREA OF 7TH AVENUE AND ROOSEVELT.

I ASKED HUMBERTO TO TELL ME WHAT HAPPENED. HUMBERTO DROVE THE MOTORCYCLE DOWN NORTH 37TH AVENUE AND HUMBERTO OBSERVED THE SUBJECT (LEONTAE KIRK) WALK OUT OF THE ALLEY WHILE PUTTING A GUN IN HIS POCKET. HUMBERTO OBSERVED LEONTAE TALK TO A WHITE FEMALE IN THE ALLEY. LEONTAE CALLED THE FEMALE A "BITCH". WHILE IN THE STORE LEONTAE GRABBED SOME BEER FIRST AND ASKED HUMBERTO "WHAT'S UP". WHILE HUMBERTO WAS WAITING TO PURCHASE BEER LEONTAE INSULTED HUMBERTO BY TELLING HUMBERTO TO "SHUT UP" AND SAYING OTHER INSULTING THINGS TO HUMBERTO. HUMBERTO WENT OUTSIDE AND TRIED TO START THE MOTORCYCLE AND NOTED THE MOTORCYCLE WOULD NOT START. HUMBERTO NOTED THE MOTORCYCLE HAD ELECTRICAL PROBLEMS. HUMBERTO SAW LEONTAE EXIT THE STORE. HUMBERTO TOOK OUT A BLACK 9MM RUGER HANDGUN WHICH WAS STOWED IN A COMPARTMENT ON THE MOTORCYCLE. AS LEONTAE EXITED THE STORE LEONTAE PULLED OUT A GUN, POINTED THE GUN AT HUMBERTO, AND HUMBERTO BELIEVED LEONTAE WAS GOING TO SHOOT HUMBERTO. HUMBERTO PULLED OUT THE BLACK 9MM RUGER, POINTED THE GUN AT LEONTAE, AND PULLED THE SLIDE BACK ON THE GUN TO SCARE LEONTAE OFF. HUMBERTO STATED THE GUN HE HAD DID NOT HAVE BULLETS. HUMBERTO NOTED THE GUN DID NOT BELONG TO HIM AND HUMBERTO DID NOT KNOW WHO THE GUN BELONGED TO AS IT WAS ON THE MOTORCYCLE WHEN HE RETRIEVED IT FROM "GUERO".

HUMBERTO HID BEHIND A WHITE CAR. HUMBERTO NOTED THE POLICE ARRIVED AND SHOT AND KILLED LEONTAE.

HUMBERTO NOTED LEONTAE SHOT AT LEAST ONE TIME IN AN UPWARD DIRECTION.

WHEN THE SHOOTING OCCURRED, HUMBERTO RAN TO THE ALLEY AND RAN UP THE ALLEY. HUMBERTO DISCARDED THE GUN IN THE ALLEY, AS HUMBERTO DID NOT WANT TO HAVE

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

ANY PROBLEMS. PRIOR TO THE INTERVIEW HUMBERTO SHOWED ME THE LOCATION WHERE HE DISCARDED THE GUN AND THE GUN WAS NOT LOCATED.

HUMBERTO HAD NEVER SEEN LEONTAE PREVIOUSLY. HUMBERTO DESCRIBED LEONTAE AS A BLACK MALE, SHORTS, WHITE "CAMISA DE TIRANTES" (POSSIBLY A TANK TOP). HUMBERTO NOTED LEONTAE APPEARED TO BE ON DRUGS OR DRUNK.

HUMBERTO HAD BEEN ARRESTED PREVIOUSLY FOR A TRAFFIC VIOLATION. I ASKED HUMBERTO IF HE HAD A FELONY CONVICTION AND HUMBERTO DID NOT BELIEVE HE HAD A FELONY.

141.   Humberto lied in his report to Officer Cuthbertson to protect himself.

142.   He was the aggressor.

143.   He pulled his gun on Leontae before Leontae knew what was going on.

144.   Video footage proves this.

145.   The only reason Leontae pulled his gun from his pocket was because he was threatened by Humberto with deadly force.

146.   Humberto lied about almost everything he told the police.

147.   He was in possession of a – at the very least – chopped up motorcycle. None of the VIN numbers matched.

148.   He did not try to start the motorcycle as he claimed.

149.   He claimed Leontae fired his weapon which was 100% false.

150.   Instead, the video shows that Humberto continued to hunt Leontae.

151.   This continued until Humberto apparently saw police vehicles heading their way.

152.   He ran from the property leaving Leontae hiding and wondering if he was going to continue being hunted.

153.   Ultimately, Leontae was killed by the Phoenix Defendants and Humberto walked away without a scratch.

///

23

## Officers on the Ground

154.    The available video then shows officers arriving.

155.    Without warning, provocation, or otherwise, three Phoenix Police officers – Ladines, Roy, and Garza - began shooting at Leontae.

156.    None of the Phoenix Defendants secured the scene.

157.    None of the Phoenix Defendants intervened – including Ravelo or the Helicopter Officers.[3]

158.    Again, by that time, Leontae no longer had a gun in his hand.

159.    Ravelo admits that she saw Leontae unarmed before the shooting started.

160.    He had thrown his gun to the ground to avoid the very fate he suffered at the hands of the Defendants.

161.    He was defenseless and harmless.

162.    He had his hands up and assumed a surrendering position by beginning to slowly sit with his hands up at all times.

163.    No police officers announced their presence.

164.    No police officers attempted to contact Leontae prior to opening fire on him.

165.    No police officers used less lethal methods until after firing their LETHAL service weapons at Leontae.

### Sergeant Roy

166.    Sergeant Roy is a rank above Officer or Detective. He was a supervisor to the Officers on-scene. He had heightened duties commensurate to his rank.

167.    Despite this, Sergeant Roy fired SEVENTEEN bullets at Leontae immediately upon his arrival on scene.

168.    Roy is no stranger to using force and being involved in the fatal shootings of suspects.

169.    In April 2013, he shot and killed a suspect with a shotgun.

---

[3] There were other officers on scene who are unknown to Plaintiffs at this time. They all potentially failed to intervene to prevent the grossly negligent and reckless actions of Officers Garza, Ravelo, Ladines, and Sergeant Roy.

