LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL, 16TH FLOOR
PHOENIX, AZ 85004
(602) 271-7700

Sarah L. Barnes /Bar No. 020362
Kelley M. Jancaitis /Bar No. 025555
Jeremiah M. Sullivan/Bar No. 038569
E-mail:slb@bowwlaw.com
        kel@bowwlaw.com
        kmj@bowwlaw.com
        mjk@bowwlaw.com
*Attorneys for Defendants City of Phoenix,*
*Sullivan, Ladines, Garza, Roy, Ravelo, Ramirez*
*and Howard*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kashane Kirk, *et al.*, | Case No. CV 23-00836-MTL (CDB) |
| Plaintiffs, | |
| vs. | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) & RULE 8(d)** |
| City of Phoenix, *et al.*, | |
| Defendants. | **(Oral Argument Requested)** |

Defendants City of Phoenix, Michael Sullivan, Autumn Ladines, Antonio Garza, Eric Roy, Jaclyn Ravelo, Steven Ramirez, and Jonathan Howard (collectively referred to hereinafter as "Defendants"), by and through counsel undersigned, hereby file this Reply in support of their Motion to Dismiss, to refute the positions taken in Plaintiff's Response In Opposition to Defendants' Motion to Dismiss The Third Amended Complaint ("Plaintiffs' Response"). (Doc. 67).

Plaintiffs agree to Sections I, II, and IV of Defendants Motion to Dismiss and only dispute the arguments regarding (1) the failure to intervene claim against all Defendants; and (2) dismissal the entire Complaint pursuant to Rule 8. Accordingly, this Reply will

address the arguments raised in Plaintiffs' Response to these two arguments.

## I.    THE FAILURE TO INTERVENE CLAIM AGAINST THE OFFICERS DOES NOT CONTAIN ADEQUATE ALLEGATIONS TO ESTABLISH A MEANINGFUL OPPORTUNITY TO INTEVENE

Plaintiffs' Response maintains that their failure to intervene claim against Officers Ravelo, Ramirez, Howard, Roy, Garza, and Ladines is sufficiently pled. (Doc. 67, at 4-7.) Yet to support this argument, Plaintiffs initially cite *Cunningham*, which actually stands for the proposition that "officers can be held liable for failing to intercede ***only if they had an opportunity to intercede.***" *Cunningham v. Gate*s, 229 F.3d 1271, 1289 (9th Cir. 2000) (emphasis added). Application of the holding from *Cunningham* to the facts alleged in the TAC actually advances Defendants' position, namely, that Plaintiffs fail to state a failure to intervene claim against Officers Ravelo, Ramirez, Howard, Roy, Garza, and Ladines. And it is not the paucity of the allegations that lead to this conclusion, rather it is that the allegations are substantively lacking and not surprisingly so.

### A.    Officers Howard and Ramirez

Plaintiffs reference two paragraphs from the TAC to support the failure to intervene claim against Officers Howard and Ramirez: "[a]t any point during their constant observation, they could have relayed updated information – that Leontae was not in fact firing a weapon. They did not." (Doc. 67, at 5; Doc. 63 ¶¶ 118-19.) This allegation does not explain how two officers flying a helicopter hundreds of feet over the ground and only able to communicate over radio had a meaningful opportunity to intervene.

In fact, the argument Plaintiffs advance to support the failure to intervene claim against Officers Howard and Ramirez was flatly rejected in *Waller v. City of Nogale*s, 4:22-CV-00244-RCC, 2023 WL 3863655, at *1 (D. Ariz. June 7, 2023) (denying leave to amend a failure to intervene claim to include officers who were merely present at the scene where a suspect was shot by police because it was "unlikely that these additional officers had a realistic opportunity to intercede on [the decedent's] behalf[,]" despite being in the vicinity

1  and equipped with radios). Nonetheless, Plaintiffs makes the dubious argument that *Waller*

2  is inapposite because "[t]here, the court held that '[n]or are any individual actions of these

3  officers detailed in the amendment." (Doc. 67, 6 (citations omitted).) Plaintiffs' inaccurate

4  reading of *Waller* should be rejected. When the Court said "[n]or are any individual actions

5  of these officers detailed in the amendment" it was referencing paragraph 192 of the

6  proposed amended complaint. *See Waller v. City of Nogales et al.,* 4:22-cv-00244-RCC,

7  Proposed First Amended Complaint, Nov. 9, 2022, *attached hereto as* **Exhibit A**.[1] The

8  proposed amended complaint alleged that the newly named defendant/officers, who were

9  at the scene of the incident but did not shoot, "failed to interject on the radio." **Exhibit A**

10  ¶¶ 191-92. This Court declined to grant further amendment because the allegation that the

11  officers failed to interject on radio, absent more detail, rendered it "unlikely that these

12  additional officers had a realistic opportunity to intercede." *Waller,* 2023 WL 3863655, at

13  *1. While admittedly in a slightly different procedural posture, Plaintiffs advance the same

14  argument, that Officers Ramirez and Howard failed to intervene because they did not use

15  their radios to provide updated information to the officers on the ground, which does not

16  amount to, as a matter of law, a reasonable or realistic opportunity to intervene.

17  **B.  Officer Ravelo**

18       Plaintiffs quote and cite five (5) paragraphs from the TAC to support the failure to

19  intervene claim against Defendant Ravelo, who did not deploy any force against Mr. Kirk.

20  The quoted paragraphs generally allege: (1) "Ravelo admits that she saw Leontae unarmed

21  before the shooting started"; (2) "[s]ince [Ravelo's] partner, Ladines, was running with her,

22  Ravelo knew that Ladines had her firearm in her hands pointing at Leontae"; (3) "Ladines

23  kicked off the shooting"; and (4) Officer Ravelo heard gunshots, that seemed to be fired by

---

[1] The Court may take judicial notice of public records without converting a motion to dismiss into a motion for summary judgment. *Intri-Plex Techs., Inc. v. Crest Group, Inc.,* 499 F.3d 1048 (9th Cir. 2007). And court filings are matters of public record appropriately subject to judicial notice. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n.6 (9th Cir. 2006) (citation omitted).

multiple officers simultaneously. (Doc. 67, at 6; Doc. 63 ¶¶ 160, 241-42, 246-47.) These allegations are insufficient to support a failure to intervene claim for multiple reasons.

First, Plaintiffs fail to allege sufficient facts to identify the proximity of Ravelo to Ladines *when Ladines deployed force.* If these allegations were accepted as sufficient support for the failure to intervene claim, then any non-shooting officer, regardless of their proximity to other force-using officers, could be sued due to their mere presence anywhere in the vicinity whatsoever at the time force was deployed. Second, Officer Ladines use of force has no bearing on whether Officer Ravelo had a meaningful opportunity to intervene. Similarly, the simple fact that Officer Ravelo heard gunshots does not support a failure to intervene claim against her. While Plaintiffs allege Officer Ravelo saw Mr. Kirk unarmed, there is no well-pled allegation to establish that she had sufficient time to prevent other officers from using force, especially the force of firing an automatic weapon.

Third and finally, the allegation that Officer Ravelo knew Officer Ladines had her firearm pointed at Mr. Kirk at some point before force was deployed does not establish a duty or failure to intervene. At the outset, and as argued above, Plaintiffs fail to identify any allegations in the TAC that indicate Officer Ravelo's proximity to Officer Ladines at the time Officer Ladines deployed force. And even if Officer Ravelo knew that Officer Ladines had her firearm pointed at Mr. Kirk at some point after she allegedly discovered Mr. Kirk was unarmed, but before excessive force was deployed, the TAC contains no allegations to identify what Officer Ravelo knew, saw, or could do at the time Officer Ladines decided to deploy force. If Plaintiffs' arguments were accepted, any time another officer drew their firearm, fellow officers would be required to immediately tell them to put the firearm away or to not use lethal force. This is precisely why prior cases have recognized that allegations concerning timing and proximity are quintessential to a claim premised on a failure to intervene. *See Andrich v. Kostas*, 470 F. Supp. 3d 1048, 1060-61 (D. Ariz. 2020), *aff'd,* 22-16226, 2023 WL 6157407 (9th Cir. Sept. 21, 2023) (granting a

motion to dismiss a failure to intervene claim alleged in a second amended complaint because those officers had no "opportunity to stop" the other officers from shooting the decedent); *Waller*, 2023 WL 3863655, at *1 (cited and discussed via parenthetical, *supra*).

