LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL, 16TH FLOOR
PHOENIX, AZ 85004
(602) 271-7700
Sarah L. Barnes /Bar No. 020362
Kelley M. Jancaitis /Bar No. 025555
Jeremiah M. Sullivan/Bar No. 038569
E-mail:slb@bowwlaw.com
       kel@bowwlaw.com
       kmj@bowwlaw.com
       jms@bowwlaw.com
*Attorneys for Defendants City of Phoenix,
Sullivan, Ladines, Garza, and Roy*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kashane Kirk, *et al.*,<br><br>        Plaintiffs,<br><br>vs.<br><br>City of Phoenix, *et al.*,<br><br>        Defendants. | Case No.: CV 23-00836-MTL (CDB)<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Defendants Roy, Garza, Ladines, the City of Phoenix (the "City") and Sullivan (hereinafter collectively referred to as "Defendants"), by and through undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby move for summary judgment on Plaintiff's remaining federal and state law claims.

## I.    INTRODUCTION

An officer's decision to deploy deadly force is reasonable when they respond to a report of an active shooter and observe a suspect waving a gun around in a public parking lot in broad daylight. In such rapidly evolving scenarios that take place over a matter of seconds, officers should not be required to wait and see if the suspect will decide to fire his weapon or confirm whether the suspect is still armed after he runs and takes cover between vehicles.

This scenario is precisely what unfolded on November 2, 2022, when Defendants Roy, Garza, and Ladines reasonably deployed deadly force to protect themselves, their fellow officers, and innocent bystanders. On November 8, 2024, Plaintiffs filed their Third Amended Complaint. On July 16, 2025, the Court granted Defendants' Motion to Dismiss in part, reducing the parties, narrowing some of Plaintiffs' claims, and dismissing Plaintiffs' failure to intervene claim in its entirety. (Doc. 93, at 15-16). Defendants are entitled to summary judgment on Plaintiffs' remaining claims for excessive force, *Monell* liability, gross negligence, negligent training.

Plaintiffs' excessive force claim (Count II) against Defendants Roy, Garza, and Ladines fails because these officers acted reasonably under the circumstances. *See* Section IV, *infra*. The fact that Kirk ditched his firearm and never fired a bullet does not create a fact question on the issue of reasonableness. Moreover, these officers are entitled to qualified immunity because it was not clearly established at the time of the incident that an officer's decision to use lethal force in response to a report of an active shooter, who was observed waving a gun, was unconstitutional. *See* Section V, *infra*.

Even if Plaintiffs could manufacture a fact question on the above issues, they cannot demonstrate that a policy, custom, or practice existed that was the moving force behind the alleged unconstitutional use of deadly force. *See* Section VI, *infra*. No such policy existed and Plaintiffs cannot point to prior, specific incidents of related conduct by Defendants Roy, Garza, and Ladines, which are necessary to establish a custom or practice. Therefore, Plaintiffs' *Monell* claim (Count III) against the City and Sullivan fails.

Plaintiffs' gross negligence claim (Count V) against the City and Sullivan also fails because this claim is premised on the failure to intervene claim, which was dismissed, and excessive force, which fails for the reasons argued below. *See* Section VII, *infra*. Moreover, Plaintiffs' gross negligence claim, as pled, is deficient because Arizona does not recognize a claim for negligent use of intentional force.

Plaintiffs' negligent training claim (Count VI) further fails because it is based on allegations of mere negligence, as opposed to gross negligence, and thus the City and Sullivan are entitled to qualified immunity. *See* Section VIII, *infra*. Nonetheless, even if the Court was inclined to consider the merits of this claim, the claim fails due to a lack of evidence.

Because the above claims fail, Plaintiffs wrongful death and survival action (Count I), and punitive damages claims fail. *See* Section IX, *infra*; Section XI, *infra*. Moreover, to make sure that all potential theories of liability that Plaintiffs may maintain are adequately addressed, any theory of liability premised on a loss of familial relations or alleged failure to render prompt medical aid are not viable claims. *See* Section X, *infra*; Section XII, *infra*,

No matter the circumstances, the loss of human life is tragic. But liability does not flow from every tragedy. Defendants are entitled to summary judgment.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On November 2, 2022, an individual called 9-1-1 and reported a black male with a red hoodie and black hat with a "NY" logo pointing a gun at him. (SOF ¶ 1.) The caller further stated that the suspect, later identified as Leontae Kirk, stated that he "has one (1) in the chamber" and that he was "not afraid to use it." (SOF ¶ 2.)

The information provided by the 9-1-1 caller was relayed over dispatch and a helicopter unit with Officer Ramirez, the spotter, and Officer Howard, the operator, was dispatched to the location of the 9-1-1 call. (SOF ¶ 3.) From approximately 500 feet above the scene, Officer Ramirez spotted Kirk and observed him pointing a gun around in a strip mall parking lot located at the northwest portion of 37th Avenue and McDowell. (SOF ¶ 4.) Further based on his observations, Officer Ramirez reported that Kirk was shooting at people. (SOF ¶ 5.) Dispatch requested that units be deployed to the scene and reported "we have an active shooter." (SOF ¶ 6.) Video footage collected from the stores at the strip mall depict Kirk waving a gun around in the parking lot, pointing it at innocent bystanders, and bystanders

fleeing from Kirk. (SOF ¶ 7.)[1]

Officers Roy, Garza, Ladines, and Ravelo, in three separate vehicles, responded to dispatch's report of an "active shooter."[2] (SOF ¶ 11.) Officer Ladines and Ravelo were in the first vehicle; Officer Garza was in the second vehicle, and Seargent Roy was alone in the third vehicle. (SOF ¶ 13.) All three vehicles drove eastbound on McDowell and were parked at or near the intersection at 37th Drive and McDowell, directly southwest of strip mall parking lot. (SOF ¶ 14.)

