# EXHIBIT R

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

---

|  |  |  |
|---|---|---|
| Kashane Kirk, as Personal Representative and on behalf of the Estate of Leontae Kirk, *et al.,* | : : : | No. CV-23-00836-PHX-MTL(CDB) |
| Plaintiffs, | : | |
| vs. | : | |
| City of Phoenix, *et al.*, | : | |
| Defendants. | : : | Report of Ken Wallentine |

---

The following report of Ken Wallentine is submitted after reviewing the following documents, pleadings, records, and reports:

Plaintiff's Third Amended Complaint

Phoenix Police Department Incident Report no. 2022-1649049 and associated supplemental reports

Phoenix Police Department photos

JR's Cellular store enhanced video

JR's Cellular store Camera 5 video

Body worn camera video recordings from Sergeant Eric Roy, Officers Antonio Garza, Autumn Ladines, and Jaclyn Ravelo

Maricopa County Attorney letter

City of Phoenix Internal Investigation SH22-0022

Deposition transcripts of Sergeants Eric Roy and Jonathan Howard, Officers Jaclyn Ravelo, Steven Ramirez, and Autumn Ladines

Phoenix Police Department dispatch audio files

Phoenix Police Department Critical Incident Briefing Video

Mark Hafkey opinion


Kenneth R. Wallentine states as follows:

I.      In the instant matter I have relied upon the documents, pleadings, records, photographs, videos, reports, and statements previously described.  I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional standards, accepted law enforcement practices, actions, inactions, tactics, or techniques that are used with a degree of consistency, and professional publications.  I understand that police practices experts are generally prohibited from intruding upon the Court's role as stating the applicable law and instructing the jury on the law, or the trier of fact's role in determining the facts.  My statements are intended to provide background and explanation as to how officers are trained, instructed, guided, evaluated, and held accountable in their actions or inactions in performance of their duties, and how I have instructed and evaluated officers.

My opinions expressed in this report are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty within contemporary standard law enforcement practice, considering potentially case-relevant current law enforcement guidance and accountability standards.  Opinions herein were developed using one or more qualitative and/or quantitative research methodologies, in addition to my knowledge, skill, experience, training, education, and/or review of literature.  My methodology and processes are consistent with scientific methodologies and experiential-based practices for conducting analyses of such incidents.  A summary of my opinions, and a brief summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows.

**Abbreviated summary of reported events:**

On the afternoon of November 2, 2022, Pedro Everardo Hernandez Armenta called the Phoenix Police Department and stated that a man–subsequently identified as Leontae Kaameech Kirk–approached him, pulled out a gun, and pointed the gun at him and his two small children (Kirk 001568 at 00:39).  Kirk confronted Armenta and said, "Who the fuck you think you are, homie?  This is L.A.  My uncle's Snoop Dog" (Kirk 000143).  Kirk told Armenta that there was "one in the chamber," he "was not afraid to use it," and "I'll shoot your ass right now" (Kirk 001568 at 00:55, Kirk 000143).  Armenta also reported that Kirk was on felony probation and appeared to be a drug addict[1] (Kirk 001568 at 01:43, Kirk 000143).  Armenta described Kirk as a black male, wearing an LA hat, a red hoodie sweatshirt, and dark colored shorts (Kirk 000004).

Armenta tried to calm Kirk, telling him that he had a wife and kids.  Kirk responded, "Fuck your wife, fuck your kids" (Kirk 000144).  Armenta's uncle, Jorge Gomez Rojas, owns the barber shop in the strip mall at 3710 West McDowell Road.  The strip mall consists of Rojas's barber shop, JR's Cellular store, Grand Stop convenience and liquor store, and Regal Laundromat.  Rojas had just walked out of his barber shop and was near Armenta as Kirk confronted him.  During Armenta's call to 911, Rojas was video recording the confrontation with his mobile phone (Kirk 000088).  Armenta walked back to his vehicle which was parked in front of Rojas's home on North 37th Avenue. As Armenta walked away he heard gun fire (Kirk 000144).  Armenta got into his car with his family and drove away to be out of the range of the gun fire.  As he drove away, a Phoenix Police Department officer drove up to the scene.

A Phoenix Police Department helicopter piloted by Flight Sergeant Jonathan Howard and carrying Flight Officer Steven Ramirez arrived overhead approximately one minute after the call

---

[1] In addition to Armenta's observation, Humberto Gonzales-Rios also reported that Kirk appeared to be "on drugs or drunk" (Kirk 000140).  Another witness, Michael Badilla, reported that Kirk "appeared to be under the influence of drugs or some kind of substance due to [his] eyes being glazed over" (Kirk 000108).  Post-mortem toxicology tests revealed both tetrahydrocannabinol compounds in Kirk's blood and a blood alcohol level of .234 g/100 mL (Kirk 000014).

WALLENTINE 000009

was dispatched to patrol units. At approximately 4:29:27 p.m., the helicopter crew broadcast that Kirk was shooting his gun toward victims in front of the strip mall (Kirk 001567 at 00:02:31-00:04:30, Kirk 000004). Flight Officer Steven Ramirez saw Kirk "produce a black handgun and began pointing it in the direction of the crowd of people and doing what appeared to me to be firing actions and motions from the gun" (Ramirez depo. p. 16). Flight Sergeant Jonathan Howard saw Kirk in "what was pretty clear to be a shooting stance. I saw what appeared to be like handgun recoil. And then I saw what appeared to be him, you know, looking around a handgun or dodging bullets" (Howard depo. pp. 16, 26).

Sergeant Eric Roy, Officers Autumn Ladines, Jaclyn Ravelo, and Antonio Garza were the first responding officers to the 911 call about Kirk threatening with his gun. Officers Ladines and Ravelo, riding together in a patrol vehicle with emergency lights and siren turned on (Ladines depo. p. 14), arrived approximately two and one-half minutes later at approximately 4:29:46 p.m. Officer Ladines went to the southwest corner of the strip mall parking lot and Officer Ravelo ran to the east (see diagram below). Officer Garza arrived at approximately 4:29:46 p.m. and took a position near Officer Ladines. A few seconds later, Sergeant Roy arrived near the north end of the strip mall, at approximately 4:29:50 p.m., at the sidewalk running parallel to the store fronts.



WALLENTINE 000010

The officers were unaware that, in addition to aiming his gun at Armenta, his children, and other persons, Kirk had argued with Humberto Gonzalez-Rios prior to the officers' arrival. Gonzalez-Rios saw Kirk in the alley behind the strip mall, placing his gun in his pocket as he spoke to a woman and called her a "bitch" (Kirk 000139). Shortly thereafter, Gonzalez-Rios encountered Kirk in the liquor store. As Kirk and Gonzalez-Rios waited in line inside the liquor store, Kirk insulted Gonzalez-Rios. Gonzalez-Rios went outside to his motorcycle and retrieved a gun. Gonzalez-Rios manipulated the slide on the Ruger automatic pistol, intending to frighten Kirk (Kirk 000139). The officers also did not know that just moments before their arrival Kirk had used his gun to threaten Gustavo Corte Pichon and another man (Kirk 000137, 000123). Over the course of a few minutes, Kirk had accosted 11 people with his gun (Kirk 000007).

