Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
rmills@millsandwoods.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kashane Kirk, as Personal Representative and on behalf of the Estate of Leontae Kirk; Sharon Roberts, individually; Brittnie Turner, on behalf of and as legal guardian and parent of her minor child, MC, <br><br> Plaintiffs, <br><br> vs. <br><br> City of Phoenix, a governmental entity; Michael Sullivan, Chief of the Phoenix Police Department; Autumn Ladines and John Doe Ladines, husband and wife; Officer Antonio Garza and Jane Doe Garza, husband and wife; Sergeant Eric Roy and Jane Doe Roy, husband and wife; Jaclyn Ravelo and John Doe Ravelo, husband and wife; Steven Ramirez and Jane Doe Ramirez, husband and wife, and; Jonathan Howard and Jane Doe Howard, husband and wife, <br><br> Defendants. | No.: CV-23-00836-PHX-MTL (CDB) <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> (Assigned to the Honorable Michael T. Liburdi and referred to the Honorable Camille D. Bibles) |

Plaintiffs Kashane Kirk, as Personal Representative and on behalf of the Estate of Leontae Kirk, and Sharon Roberts (collectively, "Plaintiffs") hereby respond in opposition to "Defendants' Motion for Summary Judgment" filed by Defendants City of Phoenix, Michael Sullivan, Autumn Ladines, Antonio Garza, and Eric Roy (collectively, "Defendants"). This Response is supported by Plaintiffs' Controverting Statement of Facts

("CSOF") and accompanying Exhibits attached hereto, all relevant parts of the record in this action, and the Memorandum of Points and Authorities below.

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### INTRODUCTION

On November 2, 2022, Phoenix Police Officers fired twenty-four bullets at Leontae Kirk, a twenty-nine-year-old father, killing him in a strip mall parking lot. The undisputed evidence establishes that Kirk was ***unarmed*** when Sergeant Roy fired seventeen rounds and Officer Garza fired three rifle rounds into his body. Roy himself admitted under oath that he did not see a gun in Kirk's hand when he opened fire. Officer Ravelo, the only non-shooting officer at the scene, testified she never saw Kirk with a gun. Kirk's firearm was recovered underneath a vehicle approximately ten feet from his body, discarded outside the officers' view before the fatal volleys began.

The officers arrived at the scene responding to an erroneous "active shooter" designation, one triggered by helicopter observer Officer Ramirez, who admitted he only "perceived" Kirk to be shooting but never confirmed actual gunfire. Kirk had never fired his weapon. Not a single officer announced their presence. Not a single officer issued a warning or command before deploying lethal force. Kirk was shot in the back by Officer Ladines, who failed to activate her body camera. When Kirk emerged from between two vehicles with his hands visible and no weapon, Sergeant Roy emptied his entire seventeen-round magazine into Kirk's body while Kirk slid backwards on his buttocks in a defensive posture. Plaintiffs' use of force expert, retired Phoenix Police Lieutenant Mark Hafkey, opines unequivocally that the officers' use of deadly force was objectively unreasonable under the Fourth Amendment.

The record is replete with genuine disputes of material fact that preclude summary judgment on every claim. Defendants' motion should be denied in its entirety.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**FACTUAL BACKGROUND**

On November 2, 2022, at approximately 4:29 p.m., an individual called 9-1-1 to report a Black male with a red hoodie and black hat with a "NY" logo pointing a gun at him. DSOF ¶ 1. What the 9-1-1 caller did not report, and what the officers never learned before deploying deadly force, was that another armed individual, later identified as Humberto Gonzalez-Rios, had *first* brandished a pistol at Kirk from a motorcycle. *See* CSOF ¶¶ 7, 51-52. Surveillance video from the strip mall confirms that Kirk drew his weapon *in response to* Gonzalez-Rios threatening him with a gun. CSOF ¶¶ 7, 52.

A Phoenix Police helicopter with Officer Steven Ramirez as spotter and Sergeant Jonathan Howard as pilot was dispatched to the scene. DSOF ¶ 3. From approximately 500–600 feet above the scene, Ramirez observed Kirk in the parking lot. DSOF ¶ 4. Critically, Ramirez reported to dispatch that Kirk was "shooting at people." DSOF ¶ 5. At his deposition, however, Ramirez admitted he only "*perceived*" Kirk to be shooting – he never confirmed actual gunfire, never observed muzzle flashes, and could not have heard gunshots from his altitude. CSOF ¶¶ 5, 50. The investigation subsequently confirmed that Kirk never fired his weapon. E.g., CSOF ¶¶ 5, 42. Ramirez also never saw Gonzalez-Rios, the armed individual who had threatened Kirk. CSOF ¶ 9.

Based on Ramirez's unverified perception, dispatch declared "we have an active shooter." DSOF ¶ 6. Sergeant Howard, the helicopter pilot, independently observed what he described as Kirk "exchanging gunfire with someone," but this critical information, which would have alerted ground units that Kirk may have been *defending himself* against another armed threat, was never relayed to responding officers. CSOF ¶¶ 10, 51.