24

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

170. In April 2018, he "deployed his rifle", was "able to shoot at the suspect", and "ended the threat".

171. In August 2018, he shot a suspect seven (7) times resulting in the suspect's death.

172. Officer Ladines and Garza fired no less than seven (7) bullets at Leontae.

173. The Incident Report details twenty-five (25) separate casings from Phoenix Police service weapons were found strewn about.

174. Body cam footage was obtained for all officers that fired their weapons.

175. Sergeant Roy's Body Cam Footage shows that within thirty-one (31) seconds – and without announcing his presence, he fired his entire seventeen (17) bullet clip into Leontae from a position directly to Leontae's right side down a sidewalk of a busy business strip mall.

176. The footage shows that Sergeant Roy did nothing to assess the situation; did nothing to secure the scene to prevent danger to civilians; clearly could see that Leontae was not holding a weapon; clearly could see Leontae was falling backwards from already being shot; and, despite these facts, recklessly and with conscious disregard to the safety of civilians, including Leontae, fired his entire 17 bullet clip without pause.

177. The scene was wildly busy.

178. There were civilians entering and exiting businesses within minutes of Roy's actions.

179. At two minutes and 25 seconds of Roy's body cam footage a School Bus drives by the scene.

180. At two minutes and 59 seconds, a patron exits the liquor store.

181. Again, Sergeant Roy took no steps to secure the scene before firing and was by all means lucky nobody exited the liquor store at 31 seconds when he began firing his service weapon.

182. According to Detective Interviews of Sergeant Roy, he stated:

SERGEANT ROY COULD SEE THE SUBJECT IN THE PARKING LOT, NEAR THE BACK OF A SILVER TRUCK (DODGE RAM). THE SUBJECT WAS FACING AWAY FROM SERGEANT ROY, HOWEVER

25

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

SERGEANT ROY COULD SEE A GUN IN HIS RIGHT HAND, BEING POINTED IN A NORTHEAST DIRECTION TOWARDS THE BARBER SHOP AND LIQUOR STORE. SERGEANT ROY COULD NOT SEE IF THE SUBJECT WAS FIRING THE WEAPON.

SERGEANT ROY KNEW OFFICERS WERE TO THE SOUTH OF THE SUBJECT. SERGEANT ROY BELIEVED THE OFFICERS HAD "CHALLENGED" THE SUBJECT BECAUSE HE RAN NORTH, BETWEEN THE TRUCK AND VOLKSWAGEN, TOWARDS THE CELLULAR STORE. SERGEANT ROY RAN NORTH TO THE SIDEWALK THAT RUNS EAST AND WEST IN FRONT OF THE BUSINESS COMPLEX.

AS SERGEANT ROY REACHED THE SIDEWALK (JUST EAST OF 37TH DRIVE), HE SAW THE SUBJECT EMERGE FROM BETWEEN THE TWO VEHICLES. THE SUBJECT "CROUCHED DOWN" AND TURNED TOWARDS THE OFFICERS (TO THE SOUTH). SERGEANT ROY BELIEVED THE SUBJECT WAS GETTING INTO A POSITION TO ENGAGE THE OFFICERS IN A "GUNFIGHT".

SERGEANT ROY COULD NOT SEE THE GUN BUT HIS BODY LANGUAGE AND POSITIONING MADE SERGEANT ROY BELIEVE HE WAS STILL ARMED WITH THE GUN.

SERGEANT ROY FEARED FOR THE SAFETY OF THE OFFICERS AND FIRED HIS HANDGUN AT THE SUBJECT.

SERGEANT ROY FIRED HIS WEAPON UNTIL THE SUBJECT WAS NO LONGER IN A POSITION TO BE A THREAT. AT THIS POINT, THE SUBJECT WAS ON THE GROUND. SERGEANT ROY DID NOT KNOW AT THE TIME HOW MANY ROUNDS HE HAD FIRED. SERGEANT ROY DID A "TACTICAL EXCHANGE" AND LATER LOOKED AT HIS MAGAZINE AND DISCOVERED HE HAD FIRED 17 ROUNDS.

SERGEANT ROY SAW A TEAM BEING DEVELOPED TO APPROACH THE SUBJECT. SERGEANT ROY RETRIEVED THE SHIELD FROM HIS PATROL VEHICLE, JOINED THE TEAM, AND EVENTUALLY THEY MOVED UP TO THE SUBJECT.

SERGEANT ROY EXPLAINED WHEN HE FIRED HIS WEAPON, HE DID NOT SEE ANY CIVILIANS IN THE AREA. HIS BACKDROP WAS DESCRIBED AS BEING THE SUBJECT.

SERGEANT ROY DID NOT HEAR ANY OTHER GUNFIRE BESIDES

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

HIS.

183. It appears that Roy was not upset by his actions.

184. In fact, on his body cam footage it shows that he was bouncing around gleefully following his participation in the killing of Leontae.

185. He can be heard on his bodycam footage stating that he has calmed down and displays his hands to the camera and then begins laughing.

186. This is less than 10 minutes following the killing of Leontae.

187. The remaining Phoenix Defendants and other officers did nothing to intervene.

188. Not a single officer paused for reflection.

189. Not a single Phoenix Defendant or officer put their foot down to establish proper assessment procedures and prevent the death of an innocent civilian, Leontae.

190. Not a single Phoenix Defendant or officer made any attempt – verbal or physical – to de-escalate and prevent their fellow officers from engaging in the most reprehensible and reckless activity possible.

191. Bystanders were everywhere.

192. According to police reports, a 13-year-old[4] was found in the back of a Dodge Ram pickup truck mere feet from the gunshots – and had been there the entire time of the Incident.

193. Diana Concepcion Flores Ochoa was the driver of the Dodge Ram.

194. According to Police Reports and her interview, she was also inside the Ram during the Incident.

195. She saw Leontae run out of the Convenience Store but did not see anyone with a gun.

196. While the Phoenix Defendants were firing their weapons recklessly and with wanton disregard to the safety of civilians and property, multiple businesses' store fronts ended up with gunshots hitting their windows and walls.