### C. <u>Officers Roy, Garza, and Ladines</u>

Plaintiffs quote and cite to the following allegations from the TAC to support the failure to intervene claim against Defendants Roy, Garza, and Ladines: (1) "Roy, Garza, and Ladines had the same opportunity [as Ravelo] to observe that Leontae was not a threat"; (2) the remaining Phoenix Defendants and other officers did nothing to intervene despite having enough time for at least one of the officers – Ravelo – to see that Leontae was not a threat and did not match the description provided"; and (3) "as the Phoenix Defendants arrived at the scene, Leontae had already thrown his weapon to the ground, put his hands in the air and began to sit in a surrendering position." (Doc. 67, at 7; Doc. 63 ¶¶ 134, 190, 245.) However, each of these facts, whether viewed individually or collectively, fail to state a failure to intervene claim against Defendants Roy, Garza, and Ladines.

First, the above allegations cited by Plaintiffs do not provide factual support for sequencing, timing, and the relative location of each officer to one another. Such facts are essential yet missing from the TAC. Second, the above allegations merely focus on the officers' observations of Mr. Kirk. This is not the standard. The TAC must allege sufficient facts to show that Defendants Roy, Garza and Ladines had a meaningful opportunity to intervene to prevent the purported constitutional violations by *other officers*. For example, Officer Roy had to have a meaningful opportunity to prevent Officers Garza and Ladines from using excessive force. What the officers observed Mr. Kirk do has no bearing on this analysis, and, as argued above, Plaintiffs do not identify any facts in the TAC that would aid in this analysis.

Third, the second and third allegations listed above do not identify the individual Defendants' specific conduct. Instead, Plaintiffs' improperly lump all the officers together

as "Phoenix Defendants." As previously argued, at a minimum, under Rule 8, merely lumping Defendants together without referencing the specific conduct that serves as the basis for the claim against them warrants dismissal of the failure to intervene claim. *E.g., Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988)

As a final point, Plaintiffs argue that "if officers who were directly in each others' presence and actually shooting at Leontae can be said to not have had an opportunity to intercede to stop their fellow officers, it is difficult to imagine in what circumstances any officer **could** have had such an opportunity." (Doc. 67, at 7 (emphasis in original).) Even if the Court overlooked the complete speculative nature of this argument (it should not), Plaintiffs offer no reference to the TAC to support this argument, nor do they or can they point to any persuasive, let alone binding, case law in support of their speculation as detailed *supra* and further *infra,* Section II. For these reasons, dismissal of Plaintiffs' failure to intervene claim against Defendants Roy, Garza, and Ladines is appropriate.

## II.  PLAINTIFFS' CASE RELIANCE AS TO NON-SHOOTING OFFICERS DO NOT OVERCOME THEIR FAILURE TO ALLEGE SUFFICIENT FACTS TO SUPPORT THE FAILURE TO INTERVENE CLAIM

As legal support for the failure to intervene claim against non-force using officers, namely, Defendants Ravelo, Ramirez, and Howard, Plaintiffs quote the general principles espoused in *Boyd v. Benton County* and *Bravo v. City of Santa Maria*. (Doc. 67, at 4.)[2] Closer inspection reveals that these cases support Defendants' position. Plaintiffs rely on *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004) for the proposition that "[o]fficers that provide armed backup during an unconstitutional search are integral to that search."

---

[2] Plaintiff also cites dicta contained in a footnote in the *United States v. Koon* opinion, which recognizes the general principal that "constitutional right[s] violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *United States v. Koon*, 34 F.3d 1416, 1447, n.25 (9th Cir. 1994), *aff'd in part, rev'd in part,* 518 U.S. 81, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996). *Koons* is a criminal case in which police officers were convicted for their use of force and is inapposite here as to the civil failure to intervene claim.

1    (Doc. 67, at 4.) In *Boyd*, a SWAT team huddled outside of the door to an apartment unit,

2    while one member deployed a flash bang device upon entry into an apartment, and an

3    individual sleeping on the floor by the front door was injured when the flash bang was

4    used. 374 F.3d at 777-78. The Ninth Circuit held that each SWAT team member involved

5    in the raid was an integral participant. *Id.* At 780. This holding was supported by the

6    following facts: each officer stood armed behind the officer that used the flash bang; each

7    officer "participated in the search in some meaningful way;" and third, and most vitally,

8    "every officer was aware of the decision to use the flash-bang, did not object to it, and

9    participated in the search operation knowing the flash-bang was to be deployed." *Id.* This

10   type of planned use of a particular force in tandem with the other officers is wholly

11   distinguishable from the use of deadly force in this case.

12        Next, Plaintiffs cite *Bravo v. City of Santa Maria*, 665 F.3d 1076 (9th Cir. 2011) for

13   the proposition that "liability under § 1983 extends to officers 'who perform functions

14   "integral" to an unlawful search, even if their individual actions do not themselves rise to

15   the level of a constitutional violation" in an apparent attempt to further support the failure

16   to intervene claim. (Doc. 67, at 4.) But both cases—*Bravo* and *Boyd*, as already explained

17   above as to *Boyd*—involve a SWAT team's nighttime search of a home. In contrast, this

18   case involves the unplanned use of ultimately deadly force in a public parking lot, in broad

19   daylight, in front of a strip mall and involving a suspected active shooter who is, at a

20   minimum, seen pointing/waiving a gun in that parking lot. *Bravo*, like *Boyd*, is not a

21   credible comparison nor support for the claim that Officers Ravelo, Ramirez, and Howard

22   failed to intervene; the integral participation doctrine does not apply to warrant the failure

23   to intervene claim surviving.

24        In fact, later Ninth Circuit case law further developed the integral participation

25   doctrine utilized in *Boyd* and *Bravo*. In *Peck v. Montoya*, the Ninth Circuit recognized that

26   liability under this doctrine arises in two scenarios: (1) "the defendant knows about and

acquiesces in the constitutionally defective conduct as part of a common plan with those whose conduct constitutes the violation;" or (2) "the defendant 'set[s] in motion a series of acts by others which [the defendant] knows or reasonably should know would cause others to inflict the constitutional injury.'" *Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)) (alterations in original). The *Peck* court recognized that the *Boyd* decision is illustrative of the first scenario, which is rather limited. *Id.* Specifically, "simply being present at the scene does not demonstrate that an officer has acted as part of a common plan" under *Boyd*. *Id*; *see also Hopkins v. Bonvicino,* 573 F.3d 752, 770 (9th Cir. 2009) (recognizing that *Boyd* does not extend to an officer who conducts an interview in front of a house while other officers conduct an unconstitutional search inside of the house because the interviewing officer neither planned nor conducted the search). Here, Plaintiffs' reliance on *Boyd* is misplaced.

Again, unlike the situation in *Boyd*, Defendants Ravelo, Ramirez, and Howard were not huddled behind the officers that deployed lethal force. Officers Ramirez and Howard were hundreds of feet in the air. And Officer Ravelo is not alleged to be huddled behind or even near the officers who shot at Kirk. Further, Officers Ravelo, Ramirez, and Howard were not participants in a planned search. Unlike the injured party in *Boyd*, who was injured during the search of an apartment, Kirk was shot in an occupied public parking lot while he was seen, at least, waiving and pointing a gun. And unlike the officers in *Boyd*, who knew of and did not object to the planned use of a flash bang, Officers Ravelo, Ramirez, and Howard were not (and could not have been) aware of the other officer's decision to use lethal force. Plaintiffs argue that Officer Ravelo stated she did not see Kirk wielding a gun and knew that Officer Ladines had her gun drawn at some point before deploying force. (Doc. 67, at 6.) Plaintiffs fail to show how either of these alleged facts, even if true, establish that Officer Ravelo knew or even had reason to know that another officer was going to deploy lethal force and/or that she supported the use of lethal force by other

officers. Moreover, Officers Ramirez and Howard had no opportunity to object to and/or prevent the use of lethal force while flying above the scene in the helicopter.