Officer Ladines and Ravelo's vehicle arrived at or around 16:29:44. (SOF ¶ 15.) Upon exiting the vehicle, at approximately 16:29:50 Officer Ladines observed Kirk armed with a gun and from the sidewalk located just southwest of the strip mall fired four successive rounds over two (2) seconds.[3] (SOF ¶ 16.) Immediately thereafter, as seen by Officer Ravelo's body cam and contemporaneous video footage from the storefronts, Kirk began to flee between a silver truck and silver sedan both parked in the strip mall parking lot. (SOF ¶ 18.) Sometime after fleeing between the two vehicles, Kirk discarded his firearm outside of the officers' view. (SOF ¶ 19.)

Sergeant Roy arrived at approximately 16:29:50. (SOF ¶ 20.) While approaching the scene, he observed Kirk with a firearm. (SOF ¶ 21.) Upon exiting the police cruiser, Seargent Roy paralleled Kirk, who had just disappeared between the two vehicles. (SOF ¶ 22.) At

---

[1] Video footage further depicts Kirk drawing his weapon in response to an individual in a blue shirt on a motorcycle, later identified as Humberto, brandishing a pistol. (SOF ¶ 8.) Officer Ramirez did not see Humberto, the man in the blue shirt, when he observed Kirk brandish a firearm. Based on the video footage from the parking lot, Humberto was out of the officers' view when they arrived at the scene and fled the scene after Ladines fired the initial shots at Kirk. (SOF ¶ 10.)

[2] Officer Ladines did not activate her body cam until after Roy, Garza, and herself deployed deadly force. (SOF ¶ 12.)

[3] Sergeant Roy and Officer Garza also reported seeing Kirk waving a gun around when he arrived at the scene. (SOF ¶¶ 17, 28.)

16:29:57, Roy took position at west end of the strip mall at the sidewalk that ran immediately in front of the storefronts. (SOF ¶ 23.) At 16:30:00, Kirk, facing southward, emerged from between the two vehicles with an outstretched right arm. (SOF ¶ 24.) One second later, starting at 16:30:01 Sergeant Roy fired seventeen successive rounds from 16:30:01. (SOF ¶ 25.) Sergeant Roy ceased firing at 16:30:07. (SOF ¶ 26.)

Officer Garza arrived at approximately 16:29:47. (SOF ¶ 27.) While exiting his vehicle, he heard gunshots, saw Kirk armed with a gun, and watched Kirk flee between the two vehicles and began to position himself behind a pony wall located just south of Kirk's position for cover. (SOF ¶ 28.) Shortly thereafter, he moved eastward to position himself behind a pony wall located just south of Kirk's position for cover. (SOF ¶ 29.) At 16:30:01, while moving into position behind the pony wall Officer Garza can be heard saying "where is he?"; and gunshots are simultaneously heard on his bodycam footage. (SOF ¶ 30.) Within two (2) seconds, Kirk comes into Officer Garza's field of vision. (SOF ¶ 31.) Within one (1) second of Kirk coming into sight, Officer Garza fired three (3) rounds, critical mass. (SOF ¶ 32.) Officer Garza ceased firing at 16:30:04. (SOF ¶ 33.)

Approximately 20 seconds elapsed between when Officers first exited their vehicles and when the last round was fired. (SOF ¶¶ 15, 26.)

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). The movant must inform the court of the basis for its motion and identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *Id.* The movant can also discharge its initial burden by pointing out to the court there is an absence of evidence to

support the nonmoving party's case. *Id.* at 325. Then, if the movant meets this burden, the party opposing summary judgment must offer evidence of specific facts sufficient to raise a genuine issue for trial. *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The nonmoving party must go beyond the pleadings and by his own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. Here, Defendants are entitled to summary judgment on Plaintiffs' remaining federal and state law claims.

## IV.    LEGAL ARGUMENT: DEFENDANTS USE OF DEADLY FORCE WAS REASONABLE UNDER THE CIRCUMSTANCES

Courts analyze three factors to determine whether an officer's use of deadly force was reasonable (known as the *Graham* factors):

(1) the severity of the crime at issue[;]

(2) whether the suspect poses an immediate threat to the safety of the officers or others[;] and

(3) whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1865 (1989). Here, each of the three factors cuts in Defendants' favor. Defendants Roy, Garza, and Ladines acted reasonably.

### a.    Officers Reasonably Believed Kirk Was Committing a Serious Crime

The crime that Defendants Roy, Garza, and Ladines believed Kirk was committing was severe. The Arizona Criminal Code defines assault as "[i]ntentionally placing another person in reasonable apprehension of imminent physical injury." A.R.S. § 12-1203(2). Aggravated assault, a felony, arises "[i]f the person uses a deadly weapon or dangerous instrument." A.R.S. § 12-1204(A)(2). Video footage and eyewitness accounts confirm that Kirk was waiving around a firearm, in broad daylight, in a public parking lot. In fact, the reason that the helicopter unit was deployed in the first place was due to a 9-1-1 call

concerning Kirk threatening a man and his family with a firearm and stating he had "one in the chamber." Officer Ramirez observed Kirk waiving the gun around in the parking lot with an outstretched arm, which he testified looked like a shooting motion.