Officer Ladines saw Kirk "actively shooting in the direction of an occupied building, committing aggravated assault" (Kirk 000041, Ladines depo. pp. 11, 17). She heard the helicopter crew broadcast that Kirk was "pointing a gun at people. Now he's shooting in the parking lot" (Kirk 000008, Ladines depo. p. 25). She also saw several people around the stores in the strip mall (Kirk 000004). Officer Ladines stated that she believed Kirk aimed his gun at her during initial contact, and believed Kirk fired at officers (Kirk 000041, 000005). Officer Ladines perceived that Kirk fired three to five shots (Kirk 000041).

Officer Ladines saw Kirk's hand moving up and down in what she perceived to be the recoil action from Kirk's handgun as he fired at an occupied store (Kirk 000004, 000009, Ladines depo. p. 14).[2] Officer Ladines fired four rounds at Kirk from her Glock 9mm handgun from approximately 62 feet from Kirk at approximately 4:29:50 p.m. (Kirk 000004-005). Officer Ravelo shouted at Kirk, "Stop! Stop! Stop! Stop! Phoenix Police. Put your hands up now" (Kirk 001556 at 16:29:59-16:30:09), followed by "Phoenix Police. Put your hands up now" (Kirk

---

[2]  Though multiple officers perceived that Kirk was firing his weapon and saw Kirk's physical movements consistent with firing and experiencing recoil forces (Kirk 000040-042, 000090), and despite several victims reporting that Kirk had fired his gun at them (Kirk 000012, 000087-088, 000109, 000113, 000135, 000140), the investigation did not support a finding that Kirk actually fired.

001556 at 16:30:12), and "Hey! Drop the gun! Phoenix Police, drop the gun!" (Kirk 001556 at 16:30:28). Officer Ladines believed that she had also shouted at Kirk to stop (Kirk 000041).

As Officer Garza got out of his patrol vehicle with his rifle, he saw Kirk standing in the middle of the parking lot holding his gun in one hand and pointing and shooting his weapon toward the occupied businesses (Kirk 000005). Officer Garza heard gunshots simultaneously with seeing Kirk's hands move up and down, "as if the gun was cycling and recoiling while he was walking" (Kirk 000011). After Officer Ladines fired at Kirk, Officer Garza moved to the east and south of a half-height block wall. Near simultaneously with Sergeant Roy's shots, Officer Garza fired three rounds from his Daniel Defense .223 caliber rifle at Kirk from an approximate distance of 48 feet at approximately 4:30:04 p.m.

As he drove up to the strip mall, Sergeant Roy saw Kirk pointing his gun into one of the businesses (Roy depo. pp. 120-121). From his vantage point at the west end of the strip mall, Sergeant Roy saw Kirk crouch between the parked cars and the storefronts, facing south toward Officers Ladines, Ravelo, and Garza (Kirk 000005, Roy depo. p. 120). Sergeant Roy "clearly saw [Kirk's] gun pointing ... towards the stores" (Kirk 000013). Sergeant Roy perceived that Kirk's movement, pattern, and posture were consistent with a person moving towards cover (Kirk 000014, Roy depo. p. 146). Sergeant Roy believed Kirk intended to use the cover of the parked cars to create a tactical advantage and to fire upon the officers south of him (Kirk 000005, 000013, Roy depo. pp. 155-156, 158).

Kirk slid backwards on his buttocks toward the strip mall front exterior wall, at the same time extending his arm toward Officers Ladines, Ravelo, and Garza (Kirk 000005). Though Sergeant Roy could not see Kirk's gun, Kirk's body language and positioning led him to believe Kirk was still armed with his gun (Kirk 000005, 000014). Sergeant Roy fired 17 rounds from his Glock 9mm handgun at approximately 4:30:01 p.m. (Kirk 000006).

After Officer Garza fired his rifle at Kirk, Officers Ladines and Ravelo joined him behind the short block wall. Kirk was still moving his hands around his waistband (Ladines depo. p.

33).  It appeared that Kirk's gun might be underneath him (Kirk 000006), though Officer Ladines found it underneath a nearby car a few moments later (Kirk 000010).  Officer Ladines used a 40mm foam impact projectile launcher to fire a single impact projectile at Kirk to help ascertain that he was not feigning an inability to renew an attack (Kirk 000006).  When Kirk did not respond to the impact projectile strike, the officers approached him and rendered medical aid until the Phoenix Fire Department medics arrived and pronounced him deceased (Kirk 000006).

**Discussion and opinions:**

a.    **The force used by Officer Ladines was consistent with the actions of a reasonable and properly trained officer and was consistent with accepted law enforcement policies, practices, and training.**

1.    From the moment that Officer Ladines arrived at the strip mall she saw Kirk "actively shooting in the direction of an occupied building, committing aggravated assault" (Kirk 000041, Ladines depo. pp. 11, 17).  Her visual observation included seeing Kirk's hand moving up and down in what she perceived to be the recoil action from Kirk's handgun as he fired at an occupied store (Kirk 000004, 000009, Ladines depo. p. 14).  Any experienced handgun shooter is familiar with the recoil force created by firing the handgun and the consequential physical reactive movement of the hand and arm holding the gun.[3]  Kirk was physically posturing and moving in a manner that was more pronounced than merely consistent with holding a gun in his hand but was highly probable to be firing the gun in his hand.  Officer Ladines was also informed by the helicopter crew broadcast that Kirk was "pointing a gun at people.  Now he's shooting in the

---

[3]  Even trained and experienced shooters experience the distinctive upward/downward arm and hand movement from the recoil force.  *See, e.g.,* Kirk 001553 at 16:30:01-16:30:05, Kirk 001554 at 16:30:04.

*Kirk, et al. v. City of Phoenix, et al.*
*Report of Kenneth R. Wallentine*                    7

parking lot" (Kirk 000008, Ladines depo. p. 25). Officer Ladines verified the helicopter crew report that there were people in the parking lot around the strip mall stores (Kirk 000004).

2.  Officer Ladines believed Kirk aimed his gun at her during initial contact, and she believed that Kirk fired three to five shots at the officers (Kirk 000041, 000005). She perceived an imminent deadly danger to the nearby public, the other officers at the strip mall, and to herself (Kirk 000009). When an officer is presented with a threat that the officer perceives as a critically consequential, substantial, and urgent threat, the officer is most likely to respond with a defensive action that the officer judges to be an appropriate response, based on the officer's training and experience.[4]

3.  The human survival system is predisposed to focus all its resources on responding to an imminent threat to the detriment of cognition or conscious thought and slower reasoned decision-making. Officers Ladine, Garza and Sergeant Roy each identified and comprehended the deadly threat posed by Kirk holding and pointing his handgun. As perception of a threat commences, vision narrows, and the brain's ability to evaluate the threat also diminishes. Dr. John Ratey, a Harvard Medical School professor of psychiatry, developed a reactionary response model to describe threat response. The model has three stages:

    (1) perceiving and assessing the threat,

    (2) formulating a response, and,

    (3) initiating a motor response.

---

[4] Dr. Gary Klein concludes that most officers faced with a dynamic and complex threat situation use a "recognition-primed decision." Gary Klein, *Sources of Power-How People Make Decisions*, MIT Press (1998).

WALLENTINE 000014

Each component must be sequentially processed in the brain, and the stages must align with the effects of cognition, sympathetic nervous system, and vision.[5] To react to a threat, an officer must first perceive a consequential threat, which will typically result from processing the perceived actions of the aggressor and then determining the appropriate response. The aggressor, however, will by then *already* have moved into the shorter response phase (e.g., raising, and aiming, and firing a gun), resulting in execution of the fundamental and well known scientific and human factors principle that *action always precedes and is faster than reaction*, often expressed succinctly as "*action beats reaction.*"[6] The greater the intensity of focus on a prior stimulus at the time of stimulus change, the longer it will take an officer to notice and respond to the change. A practical application of this core principle is that no human–not even a trained and experienced officer–would ever be able draw a gun (or even raise a drawn gun) and fire more quickly than a person with a gun pointed at them and finger pressed against the trigger.