Officers Roy, Garza, Ladines, and Ravelo responded in three vehicles. DSOF ¶¶ 11, 13. Officer Ladines and Officer Ravelo arrived first at approximately 16:29:44. DSOF ¶ 15. Officer Garza arrived at approximately 16:29:47. DSOF ¶ 27. Sergeant Roy arrived at approximately 16:29:50. DSOF ¶ 20.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**A. Officer Ladines Fires First, Without Warning, Into Kirk's Back.**

Officer Ladines claimed that upon exiting her vehicle she observed Kirk "with a gun in his hand pointed out towards the northeast and what appeared to be firing it multiple times." CSOF ¶ 72. However, Kirk *never fired his weapon*, e.g., CSOF ¶¶ 5-6, directly contradicting Ladines' account. Ladines fired four rounds at Kirk from behind, aiming at "center mass at Mr. Kirk's back." CSOF ¶¶ 16, 58.

Ladines gave no specific warnings before opening fire.  CSOF ¶¶ 16, 53. When asked directly, "Do you recall giving Leontae any warnings?" Ladines answered: "No." CSOF ¶ 16. Ladines also failed to activate her body-worn camera, which she attributed to "human error." CSOF ¶ 12. Officer Ravelo, who arrived with Ladines and was steps behind her, testified that she did *not* see Kirk with a gun and did *not* see Kirk firing. CSOF ¶¶ 16, 46.  As a result, she also testified that she did not shoot. CSOF ¶ 46. In fact, she testified that she saw a person casually sitting at the bus stop in front of the scene.  CSOF ¶ 46. That person did not leave until he saw Officer Ravelo brandishing a gun. *Id.*

**B. Kirk Discards His Firearm**

After Ladines' initial shots, Kirk fled between a silver pickup truck and a silver sedan in the parking lot. *See* DSOF ¶ 18. Sometime during this movement, Kirk discarded his firearm. DSOF ¶ 19. The gun was later recovered underneath a vehicle, approximately ten feet from where Kirk's body came to rest. CSOF ¶¶ 19, 43; *see also* CSOF ¶ 48 (noting on-scene statements from Ravelo such as "Gun's underneath him?" "I'm not seeing anything" and "Boss, I can't see if he has a gun or not"). The officers claim to have not seen Kirk discard the weapon. DSOF ¶ 19.

**C. Sergeant Roy Fires Seventeen Rounds at an Unarmed Man.**

Sergeant Roy paralleled Kirk's movement and took position at the west end of the strip mall sidewalk. DSOF ¶¶ 22–23. At approximately 16:30:00, Kirk emerged from between the two vehicles facing southward. DSOF ¶ 24. Defendants characterize Kirk as having an "outstretched right arm," but critically, **Roy admitted under oath that he did not see a gun in Kirk's hand**:

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

*I don't recall seeing a gun. However, his positioning and the way he crouched with his arm extended led me to believe he was armed with a gun, which I had seen him with when he ran between the vehicles.*

CSOF ¶ 44. Roy further acknowledged: "I don't recall seeing a gun in his hand when he was crouched down." CSOF ¶ 45. His belief was based solely on "arm and body position." *See id.*

Despite this uncertainty, Roy fired seventeen successive rounds, his *entire magazine within six seconds*, beginning at 16:30:01 and ceasing at 16:30:07. CSOF ¶ 25; DSOF ¶¶ 25–26. He gave *no* warnings before firing. CSOF ¶ 25. When asked "Why didn't you give any warnings?" Roy answered: "I didn't have time." *See* CSOF ¶ 53. Yet Roy also testified he had sufficient time to observe Kirk's movements, watch Kirk crouch down, and see Kirk slide backwards on his buttocks. CSOF ¶ 54. Video evidence shows Kirk ended up in a seated position, pushing himself backwards with his hands on the ground in a surrendering posture – not advancing toward officers or pointing a weapon. *See* CSOF ¶ 56. After Roy began firing, he never saw Kirk raise a weapon at anyone. CSOF ¶ 57.

**D. Officer Garza Fires Three Rounds**

Officer Garza moved to position himself behind a pony wall south of Kirk's position. DSOF ¶ 29. At 16:30:01, he can be heard asking "where is he?" while Roy's gunshots are already firing. DSOF ¶ 30. Kirk came into Garza's field of vision, and Garza fired three rounds. DSOF ¶¶ 31–32. Garza told investigators he "couldn't see [Kirk's] hands" before firing. CSOF ¶ 28. There was no weapon visible in Kirk's hands when Garza fired. CSOF ¶ 28. Garza had a scope on his rifle and was looking directly at Kirk while Kirk was in a surrendering position. CSOF ¶ 32. Garza gave no announcement or warning before discharging his weapon. CSOF ¶¶ 32, 53.

**E. Failure to Provide Medical Aid**

After the last shot was fired at approximately 16:30:06, officers did not initiate life-saving measures until approximately 16:34:10, a four-minute delay. CSOF ¶ 61. The Fire Department was not notified to respond until approximately 16:43:13, over thirteen minutes after the last shot, despite being staged in a nearby area. CSOF ¶ 61. Fire arrived

at 16:45:51, approximately sixteen minutes after the shooting. CSOF ¶ 61. During the intervening time, Officer Ladines shot Kirk with a 40mm less-lethal baton round, despite Kirk being visibly limp and non-responsive on the ground. *See* CSOF ¶ 62. Officer Garza ordered Officer Ravelo, who had approached Kirk to provide aid, away from Kirk's body. CSOF ¶ 63.