---

[4] Upon information and belief this is inaccurate information. It appears that this civilian stated in Spanish that she was in her twenties according to video footage obtained.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

197. Multiple vehicles were also struck by gunshots fired by the Defendants.

198. According to Police Reports:

THERE WAS AN APPARENT BULLET STRIKE (LABELLED "A") TO A SOUTH FACING WINDOW OF THE GRAND STOP TWO BUSINESS. THE INTERIOR SIDE OF THE WINDOW WAS LABELLED "A1". THERE WAS AN APPARENT BULLET STRIKE (LABELLED "A2") TO THE INTERIOR MIRRORS MOUNTED ON THE EAST WALL. THE PROJECTILE WAS UNABLE TO BE RECOVERED.

THERE WERE TWO (2) APPARENT BULLET STRIKES (LABELLED "B" AND "C") ON THE EXTERIOR SOUTH FACING WALL OF JR'S CELLULAR, NEAR THE DECEDENT.

THERE WAS ONE (1) APPARENT BULLET STRIKE (LABELLED "D") ON THE LEFT REAR QUARTER PANEL OF THE GOLD HONDA PILOT, PARKED FACING NORTH TOWARD BUILDING (SPACE 9). ONE (1) PROJECTILE (ITEM 42) WAS LOCATED IN THE REAR CARGO AREA OF THE GOLD HONDA PILOT, PARKED FACING NORTH TOWARD BUILDING (SPACE 9)
THERE WERE POSSIBLE BULLET STRIKES (LABELLED "E", "F", AND "G") ON THE REAR BUMPER TO THE PARKED GRAY VOLKSWAGEN JETTA, PARKED FACING NORTH TOWARD BUILDING (SPACE 10).

199. The Defendants displayed a conscious and reckless disregard to not only Leontae's rights and life, but they endangered civilians, business owners, patrons, property, children, and anyone who found themselves unlucky enough to be in the vicinity.

### Officer Ladines

200. According to Ladines, she was riding with Ravelo in response to a "SUBJECT WITH A GUN" call.

201. She heard the helicopter dispatch call that there was an active shooter.

202. Ladines – in contravention to the video evidence – claimed that Leontae was holding his gun "GANGSTER STYLE."

203. Ladines claims she heard shots from Leontae – even adding detail that he had the gun in his hand and it was moving up and down as he fired.

204. Again, video evidence proves this to be demonstrably false.

205. She claimed that Leontae was shooting to the North and the East.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

206.  Ladines saw pedestrians walking nearby.

207.  It is important to note that she only saw them "walking" and not running or screaming in fear for their lives because a purported gun battle was occurring.

208.  Additionally, as seen in body cam footage and corroborated by Officer Ravelo in her investigation interview with Detective Shuck, "THERE WAS AN UNIDENTIFIED PERSON AT THE BUS STOP WHO QUICKLY WALKED AWAY AFTER BEING ASKED TO DO SO BY OFFICER RAVELO."

209.  The bus stop was directly in front of the Incident.

210.  Pedestrians were unconcerned.

211.  No weapon was fired by Leontae or anyone else – and the Defendants knew it.

212.  The Defendants had all the information they needed to know this was decidedly not an active shooter situation.

213.  They deliberately and consciously disregarded the information that was readily available to them. They then killed Leontae.

214.  According to police reports in response to an interview by detectives, "OFFICER LADINES TOLD ME THE SUBJECT WAS "ACTIVELY SHOOTING IN THE DIRECTION OF AN OCCUPIED BUILDING COMMITTING AGGRAVATED ASSAULT".

215.  Ladines claimed that Leontae had fired between three (3) and five (5) bullets.

216.  Ladines "THOUGHT" she told the subject to stop.

217.  Video shows she did not – until after Leontae lie bleeding on the concrete.

218.  Ladines fired her weapon multiple times into Leontae. She believes she shot five (5) times.

219.  Ladines then moved closer to Leontae – who was dying on the concrete with no weapon and claims to have heard him firing more bullets.

220.  Only after Ladines moved to Garza's position did she see that Leontae was slumped against the wall on the concrete.

221.  She claims that Leontae was raising his hands up and down and moving

around.

222. He had his hands up in a surrendering body position.

223. At this point, the Phoenix Defendants began shouting commands for Leontae to drop his gun over and over – even though all of the Phoenix Defendants could plainly see Leontae had no weapon.

224. Ladines claims that Leontae was not complying.

225. Concerningly, Ladines then retrieved a non-lethal weapon and fired a 40mm canister into Leontae.

226. No force was necessary, but if any force should have been used, it would have been Non-lethal force – instead of firing a hail of bullets at and into Leontae.

227. Instead, Roy, Ladines, and Garza used their lethal firearms without performing any assessment; without announcing; without using de-escalation techniques; and without even securing the scene.

228. Ladines and Ravelo quickly concocted a story that Leontae's gun was underneath him as they clearly could not see a weapon.

229. Ladines claims then that additional officers arrived with their shields.

230. Ballistic shields should have been used before lethal force.

231. Only after waiting anywhere between six and ten minutes, did officers approach Leontae to provide medical care.

232. Ladines' and Ravelo's story about the gun being underneath Leontae fell apart in a matter of seconds.

233. The gun was found underneath a vehicle.

234. It was at this point that Ladines realized that a 13-year-old girl was in a vehicle mere feet from the location of Leontae's dying body.

235. Ladines doubled-down towards the end of her interview and told the investigator that she fired her weapon because Leontae was actively firing his weapon in public and she wanted to protect civilians and other officers.

236. She also stated she did not see other officers firing weapons.

///

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**Officer Ravelo**

237.     In Ravelo's investigation, she stated that "OFFICER LADINES REMOVED HER 40MM GUN, DESIGNED FOR "LESS LETHAL USE," FROM THEIR PATROL CAR'S REAR CARGO AREA AND PLACED THE WEAPON IN THE PASSENGER COMPARTMENT WITH OFFICER RAVELO BEFORE RESPONDING TO THE EMERGENCY RADIO CALL."