Finally, while Plaintiffs' integral participation theory fails under the first instance identified in *Boyd* – knowledge and acquiescence in the constitutionally defective conduct as part of a common plan, Defendants will also address the second recognized example, namely, that a defendant's conduct sets in motion the series of acts by others that the defendant knows or reasonably should have known would cause the constitutional violation. *Peck,* 51 F.4th at 889. Applying these principles, the *Peck* court held that non-shooting officers, who were both armed and surrounding a house where a suspect was shot, were not integral participants to a constitutional violation because they neither "form[ed] a plan to shoot" (the first instance under *Boyd*), nor "set in motion acts" that "cause[d] a constitutional violation" (the second instance). *Id.* at 892. Similarly, in *Lane v. City of Mesa*, this Court concluded that the only integral participants to a constitutional violation that resulted in the death of a passenger in a stopped motor vehicle were those officers that actually shot at the vehicle. *Lane v. City of Mesa*, CV-19-00852-PHX-SMB, 2021 WL 11650853, at *13 (D. Ariz. Nov. 9, 2021). It is worth noting that the officers *Lane* discovered after the fact that none of the occupants in the vehicle were armed. *Id.* at *2.

Here, the alleged facts in Plaintiffs' TAC do not allege any conduct of Officers Ravelo, Ramirez, and Howard that set in motion the series of acts by the offers that deployed lethal force. While Officers Ramirez and/or Howard relayed an active shooter message to dispatch, Plaintiffs fail to explain how Officers Ramirez or Howard knew or should have reasonably known that the other officers would deploy lethal force resulting in an alleged constitutional violation at the time they did and/or in the context they did. In fact, the only allegations in the TAC to support the failure to intervene claim against Officers Ramirez and Howard is that they relayed inaccurate information and should have reported updated information that there was not an active shooter. (Doc. 63 ¶¶ 107-120.)

1   Indeed, they do not even actually allege that Officers Ramirez and Howard knew or should
2   have known that there was *not* an active shooter. (*Id.*)

3          Officers Ravelo, Howard and Ramirez were non-shooting officers, and Officer
4   Ravelo was merely present somewhere at the time Kirk was shot; Officers Howard and
5   Ramirez were not present, as they were multiple feet above the scene in a helicopter. As
6   such, Plaintiffs fail to allege any facts to establish that Defendants Ravelo, Ramirez, and
7   Howard were "integral participants" in the shooting of Kirk, such that their failure to
8   intervene claim can survive.

9   **III.    DISMISSAL WITH PREJUDICE IS COMPELLED BY RULE 8**

10          Plaintiffs argue that the near 400 paragraphs and 50 pages of allegations in the TAC
11   are necessary because this case is highly technical and complex. (Doc. 67, at 8.) While the
12   Court has recognized "the serious nature of Plaintiffs' allegations" (Doc. 53, at 2), this case
13   is not complex. *See generally Price v. Kramer*, 993 F. Supp. 1295, 1298 (C.D. Cal. 1997)
14   (**"With rare exceptions, excessive force cases are simple, rather than complex cases.**
15   Excessive force cases almost always involve very few events which happened over a very
16   short time span . . . and the dispositive disputes almost always involve the credibility of
17   witnesses.") (emphasis in original). While Plaintiffs highlight several amendments made
18   from the original Complaint to the TAC, they admit that "the TAC is verbose." (Doc. 67,
19   at 9.) Rule 8 requires "simple, concise, and direct" allegations. Fed.R.Civ.P. 8(d)(1).
20   Plaintiffs' admission that the TAC is verbose in effect concedes that the TAC violates Rule
21   8.

22          Plaintiff also maintains that the TAC is "neither confusing nor conclusory." (Doc.
23   67, at 10.) Despite this sweeping statement, Plaintiffs make no effort whatsoever to address
24   the multiple conclusory, argumentative, irrelevant, and/or duplicative allegations
25   highlighted in Defendants' Motion to Dismiss. (Doc. 64, at 8-10.) And though Defendants
26   appreciate Plaintiffs' efforts to further amend the operative complaint, Plaintiffs should not

be afforded limitless opportunities to amend. As argued in Defendants' Motion to Dismiss, there are numerous deficiencies that run afoul of Rule 8, which Plaintiffs do not specifically address other than to claim they had to paint a complete picture and that the bulk of their voluminous TAC is substantive. They do not explain why there are so many conclusory and duplicative allegations, and, despite agreeing to delete some other argumentative allegations, nor do they offer a credible explanation why they continue to include multiple argumentative and irrelevant allegations. Moreover, in one unsupported final paragraph, Plaintiffs suggest that dismissal is extreme and unwarranted, yet they do not elaborate why. (Dkt. 67, p. 12). And then they further do not elaborate as to why they should be offered yet another chance – a fourth, to amend again, when it is now over a year into the case and they have had multiple chances already to amend and have been on notice for that length of time as to the many deficiencies in their operative complaint from the original Complaint to this TAC. In fact, their own concessions in the Response should operate against them and warrant dismissal, i.e., conceding as to Sections I, II and IV of Defendants' Motion to Dismiss. (Doc. 67, pp. 3-4, 8). Plaintiffs, via their counsel, have been on notice for multiple months as to these arguments about proper plaintiffs, proper claims and the lack of a proper basis for punitive damages, but instead of agreeing to dismiss prior to the current Motion to Dismiss, they made Defendants assert the arguments again only to then acknowledge Defendants were right.

As such, dismissal with prejudice is warranted under Rule 8.

## IV.    **CONCLUSION**

For the foregoing reasons, and those further explained in the Motion to Dismiss, Defendants respectfully request that the Court dismiss Plaintiffs' Third Amended Complaint in its entirety pursuant to Rule 8, with prejudice, or, alternatively, dismiss the failure to intervene claim against Defendants Roy, Garza, Ladines, Ravelo, Ramirez, and Howard, with prejudice.

1         Defendants also reiterate their request they be granted leave to submit a fee request

2    to recover their reasonable fees related to this Motion to Dismiss.

3         RESPECTFULLY SUBMITTED this 17th day of December, 2024.

4                 BROENING OBERG WOODS & WILSON, P.C.

5

6               By: /s/ *Jeremiah M. Sullivan*
                 Sarah L. Barnes

7                     Kelley M. Jancaitis
                 Jeremiah M. Sullivan

8                     *Attorneys for Defendants City of Phoenix,*
                 *Sullivan, Ladines, Garza, Roy, Ravelo,*

9                     *Ramirez and Howard.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2024, I electronically transmitted the foregoing with the Clerk of the Court using the CM/ECF system for filing, with copies submitted electronically to the following recipients:

Sean A. Woods
Robert T. Mills
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

/s/ *Suzanne Beard*

# EXHIBIT A

Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
(520) 623-1922
*Attorney for Plaintiff*

**IN THE FEDERAL DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Cora J. Waller, on her own behalf and as the personal representative of the estate of Glen Ray Cockrum, Jr.,<br><br>     Plaintiff,<br><br>v.<br><br>City of Nogales (Arizona); <u>Sheriff David Hathaway;</u> ~~Santa Cruz County (Arizona);~~ Roy Bermudez, in his individual and official capacities; Joseph Bunting~~, in his individual capacity~~; Nicolas Acevedo~~, in his individual capacity~~; Guadalupe Villa~~, in his individual capacity~~; Robert Gallego~~, in his individual capacity~~; Mario Lopez~~, in his individual capacity~~; Gerardo Batriz~~, in his individual capacity~~; Jose Pimienta~~, in his individual capacity~~; Jesus Gomez~~, in his individual capacity~~; <u>Victor Yanez; Veronica Hernandez; Jose Bermudez; Xavier Gomez; Rene Lechuga; Bernardo Villela; Oscar Mesta; David Lopez, all in their individual capacities,</u><br><br>    Defendants. | Case No.:  <u>4:22-cv-00244-RCC</u><br><br><br>**<u>FIRST AMENDED</u> COMPLAINT** ~~**FOR DAMAGES**~~<br><br>**(Jury Trial Demanded)** |

1

## INTRODUCTION

1. Long ago, the law enforcement community coalesced around the principle that officers should not shoot into moving vehicles. For example, the International Association of Chiefs of Police recommends prohibiting the practice "unless a person in the vehicle is *immediately* threatening the officer or another person . . . *by means other than the vehicle.*" Similarly, the Police Executive Research Forum – comprised of top professionals from the nation's largest agencies – recommends banning the practice "unless someone in the vehicle is using or threatening deadly force *by means other than the vehicle itself*." The notion that shooting into moving vehicles is more harmful than helpful was famously embraced by the nation's largest municipal police department <u>fifty years ago</u>. In 1972, the NYPD banned the practice. Since then, most of the nation's large police departments have followed suit, including: Boston, Cincinnati, Cleveland, Denver, Detroit, Houston, Los Angeles, Miami, Orlando, Philadelphia, Phoenix, Seattle, Tucson, Washington, DC.