Plaintiffs will argue that Kirk brandished his firearm in self-defense and Officer Ramirez inaccurately reported that Kirk was firing his weapon. Both arguments are immaterial to the first *Graham* factor. The key issues is what criminal activity Defendants Roy, Garza, and Ladines reasonably believed they were responding to. Defendants Roy, Garza, and Ladines responded to dispatch's report of an "active shooter." When they arrived at the scene and observed Kirk waiving a gun, it was reasonable for them to believe that Kirk was committing a serious crime, aggravated assault.

### b.    <u>Kirk Posed an Immediate Threat to Officers and Bystanders</u>

The second factor, whether the suspect poses an immediate threat to the safety of the officers or others, is the most important factor. *Graham*, 490 U.S. at 396; *George v. Morris*, 736 F.3d 829, 837–38 (9th Cir.2013). "[T]here must be objective factors to justify" a concern that the suspect poses a threat to the officers or innocent bystanders. *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010).  When a suspect is armed with a gun, it is "well-settled that lethal force is justified if an officer has probable cause to believe that [a] suspect poses a significant threat of death or serious physical injury to the officer or others." *Estate of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023) (internal quotations omitted) (alterations in original). Reasonableness also does not "always require[ ] officers to delay their fire until a suspect turns his weapon on them." *George*, 736 F.3d at 838. "Officers shouldn't have to wait until a gun is pointed at [them] before [they are] entitled to take action." *Estate of Strickland*, 69 F.4th at 620 (internal quotations omitted) (alterations in original) (quoting *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001)). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838.

Moreover, "[o]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of an immediate threat, and in those situations courts will not hold that they have violated the Constitution." *Est. of Strickland v. Nevada County*, 69 F.4th 614, 621 (9th Cir. 2023) (quotation marks omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151 (2001) (holding that officers' perception that a plastic, airsoft replica gun was a real firearm was not unreasonable). "When an officer's use of force is based on a mistake of fact, [court's] ask whether a reasonable officer would have or *should* have accurately perceived that fact." *Id.* (quotation marks omitted) (citing *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011)). "Whether the mistake was an *honest* one is not the concern, only whether it was a *reasonable* one." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1133 (9th Cir. 2019) (alteration marks and quotation marks omitted) (quoting *Torres*, 648 F.3d at 1127).

Case law across the country recognizes that an officer's mistaken belief about whether a suspect was still armed at the time deadly force was deployed or whether a suspect actually fired his weapon may be reasonable, and thus, permit the use of deadly force. *Valderas v. City of Lubbock*, 937 F.3d 384 (5th Cir. 2019), is particularly instructive. In *Valderas*, officers witnessed a suspect brandish a firearm and deployed deadly force; however, the suspect contended that he discarded the gun before he was shot. *Id.* at 390. The Fifth Circuit held that a police officer's use of deadly force was reasonable because the "events transpired in a matter of seconds" and the officer was left "with little time to realize" the suspect discarded the firearm before using deadly force. *Id.* The Fifth Circuit reasoned that in this rapidly evolving scenario it was "immaterial whether a plaintiff was actually armed" and that the officer "was not required to wait to confirm that [the suspect] intended to use the gun before shooting. *Id.*; *see also Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008) ("The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." (quoting *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)); *Jones v. City of Cleveland*, 1:15-CV-1190, 2016 WL 1626855, at *3, n. 20 (N.D. Ohio Apr. 25, 2016) (officers

use of deadly force against an armed, fleeing suspect, who unbeknownst to the officer discarded the firearm, was reasonable because the suspect "could have intentionally or accidentally fired the gun while fleeing, creating danger for others").

Likewise, in *Mullins v. Cyranek*, officers observed an armed suspect; however, the suspect discarded his weapon prior to the officer rising from a crouched position to deploy deadly force. 805 F.3d 760, 763-64 (6th Cir. 2015). The Sixth Circuit held that the officers use of deadly force was reasonable, recognizing that "[w]hile [the officer's] decision to shoot [the suspect] after he threw his weapon may appear unreasonable in the sanitized world of our imagination, . . . [the officer was faced with a rapidly escalating situation, and his decision to use deadly force in the face of a severe threat to himself and the public was reasonable." *Id.* at 767 (internal citations and quotations omitted). Similarly, in *Estate of Valverde v. Dodge*, the Tenth Circuit held that a police officer's use of deadly force was reasonable, even assuming that the suspect, who was positioned right in front of the officer, had dropped his gun and was beginning to surrender before the officers deployed force. 967 F.3d 1049, 1057, 1062-63 (10th Cir. 2020). The Fifth Circuit concluded that no jury could conclude that the officer "made his decision to fire before he could have realized that [the suspect] was surrendering (by dropping his gun and raising his hands.)" *Id.* at 1062. Lastly, in *McElree v. City of Cedar Rapids*, the Eight Circuit held that an officer's decision to deploy deadly force was reasonable, even though he mistakenly believed that the suspect fired his weapon, because the suspect was armed and posed a threat. 983 F.3d 1009, 1017–18 (8th Cir. 2020); *see generally United States v. Martinez*, 2:22-CR-00135-GMN-NJK, 2024 WL 4542649, at *4 (D. Nev. Oct. 21, 2024) (denying a motion to suppress and recognizing that an officer's mistaken belief that a suspect fired his weapon was not relevant because an officer had "probable cause to seize [an armed suspect] with the use of their weapons").