4.    In the luxury of belated hindsight, no conclusive evidence established that Kirk was actually pulling the trigger and firing the gun as he moved about and made motions entirely consistent with firing the gun in his hand. Officer Ladines, Officer Garza, and Sergeant Roy were constrained to assess Kirk's actions, considering information relayed by dispatch and the helicopter crew, in extreme time compression. Applied research in human performance science assists in understanding officers' actions under stress and helps prevent the fallacy of holding officers to inhuman standards of performance. A broad collection of

---

[5] *A user's guide to the brain: Perception, attention and the four theatres of the brain.* Ratey, J. J. (2001), New York: Pantheon.

[6] Honig, A., & Lewinski, W., *A survey of the research on human factors related to lethal force encounters: Implications for law enforcement training, tactics, and testimony.* Law Enf. Executive Forum, 8, 129-152 (2008).

WALLENTINE 000015

human factors research demonstrates that visually observing a threat, cognitively processing and recognizing the threat (including assessing the intensity or level of the threat), and responding physically, under time pressure and stressful conditions, will typically require at least 0.5 to 0.75 seconds.[7]  Under stress, decision-making speed is reduced as is the ability to accurately cognitively process every detail of the threat.

5.    Officer Ladines, Officer Garza, and Sergeant Roy were each responding to an uncertain and rapidly evolving event in compressed time and with a significant amount of mental/emotional arousal stemming from the reports of Kirk's deadly threats and actions and their own observations of his behavior.  Each officer had an exceedingly narrow time for selecting and executing a defensive response.  A typical police officer would need at least 0.5 seconds to: (a) recognize the threat from Kirk; (b) decide how he or she could effectively respond to that threat; and, (c) physically respond/execute with his or her response decision.  An officer perceiving and interpreting a simple visual stimulus to initiate a motor program to fire a handgun typically requires slightly more than one-half second to fire the gun.[8]

---

[7]  I. E. Dror, *Perception of Risk and the Decision to Use Force*, Policing, January 2007; Lewinski, W. J., & Hudson, B. (2003).  *Time to start shooting? Time to stop shooting? The Tempe study*.  Police Marksman, 28(5); Lewinski & Redmann, *New Developments in Understanding the Behavioral Science Factors in the "Stop Shooting" Response*, Forensic Examiner; Springfield, Vol. 17, No. 4, (Winter 2008); Sharps & Hess, *Response and Interpretation of Response to Armed Assailants*, Forensic Examiner; Springfield Vol. 17, Issue 4 (Winter 2008).  Human performance researchers generally agree that reaction time increases with the complexity of the problem precipitating the reaction.  Brebner, J. T., & Welford, A. T. , *Introduction: A historical background sketch,* in A. T. Welford (Ed.), *Reaction times* (1980) (pp.1-23). New York, NY: Academic Press; Luce, R. D., *Response times: Their role in inferring elementary mental organization*.  New York, NY: Oxford University Press (1986).

[8]  Lewinski, W.J., Hudson, W.B., Dysterheft, J.L., 2014.  *Police Officer Reaction Time to Start and Stop Shooting: The Influence of Decision-Making and Pattern Recognition*.  Law Enforcement Executive Forum, October, 14(2), 7, 9 (measuring the duration of time between the onset of visual stimulus to fire and the point that the officer began to move the trigger in response, with a mean of 0.56s and a standard deviation of ± 0.08s).  It is important to note that this baseline study was conducted in laboratory conditions that did not attempt to incorporate stressors inducing test officers' emotional arousal.  Arousal level is critical to perception,

*Kirk, et al. v. City of Phoenix, et al.*
*Report of Kenneth R. Wallentine*                                    10

6.      Officer Ladines was attending to the deadly threat before her.  Her attentional focus–as she perceived that Kirk was pointing a gun at her and others–was on the substantial and urgent threat of being shot and killed.  She did not see, for example, Gonzalez-Rios retrieve a gun from his motorcycle (Ladines depo. p. 31).  Nor did she realize that she had not activated her body worn camera (Ladines depo. p. 44).  An officer assesses the relative importance of each cue or action as essential, or not, to their basic survival.[9]  This phenomenon is known as selective attention.  The eye and the brain work in coordination to attend to the information most important to survival at that moment.  As an officer's (or anyone's) level of stress increases and/or the task becomes more complex, the brain automatically narrows the individual's focus and excludes and then suppresses information that is deemed not important to managing the stressor.  Attention in particular focuses on the areas of the expected hazard at the expense of awareness toward less likely hazards.[10]  If this selective attention can occur under even the most mundane, low-stress conditions, its effect under high-stress conditions in which the officer's life or the life of someone else (in this case the lives of those around the strip mall, including other officers) is "on the line" is understandably increased.

7.      Officer Ladines "fired at [Kirk] to stop the threat" (Ladines depo. p. 12).  Officer Ladines fired four rounds at Kirk from her Glock 9mm handgun from approximately 62 feet from Kirk at approximately 4:29:50 p.m. (Kirk 000004-005).  Officer Ladines fired her weapon at Kirk in response to her fear that Kirk was trying to kill her, the public at the strip mall, and the other officers present.  She fired at the side of Kirk's torso because he had turned and she perceived that

---

response time, and performance.

[9]  Shomstein & Yantis, *Control of Attention Shifts Between Vision and Audition in Human Cortex*, Journal of Neuroscience, November 2004, 24(47):10702-10706.

[10]  Rumar, *The basic driver error: late detection*, Ergonomics 33:10-11, 1281-1290 (1990).

*Kirk, et al. v. City of Phoenix, et al.*
*Report of Kenneth R. Wallentine*                                   11

Kirk "was facing away from me and shooting at community members" (Kirk 000009, Ladines depo. pp. 24, 25). Officer Ladines could see that the vehicle immediately behind Kirk was unoccupied and she used that as a reasonably safe backstop (Kirk 000008).

8.    Based on the accounts of the incident and based upon the collective data available to me, it is my opinion that when considering the facts known and reasonably believed by Officer Ladines, a reasonable and properly trained officer would conclude that her life and the lives of the persons around her were in immediate peril from being shot by Kirk. A reasonable and properly trained officer would shoot at Kirk to stop him in an act of defensive force. Officer Ladines' use of defensive deadly force aimed at Kirk was consistent with accepted law enforcement practices, policies, and training, and was consistent with the actions of reasonable and properly trained officers.

9.    After the officers fired at Kirk and he was seated in front of the strip mall, he was still moving his hands around his waistband (Ladines depo. p. 33). The officers feared that Kirk might have access to his gun, and it might be underneath him (Kirk 000006). Officer Ladines used a 40mm foam impact projectile launcher to fire a single impact projectile at Kirk to see whether he would respond to being struck by an impact projectile in order to assess whether he was still able to attack (Kirk 000006). When Kirk did not respond to the impact projectile strike, the officers approached him in a line from behind a ballistic shield carried by Officer Morgan Traylor (Kirk 000106). It is my opinion that the use of the impact projectile launcher to fire a single less-lethal foam impact projectile at Kirk, in an effort to assess his ability to attack and/or prompt him to surrender his weapon, was consistent with accepted police practices, policies, and training, and was consistent with the actions of reasonable and properly trained police officers.