## STANDARD OF REVIEW

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In excessive force cases, the Supreme Court has emphasized that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). However, viewing the facts in the light most favorable to Plaintiffs, the non-moving party, the record creates genuine disputes of material fact on every element of every claim.

## ARGUMENT

**I.** **Genuine Disputes of Material Fact Preclude Summary Judgment on Plaintiffs' Excessive Force Claim (Count II).**

The Fourth Amendment prohibits the use of excessive force during an arrest or seizure. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Courts evaluate three factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to officers or others; and (3) whether the suspect was actively resisting arrest or attempting to

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

flee. *Id.* at 396. "The 'most important' factor is whether the suspect posed an immediate threat." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

### a. Kirk Was Unarmed When Shot by Roy and Garza, Creating a Genuine Dispute as to Immediate Threat.

The central factual dispute in this case is whether Kirk posed an immediate threat at the moment Roy, Ladines, and Garza deployed deadly force. Defendants contend that the officers reasonably perceived Kirk as armed and dangerous. But the record, viewed in the light most favorable to Plaintiffs, tells a profoundly different story.

First, it is undisputed that Kirk discarded his firearm before Roy and Garza fired. CSOF ¶¶ 19, 43; *see also* DSOF ¶ 19. The gun was found under a vehicle approximately ten feet from Kirk's body. CSOF ¶ 43. Roy admitted he did not see a gun in Kirk's hand. *See* CSOF ¶¶ 21, 24, 44. Though Garza told investigators he "couldn't see [Kirk's] hands" before firing, CSOF ¶ 28, the video evidence makes clear this was obviously untrue, *see* CSOF ¶ 32. Officer Ravelo, the only non-shooting officer who observed the encounter, testified she *never saw Kirk with a gun*. CSOF ¶ 46. Plaintiffs' expert, retired Phoenix Police Lieutenant Mark Hafkey, concludes there was no weapon visible in Kirk's hands when Garza opened fire. *See* CSOF ¶ 28.

Moreover, Hafkey testified that even having a gun, or even the belief someone has a gun, is insufficient to justify deadly force. He stated "the fact that you have a weapon in your possession, in your hand is not enough to apply deadly force because you have the ability — the suspect has the ability to apply that force. There needs to be more articulable facts that a particular person is under threat or the officer himself is under threat." CSOF ¶ 81. And even more directly, "if there's no gun in their hand, a belief that somebody is [armed] is not sufficient in my mind. There's no means there." CSOF ¶ 81.

Second, Kirk was in a surrendering posture when shot. *See* CSOF ¶¶ 24, 32. Body camera footage shows, and testimony demonstrates, that Kirk was seated or crouching, sliding backwards on his buttocks with his hands visible *up in the air*. *See* CSOF ¶¶ 24, 32, 56. He was not advancing toward officers. *See id.* He was not pointing a weapon. *See*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

*id.* He was retreating. *See* CSOF ¶ 56. He was surrendering. *See* CSOF ¶¶ 24, 32, 56. He had only brandished his weapon in self-defense at a man who had drawn a gun at him first, not at any officers. *See* CSOF ¶¶ 7-8, 52. A reasonable jury could readily conclude Kirk had abandoned his weapon, was attempting to surrender, and posed no immediate threat when twenty rounds struck his body.

### b. The "Active Shooter" Designation Was Erroneous, and a Jury Could Find the Officers Knew or Should Have Known It.

Defendants' entire justification for the use of lethal force rests on the officers' response to an "active shooter" call. But the record establishes that this designation was based on an unverified *perception*, not confirmed fact. Officer Ramirez admitted he only "perceived" Kirk shooting, he never confirmed gunfire, never saw muzzle flashes, and could not hear shots from his altitude. CSOF ¶ 50. In reality, Kirk never fired his weapon. E.g., CSOF ¶ 42.

Moreover, Sergeant Howard observed from the helicopter what appeared to be Kirk "exchanging gunfire with someone," suggesting another armed individual was involved, but this critical information was never relayed to ground officers. CSOF ¶¶ 10, 51. As Hafkey opines, this information "would have likely changed the manner of response" because it would have indicated Kirk was defending himself against a threat, not acting as an "active shooter." *See* CSOF ¶ 51. Indeed, surveillance video confirms Kirk drew his weapon *in response to* Gonzalez-Rios threatening him. CSOF ¶¶ 7-8, 52; *see also* DSOF ¶ 8. A reasonable jury could conclude that the erroneous "active shooter" label was the product of reckless miscommunication from the helicopter unit, and that the officers on the ground acted on unreliable information without taking any steps to verify the threat before deploying lethal force.

### c. No Warnings Were Given Despite Time and Opportunity.

The failure to give any warning or an order to halt before using force is a critical factor in the Fourth Amendment analysis. *See Deorle v. Rutherford*, 272 F.3d 1272, 1283–84 (9th Cir. 2001) (holding that "such warnings should be given, when feasible, if the use

of force may result in serious injury"). Here, not a single shooting officer announced their presence as police or gave Kirk any opportunity to comply. *See* CSOF ¶ 53.