238.     Ladines knew she could use less lethal force and she deliberately chose otherwise.

239.     Furthermore, Ravelo told Detective Shuck that she "WAS UNSURE IF LEONTAE WAS THE SUBJECT OF THEIR CALL, AS HE DID NOT MATCH THE DESCRIPTION, ***AND SHE DID NOT SEE LEONTAE WITH A WEAPON***. OFFICER RAVELO CONTINUED LOOKING AROUND FOR A HISPANIC MALE IN THE RED HOODED SWEATSHIRT."

(emphasis added).

240.     Ravelo also told Detective Shuck that she "DID NOT SEE ANYONE WITH A FIREARM OTHER THAN THE POLICE, SO SHE DID NOT DISCHARGE HER WEAPON. OFFICER RAVELO RECALLED HEARING APPROXIMATELY TEN GUNSHOTS BUT NOTED THAT OFFICERS SEEMED TO BE FIRING SIMULTANEOUSLY. AFTER THE GUNFIRE ENDED, LEONTAE WAS DOWN ON THE GROUND, LYING ON HIS BACK WITH HIS HANDS DOWN BY HIS SIDES IN THE SAME VICINITY WHERE OFFICER RAVELO INITIALLY OBSERVED HIM."

241.     Ravelo had time enough to note that she was unsure if Leontae was the suspect because he did not match the description ***and*** had enough time to note that Leontae was not holding a weapon – time enough to decide not to discharge her weapon.

242.     It follows that she had enough time to tell her fellow officers not to shoot.

243.     Since her partner, Ladines, was running with her, Ravelo knew that Ladines had her firearm in her hands pointing at Leontae.

244.     Ladines kicked off the shooting.

245.     Had she not, it is likely this death could have been prevented.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

246. Had Ravelo told her partner the things she was seeing, and had Ravelo told Ladines to stand down, Leontae would still be alive.

247. Officer Ravelo did nothing to stop the actions of her fellow officers.

248. Officer Ravelo's statements to Detective Shuck directly contradict Officer Garza's, Officer Ladines', and Sergeant Roy's statements that Leontae had a weapon in his hands.

### Officer Garza

249. According to Detective Interviews of Officer Garza following the incident, the following was stated:

WHEN OFFICER GARZA ARRIVED, HE PARKED ON MCDOWELL ROAD, FACING EAST, ON THE NORTH SIDE OF MCDOWELL. HIS VEHICLE WAS IDENTIFIED AS VEHICLE #111739 (STILL PRESENT). OFFICER GARZA SAW THE SUBJECT IN THE PARKING LOT, SOUTH OF THE VEHICLES AND WEST OF THE BOOST MOBILE BUSINESS, POINTING A HANDGUN "AT PEOPLE IN FRONT OF THE BUSINESS".

OFFICER GARZA DESCRIBED THE SUBJECT AS SHOOTING THE HANDGUN IN A NORTHEAST DIRECTION.

OFFICER GARZA INDICATED HE DID NOT SEE CIVILIANS, BUT KNEW IT WAS "BUSY" DUE TO THE TIME OF DAY.

OFFICER GARZA BELIEVED THE SUBJECT FIRED HIS GUN ONE OR TWO TIMES. OFFICER GARZA DESCRIBED THE SUBJECT'S GUN AS A BLACK HANDGUN.

OFFICER GARZA RETRIEVED HIS RIFLE AND EXITED HIS PATROL VEHICLE. AS HE DID THIS, HE HEARD GUNFIRE.

OFFICER GARZA ASSUMED IT WAS AN OFFICER BECAUSE IT WAS COMING FROM HIS LEFT AND KNEW THE SUBJECT WAS NOT AT THAT LOCATION.

OFFICER GARZA SAW THE SUBJECT RUN TO THE FRONT OF THE PARKED VEHICLES TOWARDS THE BUSINESSES.

OFFICER GARZA RAN EAST DOWN THE SIDEWALK AS HE WANTED TO KEEP THE SUBJECT FROM ENTERING ANY OF THE

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

BUSINESSES. OFFICER GARZA STOPPED JUST SOUTH OF THE SHORT PONY WALL, EAST OF THE BUS STOP.

OFFICER GARZA COULD SEE THE SUBJECT RUNNING FROM OTHER OFFICERS. OFFICER GARZA FIRED HIS WEAPON AT THE SUBJECT AS HE (SUBJECT) WAS NEAR THE BOOST MOBILE, NEAR THE FRONT OF A SILVER DODGE RAM TRUCK. OFFICER GARZA FIRED THREE TIMES AND BELIEVED HE HIT THE SUBJECT ALL THREE TIMES.

OFFICER GARZA WAS AIMING "CENTER MASS". OFFICER GARZA UTILIZED THE SCOPE THAT WAS ATTACHED TO HIS RIFLE.

AFTER, THE SUBJECT FELL TO THE GROUND. OFFICERS WERE GIVING COMMANDS FOR THE SUBJECT TO SHOW HIS HANDS. BECAUSE OF THE SUBJECT'S POSITIONING, OFFICERS COULD NOT SEE THE SUBJECT'S HANDS AND DID NOT KNOW WHERE THE GUN WAS.

OFFICER GARZA TOLD OFFICER LADINES TO RETRIEVE HER "LAUNCHER" (40MM). ONCE SHE RETURNED, OFFICER LADINES FIRED ONE ROUND BUT THE SUBJECT DID NOT RESPOND.

AFTER THE SHOOTING OCCURRED, OFFICER GARZA SAW NUMEROUS PEOPLE EXIT THE BUSINESSES.

250. Garza claimed that he actually saw Leontae fire his weapon multiple times despite the evidence that Leontae never fired a bullet.

251. Officer Garza had a scope on his AR-15 Daniel Defense rifle.

252. Officer Garza used that scope.

253. Officer Garza could clearly see that Leontae had no weapon.

254. Yet, Officer Garza fired three shots "CENTER MASS" and believed that all three shots hit Leontae.

255. Officer Garza had the choice to use non-lethal measures.

256. He had a scope to view Leontae through.

257. He clearly did not see Leontae holding a weapon – because Leontae was not holding a weapon.

258. Of note, Garza stated that Leontae was near the front of the silver Dodge

33

Ram.