2. Neither the Nogales Police Department nor the Santa Cruz County Sheriff's Office heeded this advice. On May 24, 2021, local law enforcement shot and killed a long-distance truck driver who had led police on a slow-speed chase through Santa Cruz County. Apparently exasperated with the unknown mystery driver who never spoke to police and never gave a hint about his motivations, the shooting officers decided it was time to "stop this guy", as Chief Bermudez stated.

3. Within a span of approximately 90 seconds, nine officers unleashed 122 bullets on the

driver as he slowly maneuvered his empty semi-truck through a busy Walmart parking lot and onto Nogales' main thoroughfare. Far from being in the path of a fast-moving vehicle, the shooting officers chased after the lumbering truck as it moved toward the Walmart parking lot exit. Other officers sped ahead of the truck and into its expected path of travel on Grand Avenue just seconds before opening fire.

4.  As gunshots rang out in the parking lot, shoppers sought cover behind parked cars. An elderly woman and her granddaughter tripped and fell as they ran for cover. At least four police officers feared being struck by friendly fire.

5.  Most of the nine shooting officers later admitted that they had no idea why their colleagues had initiated a vehicle chase in the first place. One year and hundreds of pages of investigative reports later, we are still left with a murky picture of why officers believed it necessary to engage in a lengthy police chase and shootout.

6.  As the police chase commenced, the driver was suspected – at most – of misdemeanor trespass. The driver exchanged no words with law enforcement, made no verbal threats to officers or civilians, and at all times remained in the cab of his truck. As the day proceeded, the driver had racked up – at most – a few additional minor offenses: speeding in a construction zone, running two red lights, and a slow-speed fender bender in the parking lot.

**JURISDICTION AND VENUE**

7.  This court has subject-matter jurisdiction under 42 U.S.C. §§ 1983; 28 U.S.C. §§ 1331 and 1343; the Fourth Amendment, and the Fourteenth Amendment to the U.S. Constitution.

8.  Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over all state law claims because each state law claim arose out of the same set of facts and is so related to the federal law claims that it forms part of the same case or controversy.

9.  Plaintiff, through her previous counsel, timely served notices of claim related to her state-law claims, per A.R.S. § 12-821.01.

10. Venue is proper in the Tucson Division of the District of Arizona because all of the incidents and omissions giving rise to this suit occurred in Santa Cruz County.

**PARTIES**

**<u>Plaintiff</u>**

11. Plaintiff Cora J. Waller (hereafter "Waller") is a resident of Shirley, Arkansas.

12. Waller is the biological mother of her deceased, unmarried, adult son, Glen Ray Cockrum, Jr. (hereafter "Cockrum").

13. Cockrum died on May 24, 2021 in Santa Cruz County, Arizona.

14. At the time of his death, Cockrum was a resident of Volusia County, Florida.

15. Waller is the lawfully-designated personal representative of the estate of Glen Ray Cockrum, Jr., having been appointed by Volusia County Circuit Court Judge Margaret W. Hudson on May 12, 2022.

16. Pursuant to A.R.S. § 14-3110 and A.R.S. § 12-612, Waller has standing to bring the state-law claims and Section 1983 claims in this suit in her role as personal representative of the estate of the deceased.

17. Except as to Count IV, Waller brings each Count in her role as personal representative of the estate.

**Nogales Police Department Defendants**

18. Defendant City of Nogales is a public entity established by the laws and Constitution of the State of Arizona. Through its council, mayor and city manager, Defendant City of Nogales operates, manages, directs, and controls the Nogales Police Department, which employs other defendants in this action.

19. Defendant Nicolas Acevedo was employed as a Nogales Police officer on May 24, 2021, with the rank of Sergeant. He is sued in his individual capacity.

20. At all relevant times, Defendant Acevedo acted under the color of state law.

21. Upon information and belief, during the years leading up to May 2021, Defendant Acevedo served as the primary firearms instructor for the Nogales Police Department. In addition to his regular duties, Defendant Acevedo was responsible for conducting periodic firearms trainings of his colleagues – periodic trainings that are required for ongoing law enforcement pursuant to the Arizona Peace Officer Standards and Training Council.

22. Defendant Robert Gallego was employed as a Nogales Police officer on May 24, 2021, with the rank of sergeant. He is sued in his individual capacity.

5

23. At all relevant times, Defendant Gallego acted under the color of state law.

24. Defendant Gerardo Batriz was employed as a Nogales Police officer on May 24, 2021, with the rank of Corporal. He is sued in his individual capacity.

25. At all relevant times, Defendant Batriz acted under the color of state law.

26. Defendant Jose Pimienta was employed as a Nogales Police officer on May 24, 2021. He is sued in his individual capacity.

27. At all relevant times, Defendant Pimienta acted under the color of state law.

28. Defendant Jesus Gomez was employed as a Nogales Police officer on May 24, 2021. He is sued in his individual capacity.

29. At all relevant times, Defendant Gomez acted under the color of state law.

30. Defendant Roy Bermudez was employed as the chief of police of the Nogales Police Department on May 24, 2021. He is sued in both his individual and official capacities.

31. At all relevant times, Defendant Bermudez acted under the color of state law.

32. Defendant Guadalupe Villa was employed as a Nogales Police officer on May 24, 2021. He is sued in his individual capacity.

33. At all relevant times, Defendant Villa acted under the color of state law.

34. Defendant Mario Lopez was employed as a Nogales Police officer on May 24, 2021. He is sued in his individual capacity.

35. At all relevant times, Defendant Lopez acted under the color of state law.

36. Defendant Victor Yanez was employed as a Nogales Police officer on May 24, 2021. He is sued in his individual capacity.

37. At all relevant times, Defendant Yanez acted under the color of state law.

38. Defendant Veronica Hernandez was employed as a Nogales Police officer on May 24, 2021 with the rank of lieutenant. She is sued in her individual capacity.

39. At all relevant times, Defendant Veronica Hernandez acted under the color of state law.

40. Defendant Jose Bermudez was employed as a Nogales Police officer on May 24, 2021 with the rank of sergeant. He is sued in his individual capacity.

41. At all relevant times, Defendant Jose Bermudez acted under the color of state law.

42. Defendant Xavier Gomez was employed as a Nogales Police officer on May 24, 2021. He is sued in his individual capacity.

43. At all relevant times, Defendant Gomez acted under the color of state law.

44. Defendant Rene Lechuga was employed as a Nogales Police officer on May 24, 2021. He is sued in his individual capacity.

45. At all relevant times, Defendant Lechuga acted under the color of state law.

46. Defendant Bernardo Villela was employed as a Nogales Police officer on May 24, 2021. He is sued in his individual capacity.

47. At all relevant times, Defendant Villela acted under the color of state law.

48. Defendant Oscar Mesta was employed as a Nogales Police officer on May 24, 2021. He is sued in his individual capacity.

49. At all relevant times, Defendant Mesta acted under the color of state law.

50. Defendant David Lopez was employed as a Nogales Police officer on May 24, 2021. He is sued in his individual capacity.

51. At all relevant times, Defendant David Lopez acted under the color of state law.

**Santa Cruz County Defendants**

52. Defendant David Hathaway is the duly-elected Sheriff of Santa Cruz County, Arizona.

53. Defendant Hathaway was the Sheriff of Santa Cruz County on May 24, 2021.

54. Defendant Hathaway is sued only under state law.

55. Pursuant to A.R.S. § 11-409, Defendant Hathaway was the appointing authority of Defendant Bunting from January 2021 through May 24, 2021. Accordingly, Defendant Hathaway was responsible for training, correcting, and disciplining Defendant Bunting for any identified deficiencies prior to February 1, 2022. *See, e.g., Hounshell v. White*, 220 Ariz. 1, 2 (Ct. App. 2008).

56. Under state law, between January 2021 and May 24, 2021, Defendant Hathaway was responsible for developing and updating policies for the use of force and the use of deadly force by deputies employed within the Santa Cruz County Sheriff's Office.

57. Between January 2021 and May 24, 2021, Defendant Hathaway was the appointing authority of communications dispatchers working within the Santa Cruz County Sheriff's Office.

58. Between January 2021 and May 24, 2021, Defendant Hathaway was the county official responsible for ensuring safe and effective radio communications between

POST-certified officers employed within the Santa Cruz County Sheriff's Office and POST-certified officers working for other state and local law enforcement agencies.