Here, Defendants Ladines, Roy, and Garza reasonably believed that Kirk posed a threat to themselves, their fellow officers, and innocent bystanders. All three officers responded to

dispatch's report of an active shooter, saw a gun in Kirk's outstretched arm, and witnessed Kirk flee between two vehicles while armed. The fact that Kirk discarded his weapon outside of Defendants Roy, Garza, and Ladines's view and never fired his weapon are immaterial to whether the officers' use of deadly force was reasonable. At the time Ladine's deployed lethal force, Kirk was still armed and waving his gun around. When Roy deployed force, Kirk had just emerged from between the two vehicles he fled between and was observed with an outstretched arm where Roy knew his fellow officers were positioned. Right before Garza used deadly force, he could be heard asking "where is he?" as gunshots simultaneously rang out. Almost simultaneously with Kirk coming into Garza's field of vision, Garza deployed lethal force. Plaintiff may argue Defendants did not actually see a firearm in Kirk's hand; however, the Court need not entertain this factual fiction. Officer Ramirez observed the gun and contemporaneous video footage from the parking lot depicts Kirk waiving a gun around and innocent bystanders fleeing as Defendants Roy, Garza, and Ladines arrived on the scene. Under these circumstances, and based on these facts, no reasonable juror could conclude that Defendants Roy, Garza, and Ladines's actions were unreasonable. On the contrary, they reasonably deployed deadly force in response to a reported active shooter armed with a gun.

        **c.**    <u>**Officers Reasonably Believed Kirk Was Either Resisting or Evading Arrest**</u>

For the third *Graham* factor, in the excessive force context, resistance "runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). Again, what matters is what the officer reasonably believed was occurring, not what is known to have actually occurred with the benefit of the 20/20 vision of hindsight.

Here, a police helicopter flew overhead, and Defendants Roy, Garza, and Ladines arrived at the scene with sirens blaring. When Ladines fired four shots, Kirk had neither surrendered nor dropped his weapon. Kirk then fled between two vehicles and was outside of Defendants Roy and Garza's view. Roy's body camera footage shows Kirk emerging with an

outstretched arm towards where his fellow officers were positioned. Audio from Garza's body camera footage captured Garza stating, "where is he?", and a simultaneous eruption of gunshots. Within two (2) to three (3) seconds, Kirk comes into Garza's field of vision, and Garza fired three (3) rounds. It was reasonable for Defendants to believe that Kirk, who was armed, pointing/waiving his weapon in a public parking lot and could have still been armed, was attempting to resist arrest and/or flee, at a minimum.

## V.    LEGAL ARGUMENT: THE INDIVIDUAL OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY

Even when an officer violates a suspect's constitutional rights, she is not necessarily liable for money damages under 42 U.S.C. § 1983. Unless the officer "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known," she is entitled to qualified immunity. *City of Escondido v. Emmons*, 586 U.S. 38, 42, 139 S.Ct. 500, 202 L.Ed.2d 455 (2019) (per curiam) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104, 138 S. Ct. 1148 (2018)). Qualified immunity serves an important purpose, it ensures that "the officer had fair notice that her conduct was unlawful" when "judged against the backdrop of the law at the time of the conduct," *Kisela*, 584 U.S. at 104, 138 S.Ct. 1148 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam). Qualified immunity shields "***all but the plainly incompetent or those who knowingly violate the law***." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092 (1986) (emphasis added). Again, qualified immunity allows for mistaken judgments. *Id.* And if any officer of reasonable competence disagrees, then qualified immunity is warranted. *Id.*[4]

Indeed, the Supreme Court of the United States has taken great care to elaborate on the wide-reaching protections officers are afforded by qualified immunity. In *City and County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015), in concluding that officers were

---

[4] This aspect alone calls for a grant of qualified immunity here, as Defendants' use of force expert opines that Defendants' decision to deploy lethal force was reasonable, as well as the fact that more than one officer on the scene deployed lethal force. (SOF ¶ 35.)

entitled to qualified immunity, the Supreme Court relied on the long-standing premise that an officer cannot be said to have violated a clearly established right, unless the right's contours are sufficiently definite, such that <u>any</u> reasonable officer in his shoes would have known he was violating constitutional rights. (Emphasis added). The Court further opined that means that the ***existing precedent must place the constitutional question beyond debate***, and that this exacting standard gives officers "'***breathing room to make reasonable but mistaken judgments***.'" *Id.* (emphasis added) (internal citation omitted). Even where officers misjudge the situation and use bad tactics, courts cannot view officers with the 20/20 vision of hindsight. *Id.* at 1777. Further, the definition of what is clearly established law must not be at a high level of generality. *Id.* (emphasis added). In fact, even an officer who acts contrary to his or her training does not necessarily negate the availability of qualified immunity. *Id.* If the officer could have believed his conduct was justified, then summary judgment on qualified immunity is appropriate. *Id.* Without "fair notice," and a "clear warning" about what the constitution requires, an officer is entitled to qualified immunity. *Id.*