10. Mr. Hafkey opines that the officers' use of force against Kirk was "unreasonable under the Fourth Amendment" (Hafkey report ¶ 1). I do not intend to opine on the legal conclusion. I disagree with Mr. Hafkey's opinion that a "series of Phoenix police officer errors led to the wrongful death of Leontae Kirk" (Hafkey report ¶ 1). The bases for my rebuttal of Mr. Hafkey's opinions are contained herein.

11. It is my opinion that Officer Ladines acted consistently with the actions of a reasonable and properly trained law enforcement officer, and she acted consistently with constitutional requirements and police practices as commonly taught to and practiced by law enforcement officers.

b. **The force used by Officer Garza was consistent with the actions of a reasonable and properly trained officer and was consistent with accepted law enforcement policies, practices, and training.**

1. Officer Garza heard the emergency alert tone broadcast in connection to the 911 emergency call made by Armenta. As he drove to the strip mall, he heard the radio broadcast from the helicopter crew, "The suspect was in the parking lot shooting at people" (Kirk 000011). Officer Garza heard the dispatcher broadcast, "There was a male that was pointing a gun and shooting at people and that one of the victims was with his two kids" (Kirk 000011).

2. As Officer Garza got out of his patrol vehicle with his rifle, he saw Kirk standing in the middle of the parking lot holding his gun in his right hand and shooting his weapon toward the laundromat or cell phone store (Kirk 000005, 000011). Officer Garza heard gunshots simultaneously with seeing Kirk's hands move up and down, "as if the gun was cycling and recoiling while he was walking" (Kirk 000011). Officer Garza believed there were people inside the strip mall businesses because the event was during business hours and there were several vehicles in the parking lot (Kirk 000011).

3.      Officer Garza ran eastbound along the sidewalk, intending to intercept Kirk and stop Kirk from going into one of the strip mall businesses.  Officer Garza heard more gunfire as he ran, prompting him to stop running and take cover behind the short block wall that ran parallel to most of the city sidewalk (Kirk 000011). Officer Garza saw Kirk crouch down on the concrete sidewalk in front of the brick wall of JR's Cellular store front (Kirk 000011, Kirk 1554 at 16:30:02).

4.      Officer Garza perceived that Kirk had fired northeast where there was almost certainly multiple customers (Kirk 000042).  He told investigators that he feared Kirk going into stores where there were customers, while still armed with his handgun (Kirk 000012).  "My main concern was that we needed to stop him from getting inside the stores because he was just shooting at people ... couldn't see his hands and he was still running away from us ... that's why I shot him" (Kirk 000012).[11]

5.      Shortly after Officer Ladines's shots and nearly simultaneous with Sergeant Roy's initial shots, Officer Garza fired three rounds from his Daniel Defense .223 caliber rifle at Kirk from an approximate distance of 48 feet (Kirk 1554 at 16:30:04). Officer Garza could see that there was a full height solid brick wall immediately behind Kirk, constituting a safe backstop and that there were no other people in his line of fire (Kirk 000011, Kirk 001554 at 16:30:04).

6.      Based on the accounts of the incident and based upon the collective data available to me, it is my opinion that when considering the facts known and reasonably believed by Officer Garza, a reasonable and properly trained officer would conclude that his life and the lives of the people around him were in immediate peril from being shot by Kirk.  A reasonable and properly trained officer would

---

[11]  Each of the elements of time compression, response time factors, and selective attention addressed in paragraphs a.3 through a.6 above are applicable to the constraints under which Officer Garza acted in assessing the threat presented by Kirk, choosing a response, and executing the response.

shoot at Kirk to stop him in an act of defensive force.  Officer Garza's use of defensive deadly force aimed at Kirk was consistent with accepted law enforcement practices, policies, and training, and was consistent with the actions of reasonable and properly trained officers.  It is my opinion that Officer Garza acted consistently with constitutional requirements and police practices as commonly taught to and practiced by law enforcement officers.

c.     **The force used by Sergeant Roy was consistent with the actions of a reasonable and properly trained officer and was consistent with accepted law enforcement policies, practices, and training.**

1.     As Sergeant Roy was en route to the strip mall, he heard the broadcast from the helicopter crew that Kirk was in the parking lot and had a gun (Kirk 000043). Sergeant Roy saw Kirk armed with his handgun when he drove up to the strip mall (Kirk 000043).  Sergeant Roy saw Kirk pointing his gun into one of the businesses (Roy depo. pp. 120-121).  From his vantage point at the west end of the strip mall, Sergeant Roy saw Kirk crouch between the parked cars and the storefronts, facing south toward Officers Ladines, Ravelo, and Garza (Kirk 000005, Roy depo. p. 120).

2.     Sergeant Roy "clearly saw [Kirk's] gun pointing ... towards the stores" (Kirk 000013), though he did not see Kirk fire his gun (Kirk 000005).  Sergeant Roy perceived that Kirk's movement, pattern, and posture were consistent with a person moving towards cover (Kirk 000014, Roy depo. p. 146).  Sergeant Roy believed Kirk intended to use the cover of the parked cars to create a tactical advantage and to fire upon the officers south of him (Kirk 000005, 000013, Roy depo. pp. 155-156, 158).[12]

---

[12]  Sergeant Roy was unaware of the actions of Gonzalez-Rios holding and manipulating a gun (Roy depo. p. 149).  The element of selective attention, as well as each of the elements of time compression and response time factors addressed in paragraphs a.4 through a.6 above are applicable to the constraints under which Sergeant Roy acted in assessing the threat presented by

3.  As Kirk sat and slid backwards on his buttocks toward the strip mall's front brick wall, Sergeant Roy could no longer see Kirk's gun in his hand. However, Kirk's body language and positioning led him to believe Kirk was still armed with his gun (Kirk 000005, 000014), as he was extending his arm toward Officers Ladines, Ravelo, and Garza, consistent with a firing position (Kirk 000005). Sergeant Roy believed that "it was reasonable for me to assume he was still armed" (Roy depo. p. 146).

4.  Perceiving that Kirk was shooting at the officers in front of the strip mall (Roy depo. pp. 155-156), and fearing for their safety (Kirk 000043), Sergeant Roy fired 17 rounds from his Glock 9mm handgun (Kirk 000006, Kirk 001553 at 16:30:01-16:30:05). Sergeant Roy could see that there were no other people in his line of fire and there was an adequate backstop in the car dealership across the street east of North 37th Avenue (Kirk 000013).

5.  Sergeant Roy appears to have fired the final shot (Kirk 1554 at 16:30:06), trailing Officer Garza's final shot by just two seconds. Sergeant Roy and the other officers stopped shooting when they perceived that the immediate threat was at least mitigated. It takes time to observe, orient, decide, and act, just as it takes time to observe, orient, decide, and *stop* acting.[13] Each officer's use of defensive deadly force to stop Kirk's aggression was reasonable and consistent with generally accepted police training, policies, and practices.

---

Kirk, choosing a response, and executing the response.

[13] That's why we have yellow lights on traffic control signals. It takes a driver (who expects to be braking) 0.70 to 0.75 seconds from the stopping signal to when the driver begins braking (commonly expressed as "reaction time"). Drivers not expecting to brake have an average reaction time of over 1.50 seconds (drivers receiving multiple distracting sensory inputs have an even longer reaction time). *See* Dysterheft, J., Hudson, W., Lewinski, W., *Police officer reaction time to start and stop shooting: The influence of decision-making and pattern recognition*, Law Enforcement Executive Forum. 2014;14 (2008).