Ladines admitted she gave no warnings. CSOF ¶ 16. Roy claimed he "didn't have time" for warnings yet simultaneously testified he had sufficient time to observe Kirk's movements, watch Kirk crouch, and see Kirk slide backwards on his buttocks. CSOF ¶¶ 53-54. Garza gave no announcement before firing. CSOF ¶¶ 32, 53. Video confirms neither Roy nor Garza warned or announced. *See* CSOF ¶¶ 32, 34.

Hafkey opines there was "absolutely no reason" for the officers not to announce police presence and warn Kirk to drop any weapon, given the ample time, distance, cover, and backup available. CSOF ¶ 70. In fact, he testified that had he (a former police Lieutenant) been in their shoes, he would have proceeded much differently. First, he would have arrived with lights and sirens. CSOF ¶ 79. If he saw someone with a gun, he would first have stayed in his car behind his engine block and used his PA, to announce police presence of police and order him to drop the weapon. CSOF ¶ 79. Upon exiting his vehicle like Garza and Ladines, he would have taken a position behind cover and kept issuing warnings, in order to first give the suspect the opportunity to surrender. CSOF ¶ 79.

Kirk was essentially surrounded by officers on three sides and up against a building. CSOF ¶ 32. He was not a flight risk. Officers had access to ample cover, the pony wall running north and south, parked vehicles, and the side wall of the strip mall. CSOF ¶ 55. A reasonable jury could find that the officers' failure to give any warning before deploying lethal force even though it would have been feasible, was objectively unreasonable.

### d. Roy's Decision to Empty His Entire Magazine Was Excessive.

Sergeant Roy fired seventeen rounds, his entire magazine, in approximately six seconds. CSOF ¶ 25; *see also* DSOF ¶¶ 25–26. As Hafkey opines, PPD training primarily instructs officers to "shoot a few rounds center mass and then assess the threat before continuing to fire," as "[c]ontinuing to fire would effectively negate an officer's ability to assess a continuing imminent threat." CSOF ¶ 25. Roy's decision to empty his entire

9

magazine without pause or assessment violated this training principle and creates a genuine dispute as to the reasonableness of the force used. *See* CSOF ¶ 59.

### e. The Officers Created Danger to Bystanders.

The officers fired twenty-four rounds in a busy strip mall parking lot at approximately 4:30 p.m. Hafkey identifies evidence that rounds ricocheted off cement, struck the mirror at Grand Stop, struck the exterior window of JR Cellular near Kirk's body, and hit at least two parked vehicles. *See* CSOF ¶ 60. Garza's bullets "passed just one parking stall's width" from a vehicle occupied by a civilian female. *See* CSOF ¶ 60. PPD policy prohibits the use of firearms "under circumstances in which a substantial and unjustifiable risk of injury or death to bystanders exists." CSOF ¶ 73. Multiple occupied businesses with glass windows and doors were in the officers' backdrop. CSOF ¶ 60. A reasonable jury could find the officers violated PPD policy and acted unreasonably in firing with such reckless disregard for bystander safety.

## II.    Defendants Are Not Entitled to Qualified Immunity.

Qualified immunity shields officers from liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

### a. It Was Clearly Established That Shooting an Unarmed Person Without Warning Violates the Fourth Amendment.

By November 2022, it was clearly established in the Ninth Circuit that: (1) officers may not use deadly force against an individual who does not pose an immediate threat, *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); (2) officers should give a warning before using deadly force when feasible, *Deorle v. Rutherford*, 272 F.3d 1272, 1283–84 (9th Cir. 2001); and (3) the use of deadly force against a suspect who has discarded his weapon and is in a

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

defensive posture is unreasonable, *Glenn v. Washington County*, 673 F.3d 864, 876-80 (9th Cir. 2011).

Defendants invoke cases involving officers who reasonably but mistakenly believed a suspect was armed. But those cases are distinguishable because they involved truly split-second decisions where officers had no time to assess the threat. Here, viewing the facts in the light most favorable to Plaintiffs, the officers had time and opportunity to observe Kirk's movements, assess his position, and determine whether he was actually armed, and they failed to do any of this. Roy admitted he had time to watch Kirk crouch, slide backwards, and push himself along the ground, but claimed he lacked time for a single verbal warning. *See* CSOF ¶¶ 53-54.

Moreover, Defendants' cases do not address the officers' complete failure to announce their presence or give any warning whatsoever. *Deorle* clearly establishes that warnings should be given before causing a suspect serious injury, when feasible. *See* 272 F.3d at 1284. Hafkey opines that "an announcement may have prevented this tragedy," and that "there was absolutely no reason" for officers not to announce police presence and warn Kirk. CSOF ¶ 70. When asked directly whether Roy had enough time to decide not to shoot Kirk, Hafkey's answer was unequivocal: "***All those officers had plenty of time***." CSOF ¶ 80. Also, the evidence suggests Kirk may not have even been aware police had arrived behind him when the shooting began. CSOF ¶ 71.