259. Again, there were people inside the Dodge Ram.

260. Garza did not even clear the area of civilians before he helped kill Leontae by firing his lethal weapon.

### Autopsies and Weapons Used

261. The following is taken from the Autopsy information reported in the Police Reports:

DATE OF AUTOPSY: FRIDAY, NOVEMBER 4, 2022

OME CASE NUMBER: 2022-11285
DECEASED: LEONTAE KAAMEECH KIRK
PATHOLOGIST: DOCTOR CROSS
CAUSE OF DEATH: MULTIPLE GUNSHOT WOUNDS
MANNER OF DEATH: HOMICIDE

262. The Police Autopsy describes seventeen (17) projectiles removed from Leontae's body during examination:

- PROJECTILE; FROM LEFT MID BACK
- PROJECTILE; FROM RIGHT WRIST
- PROJECTILE; FROM LEFT HAND
- PROJECTILE; FROM RIGHT KNEE
- PROJECTILE; FROM LEFT CHEST WELL
- PROJECTILE; FROM LEFT INTERCOSTAL SPACE
- PROJECTILE; FROM POSTERIOR LEFT ABDOMEN
- PROJECTILE; FROM RIGHT PELVIS
- PROJECTILE; FROM LEFT PELVIS
- PROJECTILE; FROM LEFT 11TH RIB
- PROJECTILE; FROM LEFT BUTTOCK
- PROJECTILE; FRAGMENTS FROM RIGHT THIGH
- PROJECTILE; FRAGMENT FROM LEFT PERIRENAL TISSUE
- PROJECTILE; FRAGMENT FROM RIGHT LUNG
- PROJECTILE; FRAGMENTS, MISC
- OTHER; BLUE FRAGMENT FROM RIGHT ABDOMEN
- OTHER; METAL FRAGMENT FROM PUBIS

263. A private autopsy was also performed. Similar results were found – except that the private autopsy found nineteen (19) bullet wounds. Both autopsy reports list cause of death as Homicide.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

264. The types of weapons used included a Daniel Defense 5.56 Caliber AR-15 Rifle by Officer Garza.

265. These types of rifles cause cavitation. This means that instead of a bullet passing straight through, it creates a cavity in the body. The high velocity of the weapon also liquifies organs.

266. Officer Ladines used her 9MM Glock.

267. Sergeant Roy used his 9MM Glock.

268. Three Projectiles were recovered from the parking lot south of Jorge's Barbershop, the ground underneath a silver 2005 Honda Lx, and the rear cargo area of a gold 2003 Honda Pilot.

269. A black projectile (.40 caliber) was recovered in a parking space south of JR's Cellular.

270. Seventeen bullet casings from a WIN 9MM Luger were recovered on the ground and the sidewalk on the northwest corner of the parking lot.

271. Four bullet casings from a WIN 9MM Luger were found in the roadway south of businesses and in the rocks south of businesses.

272. Another bullet casing was found from an EXT SH 223 REM in the rocks on the east side of North 37th Drive.

273. Three other bullet casings from an FC 223 REM were found in the parking lot south of Jorge's Barber Shop / Beauty Salon.

274. A cartridge from an FC 223 REM was found in the rocks south of the businesses.

## THE AFTERMATH

275. In spite of the Phoenix Defendants' unreasonable, misleading, malicious, unlawful conduct on November 2, 2022, and their alarmingly inaccurate account of the events surrounding Leontae's death, upon information and belief, all of the Phoenix Defendants remain employed at the Phoenix Police Department.

276. Upon information and belief, the City and the Phoenix Police Department failed to place any of the officers involved in the killing of Leontae on disciplinary leave

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

and it is unknown if any of them received any kind of disciplinary action at all.

277. The Phoenix Police Department's, Sullivan's, and the City's deliberate decision to keep all three officers employed is just another glaring example of their indifference towards officers' unlawful use of deadly force.

278. In fact, upon information and belief, the City, Sullivan, and the Phoenix Defendants acted swiftly to try and cover up what actually happened.

279. On the body cam footage obtained, it was only after the Phoenix Defendants shot Leontae nineteen (19) times – not including the bullets that missed Leontae and put other civilians and business in danger – that the Phoenix Defendants began yelling at Leontae to "drop the gun" repeatedly.

280. Leontae did not have a gun.

281. The Phoenix Defendants then began frantically asking each other where the gun was.

282. The Phoenix Defendants continue frantically telling each other that they cannot see a gun.

283. They concoct quick stories that the gun must be underneath his body.

284. They continue to yell at him to put his hands up, but he was already unconscious.

285. On Ladines' body cam footage she can be heard saying "Hey where's the gun?", and "I'm not seeing anything".

286. Later on the same footage, while Leontae lied upon the ground dying, officers can be heard stating "Where's the fire department? No clue – maybe these barricades are too good" and then laughter all around is heard.

287. On the same day that Leontae was wrongfully killed, the Phoenix Police Department issued a statement that said in its entirety:

Phoenix police detectives are investigating an officer involved shooting that left one man dead. Officers were dispatched to a subject with a gun call in the area of 37th Drive and McDowell Road.

The caller told the 911 operator that a man was armed with a gun and was pointing it at him.

When the officers got there, they found multiple people with guns in the parking lot of a strip mall. ***The officers saw one of the men shooting his gun at others and this was when the officer involved shooting occurred.***

After the shooting, officers moved up and used a less-lethal tool in order to encourage the suspect to show his hands. After no response, the officers moved up and provided aide until the fire department arrived. The suspect was pronounced deceased on scene. A gun was located near the suspect.

Homicide detectives responded and are currently on scene and investigating the shooting. The investigation remains active. There were no injuries to officers or other community members.

Phoenix Police Department Media Advisory, Incident # 2022-1649049. (emphasis added).