59. Defendant Joseph Bunting was employed as a deputy with the Santa Cruz County Sheriff's Office on May 24, 2021, with the rank of detective. He is sued in his individual capacity.

60. At all relevant times, Defendant Bunting acted under the color of state law.

61. ~~Defendant Santa Cruz County is a public entity established by the laws and Constitution of the State of Arizona. Santa Cruz County has been recognized by the courts of Arizona to be the appropriate jural entity when the actions and omissions of the Santa Cruz County Sheriff's Office are at issue. Santa Cruz County, through its Sheriff's Office, employed Defendant Bunting on May 24, 2021.~~

## FACTUAL ALLEGATIONS

### Nogales Police Department has a History of Excessive Force

62. During the fifteen years leading up to Cockrum's death, the Nogales Police Department had maintained a longstanding practice or custom of needlessly escalating interactions with members of the public who were non-violent, posed no imminent threat to the general public, suspected only of minor offenses, and whose behavior suggested they may be experiencing a mental health crisis. The Nogales Police Department appears to have developed a habit of reflexively relying on excessive force when confronted with such non-violent situations.

9

63. In 2008, for example, an unarmed 60-year-old Hilda Bojorquez was physically assaulted and Tased three times by Nogales police officers while visiting her daughter at Holy Cross hospital, requesting that the hospital staff explain her daughter's medical diagnosis. Ms. Bojorquez's suspected offense? Misdemeanor trespassing and disorderly conduct.

64. In 2011, for example, an unarmed Diego Lerma was disoriented and hiding in a restricted, employee-only section of the La Cinderella store moments after experiencing an epileptic seizure. Although multiple eyewitnesses reported to police that Mr. Lerma appeared harmless and in need of medical assistance, Nogales Police officer Jose Pimienta – also sued here – Tased Mr. Lerma five times. Mr. Lerma's suspected offense? Misdemeanor trespassing.

65. In 2019, for example, an unarmed Luis Contreras had attracted police attention when he peacefully sat at an IHOP restaurant for an extended period of time without ordering a meal. When questioned by police while seated at his restaurant table, Mr. Contreras spoke with slurred speech and displayed signs of hallucinations. Shortly after, and without provocation, Nogales police officers Tased Mr. Contreras twice, took him to the ground, and beat him. His suspected offense? Misdemeanor trespassing.

66. Upon information and belief, the command staff of the Nogales Police Department prior to May 24, 2021 were aware of these three incidences, as well as other

examples, where line officers resorted to excessive force when confronted with nonviolent individuals who, at most, had committed misdemeanor offenses.

**Cockrum is Working as a Long-Haul Truck Driver**

67. Thanks to its strategic location along a major north-south corridor connecting the United States with Mexico, Santa Cruz County boasts approximately 85 fresh produce warehouses. Produce is trucked north from Mexican farm fields, crossed through the international land port, temporarily stored in refrigerated warehouses in Santa Cruz County, and loaded onto new trucks bound for grocery stores and restaurants throughout the United States.

68. On May 24, 2021, Cockrum was one of thousands of long-haul truck drivers who are daily dispatched to the region's fresh produce warehouses with the task of carrying food to end consumers.

69. Cockrum drove a truck for the Iowa-based A&B Logistics trucking company.

70. The truck that Cockrum drove was owned by and registered to A&B Logistics.

71. On May 24, 2021, a law enforcement officer inputting the vehicle's license plate number into a law enforcement database would identify only the name and address of the trucking company.

72. On May 24, 2021, the weather conditions in Santa Cruz County were clear.

73. Early in the morning on May 24, 2021, Cockrum delivered cargo to a Phoenix warehouse. Cockrum was then instructed to pick up fresh produce at a warehouse in Rio Rico, Arizona.

74. Upon arriving to Rio Rico, Cockrum parked his truck at a produce warehouse where he was not scheduled to pick up a load. Despite having no business at this particular warehouse, Cockrum parked his truck in front of the loading bays and remained in the cab of his truck.

75. At approximately 11:45am, a warehouse employee observed Cockrum's truck blocking the loading bays. He approached Cockrum's truck and requested that Cockrum move.

76. In response, Cockrum remained seated in the cab of his truck and displayed a knife while the warehouse employee remained standing on the pavement below.

77. Upon information and belief, Cockrum never made verbal threats to the employee, never spoke to the employee, never climbed down from the elevated truck cab, and never approached the employee on foot.

78. At 11:54am, the warehouse employee sent a text message to a family member who worked as a 911 dispatcher, seeking advice about the proper course of action.

79. A Santa Cruz County Sheriff's deputy was dispatched to the scene and, while the deputy was en route, Cockrum moved his truck off of the warehouse property.

**<u>Law Enforcement Officers First Engage with Cockrum</u>**

80. A Sheriff's deputy with the Santa Cruz County Sheriff's Office responded to the call and discovered that Cockrum had moved his truck to a neighboring produce warehouse.

81. Upon information and belief, no employee from the neighboring produce warehouse reported concern about Cockrum's presence on their property. Nevertheless, the Sheriff's deputy pursued Cockrum to the neighboring warehouse.

82. The Sheriff's deputy approached Cockrum's truck on foot. Cockrum remained seated in the driver's seat of his truck, saying nothing to the Sheriff's deputy. While seated in his truck, Cockrum displayed a knife and made a gesture as if slitting his own throat.

83. An additional Sheriff's deputy arrived to the scene, as well as two Border Patrol agents.

84. Failing to recognize that Cockrum's behavior was consistent with a mental health crisis, the two Sheriff's deputies aimed their guns at Cockrum and used a PA system to order Cockrum out of the truck.

85. In this moment, officers had probable cause to believe that Cockrum had committed only one misdemeanor offense: trespassing.

86. That one misdemeanor offense had concluded, as Cockrum had voluntarily exited the first warehouse property.

87. Shortly after the two Sheriff's deputies began pointing their guns, Cockrum put his truck into gear and began driving away. Civilian cell phone footage shows Cockrum's truck moving at a slow rate of speed, intentionally avoiding the parked law enforcement vehicles and officers. The cell phone footage also shows a Border Patrol agent standing next to his marked vehicle with his hands at his side, apparently unconcerned with Cockrum's behavior.

88. Up to this moment, neither of the two Sheriff's deputies had attempted to ascertain the owner of Cockrum's truck, for example, by reporting the license plate number to dispatch.

89. Around this time, Defendant Joseph Bunting of the Santa Cruz County Sheriff's Office received word that someone had barricaded himself inside a vehicle.

90. Defendant Bunting later told investigators that, as he prepared to assist his colleagues, he didn't "know quite what was going on" and that he "didn't know the back story." At most, Defendant Bunting had a vague understanding that the subject may have possessed a knife. Upon information and belief, Defendant Bunting didn't learn the back story until after Cockrum was dead.

### Cockrum Leads Officers on a Slow-Speed Chase

91. Cockrum began driving southbound and then shortly after, he turned northbound on the I-19 frontage road. Law enforcement followed close behind.

92. One of the pursuing Sheriff's deputies reported on the radio that Cockrum's truck was traveling at 40 m.p.h. along the frontage road.

93. Defendant Bunting left his office in Nogales to catch up to the pursuit. At that moment, he still didn't "know anything besides that there's a pursuit northbound."

94. For the first time, one of the Sheriff's deputies radioed the license plate number to dispatch. No results ever came back.

95. For the next hour, no one on any police radio frequency radioed back the identity of the truck's owner. No one called the company in whose name the truck was registered.

96. Approximately ten minutes later, Cockrum had entered the interstate, continuing northbound. Sheriff's deputies continued trailing him, reporting a maximum speed of 69 m.p.h.

97. Up to this point, three law enforcement agencies had been alerted to Cockrum's flight: the Border Patrol, Santa Cruz County Sheriff's Office, and the Arizona Department of Public Safety (ie, highway patrol). The Nogales Police Department was yet unaware of what was transpiring approximately 30 miles north of its jurisdiction.

98. The U.S. Border Patrol checkpoint was situated in Cockrum's path of travel. On the radio frequency, law enforcement expressed momentary concern about how Cockrum may respond upon arriving to this bottleneck. For example, would the mystery driver attempt to ram vehicles in his path?

99. These concerns dissipated. Voices on the radio frequency reported that Cockrum had reduced his speed well in advance of the checkpoint.