Under Ninth Circuit precedent, "the relevant question for purposes of qualified immunity' is not whether [the suspect] actually threatened the officers, but whether they 'could reasonably have believed that [the suspect] posed such a threat." *Sabbe v. Washington Cnty. Bd. of Commissioners*, 84 F.4th 807 (9th Cir. 2023) (internal quotations omitted) (quoting *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016)). "Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). At the time of the November 2, 2022, incident, it was equally well established in the Ninth Circuit that officers need not wait for a suspect to fire his or her weapon before responding with deadly force to neutralize a threat. *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (recognizing that when a suspect "is armed—or reasonably suspected of being armed," even "a furtive movement" can "create an

immediate threat" sufficient to justify the use of deadly force). Likewise, as recognized in *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079, n.2 (9th Cir. 2014), an officer who fired his weapon because he reasonably, but mistakenly, believed that a suspect was exchanging gunfire with another officer is entitled to qualified immunity. Consistent with Ninth Circuit precedent, case law from across the country plainly recognizes that an officer who deploys deadly force to neutralize a perceived threat armed with a gun acts reasonably, even if the officer was mistaken about whether the suspect was still armed or whether the suspect fired a weapon. *See, e.g.*, *Valderas*, 937 F.3d at 390; *Mullins*, 805 F.3d at 767; *Dodge*, 967 F.3d at 1062; *McElree*, 983 F.3d at 1017-18; *Martinez*, 2024 WL 4542649, at *4.

Additionally, and significantly, as just recognized by the Arizona Court of Appeals on January 28, 2026 (the same date of this Motion) in *Johnson v. State of Arizona*, a claimant must establish that an officer's actions "shock the conscience" to defeat an application of qualified immunity.1 CA-CV 25-0271, 2026 WL 218669, at *3 (App. Jan. 28, 2026). This issue is viewed through two legal lenses depending on the circumstances surrounding the use of deadly force: (1) the "deliberate indifference" test; or (2) the "purpose-to-harm" test. *Id.* Under the "deliberate indifference" test "an officer loses the shield of qualified immunity if he acts with deliberate indifference to another's rights by disregarding 'a known or obvious consequence of his action.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Under the "purpose-to-harm" test, "an officer loses the qualified immunity shield if he 'acted with a purpose to harm the decedent for reasons unrelated to legitimate law enforcement objectives.'" *Id.* (quoting *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022)). *see also Ring v. City of Chandler*, CV-24-00630-PHX-SPL, 2025 WL 254549 at *6 (D. Ariz. Jan. 21, 2025) ("In urgent, emergency situations that necessitate fast action and involve competing public safety obligations, a plaintiff must show that an official acted with a 'purpose to harm' for reasons other than legitimate law enforcement objectives to meet the 'shocks the conscience' standard.")

"Whether the deliberate-indifference test or the purpose-to-harm test applies to a given situation depends on whether the officer had time to deliberate before taking the challenged action." *Id.* "Deliberation is not possible if the officers encountered fast paced circumstances presenting competing public safety obligations." *Id.* (quoting *Ochoa*, 26 F.4th at 1056 (citation modified)). In *Johnson*, the Arizona Court of Appeals concluded that the purpose-to-harm test applied because the incident involving the use of deadly force, a traffic stop, unfolded over a matter of 18 seconds. *Id.* at *4.

Here, the "purpose-to-harm" standard applies because the November 2, 2022, incident rapidly evolved over approximately 20 seconds. *See Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008) (holding that the purpose-to-harm standard applied to the "approximately five-minute altercation[,]" which "was obviously fast paced" and "was also quickly evolving and escalating[.]") Under this standard, Plaintiffs must demonstrate that Roy, Garza, and Ladines actions were not related to a legitimate law enforcement objective. "'Legitimate objectives' that will defeat a plaintiff's attempt to satisfy the purpose-to-harm test 'include arrest, self-protection, and protection of the public.'" *Johnson*, 2026 WL 218669, at *3 (quoting *Ochoa*, 26 F.4th at 1056 (citation modified)). And under the "purpose-to-harm" standard, the undisputed facts regarding the incident, along with the absence of clearly established and controlling Ninth Circuit law at that time that would have put Defendants Roy, Garza, and Ladines (including every other officer in the world) on notice that their decisions to deploy deadly force in this context was unconstitutional, mandates the application of qualified immunity. Qualified immunity is intended to protect scenarios such as this, when an officer, engaging in legitimate police conduct, responds to a report of an active shooter, observes a suspect with a gun wielding it and waiving it in a public place in a manner that looks like he was shooting the gun, and then the suspect ditches the gun while running towards businesses but only outside of the officer's view. The fact that Kirk did not purportedly fire a bullet and ditched his gun is immaterial to the qualified immunity analysis. When officers are told there

is an active shooter and witness a suspect waving a gun around in public, they should not be required to stop and worry that they will not be afforded immunity.

## VI. LEGAL ARGUMENT: PLAINTIFFS' *MONELL* CLAIM FAILS DUE TO A LACK OF EVIDENCE OF A POLICY, CUSTOM, OR PRACTICE THAT WAS THE MOVING FORCE BEHIND THE ALLEGED CONSTITUTIONAL VIOLATION

In order to proceed on and demonstrate a § 1983 claim against the City and Chief Sullivan, Plaintiff **must show** that any purported constitutional deprivation resulted directly from a policy, custom, or practice. *Monnell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978) (emphasis added). The required elements of a § 1983 policy-based claim are: (1) the plaintiff was deprived of a constitutional right; (2) the entity had a policy; (3) the policy amounted to a deliberate indifference to the plaintiff's constitutional right; and, (4) the policy was the moving force behind the constitutional violation. *Mabe v. San Bernadino Cnty.*, 237 F.3d 1101, 1110 – 11 (9th Cir. 2001); *Berry v. Boca*, 379 F.3d 764, 767 (9th Cir. 2001).