6.      Based on the accounts of the incident and based upon the collective data available to me, it is my opinion that when considering the facts known and reasonably believed by Sergeant Roy, a reasonable and properly trained officer would conclude that his life and the lives of the people around him were in immediate peril from being shot by Kirk.  A reasonable and properly trained officer would shoot at Kirk to stop him in an act of defensive force.  Sergeant Roy's use of defensive deadly force aimed at Kirk was consistent with accepted law enforcement practices, policies, and training, and was consistent with the actions of reasonable and properly trained officers.  It is my opinion that Sergeant Roy acted consistently with constitutional requirements and police practices as commonly taught to and practiced by law enforcement officers.

d.  **The Phoenix Police Department Officers' actions to intervene during the incident were reasonable and consistent with accepted police training and practices.**

1.      Police officers are taught that the duty of an officer to intervene in the use of excessive force by another officer generally requires that:

   a.      An officer is using or is about to use excessive force,

   b.      A second officer is in a position to know that the first officer was using or was about to use excessive force, and,

   c.      The second officer had a realistic opportunity to intervene and to take reasonable action.

2.      An officer has a duty to intervene and to take reasonable steps to protect a person from another officer's use of excessive force.  Whether a duty to intervene is evident in a particular event must be considered in light of whether apparently unreasonable force was used and whether there was a realistic and reasonable opportunity to intervene.  The duration of the incident is a significant factor in assessing whether a reasonable opportunity to intervene exists, particularly where the circumstances are rapidly changing and the violent confrontation is relatively

WALLENTINE 000023

brief, as it was in this situation.  None of the Phoenix Police Department officers saw any officer use force on Kirk that was readily apparent as improper or excessive.  Thus, there was no reasonable opportunity for any single officer to intervene in any other officer's actions.

3.  Sergeant Roy and Officers Garza and Ladines each reasonably perceived Kirk presenting an imminent threat of serious bodily injury or death to innocent bystanders and the officers.  Sergeant Roy and Officers Garza and Ladines used a reasonable deadly force response to counter the threat presented by Kirk.  It is my opinion that there was no cause for any of the defendant officers to intervene in another officer's actions.  The force options used by each officer were consistent with the actions of a reasonable and well-trained officer and with accepted police training and practices and each officer recognized it as such.

e.  **The post-shooting aid provided by Phoenix Police Department officers was consistent with accepted law enforcement policies, practices, and training.**

1.  Officers cautiously approached Kirk with the ballistic shield (Kirk 000041, 001553 at 16:32:49), uncertain of his level of ability to renew his aggressive actions and uncertain whether he still had his gun within his control (Ravelo depo. p. 56).  After handcuffing Kirk and checking him for weapons, Officer Ravelo cut open Kirk's shirts and another officer began giving chest compressions[14] (Ravelo depo. pp. 53-54, 58, Kirk 001556 at 16:33:46, Kirk 000106).  She also asked Officer Brendon Reddy to verify that Fire Department medics had been called (Ravelo depo. p. 60).  Officers Reddy and Traylor assisted with chest

---

[14]  Nearly two decades ago, many police agencies shifted cardiopulmonary resuscitation ("CPR") training to compression only training, meaning that no longer were officers taught to give breaths at intervals.  This shift was in response to the American Heart Association guidelines that prescribed compression only CPR as a better way to keep blood circulating to vital organs.  Many agencies continue to teach compression only CPR, particularly in light of the increased risk of disease transmission with mouth-to-mouth rescue breaths.

WALLENTINE 000024

compressions, and the officers took turns providing cardiopulmonary resuscitation on Kirk until Phoenix Fire Department medics took over (Kirk 000148, 000167).

2.   When approaching a suspect known or believed to be armed, common police practice includes forming a line or "stick" and using a ballistic shield carried by the first officer in the line as some minimal protection against possible gunfire, knife assault, or other attack.  Once the officers are within contact distance, officers search the suspect for weapons.  Officers will also commonly cut off clothing to allow placement of chest seals or bandages and to facilitate chest compressions where appropriate.  Cutting off the clothing also eliminates the need for paramedics to remove clothing for placement of monitors, insertion of intravenous lines, and performing cardiopulmonary resuscitation.

3.   I disagree with Mr. Hafkey's opinion addressing the reasonableness of post-shooting care provided (Hafkey report ¶ 2).  It is my opinion that the officers' life-saving efforts were consistent with accepted law enforcement practices, policies, and training, and were consistent with the actions of reasonable and properly trained officers.

f.   **The Phoenix Police Department's hiring, supervision, and retention of the defendant officers was consistent with accepted police policies, training, and practices.**

1.   At the time of this incident, Officer Ladines was a five-year veteran of the Phoenix Police Department.  Officer Garza was a four-year veteran.  Sergeant Roy had approximately 14 ½ years of service.  Other than minor infractions of wasting finite resources and leaving a weapon not secured in a manner required by policy (Roy depo. pp. 50, 55), the record contains no evidence of discipline or performance deficits for any of the defendant officers.  I see no evidence that each officer was not actively certified as a police officer at the time of this incident.

WALLENTINE 000025

2.      The Arizona Peace Officer Standards and Training curriculum, with which I am personally familiar on a current and a historical basis, consists of training generally regarded by police accreditation agencies throughout the United States as being adequate and proper police training for a police officer.  The Arizona POST Academy basic training program provides a curriculum that is substantially like programs offered throughout the nation and recognized as providing the essential pre-service training for police officers.  The Arizona Peace Officer Standards and Training Board is statutorily charged with establishing training requirements for Arizona's peace officers.  Each officer must complete a Basic Peace Officer Course with a minimum of 585 hours of prescribed training. Trainees must successfully complete all the academy requirements and pass a Comprehensive Final Examination to become certified as an Arizona Peace Officer and be eligible for employment with an Arizona law enforcement agency. Additionally, each Arizona peace officer must complete annual in-service training prescribed by the Arizona POST.

3.      The Phoenix Police Department could reasonably rely upon each officer's status as holding active certification to indicate that they had been properly trained under the Arizona Peace Officer Standards and Training Board's physical, mental, and moral fitness standards and that they successfully completed the basic peace officer training curriculum.  Moreover, their continuing status as actively certified peace officers indicated that none of them were subject to disciplinary action by the Arizona Peace Officer Standards and Training Board for any malfeasance or misconduct.

4.      An element of police supervision is investigation of uses of force by officers, particularly when a death or injury results.  Investigations into officer-involved shootings are often complex and require careful coordination to ensure thorough

documentation of the incident.  The initial scene investigations may take many hours to complete a non-exhaustive list of investigative tasks such as conducting interviews, walk-throughs, obtaining warrants, photographing and video recording the scene, and identifying, marking, and collecting evidence.  Moreover, in Maricopa County every officer-involved shooting is reviewed by the County Attorney to determine whether any of the involved officers committed any crime in connection with the event (Kirk 000015, 000044).  In addition to my own investigative and command responsibility for officer-involved critical incidents, I am generally familiar with the investigative practices of the Professional Standards Bureau of the Phoenix Police Department.  It is my opinion that the Phoenix Police Department completes investigations of officers' uses of force, including deadly force, that are consistent with accepted police policies, training, and practices, and, in fact, are generally superior to investigations conducted in many jurisdictions.