### b. Defendants' Reliance on "Mistaken Belief" Cases Is Misplaced.

Defendants cite *Valderas v. City of Lubbock*, 937 F.3d 384 (5th Cir. 2019), *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015), and other similar cases decided outside the Ninth Circuit for the proposition that an officer's reasonable but mistaken belief that a suspect is armed justifies deadly force. But these cases support Plaintiffs' position when their facts are properly distinguished. In *Valderas*, the Fifth Circuit emphasized that "events transpired in a matter of seconds" and the officer had "little time to realize" the suspect discarded the firearm. 937 F.3d at 390. Here, by contrast, Roy fired immediately without assessing the scene. *See* CSOF ¶¶ 25, 59. He had approximately four seconds from taking

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

his position to opening fire, during which period he observed Kirk's crouching, sliding, and arm movements, but gave no warning. *See* CSOF ¶ 34. Roy purposefully chose to fire his weapon without assessment – there were no escalating factors or the absence of time to do an assessment. He just fired first and asked questions later. In fact, in body cam footage recorded about ten minutes after his shooting of Kirk, he stated "I think I've calmed down now" while chuckling. CSOF ¶ 74. The question of whether Roy's perception was reasonable, given that he admits he did not actually see a gun, the fact that he did not make any attempt to warn before firing, and the fact that he actually had the luxury of time, are fact questions for the jury.

Similarly, in *Mullins*, the Sixth Circuit noted the officer was "faced with a rapidly escalating situation . . . ." 805 F.3d at 767. Here, the situation was *de*-escalating. Kirk was fleeing from another man with a drawn gun, *see* CSOF ¶¶ 7-8, discarding his weapon, CSOF ¶¶ 19, 43, and retreating to a surrendering position, *see* CSOF ¶¶ 32, 56, not escalating the threat. A reasonable jury viewing the evidence most favorably to Plaintiffs could find the officers' belief that Kirk remained armed was objectively unreasonable, particularly given their complete failure to issue any commands at all. Furthermore, the cold hard facts are that Kirk *was surrendering, had his hands in the air, was seated on the ground and pushed against the storefronts wall. See* CSOF ¶¶ 24, 32, 56.

### c.   The "Purpose to Harm" Standard Does Not Apply.

Defendants argue that the "purpose to harm" standard governs because the situation was rapidly evolving. But even assuming *arguendo* that a heightened standard applies in fast-moving situations, the record here supports the inference that the officers acted with deliberate indifference to Kirk's rights. They responded to an unverified "active shooter" call, *see* CSOF ¶¶ 6, 11, 35, made no effort to confirm the threat, CSOF ¶ 75, gave no warnings, CSOF ¶ 53, and opened fire on a person who was retreating and unarmed, *see* CSOF ¶¶ 17, 19, 24, 32, 56, and who had only brandished a weapon in self-defense because Gonzales-Rios had drawn his weapon on Leontae first, *see* CSOF ¶¶ 7-8.   The failure to take any steps whatsoever to verify the threat or give warnings before deploying lethal

force supports a finding of deliberate indifference, i.e., "the conscious or reckless disregard of the consequences of one's acts or omissions." *See Gantt v. City of L.A.*, 717 F.3d 702, 707 (9th Cir. 2013) (noting that "[w]here actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience"); *see also* CSOF ¶ 75 At a minimum, these are fact questions for the jury.

### III.    **Plaintiffs' Monell Claim Against the City and Sullivan Survives Summary Judgment (Count III).**

A municipality is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) if its policy, custom, or practice was the "moving force" behind a constitutional violation. *See id.* at 694. Plaintiffs may establish *Monell* liability through: (1) an official policy; (2) an established custom; (3) a failure to adequately train employees; or (4) a decision or ratification by a final policymaker. *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010).

#### a.   *Evidence of Custom and Practice*

Contrary to Defendants' assertions, the evidence supports the existence of a custom and practice of deploying excessive force without consequences. First of all, the scope of the problem extends far beyond this case. In 2022 alone, Phoenix had 24 officer-involved shootings, 10 fatal.  CSOF ¶ 85.

Moreover, Sergeant Roy alone has been involved in *four* officer-involved shootings, all resulting in the death of the subject, and was never found to have used excessive force in any of them. *See* CSOF ¶¶ 38, 67; DSOF ¶¶ 38–40. While Defendants characterize these as justified shootings, a reasonable jury could view Roy's pattern, four fatal shootings by a single officer, all found within policy, as evidence that the Department's review process is a rubber stamp that fails to hold officers accountable for the use of lethal force.

This inference is strongly supported by Plaintiffs' expert Hafkey's thorough analysis of PPD's internal investigation of the Kirk shooting. Hafkey concluded that the Professional Standards Bureau investigation was "subpar," prejudicial, and fundamentally flawed. CSOF ¶¶ 37, 64. Specifically:

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

• The investigation included prejudicial references to Kirk being "a known drug user and on felony probation", information the officers did not have and that was irrelevant to the use of force analysis, in what Hafkey describes as "an attempt to prejudice the intended readers, i.e., CIRB members." CSOF ¶ 64.

• The investigation falsely asserted Kirk "fire[d] his handgun northbound at an occupied store" when physical evidence confirmed he never fired. CSOF ¶ 64.

• The investigation completely ignored "one of the most critical aspects of th[e] case:" the officers' failure to announce their presence before using lethal force. CSOF ¶ 64.