288.    The City and Phoenix Defendants knew that Leontae had not fired his weapon.

289.    They knew that his weapon was found under a vehicle.

290.    The City, Sullivan, and the Phoenix Defendants deliberately lied to the public in an attempt to save face knowing full well that they had wrongfully killed Leontae.

291.    On December 4, 2023, the Professional Standards Bureau ("PSB") issued an internal investigation report to Chief Sullivan.

292.    The findings never once mention that Leontae did not fire his weapon ever.

293.    Instead, the findings specifically state that the Helicopter Officers, Garza, Roy, and Ladines all saw Leontae physically fire his handgun multiple times at some of the storefronts and at other people.

294.    The findings specifically state that the reason that Roy, Garza, and Ladines fired their weapons at Leontae was because they saw Leontae fire his weapon.

295.    Furthermore – and disturbingly – the findings dictate that Leontae was the aggressor against Humberto.

296.    The findings state that this was corroborated by criminal investigators.

297.    This is a total and complete fabrication.

298.    Video evidence shows that Humberto was waiting for Leontae with his gun

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

out while sitting on a motorcycle.

299. When Leontae exited the convenience store, he saw Humberto pointing his gun at him.

300. As discussed herein, Leontae then reacted, running away while fumbling to get his gun out of his pocket to display in a defensive manner.

301. This Internal Investigation was completed after this complaint was originally filed.

302. All the evidence that Plaintiffs had were also in the possession of the City of Phoenix Police Department.

303. The Phoenix Defendants acted maliciously, recklessly, and with an extreme indifference to the value of human life, causing the wrongful death of Leontae.

304. Despite this, the City, Sullivan, and the Phoenix Police Department have made the conscious decision to keep all three officers employed within positions where they will continually have contact with the citizens of Phoenix, Arizona.

305. The only explanation for a willful decision of this disturbing nature is that both the Phoenix Police Department, the City, and Sullivan are acting with blatant disregard towards the constitutional rights of citizens and the sanctity of their lives.

## COUNT I

## WRONGFUL DEATH AND SURVIVAL ACTION PURSUANT TO A.R.S § 12-611, *et seq.* and A.R.S. § 14-3110

### *(All Defendants)*

306. Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

307. A.R.S. § 12-611, *et seq.* provides that "When death of a person is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death was caused under

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

38

such circumstances as amount in law to murder in the first or second degree or manslaughter."

308. A.R.S. § 14-3110 provides that "Every cause of action, except a cause of action for damages for breach of promise to marry, seduction, libel, slander, separate maintenance, alimony, loss of consortium or invasion of the right of privacy, shall survive the death of the person entitled thereto or liable therefor, and may be asserted by or against the personal representative of such person, provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed."

309. Kashane Kirk is the personal representative of the Estate and has the authority to bring a survival action.

310. Sharon Roberts is the mother of Leontae and has the right under Arizona law to bring a wrongful death action on behalf of all statutory beneficiaries including MC.

311. Phoenix Defendants caused the wrongful death of Leontae by their unlawful act of shooting Leontae nineteen (19) times, and by their failure to intercede in violation of their duties.

312. Additionally, the City is vicariously liable for the acts and omissions of their employees, including without limitation those employees listed herein as the Phoenix Defendants.

313. As a direct and proximate result of the unlawful, reckless, and grossly negligent actions of the Phoenix Defendants, Leontae suffered an untimely and preventable death and lost the ability to provide for his daughter and mother.

314. As a direct and proximate result, Leontae's mother and daughter have been deprived of the continued companionship and society of their son and father, and have suffered and continue to suffer the loss of a loved one, affection, companionship, care, protection, guidance, as well as pain, grief, sorrow, anguish, stress, shock, mental suffering, and have suffered both economic and non-economic damages in an amount to be proven at trial.

315. Additionally, the acts of Defendants and their employees and agents, as set forth above, demonstrate gross and wanton negligence in that each of them knew or had

39

reason to know that their acts individually and collectively created an unreasonable risk of bodily harm to Leontae and a high probability that substantial harm would result.

### COUNT II

### EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983

(*Ladines, Garza, and Roy*)

316.    Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

317.    42 U.S.C. § 1983 provides individuals with a cause of action to sue for violations of his or her constitutional rights. The 14th Amendment protects individuals from constitutional violations of State and local authorities. As incorporated by the 14th Amendment, the 4th Amendment protects individuals from the use of excessive force by law enforcement officers. These Defendants, while acting in their official capacity and individual capacities and under the color of law, violated Leontae Kirk's rights to freedom from unreasonable seizures.

318.    These Defendants acted willfully, knowingly, and with specific intent to deprive Leontae of his rights under the Fourth Amendment of the United States Constitution, including his right to be secure in his person and free from the use of unreasonable force and seizure.

319.    These Defendants acted unreasonably by using unnecessary deadly forced as described herein.

320.    Leontae was not resisting arrest.

321.    Leontae was unarmed.

322.    Leontae was holding his hands up and began to sit down in a surrendering position.

323.    Despite the clear evidence that Leontae was unarmed, not resisting arrest, and was surrendering with his hands in the air, Defendants Garza, Roy, and Ladines used lethal force which was objectively unreasonable under the totality of the circumstances.

324.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

325.     Leontae's death was the direct result of these Defendants' actions and inactions.

326.     Additionally, the acts of these Defendants and their employees and agents, as set forth above, demonstrate gross and wanton negligence in that each of them knew or had reason to know that their acts individually and collectively created an unreasonable risk of bodily harm to Leontae and a high probability that substantial harm would result.

327.     In causing the painful, barbaric and premature death of Leontae, these Defendants and their employees and agents acted with an evil mind and a malignant heart warranting an award of punitive damages.

## COUNT III

## EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983 – *Monell* - POLICY

*(City; Sullivan)*

328.     Plaintiff incorporates by reference all previous allegations as fully set forth herein.

329.     As previously explained, U.S.C. § 1983 provides individuals with a cause of action to sue for violations of their constitutional rights.