100.    Around this time, communications personnel employed by the Sheriff's Office and communications personnel employed by the Arizona Department of Public Safety conveyed in both phone calls and radio communications that the driver of the truck presented with signs of mental illness. This assessment was repeated later in the afternoon, before Cockrum arrived into the City of Nogales.

101.    At this moment, Defendant Bunting approached the Border Patrol checkpoint, having rushed north from Nogales. Not yet knowing a description of the vehicle, Bunting looked straight at Cockrum's truck for several moments as it approached the checkpoint. Nothing about Cockrum's truck appeared out of the ordinary, and Bunting believed he was searching for a smaller vehicle.

102.    Also at this moment, Defendant Officers Jose Pimienta and Gerardo Batriz of the Nogales Police Department happened to be traveling north on I-19, completely unaware of the events that had transpired at the produce warehouses. Neither had heard radio transmissions about the police chase then underway.

103.    As they approached the I-19 Border Patrol checkpoint at approximately 1:13pm, Defendants Pimienta and Batriz saw law enforcement vehicles from their sister agencies with emergency lights activated. Moments later, they observed Cockrum's truck slowly crossing over the median that divides the northbound and southbound lanes of I-19, in an apparent effort to circumvent the Border Patrol checkpoint.

104.    As the truck prepared to make the U-turn, several Border Patrol agents approached with guns drawn. Cockrum began to make the U-turn, causing the trailer to cut at an angle and forcing the Border Patrol agents to quickly step back from the trailer's path.

105.    Still riding in the southbound lanes of I-19, Defendant Batriz observed a Santa Cruz County Sheriff's deputy standing outside his patrol vehicle, firing several shots at the tires of Cockrum's truck as it maneuvered into the southbound lanes of I-19.

106.    At this point, Defendants Pimienta and Batriz made a U-turn of their own. They joined the growing law enforcement pursuit of the vehicle operated by an unknown driver who posed an unknown risk.

107.    For a brief time, four law enforcement agencies followed Cockrum southbound. The Border Patrol disengaged shortly after, leaving a long procession comprised of the Santa Cruz County Sheriff's Office, the Department of Public Safety, and the duo from the Nogales Police Department.

108.    Beginning at approximately 1:14pm, Defendant Pimienta narrated the events for the benefit of his Nogales Police Department colleagues.

109.    But there wasn't much for Defendant Pimienta to report: Defendants Pimienta and Batriz knew only that *something* caused their law enforcement partners to take interest in Cockrum and that *something* motivated Cockrum to evade the Border Patrol checkpoint. Even the speed of the 'chase' was not particularly noteworthy: Cockrum's speed ranged from 60 mph to 67 mph as he traveled southbound.

110.    Around this time, Nogales Police Chief Roy Bermudez was becoming aware of the situation. He later recalled to investigators, however, that he "had no idea why the truck was being chased." He knew only that "the truck didn't wanna stop."

111.    Around this time, Defendant Officer Mario Lopez was becoming aware of the situation. He later recalled to investigators that he understood only that "the vehicle was being chased" and that he didn't know why it was being chased.

112.    Around this time, Defendant Officer Nicolas Acevedo was learning more about the unfolding events. A few minutes earlier, Defendant Acevedo had spoken by phone with a Sheriff's deputy who informed him only that a chase was underway. As the procession neared the City of Nogales, Acevedo pieced together only that the driver was "not pulling over" and that the driver "threw a couple bags out the window" as he continued south.

113.    Over the radio, Defendant Acevedo issued commands for Nogales officers to block the various interstate exits dumping onto city streets.

114.    Traveling south on I-19, Exit 8 is the first exit into the City of Nogales. Cockrum approached Exit 8 driving under the speed limit. He slowed further and exited. He carefully maneuvered his truck around the two parked, unoccupied police vehicles that had been placed there to block his exit. The two officers watched from a nearby embankment as Cockrum intentionally avoided crashing into their vehicles.

115.    Now traveling south on Grand Avenue, Cockrum ran two stop lights at approximately 35 mph. Perplexingly, however, he came to a complete stop at a third stop light. Nogales police were notified over the radio that Cockrum had come to a stop at one of the red lights.

116.    As Cockrum passed the intersection at Mariposa Road, Chief Bermudez was helping to direct traffic. Bermudez explained his brief interaction with the driver this way: "As he passed by . . . I just raised my hands like 'what the hell?'. . . we locked eyes and the guy just flips me off and keeps driving south."

117.    Shortly after locking eyes with Chief Bermudez, Cockrum turned into the Walmart parking lot.

**Officers Shoot at Cockrum at least 18 Times in the Walmart Parking Lot**

118.    Cockrum brought his truck to a complete stop in the Walmart parking lot and remained in the cab of his truck.

119.    Dozens of shoppers were at the Walmart that day.

120.    Deputy Bunting and two others from the Santa Cruz County Sheriff's Office, along with more than a dozen Nogales police officers, converged on the Walmart parking lot. Some of them exited their vehicles with guns in hand. Some of them took shooting stances.

121.    Defendant Pimienta radioed asking for authorization to use deadly force. There was no response.

122.    Although Defendant Acevedo was the on-duty incident command and Chief Bermudez was on scene, neither asserted his authority to coordinate the chaotic scene in these moments. In the absence of direction, various officers made their own decisions – often without communicating their plans through the radio.

123.    For example, one police officer approached the stationary trailer and cut one of the brake lines, hoping to lock up the rear tires.

124.    For example, at least one officer rushes to the truck to place spike strips in front of the tires.

125.    For example, Defendants Bunting and Pimienta hatched a plan to break out one of the truck windows and deploy a non-lethal flash bang grenade inside the truck cab. Defendant Pimienta successfully broke the window but was unable to activate the flash bang.

126.    Almost immediately after Defendant Pimienta broke the window, Cockrum put the truck into gear. Because some of the rear tires were now locked up, the truck and trailer began bouncing in an unnatural way.

127.    Defendant Pimienta jumped down from the rig. Shots began to ring out.

128.    Officers and civilians alike were confused.

129.    Unknown officers yelled "crossfire, crossfire."

130.    Defendant Pimienta pulled Defendant Bunting out of the way, fearing crossfire.

131.    Defendant Batriz grabbed Defendant Acevedo, also fearing crossfire.

132.    Defendant Villa fell down as shots were going off. Defendant Gomez pulled him up, not knowing whether he had been hit.

133.     Immediately after hearing gunshots, Chief Bermudez saw two women and a little girl running and then tripping. He helped them up, and pulled them behind his car for cover.

134.     Chief Bermudez – the highest ranking police officer on scene – later told investigators that he "had no idea what was happening" in that moment.

135.     Various officers reported seeing the windshield of Cockrum's truck begin to crack.

136.     In total, six officers fired shots while standing in the Walmart parking lot. No officers were injured.

137.     While standing in the Walmart parking lot, Defendant Acevedo fired two shots at the cab of Cockrum's truck.

138.     While standing in the Walmart parking lot, Defendant Gallego fired at least two shots at the cab of Cockrum's truck.

139.     While standing in the Walmart parking lot, Defendant Villa fired six shots at the cab of Cockrum's truck.

140.     While standing in the Walmart parking lot, Defendant Lopez fired four shots at the cab of Cockrum's truck.

141.     While standing in the Walmart parking lot, Defendant Gomez fired three shots at the cab of Cockrum's truck.

142.     While standing in the Walmart parking lot, Defendant Batriz fired at least two shots into the driver's side window of Cockrum's truck.

143.    Cockrum's truck slowly moved through the parking lot as gunfire erupted.

144.    Because the trailer's brakes had been engaged after an officer cut the brake lines moments earlier, the trailer was being dragged.

145.    Cockrum sought to escape as officers opened fire on him, but two unoccupied police vehicles had been strategically parked to block him in. As gunfire continued, Cockrum nudged the two police SUVs out of the way.

146.    One of the two police vehicles sustained only cosmetic damage when Cockrum's truck pushed past. The second vehicle lost either a bumper or front quarter panel. Cockrum traveled at between 5 mph and 10 mph at that moment.

147.    During interviews with investigators, none of the officers who fired in the Walmart parking lot could identify an *imminent* threat posed by Cockrum's vehicle in that moment.

148.    None of the officers observed civilians in the path of Cockrum's truck.

149.    None of the officers stood in the path of Cockrum's vehicle.

150.    If officers expressed any concern at all while standing in the Walmart parking lot, it was concern born out of their colleagues' gunfire.