Simply put, Plaintiffs must show that Defendants Roy, Garza, and Ladines deployed excessive force, **and** that such force was motivated by policies that resulted in the use of excessive force. And if Plaintiffs cannot demonstrate an unconstitutional policy existed, which Plaintiffs cannot prove, then they must demonstrate a widespread custom or practice; a "custom" for purposes of liability as to the City and Sullivan is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (emphasis added). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Additionally, as recognized by the Supreme Court of the United States, a *Monell* claim based on inadequate training may succeed "when city policymakers are on actual or constructive notice that a particular

omission in their training program causes city employees to violate citizens' constitutional rights" yet choose to retain that program. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In other words, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference" in training. *Id.* at 62 (citation omitted); *see also Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018) (evidence of widespread practice shows deliberate indifference to constitutional violations). Moreover, it is well established in the Ninth Circuit that "one or two incidents are insufficient to establish a custom or policy…." *Oyenik v. Corizon Health Inc.*, 696 Fed. Appx. 792, 794 (9th Cir. 2017).

Here, Plaintiffs' *Monell* claim fails because they cannot establish the underlying excessive force claims against Defendants Roy, Garza, and Ladines.[5] Nonetheless, even assuming the excessive force claim against the individual Defendants could survive summary judgment, Plaintiffs cannot establish there was a policy, custom, or practice that was the moving force behind the alleged constitutional violation. In a futile attempt to establish a policy, custom, or practice, Plaintiffs allege that the City and Sullivan enacted a new policy after the incident involving Kirk and failed to implement recommendations that stemmed from the United States Department of Justice investigation into the City of Phoenix police force and subsequent report that contained the findings from the investigation. (Doc. 41, at 7-18, ¶¶ 31-85.)

### a.    New Use of Force Policy

Plaintiffs' *Monell* claim is based in part on the City's decision to implement a new use of force policy, which occurred after the November 2, 2022, incident. (Doc. 63, at 43, ¶ 349.) The City's decision to issue a new use of force policy is not relevant to whether the policy in place at the time of the incident involving Kirk was constitutional. Even if the prior policy

---

[5] To the extent Plaintiffs' *Monell* claim is premised on a failure to intervene, that claim was already dismissed. (Doc. 93, at 15.)

was constitutionally deficient, which it was not, the enactment of a new policy merely evidences a subsequent remedial measure, which cannot be used to establish liability. *See* Fed.R.Evid. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; [or] culpable conduct."). Plaintiffs must demonstrate that the policy in effect on November 2, 2022, was the moving force behind the alleged constitutional violation, namely, the alleged unconstitutional use of deadly force against Kirk. Defendant Roy, Garza, and Ladines actions were not the biproduct of the City's use of force policy, but rather Kirk's own conduct on the date of the incident. In fact, Plaintiffs' own allegations concede that the City's "Operation Orders advise officers on the use of de-escalation techniques in situations where objectively no lethal force is warranted." (Doc. 63, at 43, ¶ 344.) Plaintiff further alleges that "the customs and practices of the City, the Phoenix Police Department, and Sullivan show that the de-escalation and use of non-lethal force is not enforced through written policy but established and ratified by custom and practice. (*Id.* at ¶ 347.) In other words, Plaintiffs in effect concede that the City did not have a policy in place that was the moving force behind the alleged constitutional violation, and thus, Plaintiffs cannot demonstrate the existence of a policy as mandated by *Monell*.

### b.    The DOJ Investigation and Subsequent Report

Without a policy to support the *Monell* claim, Defendants anticipate that Plaintiffs will rely on the DOJ's investigation and report to establish the existence of a custom or practice regarding the improper use of deadly force. (*Id.* at ¶¶ 57-85.) The DOJ report was rescinded and contains unsubstantiated hearsay. (SOF ¶ 36.) Therefore, the DOJ investigation and report cannot be used to establish the existence of a custom or practice of using excessive force. In fact, this Court has recently addressed this issue in a case in which plaintiffs sought to add *Monell* claims. *See*, *e.g., Gerow v. U.S. Dep't of Just.*, No. CV-23-01059-PHX-DGC, 2024 WL 4528167, at *4 (D. Ariz. Oct. 17, 2024). This Court held declined to permit a plaintiff to

add a *Monell* claim against the City because in order to use the DOJ report to establish the existence of a custom or practice, a plaintiff must "point to any finding in the DOJ report that relates to the specific claims" maintained in a complaint. *Id.* Defendants anticipate that Plaintiffs will attempt to highlight portions of the DOJ report that are supposedly similar to the incident involving Kirk. Defendants will address any such argument in their Reply; however, the rescinded DOJ report does not contain sufficiently similar instances to the incident involving Kirk to establish the existence of a custom or practice. Therefore, as argued below, Plaintiffs must produce competent evidence of similar instances of excessive force deployed by Defendants Roy, Garza, and Ladines for the *Monell* claim to survive.