5.    No two officer-involved shooting scenarios are alike.  Consequently, the investigative scope for each incident will necessarily vary.  I have been responsible for the final review of more than 20 officer-involved shootings and am familiar with the nature and quality of fact-gathering that is necessary to both assess compliance with agency policy, need for training, equipment, and/or additional resources, and to guide a prosecutorial review.  I disagree with Mr. Hafkey's opinion on the adequacy of the Phoenix Police Department's Professional Standards Bureau investigation (Hafkey report ¶ 3).  The bases for my rebuttal of Mr. Hafkey's opinions are contained herein.  It is my opinion that the investigative scope of the Kirk incident was reasonable given the dynamic nature of the incident, the number of officers present, and the size and nature of the crime scene.

6.  The Phoenix Police Department Operations Order 1.5 in effect at the time of this incident was consistent with accepted police policies and practices. The foundation of that policy is the United States Supreme Court decision in *Graham v. Connor*, 490 U.S. 386 (1989). The *Graham* decision is ubiquitous to thousands of police use of force policies for public safety agencies throughout the United States. The factors articulated in the *Graham* decision that guide police force applications are the backbone of the 2020 National Consensus Policy on Use of Force promulgated jointly by the International Association of Chiefs of Police and ten other major public safety leadership and labor organizations in the United States.[15]

7.  Operations Order 1.5(3)(B)(2)(a) explicitly incorporates the three critical factors that officers should consider when using force as prescribed in the *Graham* decision:

    a.  The severity of the crime at issue.

    b.  Whether the suspect poses an immediate threat to the safety of public safety officers or others.

    c.  Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

    Operations Order 1.5 also contains the Supreme Court's proscription of "20/20 hindsight," stating "the reasonableness of a particular response to resistance must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight" and includes the assessment standard of the "totality of

---

[15]  *See* National Consensus Policy on Use of Force, July 2020 revision, available at: https://www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Use_Of_Force%2007102020%20v3.pdf.

*Kirk, et al. v. City of Phoenix, et al.*
*Report of Kenneth R. Wallentine*

WALLENTINE 000028

the circumstances"[16] (Operations Order 1.5(3)(B)(2)(b)).  Though police officers are not required to be intimately familiar with Supreme Court jurisprudence, the essence and critical language of the *Graham* decision is commonly taught in police basic training and repeated in in-service training.

8.   Police department policies are a set of written general guidelines expressing the values and philosophy of the particular department's administration on a limited scope of subjects.  Just as no person ever steps into the same river twice, no policy can guide an officer in each and every particular call for service or decision that the officer must face.  Nor can policy guidance and training encompass the incalculable variety of nuanced circumstances that officers face on a continual basis, particularly in relatively unusual events such as the circumstances presented by the call for service involving Plaintiff.  I have been involved in police policy development, review, and maintenance at the command level for over two decades; having been a co-creator of policies in use by thousands of police departments and sheriff's offices throughout the nation, including working with major metropolitan agencies under federal court consent decrees and technical advice letters from the United States Department of Justice.  I have served as a Special Master appointed by a federal district court to assist a large metropolitan police agency in policy reform.  I have served as a consultant and expert witness for the United States Department of Justice Special Litigation Section in federal prosecutions of police officers criminally charged for unlawful use of force.

9.   It is my opinion that the Phoenix Police Department Operations Order 1.5 (dated July 2022, Roy depo. Ex. 8) is consistent with common police guidance on an

---

[16]  *Graham v. Connor*, 490 U.S. 386, 396 (1989), *citing Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).

officer's use of force in the most common circumstances where force is reasonably likely to be used by a police officer.

10.    It is my objective to apply accepted police practices and training principles to the event and opine on whether the actions of the officers were consistent with constitutional requirements as commonly taught to and practiced by police officers. Based on the accounts of the incident and based upon the collective data available to me, it is my opinion that the defendant Phoenix Police Department officers acted consistently with the actions of reasonable and well-trained officers. It is my further opinion that the actions of Phoenix Police Department defendant officers do not represent any material deviation from the issued general operations orders of the Phoenix Police Department.

II.    In reaching my opinions in this matter, I have relied upon my training and experience in public safety acquired throughout my career. A summary of my qualifications, publications, litigation history, and fee schedule are recited in the attached exhibits.

III.    The observations and opinions stated herein are based on the materials provided to me for consideration and are preliminary insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with objective evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by Plaintiff's experts, further investigation, and/or further witness interviews. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video, and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, videos, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or drawings created to better illustrate the aforementioned documents.  The exhibits, testimony aids, or list of references used as a summary of, support for, and/or graphic depiction or illustrative description, summary, or synopsis for the information, statements, summaries, and opinions in this report specifically include, but are not limited to, each (or any compilation, synopsis, summary, demonstrative, illustration, or graphic) pleading, document, statement, deposition, diagram, photograph/image, report, citation, reference, paper, book, illustration, graphic, chart, drawing, diagram, table, PowerPoint® slide, set, or deck, picture, image, and/or video in this report, referenced or cited in this report, or included in any of the references to this report.  These may be utilized as exhibits, and/or explanatory or demonstrative aids to support deposition and/or trial testimony, or for any other purpose.  These exhibits specifically include any illustrative evidence such as visual presentation of computer-generated slides and visual images projected onto a screen or charts, graphs, or illustrations created to better illustrate the aforementioned exhibits.  I reserve the right to create, use, or utilize PowerPoint or other graphics or illustrations, or compilations as exhibits at deposition, trial, or for any other purpose after submission of this report.

WALLENTINE 000031

**Conclusion**

Based on the accounts of the incident and based upon the collective data available to me, it is my opinion that each defendant Phoenix Police Department officer acted consistently with the actions of a reasonable and properly trained law enforcement officer and each defendant Phoenix Police Department officer acted consistently with constitutional requirements and police practices as commonly taught to and practiced by law enforcement officers.

Ken Wallentine
August 18, 2025

## Exhibit A

**My qualifications as an expert in this subject matter include the following:**

I am a law enforcement officer in the State of Utah.  I became certified as a law enforcement officer in the State of Utah in 1982.  I am the Chief of the West Jordan (Utah) Police Department, where I oversee all police operations and investigations.  I am the immediate past-Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah.  I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement.  After a period in private practice, I was employed as a Special Agent with the Utah Attorney General Investigation Division, where I coordinated a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations.  I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah.  I also supervised the police service dog training and certification program for the State of Utah.  I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians.  I commanded the State of Utah Child Abduction Response Team.  I commanded the State of Utah Officer-Involved Fatality Investigation Team.  I am a former member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations.  In 2010, Governor Herbert

WALLENTINE 000033

selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

I currently serve on the Use of Force Standards and the K9 Standards Committees of the Utah Peace Officer Training and Standards Division, articulating the standards for use of force by police officers and deployment of police service dogs. I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I am certified by the Force Science Research Center as a Realistic De-Escalation Instructor, a course certified by the International Association of Directors of Law Enforcement Standards and Training. I am a certified POST Firearms Instructor, and often served as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®. I am a former certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems. In 2022, I was certified by the Institute for the Prevention of Sudden In-Custody Death in the application and use of spit restraint devices.