• PSB investigators omitted material evidence, failed to interview key witnesses including Officer Ravelo and the helicopter crew, and provided the Critical Incident Review Board with "a completely distorted internal investigation seeming to justify the actions of all officers involved by omitting critical material/evidence." *See* CSOF ¶ 64.

This evidence of a systematically deficient review process is precisely the type of "practice[] of sufficient duration, frequency and consistency" that supports a *Monell* claim. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

### b. The DOJ's Findings Remain Relevant Evidence.

Defendants argue that the DOJ report was "rescinded" and therefore cannot support Plaintiffs' claims. But the rescission of the report does not erase the underlying evidence upon which the DOJ's conclusions were based. The Trump Administration's decision to retract the report was a political decision, not a judicial determination that the findings were incorrect. CSOF ¶ 36. The *evidence* gathered during the investigation including documents, interviews, and data remains relevant, CSOF ¶ 36, and admissible to the extent it satisfies the Rules of Evidence. The DOJ's conclusions may be challenged on weight, but their wholesale exclusion is not warranted at the summary judgment stage. In fact, the City of Phoenix still provides public facing information regarding the DOJ investigation. CSOF ¶ 77.

14

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Notably, the City's own 30(b)(6) designee confirmed that the DOJ found "reasonable cause to believe that the City of Phoenix and the Phoenix Police Department engage in a pattern or practice of conduct that deprives people of their rights under the constitution and federal law," including "excessive force including unjustified deadly force." CSOF ¶ 84. While Orender testified that the report has been "rescinded fully," he also confirmed the City never formally agreed or disagreed with its findings. See CSOF ¶ 84. The City's refusal to take a position on the DOJ's conclusions while simultaneously overhauling its policies in response, as set forth herein speaks volumes.

Additionally, at the same time the DOJ investigation was occurring, City of Phoenix Mayor Kate Gallego, prompted by the police shooting and killing of another individual in September 2022, to whose family the City paid a $5.5 million settlement, stated that "[t]he problem was at a policy level. We did not have the right policies guiding how to respond, so we have dramatically changed what we would do today." CSOF ¶ 78. The City's designated representative verified these statements during its 30(b)(6) deposition. CSOF ¶ 78. His testimony is as if the City itself testified. *See Snapp v. United Transp. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018) ("[An] [entity] generally cannot present a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative.")

Furthermore, Defendants' citation to *Gerow v. U.S. Dep't of Just.*, No. CV-23-01059-PHX-DGC (D. Ariz. Oct. 17, 2024) is inapposite. *Gerow* addressed whether a plaintiff could add a *Monell* claim at the pleading stage. *Id.* at *4. Here, Plaintiffs' *Monell* claim has already survived a motion to dismiss, discovery is complete, and the evidence supporting a custom or practice extends far beyond the DOJ report.

### c. Failure to Train

A municipality's failure to train its employees may give rise to *Monell* liability where the failure "amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The 30(b)(6) testimony of Dennis Orender who is currently the City's Executive Assistant Chief reveals precisely such deliberate indifference. Orender confirmed that the

Department's 40-hour annual in-person training module was discontinued around 2018–2019 and was not restarted until February 2026. CSOF ¶ 65. At the time of the Kirk shooting in November 2022, there was no annual in-person use of force training module in existence. CSOF ¶ 65. Instead, policy updates were communicated through electronic acknowledgments on PowerDMS with no in-person instruction, no scenario-based training, no assessment of comprehension. CSOF ¶ 65. It was not until after Interim Chief Sullivan arrived, who was hired specifically because the City Manager "sought someone with experience dealing with DOJ pattern-or-practice investigations", that PPD implemented mandatory in-person training. *See* CSOF ¶ 65. That 16–20 hour module began in February 2024, over fourteen months after Kirk was killed. *See* CSOF ¶ 65.

Plaintiffs' expert Hafkey confirmed the consequences of this training vacuum. Shockingly, Hafkey testified that PPD stopped providing constitutional law training entirely around 2013. *See* CSOF ¶ 64. The organizational structure of PPD further supports deliberate indifference. The Professional Standards Bureau was placed under "Organizational Professional Development" rather than under an independent investigations division. *See* CSOF ¶ 66.

Additionally, the Critical Incident Review Team ("CIRT") did not exist when Kirk was killed, and performance review boards promised in the City's "Road to Reform" submission to the DOJ were never implemented, as Orender testified he was unfamiliar with them. *See* CSOF ¶ 82.

### d. Ratification by Final Policymaker

Decisions to both maintain, and substantially change, the status quo, by Phoenix PD's final policymaker(s) with no in-person training, no independent review, and no constitutional law instruction were itself policy choices attributable to the City. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). In fact, Mayor Gallego publicly stated in November 2023 regarding the City's $5.5 million settlement in the Ali Osman shooting from September 2022, one month before Kirk was killed that "[t]he problem was at a policy level. We did not have the right policies guiding how to respond." *See* CSOF ¶

16

78. Orender verified these statements during his deposition. *See* CSOF ¶ 78. The City's highest elected official has admitted policy-level failure, which means the City has also done so. *See Snapp*, 889 F.3d at 1103. A jury is entitled to draw the obvious inference.