330.     Defendant City and Defendant Sullivan's acts or failure to act deprived Leontae of his constitutional rights.

331.     The City has for years established and implemented policies and procedures that created a pattern and practice in the Phoenix Police Department that consistently acts with wanton disregard for the rights of individuals and the sanctity of human life.

332.     Despite the Phoenix Police Department's and the City's ministrations, de-escalation techniques are upon information and belief rarely used and the wrongful use of deadly force has become the norm.

333.     The City and Sullivan provide little transparency to the investigation and discipline – if any – of its officers and agents.

334.     The City and Sullivan release edited or redacted versions of evidence which limit or hide information that should be released.

41

335. If de-escalation was truly a priority, Leontae would still be alive today.

336. The policies and procedures in place have failed and established a police force that has consistently acted with blatant disregard to Leontae's constitutional rights and extreme indifference to the value of his life.

337. The Phoenix Police Department has consistently failed to adequately discipline their officers who engage in unlawful conduct, ultimately creating a culture in which use of excessive force and unreasonable use of deadly force is commonplace.

338. Therefore, the formal policy adopted by Defendant City and Defendant Sullivan, lead their officers to deliberately follow their rules and regulations, resulting in Leontae's wrongful death.

## COUNT IV

## EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983 – *Monell* – CUSTOM AND PRACTICE

### *(City; Sullivan)*

339. Plaintiff incorporates by reference all previous allegations as fully set forth herein.

340. As previously explained, U.S.C. § 1983 provides individuals with a cause of action to sue for violations of their constitutional rights.

341. Defendant City and Defendant Sullivan's acts or failure to act deprived Leontae of his constitutional rights.

342. As described herein, the City and the Phoenix Police Department through Defendant Sullivan and his predecessors has for years created a legacy of using deadly and unlawful force against the citizens of Phoenix, Arizon.

343. The City, the Phoenix Police Department, and Defendant Sullivan as well as his predecessors has for years acted pursuant to their customs and practices in the use of deadly force, which is an expressly adopted official policy or custom within the Phoenix Police Department.

344. Operation Orders advise officers on the use of de-escalation techniques in situations where objectively no lethal force is warranted.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

345.    The City and Sullivan were aware of the Phoenix Police Department's history of Chiefs claiming that new de-escalation policies or use of force policies had been established.

346.    The statistics show otherwise.

347.    Instead, the customs and practices of the City, the Phoenix Police Department, and Sullivan show that the de-escalation and use of non-lethal force is not enforced through written policy but established and ratified by custom and practice.

348.    Despite the Phoenix Police Department's and the City's ministrations, de-escalation techniques are upon information and belief rarely used and the wrongful use of deadly force has become the norm.

349.    If de-escalation was truly a priority, Leontae would still be alive today.

350.    The policies and procedures in place have failed and established a police force that has consistently acted with blatant disregard to Leontae's constitutional rights and extreme indifference to the value of his life.

351.    It is unquestionable that there is a systemic failure by the City, the Phoenix Police Department, and Sullivan that have allowed, supported, and established the commonplace use of lethal force violative of the rights of the citizens of Phoenix, Arizona.

352.    Therefore, the established customs and practices led directly to the death of Leontae.

353.    The City and Sullivan are liable for Leontae's death due to its established customs, patterns, and practices.

## COUNT V

## DUTY AND FAILURE TO INTERVENE

*(Phoenix Defendants)*

354.    Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

355.    "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." Cunningham, 229 F.3d at 1289 (quotations omitted) (quoting United States v. Koon, 34 F.3d 1416, 1447, n.25 (9th Cir.

43

1994)). "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." Id. (citation omitted).

356. Law enforcement officers who have a realistic opportunity to prevent a fellow officer from violating a citizen's Constitutional rights have a duty to intervene to protect the victim from the unconstitutional retaliation, use of force or violation of due process of law.

357. As set forth herein, at no time did any of the Phoenix Defendants make any affirmative step to intervene to protect Plaintiffs' Constitutional rights.

358. The acts and/or omissions of Phoenix Defendants were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard for the rights of Plaintiffs. Plaintiffs, therefore, prays for an award of punitive and exemplary damages against these individual defendants in an amount to be determined according to proof.

359. Plaintiffs suffered damages as a direct and proximate result of the illegal acts of the Phoenix Defendants.

## COUNT VI
## GROSS NEGLIGENCE
### *(All Defendants)*

360. Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

361. Under Arizona Revised Statute § 12-820.02(A) a public employee acting within the scope of the public employee's employment can be liable for damages and injuries if the employee was grossly negligent.

362. Roy's, Garza's, Ladines', Howards', and Ramirez' actions were willful and wanton with reckless indifference to Leontae's life and safety.

363. Roy's, Garza's, Ladines', Howards', and Ramirez' actions created an unreasonable risk of harm to Leontae and that risk was so great that it was highly probable that harm would have resulted.

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

364.     Defendants systematically and repeatedly acted with reckless indifference towards Leontae's life and safety, including their acts and omissions set forth above, resulting in the wrongful death of Leontae.

365.     Defendant City of Phoenix is vicariously liable under *respondeat superior* for the actions of any employee, agent, or servant of the City of Phoenix, including that of the other named Defendants in this case.

366.     Defendant Roy was grossly negligent and acted with reckless indifference to Leontae's life and safety by using excessive force objectively unreasonable under the totality of the circumstances.

367.     Defendant Garza was grossly negligent and acted with reckless indifference to Leontae's life and safety by using excessive force objectively unreasonable under the totality of the circumstances.

368.     Defendant Ladines was grossly negligent and acted with reckless indifference to Leontae's life and safety by using excessive force objectively unreasonable under the totality of the circumstances.

369.     The remaining Phoenix Defendants, Ramirez, Ravelo, and Howard breached the standard of care by failing to intercede or intervene to prevent their fellow officers from using unwarranted, reckless force with wanton disregard to the preservation of life.

370.     The Phoenix Defendants, while acting as agents and employees for the Phoenix Police Department, owed a duty to Leontae to perform their responsibilities as officers of the law without reckless indifference to Leontae's life and safety.