**<u>Cockrum is Fatally Shot</u>**

151.    Cockrum managed to exit the parking lot, turning southbound onto Grand Avenue.

152.    Despite the fact that Cockrum had – at most – committed nonviolent misdemeanor offenses and demonstrated no intention of using his truck as a deadly

weapon during the two hours leading up to this moment, various officers had become resolute. They had decided to kill Cockrum.

153.    Chief Bermudez explained his thinking in that moment, as Cockrum's truck exited the parking lot: "that truck needed to be stopped at all costs."

154.    Defendant Bunting recalled thinking to himself: "I needed to stop this vehicle."

155.    Defendant Gallego recalled thinking to himself that Cockrum was willing to do just about anything because he ran at least one stop light and because Cockrum flipped off Chief Bermudez.

156.    Defendant Bunting drove his Sheriff vehicle onto Grand Avenue, ahead of the slow-moving, partially-disabled truck. Bunting parked in the center median of Grand Avenue, exited, took position behind his vehicle, raised up his rifle, and yelled out a command for the truck to stop.

157.    The truck traveled in the far-right lane and at a safe distance from where Defendant Bunting had positioned himself. Cockrum's truck slowly approached, staying in the same lane at all times.

158.    Defendant Bunting does not recall seeing any civilian pedestrians in Cockrum's immediate path of travel.

159.    Defendant Bunting does not recall seeing any civilian vehicles in Cockrum's immediate path of travel.

160.    Defendant Bunting was the first law enforcement officer to fire rounds at the Grand Avenue location, and he initially fired two or three bullets into the driver's side window.

161.    Defendant Bunting recalls thinking to himself that the driver appeared to be ducking the windshield shots. So Defendant Bunting changed his tactic. He began firing at the driver's side door, with the hope that his bullets would pierce the door's metal and strike Cockrum.

162.    In total, Defendant Bunting fired 28 bullets on Grand Avenue.

163.    Defendant Bunting recalls thinking that his gunshots were effective, as he believes that the truck was coming to a stop before any additional officers opened fire on Grand Avenue.

164.    As Defendant Bunting stopped shooting, four other officers from the Nogales Police Department started their assault on Cockrum.

165.    By this time, Defendants Batriz, Pimienta, Bermudez, and Gallego had caught up to the approximate location where Defendant Bunting had positioned himself moments earlier.

166.    At this location, Defendant Gallego fired approximately 28 rounds at the cab of Cockrum's truck.

167.    At this location, Defendant Batriz fired 18 rounds at the cab of Cockrum's truck.

168.    At this location, Defendant Pimienta fired 15 rounds at the cab of Cockrum's

truck.

169.    At this location, Chief Bermudez fired 13 rounds at the cab of Cockrum's

truck.

170.    Approximately 90 seconds elapsed from the first volley of gunfire in the

Walmart parking lot until the final gunshot was fired along Grand Avenue.

171.    Cockrum was struck with three bullets. At least one of those three bullets was

fatal.

**COUNT I**
**42 U.S.C. § 1983 – Fourth Amendment**
**Unreasonable Seizure (Excessive Force)**
**Against Defendants Acevedo, Gallego, Batriz, Gomez, Villa, Lopez, Pimienta, Bunting,**
**and Bermudez in his individual capacity**

172.    The allegations above are incorporated by reference in this Count.

173.    Defendants Acevedo, Gallego, Batriz, Gomez, Villa, and Lopez first seized

Cockrum by firing at him while his vehicle was moving toward the exit of the

Walmart parking lot at approximately 1:41pm on May 24, 2021. The Defendants'

actions amounted to a seizure because they fired their weapons with the intent of

restraining Cockrum's movement and with the object of apprehending Cockrum.

174.    The shots fired from the Walmart parking lot were unreasonable even if they

did not strike Cockrum, as they placed Cockrum in reasonable apprehension for his

safety. In that moment, there was no justifiable reason to use deadly force.

25

175.    Defendants Gallego, Batriz, Pimienta, Bermudez, and Bunting seized Cockrum by firing at him while his vehicle was traveling southbound on Grand Avenue at approximately 1:42pm on May 24, 2021. The Defendants' actions amounted to a seizure because they fired their weapons with the intent of restraining Cockrum's movement and with the object of apprehending Cockrum.

176.    The shots fired from Grande Avenue were unreasonable, as there was no imminent threat to the officers or to other bystanders.

177.    The nine Defendants named in this Count fired a total of 122 bullets at Cockrum. At least three of those shots struck Cockrum, causing Cockrum's death.

178.    The actions of the Defendants named in this Count were intentional, malicious, willful, wanton, and/or callously indifferent to Cockrum's constitutionally protected rights, thereby entitling Plaintiff to an award of punitive damages.

179.    Under this Count, Plaintiff is entitled to:

    a.  compensatory damages;

    b.  damages for loss of life (also sometimes called hedonic damages);

    c.  damages for pain and suffering of the decedent prior to death; and

    d.  punitive damages

## COUNT II
### 42 U.S.C. § 1983 – *Monell*
**Unconstitutional Policy/Custom in Violation of the Fourth & Fourteenth Amendment Against Defendants City of Nogales and Roy Bermudez in his official capacity**

180.    The allegations above are incorporated by reference in this Count.

181.    Upon information and belief, the City of Nogales, through the Nogales Police Department, maintained a written policy and/or unwritten custom permitting the firing into moving vehicles.

182.    At all relevant times, command staff within the Nogales Police Department knew of the heightened risk to both suspects and members of the public in shooting into moving vehicles.

183.    Upon information and belief, in May 2021 the City of Nogales maintained a policy and/or unwritten custom of allowing its officers to resort to excessive force when faced with nonviolent individuals who may be acting erratically but who otherwise pose no imminent threat to officers, to civilians, or to the general public. This custom and practice is evidenced, among other things, by examples cited in this Complaint of instances where Nogales police officers used Tasers on individuals who were suspected of – at most – nonviolent misdemeanor offenses.

184.    Such a policy or custom is unconstitutional because it:

    e.  presents a substantial risk of serious harm to the seized individuals;

    f.  presents a substantial risk of serious harm to innocent bystanders;

    g.  leads to a Fourth Amendment excessive force violation.

185.    As of May 2021, command staff within the Nogales Police Department were aware that shooting into moving vehicles was linked to police-involved shooting deaths throughout the United States.

186.    The maintenance of the above written policies and/or unwritten customs were

the moving forces behind the constitutional violation suffered by Cockrum.

187.    Because this is a claim against the municipality, Defendant is not entitled to the

defense of qualified immunity as to this Count.

188.    Under this Count, Plaintiff is entitled to:

h.    compensatory damages;

i.    damages for loss of life (also sometimes called hedonic damages); and

j.    damages for pain and suffering of the decedent prior to death

**COUNT III**
**42 U.S.C. § 1983 – Fourth Amendment**
**Failure to Intervene/Intercede**
**Against All Individual <u>Nogales</u> Defendants <u>Named in their Individual Capacities</u>**

189.    The allegations above are incorporated by reference in this Count.

190.    Each of the Defendants named in this Count had an opportunity to intercede

(also sometimes referred to as intervene) between the first volley of gunshots that

took place in the Walmart parking lot and the second volley of gunshots that caused

Cockrum's death.

191.    Specifically, Defendants failed to intercede by communicating face-to-face and

via radio when it became clear that gunfire was being resorted to. In particular,

Defendants Acevedo, Batriz, <u>Roy</u> Bermudez, ~~and~~ Gallego<u>, Jose Bermudez, and</u>

<u>Hernandez</u> were supervisory employees who failed to interject on the radio after the

first shots were fired. Indeed, three of these Defendants – Batriz, Bermudez, and

Gallego – rushed from the Walmart parking lot to Grand Avenue to take part in the final volley of gunshots. Far from intervening to prevent a foreseeable violation of Cockrum's Fourth Amendment rights, these three officers set an example by giving social permission to the other officers.

192.     The remaining Defendants named in this count were not supervisors but each had an independent constitutional duty to intervene to the extent they could anticipate that one or more of their colleagues were preparing to use unlawful force. They were each on scene at the Walmart, were in close proximity to their work colleagues, and were equipped with radios to communicate with one another prior to the fatal shooting.