### c.  **Prior Events**

Without the USDOJ report to lean on, Plaintiffs' last lifeline for their *Monell* claim is to rely on past incidents of deadly force deployed by the individual Defendants. Plaintiff lacks any evidence to establish that Ladines or Garza had prior instances of using excessive force. (SOF ¶ 37.) Likewise, Plaintiff has no evidence to establish the existence of a custom or practice of using excessive force based on Roy's prior conduct. While Defendant Roy utilized deadly force in three prior incidents,[6] these incidents do not establish a custom or practice for several reasons. First, none of these prior instances of using lethal force were found to be unconstitutional; all three were investigated and found to be within policy. Second, none of the prior incidents are sufficiently similar to the present incident. Two (2) of the incidents involved using lethal force to neutralize a suspect who was actively firing rounds at police officers and the third incident involved a suspect who was fleeing from police, and reached

---

[6] In mid-April of 2013, Defendant Roy, along with many other officers, returned gunfire when a suspect, who was barricaded in his home, fired over 200+ rounds at Phoenix officers. (SOF ¶ 38.) In mid-April of 2018, Defendant Roy, also along with other officers, used deadly force to respond to another suspect, who was engaged in a gun fight with police. (SOF ¶ 39.) On August 18, 2018, Defendant Roy deployed deadly force to neutralize a suspect who was fleeing from officers and reached for a firearm in his waistband before being shot by Defendant Roy. (SOF ¶ 40.)

for a gun directly in front of Defendant Roy. Third, even if the Court was inclined to consider the third incident as somewhat similar to the present case, it is well established that one (1) or two (2) sporadic incidents are insufficient to establish a custom or practice under *Monell*.

Even if the Court determined that a constitutional violation occurred regarding Roy, Garza, or Ladines use of deadly force, which is not the case, Plaintiffs lack a legal or factual basis to support their *Monell* claim. If the only evidence needed to support a *Monell* claim was other incidents involving the ***justified*** use of deadly force, then every claimant could survive summary judgment simply because officers used constitutionally permitted force in the line of duty. This is precisely why establishing a custom or practice pursuant to *Monell* requires repeated, related violations of a sufficient duration.

## VII.  LEGAL ARGUMENT: PLAINTIFFS' GROSS NEGLIGENCE CLAIM FAILS BECAUSE ARIZONA DOES NOT RECOGNIZE A NEGLIGENT USE OF INTENTIONALLY INFLICTED FORCE THEORY OF LIABILITY

Plaintiffs' gross negligence claim against the City, which is premised on vicarious liability for its police officers conduct, rests upon two theories. First, Plaintiffs maintain that Defendants Roy, Garza, Ladines willful use of excessive force "was grossly negligent." Comp. ¶¶ 362, 366-68. Second, Plaintiffs maintain that the remaining Defendants failed to intervene. Both theories fail to establish vicarious liability. The second theory fails because the Court dismissed the failure to intervene claim. The first theory fails because, as recently recognized by the Supreme Court of Arizona, there is no "cognizable claim" for "negligent use of intentionally inflicted force." *Ryan v. Napier*, 245 Ariz. 54, 60, 425 P.3d 230, 237 (2018) (citing Dan B. Dobbs et al., *The Law of Torts* § 31 (2d. ed. 2011) ("As the saying goes, there is no such thing as a negligent battery.") In other words, the City cannot be held liable under a theory of vicarious liability for Plaintiff's excessive force claim, which under Arizona law, does not sound in negligence.

## VIII.  LEGAL ARGUMENT: PLAINTIFFS LACK EVIDENCE TO SUPPORT THEIR NEGLIGENT TRAINING CLAIM

To "prevail on a negligent training claim, a plaintiff must show a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of a plaintiff's injuries." *Guerra v. State*, 234 Ariz. 482, 323 P.3d 765, 772 (Ariz. Ct. App. 2014), *vacated on other grounds*, 237 Ariz. 183, 348 P.3d 423 (2015). Importantly, "[a] showing of an employee's incompetence is not necessarily enough; the plaintiff must also present evidence showing what training should have been provided, and that its omission proximately caused the plaintiff's injuries." *Id.* at 772-73. Moreover, because Plaintiffs' negligent training claim is brought under Arizona law (Doc. 63, at 47, ¶ 383), Plaintiffs must demonstrate that the alleged failure to train amounts to gross negligence. *See* A.R.S. § 12-820.02(A) (requiring a showing of intentional misconduct or gross negligence to overcome qualified immunity); *Smyser v. City of Peoria*, 215 Ariz. 428, 160 P.3d 1186 (App. 2007) (recognizing that a lack of evidence to support a finding of intentional misconduct or gross negligence meant that the City of Peoria was entitled to qualified immunity); *Singh v. City of Phoenix*, CV-21-00099-PHX-JJT, 2025 WL 1677569, at *6 (D. Ariz. June 13, 2025) (dismissing a negligent hiring, training, supervision, and retention claim based on "Arizona's common-law doctrine of qualified immunity.")

Here, Plaintiff's negligent hiring, supervision, retention, and/or training claim fails to allege gross negligence (*see* Doc. 63, at 49, ¶ 386), and thus, the City and Sullivan are entitled to qualified immunity under State law and summary judgment on this claim. Even if Plaintiffs seek to recast this claim as one for gross negligence. Plaintiffs lack any competent evidence about what additional training, if any, the City should have provided. Absent such evidence, this claim cannot survive summary judgment. It is also undisputed that Defendants Roy, Garza, and Ladines received extensive training (SOF ¶ 41), thus completely undermining Plaintiffs' failure to train theory. Despite this pitfall, Plaintiffs allege that the City and Sullivan failed to implement suggestions stemming from the United States Department of Justice's investigation into the Phoenix Police to increase the use of de-escalation techniques and

decrease the use of deadly force. (Doc. 63, at 48, ¶¶ 390-93.) As argued above, the USDOJ's hearsay report was rescinded. Even if the Court was inclined to consider the report as evidence of a failure to train, Plaintiffs must reference specific portions of the report that establishes a causal link between any purported failure to train to the incident involving Kirk. Plaintiffs' speculative and factually unsupported claims regarding a failure to train are insufficient to survive summary judgment, especially considering that Plaintiffs' claim is premised on a garden variety negligence claim that the City and Sullivan are shielded from via State law.