I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a former Chief Deputy County Attorney and a former Utah Attorney General designated prosecutor. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of

Court.  I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities.  I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

In addition to my primary employment, I consult and provide expert witness opinions on police procedures, and use of force issues.  I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise.  I have served on several International Association of Chiefs of Police Policy Center working groups and presently serve on the Search Warrants policy working group.  I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies.  I am the co-founder of a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies.  These policies serve as a model for all Utah public safety agencies.  I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies.  I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as the president of the Utah Chiefs of Police Association.  I am a member of the Board of Governance of the Statewide Information and Analysis Center, Utah's unified intelligence fusion center.  I represent the Utah Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force,

creating strategies for police reform and relations with communities of color.  I am a founding member of First Steps to More Trust, an initiative to join young people in the BIPOC community with young public safety professionals in leadership training and community engagement.  In 2021, I was recognized by D.A.R.E. America as the "Law Enforcement Executive of the Year." In 2022, I was named as the "Utah Police Chief of the Year" by the Utah Chiefs of Police Association.  Also in 2022, upon nomination of the Attorney General, I was named as the "Utah Public Safety Officer of the Year" by the Utah Best of State Foundation.  I am a member of and the immediate past-Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah.  I currently have direct command of Officer-Involved Critical Incident Investigations Team IV, a multi-agency specialty investigations team. I am the immediate past-Chair of the Salt Lake County Law Enforcement Administrators and Directors Association.  I am a member of the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death, member of the Board of Advisors, Association of Force Investigations, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, former member of the International Association of Law Enforcement Firearms Instructors, member of the United States Police Canine Association, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member of the Utah Law Enforcement Legislative Committee.  Other professional activities include serving as a member of the Utah Commission on Criminal & Juvenile Justice and a member of the Utah Behavioral Health Master Plan Executive Committee.

I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training.  I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security

Administration, with support coordinated by the International Forensic Research Institute at Florida International University.  I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

I am a Senior Legal Advisor for Lexipol.  In that capacity, I have assisted in the drafting and review of use of force, investigative procedures, identification protocols, and other policies in current use by more than 8,000 public safety agencies in the United States.

WALLENTINE 000037

**Exhibit B**

*Publication history*

I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar Association Publishing Division.  It is a treatise on public safety and criminal procedure.  *The K9 Officer's Legal Handbook*, 3rd ed., was published in February 2019.

My other published works include:  *An Officer's Legal Obligation to Intervene*, Police Chief, V. 90, No. 5 (2023);  *An Outward Mindset Powering Multicultural Policing,* Police Chief, V. 89, No. 4 (April 2022); *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019);  *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015).


*Litigation history*

I have testified and/or provided depositions in the following cases (limited to the past four years):

*Jane Doe v. County of Santa Barbara*, No. 2:24-cv-04334-MEMF-SK, United States District Court for the Central District of California, 2025.  Deposition testimony given on behalf of defendants.  Subject matter: sexual misconduct.

*Davis v. Allen*, No. 3:21-CV-00565-WMC, United States District Court for the Western District of Wisconsin, 2025.  Trial testimony given on behalf of defendants.  Subject matter: excessive force by police, improper use of police service dog.

*United States v. Amiri, et. al,* No. 23-CR-269-JSW, United States District Court for the Northern District of California, 2024, 2025.  Trial and Grand Jury testimony given on behalf of plaintiff. Subject matter: excessive force by police, improper use of police service dog.

*State of Alaska v. Miller*, No. 3KN-24-00808CR, District Court for the State of Alaska, 2024. Grand jury testimony given on behalf of plaintiff. Subject matter: unreasonable force during arrest, improper use of police service dog.

*Simmons v. City of Edmond*, *et al.*, No. CIV-24-97-J, United States District Court for the Western District of Oklahoma, 2024.  Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.

*Herndon v. City of Clinton, et al.*, No.: CIV-23-86-F, United States District Court for the Western District of Oklahoma, 2024.  Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Barrick v. Clardy et al.*, No. CIV-23-129-JFH-GLJ, United States District Court for the Eastern District of Oklahoma, 2024.  Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Estate of Duval v. United States of America et al.*, No. 2:20-CV-01206, United States District Court for the District of Arizona, 2024.  Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Adams v. City of Cedar Rapids, et al.*, No. 1:21-cv-0005, United States District Court for the Northern District of Iowa, 2024. Trial testimony given on behalf of defendants, subject matter: use of police service dog.

*State v. Hoover*, No. 191400190, Fourth District Court for the State of Utah, 2024.  Trial testimony given on behalf, subject matter: criminal homicide.

*Huff v. City of Eufaula, et al.*, No. 18-cv-22 EFM United States District Court for the Eastern District of Oklahoma, 2024. Deposition testimony given on behalf of defendants, subject matter: wrongful death.

*Camba Ponce v. United States of America*, No. 4:22-CV-00012-DC-DF, United States District Court for the Western District of Texas*, 2024.* Deposition testimony given on behalf of defendants, subject matter: use of police service dog.

*Saddlers v. City of Lakeland,* No. 8:22-cv-2127-CEH-JSS, United States District Court for the Middle District of Florida, 2023. Deposition testimony given on behalf of defendants, subject matter: use of police service dog.

*Faucheaux v. City of Provo*, No. 100401999, Fourth District Court for Utah County, 2023. Deposition testimony given on behalf of defendants, subject matter: wrongful death.

*Strong v. City of Naples*, No. 2:22-cv-00318, United States District Court for the Middle District of Florida, 2023. Deposition testimony given on behalf of defendants, subject matter: wrongful arrest.

*Nazario v. Gutierrez & Crocker*, No. 2:21-cv-00169, United States District Court for the Eastern District of Virginia, 2023. Trial testimony given on behalf of defendants. Subject matter: police use of force.

*McGlaughlin v. State of Arizona et al.*, No. 2:21-cv-01410-SRB, United States District Court for the District of Arizona, 2022. Deposition testimony given on behalf of defendants. Subject matter: police use of force.

*Ely v. County of Santa Barbara, et al.*, No.: 2:20-cv-06549 DMG, United States District Court for the Central District of California, 2022. Trial and deposition testimony given on behalf of defendants. Subject matter: police use of force.

*Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2022. Trial and deposition testimony given on behalf of defendants. Subject matter: police use of force.

*Glass v. Robinson*, No. CV-19-04883-PHX-SMB, United States District Court for the District of Arizona, 2022. Trial testimony given on behalf of defendants. Subject matter: police use of force.

*Celestin v. City of Ocoee*, NO: 6:21-cv-00896-RBD-EJK, United States District Court for the Middle District of Florida, 2022. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Coleman v. City of Tempe*, No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2022. Trial testimony given on behalf of defendants. Subject matter: police use of force.

*Caney v. Gillette, et al.* No. CV 2019-011516, Superior Court of Arizona for Maricopa County, 2021. Deposition testimony given on behalf of defendants. Subject matter: traffic crash.

*Brown v. City of Phoenix*, No. 2:20 cv 02087 DLR JZB, United States District Court for the District of Arizona, 2021. Trial testimony given on behalf of defendants. Subject matter: police use of force.

*Coleman v. City of Tempe*, No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2021. Trial testimony given on behalf of defendants. Subject matter: police use of force.

*Khalaj v. City of Phoenix, et al.*, CV-17-01199-PHX-GMS, United States District Court for the District of Arizona, 2021. Deposition testimony given on behalf of defendants. Subject matter: police use of force.

*Bueno v. Howard, et al.*, No. 2:16-cv-03450-DGC-JZB, United States District Court for the District of Arizona, 2021. Trial testimony given on behalf of defendants. Subject matter: police use of force.

*Lane v. City of Mesa*, No. 2:19-cv-00852-DJH, United States District Court for the District of Arizona, 2021. Deposition testimony given on behalf of defendant. Subject matter: wrongful death.

WALLENTINE 000041

*Mitchell v. City of Cedar Rapids*, No. LACV087209, Iowa District Court for Linn County, 2021.

Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.