### e. Subsequent Remedial Measures

Defendants invoke Federal Rule of Evidence 407 to argue that post-incident policy changes are inadmissible. But Rule 407 excludes subsequent remedial measures only when offered to prove "negligence" or "culpable conduct." Fed. R. Evid. 407. Evidence of subsequent measures is admissible for other purposes, including to show "ownership, control, or the feasibility of precautionary measures." *Id.* The City's decision to completely overhaul its use of force policy and implement mandatory in-person training after the Kirk shooting is admissible to show the *feasibility* of the very training and policies Plaintiffs contend should have been in place. *See Gardner v. City of Bullhead City*, CV-23-08078-PCT-GMS (CDB), at 29 (D. Ariz. Mar 18, 2026) (citing Fed. R. Civ. P. 407) (evidence of a city's remedial measures put in place subsequent to an in-custody death was admissible to show the feasibility of such measures to protect other such individuals).

### IV. Plaintiffs' Gross Negligence Claim Survives Summary Judgment (Count V)

Under A.R.S. § 12-820.02(A), public employees acting within the scope of their employment are immune from liability for negligence, but not for gross negligence. *See id.* Defendants argue that Arizona does not recognize a claim for "negligent use of intentionally inflicted force." But Plaintiffs' gross negligence claim is not limited to the use of force itself – it encompasses the gross negligence of the City and Sullivan in failing to adequately train, supervise, and discipline officers. It also encompasses the Officers' failure to provide medical care and their failure to assess the scene prior to utilizing force, as set forth herein.

The evidence of PPD's systematically deficient internal review process, *see* CSOF ¶ 38, inadequate training methodology (written acknowledgments instead of hands-on training), *see* CSOF ¶¶ 41, 65, and the organizational placement of the Professional Standards Bureau, *see* CSOF ¶ 66, among others, all support a finding of gross negligence.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

A reasonable jury could find that the City's failures were not mere negligence but rose to the level of gross negligence – i.e., that it "kn[e]w, or ha[d] reason to know, facts that would [have] lead a reasonable person to recognize their conduct created an unreasonable risk of bodily harm and involved a high probability of substantial harm." *See Roebuck v. Mayo Clinic*, 575 P.3d 375, 383, ¶ 18 (Ariz. 2025).

## V.    Plaintiffs' Negligent Training Claim Survives Summary Judgment.

For the same reasons discussed above regarding training deficiencies, Plaintiffs' negligent training claim survives. The evidence demonstrates that PPD's training on use of force and de-escalation was inadequate: officers typically received policy updates through written bulletins with no in-person training requirement, *see* CSOF ¶¶ 41, 65; the officers in this case uniformly failed to announce their presence or give warnings before deploying lethal force, CSOF ¶¶ 41, 53, 70; Plaintiffs' expert has identified numerous specific training failures, *see* CSOF ¶ 41, and; the Mayor's statements, *see* CSOF ¶ 78, which the City is held to, *see Snapp*, 889 F.3d at 1103. These are quintessential factual disputes that preclude summary judgment.

## VI.    Plaintiffs' Wrongful Death and Survival Claims Survive (Count I).

Defendants argue that Plaintiffs' wrongful death and survival claims fail because the underlying constitutional claims fail. As demonstrated above, the underlying claims are supported by substantial evidence creating genuine disputes of material fact. Because the excessive force, *Monell*, gross negligence, and negligent training claims survive, as set forth in detail above, the wrongful death and survival claims necessarily survive as well.

## VII.    Punitive Damages Are Warranted Against the Individual Officers.

Punitive damages are available against individual officers in § 1983 cases when the officer's conduct was "motivated by evil motive or intent" or "involve[d] "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The evidence shows that officers fired at an unarmed man without any warning, *see* CSOF ¶¶ 16, 19, 25, 32, 34, that Roy emptied his entire magazine into Kirk while Kirk was in a surrendering position, *see* CSOF ¶¶ 25, 44-45, and that the officers'

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

18

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

actions delayed the arrival of medical providers for over thirteen minutes, during which Ladines shot the dying man with a 40mm baton round, *see* CSOF ¶¶ 61-62. Because, as set forth in detail above, "Plaintiffs have raised triable issues as to the constitutionality of [the officers' conduct], the Court [should accordingly also] find[] that the evidence is sufficient to create a triable issue as to whether [that] conduct meets the federal standards for an award of punitive damages." *See Ericson v. City of Phx.*, No. CV-14-01942-PHX-JAT (D. Ariz. Nov 02, 2016) (District of Arizona permitted punitive damages claim against officer to go to a jury, because Plaintiffs' claims against him for excessive force causing death were also sufficient to survive summary judgment); *Mendez v. City of Scottsdale*, No. CV-12-285-PHX-GMS, at **2, 14 (D. Ariz. Sep 06, 2012) (punitive damages claim against officer who grabbed Plaintiff's arm, jammed it up on his back, dropped him to the ground, and slammed his knee into the back of Plaintiff's, was sufficient to go to jury).