371.     The Phoenix Defendants, while acting as agents and employees for Phoenix Police Department, owed a duty to Leontae to act objectively reasonably and without reckless indifference to Leontae's life and safety.

372.     The Phoenix Defendants' use of deadly and excessive force upon Leontae constitutes reckless indifference to Leontae's life and safety and gross negligence for which the Defendants are individually liable.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

373. The Phoenix Defendants' conduct, in not using non-lethal force that was readily available, constitutes gross negligence for which the Phoenix Defendants are individually liable.

374. The Phoenix Defendants – after Leontae had been shot 19 times and lay on the ground – waited more than six (6) minutes before attempting any sort of health care on Leontae.

375. Instead, they shot his body with a 40mm weapon to see if he was responsive.

376. Then, instead of immediately providing medical care, frantically moved his body looking for a weapon.

377. On video, the Phoenix Defendants are distressed and frantic trying to find a weapon that would have justified their actions in shooting Leontae.

378. In taking the actions as described above, the Phoenix Defendants breached their duty to refrain from such unreasonable and recklessly indifferent conduct.

379. As a direct and proximate result of Defendants' breach, Leontae Kirk sustained severe and permanent injuries, suffered extreme pain and suffering, lost the ability to have and maintain meaningful familial relationships, lost the ability to provide for his daughter and his mother, and lost his life.

380. Defendants' acts and omissions set forth above, also demonstrate gross and wanton negligence in that each of them knew or had reason to know that their acts individually and collectively created an unreasonable risk of bodily harm to Leontae and a high probability that substantial harm would result.

## COUNT VII
## BATTERY AND SURVIVAL ACTION  PURSUANT TO A.R.S § 12-542, 14-3110
### *(Roy, Garza, Ladines)*

381. Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

382. Roy, Garza, and Ladines intentionally shot Leontae causing harmful or offensive contact with Leontae.

383. As a direct and proximate result of Roy's, Garza's, and Ladines' harmful or

46

offensive contact, Leontae died.

384.　These Defendants' acts constitute a battery upon Leontae in the above-described bodily contact was intentional, unauthorized, or grossly offensive in nature.

385.　The acts and omissions of these Defendants were intentional, negligent, reckless, and unwarranted, and without any just cause or provocation.

386.　These Defendants were known to use force – including lethal force – in previous incidents with other suspects.

387.　As a direct and proximate result of these Defendants' conduct, Leontae was deprived of his liberty, and was ultimately killed. The conduct described herein was undertaken by the Phoenix Defendants within the scope of their employment and under color of law such that their employer, Phoenix Police Department – and the City of Phoenix – are vicariously liable for their actions.

## COUNT VIII

## NEGLIGENT HIRING, SUPERVISION, RETENTION, AND/OR TRAINING

### *(Sullivan, City)*

388.　Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

389.　Under Arizona law, an employer may be held directly liable for negligent hiring, retaining and supervision of their employees if: i) The employer knew or should have known the risk of hiring, supervising, and training a particular employee and, ii) The employer's negligence proximately caused the plaintiff's injury.

390.　Upon information and belief, the Phoenix Police Department through the City is ranked as the top policing agency in the nation for use of deadly force by officers.

391.　As discussed herein, this got the USDOJ's attention and they began investigating the Phoenix Police Department for systemic violations through their failure to properly train, investigate, or discipline officers.

392.　The City through the Phoenix Police Department was negligent in their hiring, supervision, retention, and/or training of the Defendants.

393.　Defendant City and Defendant Sullivan's acts or failure to act deprived

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Leontae of his constitutional rights.

394. Defendant City and Defendant Sullivan have a duty to adequately train their police officers to protect members of the public.

395. The Phoenix Defendants and Defendant Sullivan were acting under the color of state law.

396. The Operation Orders of the Phoenix Police Department were not adequate to handle the usual and recurring situations that Phoenix Police officers face.

397. As a result of the USDOJ investigation, the Phoenix Police Department received suggestions to increase the usage of de-escalation techniques and decrease the employment of unwarranted deadly force.

398. Defendant City and Defendant Sullivan, undeniably failed to employ these suggestions from the USDOJ and maintains inadequate training.

399. Sullivan has publicly stated that over four hundred (400) officers had not received proper training on the use of less than lethal force.

400. The acts, omissions, and conduct of the Defendants as described herein were the direct and proximate cause of the injuries and death of Leontae and violated Leontae's constitutional, statutory and common law rights as guaranteed by the law and Constitution of the State of Arizona.

## JURY TRIAL DEMAND

401. Plaintiffs hereby demand a jury trial in this matter as to all claims and against all Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that the Court enter judgment against the Defendants and in favor of the Plaintiffs, as follows:

a) For compensatory, general and special damages against each and every Defendant, jointly and severally, in an amount to be proven at trial;

b) For all other non-pecuniary damages as to be proven at trial;

c) For punitive and exemplary damages against Defendants in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future;

d) For pre-and post-judgment interest to the extent provided by law;

e) For Plaintiffs' incurred costs, including all incurred attorneys' fees and court costs, pursuant to 42 U.S.C. §1988 and as otherwise authorized by any other statute or law; and

f) For such other relief as this Court may deem proper.

**RESPECTFULLY SUBMITTED** this 25th day of October 2024.

MILLS + WOODS LAW, PLLC

By_____*/s/ Sean A. Woods*_____
    Robert T. Mills
    Sean A. Woods
    5055 North 12th Street, Suite 101
    Phoenix, Arizona 85014
    *Attorneys for Plaintiffs*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Sarah L. Barnes
slb@bowwlaw.com
Kelley M. Jancaitis
kmj@bowwlaw.com
Jeremiah M. Sullivan
jms@bowwlaw.com
**BROENING OBERG WOODS & WILSON, P.C.**
kel@bowwlaw.com
szb@bowwlaw.com
rla@bowwlaw.com
2800 N Central, 16th Floor
Phoenix, AZ 85004
*Attorney for Defendants City of Phoenix, Sullivan, Ladines, Garza, Roy, Makic, Ravelo, Ramirez, Howard, Traylor, and Reddy*


_____/s/ Ben Dangerfield_____