193.     Approximately 90 seconds elapsed from the moment that the first gunshot was fired until the final gunshot. Thus, there was ample opportunity and time to intervene, had any of the Defendants wished to do so.

194.     In May 2021, this duty to intercede in such circumstances was clearly established within the Ninth Circuit.

195.     Plaintiff is entitled to compensatory and punitive damages under this Count.

**COUNT IV**
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process Clause**
**Substantive Due Process: Liberty Interest in Familial Association**
**Against ~~all Individual Police~~ Defendants Bermudez in his individual capacity, Bunting,**
**Acevedo, Villa, Gallego, Lopez, Batriz, Pimienta, and Gomez**

196.     Plaintiff re-alleges each allegation contained in the above paragraphs.

197.     Plaintiff is the biological mother of Cockrum. Plaintiff brings this Count in her

personal capacity, and not in her capacity as the personal representative of the estate.

198.     The Ninth Circuit recognizes that a parent has a constitutionally protected

liberty interest under the Fourteenth Amendment in the companionship and society of

her child, sometimes referred to as a protected liberty interest in familial association.

199.     In the Ninth Circuit, this protected liberty interest is recognized even when the

child is an adult at the time of his or her death.

200.     Defendants' behavior shocks the conscience.

201.     Defendants exercised their power in an arbitrary manner.

202.     Defendants' shocking behavior in firing more than 100 rounds at a fleeing

Cockrum was the legal, direct, and proximate cause of his death.

203.     Plaintiff is entitled to damages for the loss of companionship of her son.

## COUNT V
### A.R.S. §§ 12-611
**State-Law Battery and Negligence Causing Wrongful Death**
**Against ~~all~~ Defendants City of Nogales, Hathaway, Bermudez, Bunting, Acevedo, Villa, Gallego, Lopez, Batriz, Pimienta, and Gomez**

204.     Plaintiff re-alleges each allegation contained in the above paragraphs.

205.     Under Arizona law, when death of a person is caused by an intentional tort, the

persons who would have been liable if death had not ensued, shall be liable in an

action for damages.

206.     For the reasons explained in other counts, the individual Defendants named in

this Count (other than Defendant Hathaway) each committed the intentional tort of

battery on Cockrum by firing at him. This amounted to battery because each of the named Defendants in this Count desired to cause a harmful and offensive contact with Cockrum and each believed that a battery was the likely consequence.

207.     This battery was the direct, proximate, and legal cause of Cockrum's death.

208.     The individual Defendants named in this Count <u>(other than Defendant Hathaway)</u> are not entitled to state-law qualified immunity, as state-law qualified immunity is available to law enforcement officers only when they are alleged to have acted in a negligent manner. The individual defendants, by contrast, are sued here on an intentional tort theory.

209.     The ~~individual~~ Defendants named in this Count are not entitled to a state-law justification defense <u>for intentional torts that they are alleged to have committed</u>, as there was no imminent threat to officers or any third parties at the time the deadly force was deployed.

210.     The City of Nogales and <u>Defendant Hathaway</u> ~~Santa Cruz County~~ are sued for the wrongful death of Cockrum on two bases: 1) *respondeat superior* liability as the employers of the individual defendants who committed intentional torts; and 2) negligence liability on the basis that the City of Nogales and <u>Hathaway</u> ~~Santa Cruz County~~ negligently failed to:

a.   Establish proper communication to ensure that the employees of Santa Cruz County Sheriff's Office and employees of the Nogales Police Department all

had access to the relevant information during the approximately two hours leading up to the shooting death;

    b.  Train and supervise their employees on the proper circumstances in which to engage in lengthy law enforcement chases, where the suspect neither poses an immediate threat nor is wanted for a serious crime;

    c.  Train and supervise their employees on the proper use of deadly force, particularly in the context of shooting into moving vehicles.

211.    The above-described negligence was so wanton and egregious that it amounted to gross negligence.

212.    Plaintiff is entitled to compensatory damages ~~and punitive damages~~ under this Count.

**COUNT VI**
**42 U.S.C. § 12132 (ADA) and 29 U.S.C. § 794 (Section 504)**
**Discrimination on the Basis of Disability**
**Against Defendant City of Nogales**

213.    The allegations above are incorporated by reference in this Count.

214.    Defendant City of Nogales is a public entity, per 42 U.S.C. § 12131.

215.    During all relevant times, Defendant City of Nogales received federal financial assistance per 29 U.S.C. § 794.

216.    Both the ADA and Section 504 of the Rehabilitation Act were enacted as remedial statutes, with the goal of promoting the rights of disabled individuals and providing compensation when they experience discrimination.

217.    Both the ADA and Section 504 of the Rehabilitation Act are silent with regard to survivorship of claims seeking compensatory damages for disability discrimination.

218.    Consequently, federal common law provides the rules pertaining to the survivorship of claims brought under the ADA and Section 504 of the Rehabilitation Act for harm suffered by someone who is now deceased. Under the federal common law, federal claims typically survive a decedent's death if they are remedial in nature and not penal. Plaintiff does not seek punitive damages as to this Count.

219.    Claims for non-economic compensatory damages in the form of pain and suffering, emotional distress, and similar such claims are not punitive in nature and therefore survive the decedent's death.

220.    Cockrum had mental impairments that substantially limited his major life activities. For example, Cockrum struggled with mental health issues including, upon information and belief, undiagnosed schizophrenia and/or post-traumatic stress disorder.

221.    Additionally, Cockrum was regarded as having such an impairment because personnel of the City of Nogales subjected him to discrimination because of a mental impairment that they perceived in the moment. Accordingly, at the time of his death, Cockrum was an individual with a disability as defined by the ADA. 42 U.S.C. § 12102.

222.     Title II of the ADA applies to municipalities and protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs and activities provided by municipalities. 42 U.S.C. §§ 12131-12132.

223.     Such services, programs, and activities include police protection and police services.

224.     At all times relevant herein, Cockrum was a qualified individual with a disability.

225.     The City of Nogales' police services must comply with Title II of the ADA and relevant provisions of the Rehabilitation Act, just as do other municipally-operated programs.

226.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

227.     Pursuant to Title II of the ADA and its implementing regulations, public entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

228.     Section 504 states that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a); 11 C.F.R. § 9420.3.

229.     Defendant City of Nogales is covered within the meaning of Section 504 because it is a municipal government that provides services, programs, and activities and receives federal financial assistance. 29 U.S.C. § 794.

230.     Defendant City of Nogales is required by Section 504 to provide suspects, arrestees, and detainees who suffer from disabilities with equal access to policing.

231.     In May 2021, Defendant City of Nogales discriminated against Cockrum on the basis of his disabilities by gunning him down when it was clear that he was experiencing a mental health emergency and posed no imminent harm to officers or to the public.

232.     Nogales officers did not request assistance from specially-trained mental health professionals, although they had the time and resources to do so.

233.     Nogales officers did not request assistance of hostage negotiators or similarly-trained law enforcement personnel, although they had the time and resources to do so.

234.     Nogales officers failed to utilize loud-speaker capabilities to establish a clear line of communication with Cockrum.

235.     Nogales officers surrounded Cockrum within the Walmart parking lot when they reasonably knew that Cockrum was an individual experiencing a mental health crisis and that such tactics were likely to exacerbate panic in him.

236.     Nogales officers fired upon Cockrum within the Walmart parking lot – an action likely to trigger even more panic.

237.     Defendant City of Nogales therefore discriminated against Plaintiff on the basis of his disabilities in violation of Title II of the ADA and Section 504 of the Rehabilitation Act.

238.     Plaintiff is entitled to compensatory damages under this Count.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant her the following relief:

A. Compensatory damages, ~~including consequential, general, and special damages~~, in an amount to be determined at trial;

B. Loss of Life Damages, also called Hedonic damages, as defined by the federal common law and 42 U.S.C. § 1983;

C. Pain and Suffering damages as permitted under 42 U.S.C. § 1983;

D. Punitive damages pursuant to 42 U.S.C. § 1988;

E. Compensatory ~~and punitive~~ damages, as allowed in state law;

F. Attorney's fees under 42 U.S.C. § 1988 and 29 U.S.C. § 794a;

G. Costs of this action;

H.  Any other relief that this Court deems appropriate.

Respectfully submitted this 9th 23rd day of November May, 2022 by:

/s Paul Gattone
Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
Email: GattoneCivilRightsLaw@gmail.com
(520) 623-1922
*Attorney for Plaintiff Cora Waller*