## IX.    LEGAL ARGUMENT: PLAINTIFFS' PUNITIVE DAMAGES CLAIM FAILS

Earlier in this litigation, Plaintiffs conceded that there is not a basis to seek punitive damages against the City and Sullivan. (Doc. 93, at 6:25-6:12.) Therefore, the sole basis to recover punitive damages rests with Plaintiffs' excessive force claims against Roy, Garza, and Ladines. Because these claims fail, Plaintiffs are not entitled to punitive damages.

## X.    LEGAL ARGUMENT: PLAINTIFF CANNOT ESTABLISH THAT HIS DEATH WAS CAUSED BY ANY ALLEGED FAILURE TO PROVIDE IMMEDIATE MEDICAL ATTENTION

Similarly, the City cannot be held liable for the failure to render medical aid without evidence that the failure to render aid was pursuant to a city policy or custom. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 & n. 8, 109 S.Ct. 1197 (1989). A municipality "cannot be liable under a *respondeat superior* theory." *Long v. City & Cnty. of Honolulu*, 511 F.3d 901 (9th Cir. 2007) (emphasis in original); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018 (1978).

Here, Plaintiffs maintain that Defendants "should have provided immediate and potential life-saving medical care" and that this alleged failure to render immediate medical care was the direct and proximate cause of the injuries for which Plaintiffs' seek recovery. (Doc. 63, at 46, ¶¶ 375, 380.) Plaintiffs do not allege that the purported failure to render medical aid was the result of a policy, custom, or practice. Even if Plaintiffs could produce evidence of such a policy, custom, or practice, Plaintiffs' failure to render medical aid theory

fails because Plaintiffs lack evidence to establish causation.

To survive summary judgment, Plaintiffs must provide evidence that the alleged failure to render immediate medical aid was the proximate cause of Plaintiffs' death. A medical expert's opinion on whether immediate medical aid would have saved Kirk's life is quintessential to Plaintiffs' failure to render immediate medical aid theory of liability. Plaintiffs have no medical/causation expert. Accordingly, Plaintiffs cannot demonstrate that the earlier administration of medical attention would have resulted in a different outcome. Without an expert, the jury would be left to speculate on whether the earlier administration of medical aid would have altered the ultimate outcome. Therefore, any theory of liability premised on a failure to render immediate medical aid cannot survive summary judgment.

## XI. LEGAL ARGUMENT: PLAINTIFFS' WRONGFUL DEATH AND SURVIVAL ACTION FAIL BECAUSE NONE OF THEIR CLAIMS SURVIVE SUMMARY JUDGMENT

Plaintiff's wrongful death and survival action (Count I) is premised on the alleged excessive force, failure to intervene, and vicarious liability claims. (Doc. 63, at 40, ¶¶ 314-315.) The Court dismissed Plaintiff's failure to intervene claim. (Doc. 93, at 15.) Because the excessive force and vicarious liability claims fail for the reasons argued above, Plaintiff's wrongful death and survival action also fails.

## XII. LEGAL ARGUMENT: RIGHT TO FAMILIAL RELATION CLAIM FAILS

To the extent Plaintiffs' 14th Amendment claim is premised on a right to familial relationship theory of recover, there must be a genuine dispute of material fact as to whether the officers engaged in conduct that "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation" (citation omitted)). The first consideration is "whether the circumstances are such that 'actual deliberation is practical.' " *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (citation omitted). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the

conscience." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citing *Moreland*, 159 F.3d at 372). If the officers "did not have time to deliberate, a use of force shocks the conscience only if the officers had a 'purpose to harm' the decedent for reasons unrelated to legitimate law enforcement objections." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) (citing *Porter*, 546 F.3d at 1137). There is no time for actual deliberation, for example, when "a law enforcement officer makes a snap judgment because of an escalating situation." *Wilkinson*, 610 F.3d at 554.

Here, under the gross negligence claim against the City, Plaintiffs seemingly make a passing reference to a potential damages claim for right to familial relations. (Doc. 63, at 46, ¶ 380.) Whether this claim is analyzed under the "shock the conscience" or "purpose to harm" standard does not matter. Defendants Roy, Garza, and Ladines' use of deadly force was reasonable considering the circumstances. Moreover, their actions are entitled to qualified immunity. Therefore, Plaintiffs cannot pursue damages on a right to familial relations theory.

## XIII. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss all of Plaintiffs' remaining claims with prejudice and award Defendants their costs and fees.

RESPECTFULLY SUBMITTED this 28th day of January, 2026.

BROENING OBERG WOODS & WILSON, P.C.

By  */s/ Jeremiah M. Sullivan*
Sarah L. Barnes
Kelley M. Jancaitis
Jeremiah M. Sullivan
*Attorneys for Defendants City of Phoenix,*
*Sullivan, Ladines, Garza, and Roy*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2026, I electronically filed the foregoing with the Clerk's Office using the CM/ECF system for filing, and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Sean A. Woods
Robert T. Mills
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

/s/ Kathy Lake