**Exhibit C**

**Methodology and Process:** My opinions expressed in this report are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty within contemporary standard law enforcement practice, considering potentially case-relevant current law enforcement guidance and accountability standards. My opinions discussed in this report were developed using one or more qualitative[17] and/or quantitative[18] research methodologies, in addition to my knowledge, skill, experience, training, or education,[19] and/or review of literature.[20] These applied methodologies may have included historiography,[21] content analysis,[22]

---

[17]   There are six common types of qualitative research: phenomenological, ethnographic, grounded theory, historical, case study, and action research.

[18]   Quantitative research is the process of collecting and analyzing numerical data. It can be used to find patterns and averages, make predictions, test causal relationships, and generalize results to wider populations. The four main types of quantitative research are descriptive, correlational, causal-comparative or quasi-experimental, and experimental research. Quantitative research includes attempts to establish cause-effect relationships between and among variables.

[19]   *See* 28 U.S.C.A. Federal Rules of Evidence Rule 702.

[20]   A literature review is an identification and review of generally scholarly or authoritative sources that provides an overview of a particular topic. Literature reviews are designed to be a collection of the relevant and significant publications regarding a topic to provide a comprehensive overview of the topic. Literature reviews are not a scientific-research methodology.

[21]   The study of historical writing, the writing of history. The study of history-writing, especially as an academic discipline. OED Online, Oxford University Press, June 2022.

[22]   Content analysis is a research tool used to determine the presence of certain words, themes, or concepts within some given qualitative data (i.e. text). Using content analysis, researchers can quantify and analyze the presence, meanings, and relationships of such certain words, themes, or concepts. As an example, researchers can evaluate language used within a news article to search for bias or partiality. Researchers can then make inferences about the messages within the texts, the writer(s), the audience, and even the culture and time surrounding the text.

phenomenology,[23] ethnography,[24] discourse analysis,[25] and case study.[26]  My methodology included comparing the actions of the officers involved in this incident or litigation, with those which are accepted training and operational practices and procedures within the state and/or nation.[27]

Most of the documents I reviewed are classified by the social sciences as archival records, defined as "records that already exist."[28]  The review and analysis of archival records are an accepted research methodology in the social sciences and applies to criminal justice and law enforcement-related research.  I have provided both general and specific qualifications that demonstrate and illustrate my qualifications to provide expert testimony in this case.

My methodology in this case incorporates the following general steps:  *General Overview*.  I engage in a general overview understanding of the totality of the circumstances and potential issues in the case that may be relevant to my consulting or expert retention; *Initial Overview*.  I perform an initial overview consideration to generally consider whether I believe that any issues, concepts, myths, etc. that I am being asked to fully review and opine upon are not

---

[23]  Phenomenology.  "The division of any science which is concerned with the description and classification of its phenomena, rather than causal or theoretical explanation."  OED Online, Oxford University Press, June 2022.  Phenomenological studies examine human experiences through the descriptions that are provided by the people involved.

[24]  Ethnography.  "The systematic study and description of peoples, societies, and cultures."  OED Online, Oxford University Press, June 2022.

[25]  Discourse analysis is a method of seeking in any connected discrete linear material, which contains more than one elementary sentence, some global structure characterizing the whole discourse.  Z. S. Harris in Disc. Anal. Reprints (1963) 7.  OED Online, Oxford University Press, June 2022.

[26]  Case study: (a) a process or record of research into the development of a particular person, group, or situation that is bounded in time; this as a method; (b) a particular instance or case that may be analyzed or used as an example to illustrate a thesis or principle.  OED Online, Oxford University Press, June 2022.

[27]  Brave, M., Peters, Jr., J.G., Ross, D., Black, J.R., and Wallentine, K.R. (2023).  *"Accountability Standards" Compared to "Guidance Considerations"* Module.

[28]  Graziano, A. M., & Raulin, M. L. (1997).  *Research methods: A process of inquiry* (3rd ed.). New York: Longman.

violative of relevant existing law as I understand it;[29]  *Comparative Analysis*.  I undertake a comparative analysis of the aforementioned understanding to my skill, knowledge, experience, education, or training to determine if I believe that I am an appropriate fit for this retention and to ascertain whether the issues presented are within the scope of my expertise; *Currency of knowledge*.  I confirm that I am abreast of potentially case relevant "Guidance Considerations" and "Accountability Standards"; and *Issues List*.  I then begin analysis, consideration, and development of a list of potential concepts, issues, specifics, information, myths, etc. that I find may be relevant, outside common knowledge, and my scientific, technical, and other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue.

My analysis protocol and processes include:  *Received Materials*.  Receipt and review of provided case documents and materials as listed in case specific materials considered; *My Materials*.  Search, review, and analysis of potentially case-relevant documents and materials in my possession and/or readily accessible to me; *Online Resources*.  Search, review, and analysis of potentially case-relevant documents available on Westlaw®, Lexis®, Casetext, PACER, and/or other online resources; *Specific State Statutes, Administrative regulations and related materials*.  Search, review, and analysis of available potentially case-relevant State-specific statutes, regulations, and materials (e.g., State Peace Officer Standards and Training (POST) materials); *Peer-Reviewed Literature*.  Search, identification, review, and analysis of potentially case-relevant peer-reviewed literature regarding issues identified in the instant case; and *Other*.  Search, identification, review, and analysis of other case-related materials, such as training materials, accepted or other practices, organizational materials, etc. as applicable and available.

---

[29]  Performing my initial overview does not lock in any statements or opinions and does not create any confirmational bias.  All statements and opinions change as appropriate during full-case review, analysis, and development.

My methodologies include: *Case specific study and analysis*: an in-depth examination of a single instance or event, systematically looking at events, collecting data, analyzing information, and reporting the results; *Historiography*: considering –including in appropriate contexts– a body of historical work relevant to the issues; *Development of an objective time-line for the incident*: identification, capture, review, and inclusion of non-case specific facts or data considered, part of section listing materials considered; *Discourse analysis*: analyzing, comparing, and contrasting documents and other discourse relevant to the case; *Content analysis*: comparing documents and literature in appropriate contexts; and *Content analysis of possible inconsistencies*: compare documents to other documents to identify inconsistencies; *Case analysis*: bounded in time and specific to the events for this particular case; *General context*: considerations, regarding the backdrop of current and historical practices in case relevant areas; and *Comparative analysis*: review of case-related issues against the backdrop of materials, accepted practices, peer-reviewed literature, and/or other case-related relevant materials, etc. to my skill, knowledge, experience, education, or training.

My report development process includes:  preparing an abbreviated synopsis of relevant facts; the formulation of my opinions; authoring of my report; identifying, developing, preparing, and attaching exhibits, or plan for future exhibit submissions; verifying compliance with Federal Rule of Civil Procedure § 26(a)(2)(B) Expert disclosures; reviewing the report; and submitting for filing with the Court.  I may consider supplemental and/or rebuttal report development and submissions as identified or requested.  My methodology and processes are consistent with scientific methodologies and experiential-based practices for conducting analyses of such incidents.

**Exhibit D**

*Consultation and Expert Witness fees, effective December 31, 2023 through December 31, 2025*

For matters which progress beyond an initial brief consultation, I charge $300.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum fee of $2,000.00 for deposition or court testimony.  I bill for actual travel expenses and a travel fee of $1,200.00 per day/part-day for travel to western states and $2,000.00 per day/part-day outside western states (contiguous to or west of Utah).  Unless airline tickets are pre-paid by the client, I travel only with tickets purchased as fully refundable fares.