## VIII. <u>Plaintiffs' Claim Regarding Failure to Provide Medical Aid</u>

The four-minute delay in initiating life-saving measures, and the near sixteen-minute delay before the Fire Department arrived, CSOF ¶ 61, while Kirk lay dying on the sidewalk, *see* CSOF ¶ 62, raises genuine fact questions about the officers' deliberate indifference to Kirk's serious medical needs. PPD policy states that "life is the highest priority" and requires officers to provide medical care "as soon as reasonably practicable." CSOF ¶ 76. Instead of providing care, officers shot Kirk with a 40mm round, and Garza ordered Ravelo away from Kirk after she had approached to render aid. CSOF ¶¶ 62-63. The Defendants were more concerned about finding a gun on Kirk. Their statements create an issue of fact as to whether they were more concerned with finding a gun to justify their actions than to ensure that medical care could be immediately provided. *see* CSOF ¶ 48 (noting on-scene statements from Ravelo such as "Gun's underneath him?" "I'm not seeing anything" and "Boss, I can't see if he has a gun or not"). These facts, combined with evidence of Roy's failure as scene supervisor to properly direct subordinates or notify the Fire Department in a timely fashion, support the claim that the failure to provide medical aid was the product of policy, custom, or at minimum deliberate indifference.

19

### IX. <u>Plaintiffs' Right to Familial Relations Claim Survives (Count XII).</u>

The Fourteenth Amendment protects a parent's right to the companionship and society of his or her child. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Conduct that "shocks the conscience" in depriving a family of this right is actionable under § 1983. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). To determine whether conduct shocks the conscience, "the court must first ask 'whether the circumstances are such that actual deliberation by the officer is practical.'" *Wilkinson*, 610 F.3d at 554 (quoting *Porter*, 546 F.3d at 1137) (internal punctuation omitted). As set forth in detail herein, the circumstances here allowed the officers sufficient time for deliberation prior to utilizing deadly force. *See* CSOF ¶¶ 34, 54, 70. Because deliberation was practical, here the officer's conduct is subject to a deliberate indifference test. *See Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022). And as set forth in detail herein, the officers' conduct clearly fails that test. Of course, even if deliberation were *not* practical here, though it certainly was, Plaintiffs' loss of companionship still survives because, as set forth in detail herein, by "us[ing] force against a clearly harmless or subdued suspect," the officers "act[ed] with a purpose to harm unrelated to legitimate law enforcement objectives." *See Ochoa*, 26 F.4th at 1056; *Wilkinson*, 610 F.3d at 554. In sum, as demonstrated herein, the officers' actions – shooting an unarmed man without warning, *see* CSOF ¶¶ 16, 25, 32, emptying an entire magazine into his body while he retreated, *see* CSOF ¶¶ 24, 25, 56, and then delaying medical aid, *see* CSOF ¶ 61 – are sufficient for a jury to find conscience-shocking conduct. Summary judgment is inappropriate on this claim.

### CONCLUSION

The record in this case is replete with genuine disputes of material fact that preclude summary judgment. Viewing the evidence in the light most favorable to Plaintiffs, as this Court must, a reasonable jury could find that:

- Kirk was unarmed when Sergeant Roy and Officer Garza fired, CSOF ¶ 19;
- Kirk was retreating, surrendering, in a defensive posture, and/or completely subdued at the times each of the Officers shot him, *see* CSOF ¶¶ 16, 24, 32, 56, 58, 62;

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

20

- Kirk never fired his gun, *see* CSOF ¶¶ 6, 11, 64, and no evidence shows he ever pointed or brandished it Officers;

- The "active shooter" designation was erroneous, CSOF ¶¶ 6, 9-11, 35, and the officers failed to verify the threat, *see* CSOF ¶¶ 30, 34, 75;

- Kirk only drew his gun defensively, and in response to another man drawing a gun on him first, CSOF ¶¶ 7, 52;

- No officer announced police presence or gave Kirk any warning or opportunity to comply, CSOF ¶¶ 53, 64, 70;

- Roy's decision to fire seventeen consecutive rounds without assessment was excessive, *see* CSOF ¶¶ 25, 59;

- PPD's internal review process systematically shields officers from accountability, *see* CSOF ¶¶ 37-38;

- The City failed to adequately train officers on de-escalation and the use of deadly force, *see* CSOF ¶ 41; and

- Officers delayed medical care while Kirk lay dying, *see* CSOF ¶¶ 61-62.

Accordingly, and in light of all the foregoing, the Court should deny Defendants' Motion, and decline to grant them summary judgment on Plaintiffs' claims.

**RESPECTFULLY SUBMITTED** this 13th day of April 2026.

**MILLS + WOODS LAW, PLLC**

By  */s/ Sean A. Woods*
        Robert T. Mills
        Sean A. Woods
        5055 North 12th Street, Suite 101
        Phoenix, AZ 85014
        *Attorneys for Plaintiffs*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Sarah L. Barnes
slb@bowwlaw.com
Jeremiah M. Sullivan
jms@bowwlaw.com
**BROENING OBERG WOODS & WILSON, P.C.**
kel@bowwlaw.com
szb@bowwlaw.com
rla@bowwlaw.com
2800 N Central, 16th Floor
Phoenix, AZ 85004
*Attorney for Defendants City of Phoenix, Sullivan, Ladines, Garza, Roy, Makic, Ravelo, Ramirez, Howard, Traylor, and Reddy*


    */s/ Ben Dangerfield*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

22