Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
rmills@millsandwoods.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Kashane Kirk, as Personal Representative and on behalf of the Estate of Leontae Kirk; Sharon Roberts, individually; Brittnie Turner, on behalf of and as legal guardian and parent of her minor child, MC, <br><br> Plaintiffs, <br><br> vs. <br><br> City of Phoenix, a governmental entity; Michael Sullivan, Chief of the Phoenix Police Department; Autumn Ladines and John Doe Ladines, husband and wife; Officer Antonio Garza and Jane Doe Garza, husband and wife; Sergeant Eric Roy and Jane Doe Roy, husband and wife; Jaclyn Ravelo and John Doe Ravelo, husband and wife; Steven Ramirez and Jane Doe Ramirez, husband and wife, and; Jonathan Howard and Jane Doe Howard, husband and wife, <br><br> Defendants. | No.: CV-23-00836-PHX-MTL (CDB) <br><br> **PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> (Assigned to the Honorable Michael T. Liburdi and referred to the Honorable Camille D. Bibles) |

Through undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of Civil Procedure, Plaintiffs hereby submit their Controverting Statement of Facts ("CSOF") in opposition to Defendants' Motion for Summary Judgment and its accompanying Statement of Facts ("DSOF") in support.  This

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Controverting Statement of Facts is comprised of: (I) Plaintiffs' Response to the DSOF, and; (II) Plaintiffs' Additional Facts Precluding Summary Judgment. Statements from the DSOF that are identified as "Admitted" are admitted solely for purposes of Defendants' Motion for Summary Judgment.

This Controverting Statement of Facts is supported by the relevant parts of the record in this matter. In particular, it is supported by the following Exhibits attached hereto: "**Exhibit 1**," the Police Expert Opinion issued by Mark Hafkey; "**Exhibit 2**," additional excerpts from the transcript of Eric Roy's deposition; "**Exhibit 3**," excerpts from the transcript of the City of Phoenix's 30(b)(6) deposition; "**Exhibit 4**," additional excerpts from the transcript of Jaclyn Ravelo's deposition; "**Exhibit 5**," additional excerpts from the transcript of Steven Ramirez' deposition, and; "**Exhibit 6**," excerpts from the transcript of Mark Hafkey's deposition.

### I. PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

**1.** Admitted that a 9-1-1 call was placed. Plaintiffs note, however, that the caller did not report that Kirk had fired a weapon or that anyone was injured. *See* DSOF, Ex. A.

**2.** Admitted.

**3.** Admitted.

**4.** Admitted that Officer Ramirez observed Kirk from the helicopter, but controverted to the extent it implies Ramirez had a clear and accurate view of events. Ramirez was observing from approximately 500–600 feet above the scene. *See* DSOF, Ex. E at 33:14–34:5.

**5. Controverted.** While Ramirez reported that Kirk was "shooting at people," Ramirez admitted at his deposition that he only "*perceived*" Kirk to be shooting. He never confirmed actual gunfire, never observed muzzle flashes, and could not hear gunshots from his altitude. *See* DSOF, Ex. E at 33:14–34:5. That is because Kirk

*never fired his weapon*. *See* **Ex. 1** at 28, 30-32. Ramirez's report was based on assumption and speculation, not confirmed observation. **Ex. 1** at 5–8.

6.     Admitted that dispatch reported "we have an active shooter," but controverted to the extent this characterization is presented as accurate. The "active shooter" designation was based entirely on Officer Ramirez's unverified perception, as Kirk never fired his weapon. *See* DSOF, Ex. E; **Ex. 1** at 4, 6-9.

7.     **Controverted in part.** Admitted that video footage shows Kirk with a gun in the parking lot. Controverted to the extent it characterizes Kirk as acting as an aggressor against "innocent bystanders." Surveillance video establishes that Kirk drew his weapon *in response to* Humberto Gonzalez-Rios first brandishing a pistol at Kirk. *See* DSOF, Ex. F 0:52-1:02; DSOF ¶ 8; **Ex. 1** at 6. Kirk was *responding* to a threat, not initiating one.

8.     Admitted. This fact is critical: Kirk drew his weapon *in response to* Gonzalez-Rios brandishing a pistol at him. Surveillance video from the strip mall confirms that Gonzalez-Rios threatened Kirk *first*. *See* DSOF, Ex. F 0:52-1:02; **Ex. 1** at 6. None of the responding officers were aware of Gonzalez-Rios's role when they arrived at the scene.

9.     Admitted. This is significant because Ramirez's failure to observe the other armed individual who had threatened Kirk led to the erroneous characterization of Kirk as an "active shooter" rather than a person defending himself against an armed threat. **Ex. 1** at 9.

10.     Admitted that Gonzalez-Rios fled after Ladines fired. Plaintiffs note that Sergeant Howard, the helicopter pilot, independently observed what appeared to be Kirk "exchanging gunfire with someone," but this critical information was never relayed to ground units. **Ex. 1** at 24. Had this information been communicated, responding officers would have known Kirk may have been defending himself rather than acting as an active shooter. **Ex. 1** at 24-25.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

3

**11.** Admitted that the officers responded, but controverted to the extent it implies the "active shooter" designation was accurate. As set forth above, Kirk never fired his weapon and the designation was based on Ramirez's unverified perception. *See* **Ex. 1** at 28, 30-32.

**12.** Admitted. Officer Ladines's failure to activate her body-worn camera was a violation of PPD policy and resulted in the destruction of critical evidence from the first moments of the encounter. *See* DSOF, Ex. N at 43:25–44:8. Ladines attributed this failure to "human error." *Id.*

**13.** Admitted.

**14.** Admitted.

**15.** Admitted.

**16.** **Controverted in part.** Admitted that Ladines fired four rounds at approximately 16:29:50. Controverted to the extent it implies Ladines had a reasonable basis for opening fire. Ladines gave *no warnings* before firing. When asked directly, "Do you recall giving Leontae any warnings?" Ladines answered: "No." DSOF, Ex. N at 14:12-13. She fired at Kirk's back while he was facing away from her, aiming at "center mass at Mr. Kirk's back." *See id.* at 25:2-10. Officer Ravelo, who arrived with Ladines and was steps behind her, testified she did *not* see Kirk with a gun and did *not* see Kirk firing. *See* DSOF, Ex. M at 28:8-10. Kirk never fired his weapon. *See* **Ex. 1** at 28, 30-32.

**17.** **Controverted in part.** Roy testified he saw Kirk with a firearm upon initially approaching the scene. However, Roy subsequently admitted under oath that he did *not* see a gun in Kirk's hand when he deployed deadly force: "I don't recall seeing a gun. However, his positioning and the way he crouched with his arm extended led me to believe he was armed." DSOF, Ex. L at 122:22-123:7.

**18.** Admitted.

**19.** Admitted. This is a critical undisputed fact: Kirk discarded his firearm outside of the officers' view *before* Sergeant Roy and Officer Garza deployed deadly force.

4

*See* **Ex. 1** at 20. The gun was subsequently recovered underneath a vehicle approximately ten feet from Kirk's body. *See* DSOF, Ex. O at 6.  Kirk was *unarmed* when Roy fired seventeen rounds and Garza fired three rounds into his body. *See* Ex. 1 at 19-20.

**20.**  Admitted.

**21.**  Admitted that Roy observed Kirk with a firearm while initially approaching the scene. However, Roy admitted he did not see a gun in Kirk's hand at the time he opened fire.  DSOF, Ex. L at 122:18-123:7.

**22.**  Admitted.

**23.**  Admitted. Plaintiffs note that Roy took a tactical position to engage Kirk but gave no announcement of police presence or warning before deploying deadly force. *See* **Ex. 1** at 15-16

**24.**  **Controverted in part.** Admitted that Kirk emerged from between the vehicles. The characterization of Kirk as having an "outstretched right arm" is disputed to the extent it implies Kirk was pointing a weapon. Roy admitted he did not see a gun in Kirk's hand when he emerged. DSOF, Ex. L at 122:18-123:7. Video evidence and expert analysis show Kirk was in a crouching or seated position, sliding backwards with his hands visible in a defensive posture and not extending a weapon toward officers. *See* DSOF, Ex. H at 0:31-40; **Ex. 1** at 16; DSOF, Ex. L at 120:12-123:7.

**25.**  Admitted that Roy fired seventeen rounds beginning at 16:30:01. Plaintiffs note this constituted Roy's entire magazine, fired within six seconds, without pause or assessment and without any prior warning or announcement.  *See* **Ex. 1** at 16-17; DSOF, Ex. H at 0:31-43. As Hafkey opines, PPD training primarily instructs officers to "shoot a few rounds center mass and then assess the threat before continuing to fire," as "[c]ontinuing to fire would effectively negate an officer's ability to assess a continuing imminent threat." **Ex. 1** at 16.

**26.**  Admitted.

**27.**  Admitted.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**28.** **Controverted in part.** Admitted that Garza heard gunshots and exited his vehicle. Controverted to the extent it states Garza "saw Kirk armed with a gun." Garza told investigators he "couldn't see [Kirk's] hands" before firing.  DSOF, Ex. O at 12. Plaintiffs' expert concludes there was no weapon visible in Kirk's hands when Garza opened fire. **Ex. 1** at 19.

**29.** Admitted.

**30.** Admitted. Garza's own statement, "where is he?", demonstrates that Garza did not have Kirk in his field of vision at the time Roy began firing. He could not see Kirk, could not assess whether Kirk was armed, and could not determine whether Kirk posed a threat.

**31.** Admitted.

**32.** Admitted that Garza fired three rounds within one second of Kirk coming into his field of vision. Controverted to the extent it implies this response was reasonable. Garza fired without any warning or announcement, at a person who had no visible weapon, who was surrounded by officers on three sides and against a building, and who appeared to be in a defensive posture. *See* **Ex. 1** at 14–15.  Garza had a scope on his rifle and was looking directly at Kirk while he was in a surrendering position. *See* DSOF, Ex. I at 0:58-1:20.

**33.** Admitted.

**34.** Admitted that approximately 20 seconds elapsed. Plaintiffs note that this was sufficient time for officers to assess the scene, announce their presence, and issue commands, none of which occurred.  *See* **Ex. 1** at 11-12, 17. Roy had approximately four seconds from taking his position to opening fire, during which period he observed Kirk's movements but gave no warning. *See* DSOF, Ex. H at 0:30-35.

**35.** **Controverted.** While Defendants' expert opines the use of force was reasonable, Plaintiffs' expert, retired Phoenix Police Lieutenant Mark Hafkey, opines unequivocally that the officers' use of deadly force was objectively unreasonable under the Fourth Amendment. *See* **Ex. 1** at 3. Hafkey identifies numerous failures:

erroneous "active shooter" designation based on unverified perceptions, *see* **Ex. 1** at 4-9; failure by any officer to announce police presence, *see* **Ex. 1** at 12, 15, 19; failure to issue warnings, *see id.*; Roy's decision to empty his entire magazine without assessment, *see* **Ex. 1** at 16-17; firing at an unarmed individual in a defensive posture, *see id.*; and creation of danger to bystanders through reckless backdrop choices, *see* **Ex. 1** at 13-14. This conflicting expert testimony alone creates a genuine dispute of material fact precluding summary judgment. And importantly, *no court or tribunal has ever excluded Hafkey's testimony or opinion in a case involving use of force.* **Ex. 6** at 156:18-20.

36. **Controverted.** While the Trump Administration rescinded the DOJ report in May 2025, this was a political decision, not a judicial determination that the underlying findings were incorrect. The evidence gathered during the DOJ investigation, documents, interviews, data, remains relevant. The rescission does not erase the factual basis for the DOJ's conclusions regarding Phoenix Police Department practices.

37. Admitted that Defendants' records show no prior instances of *sustained* findings of excessive force against Ladines or Garza. This fact, however, is only relevant to the extent it reflects the adequacy of PPD's internal review process. As Plaintiffs' expert Hafkey demonstrates and opines, PPD's Professional Standards Bureau investigation of the Kirk shooting itself was "subpar," prejudicial, and fundamentally flawed, omitting critical evidence and providing the CIRB with a distorted investigation. *See* **Ex. 1** at 26-33.

38. Admitted. Plaintiffs note this is the first of *four* officer-involved shootings by Sergeant Roy, all of which resulted in the death of the subject, all of which were found "within policy." *See* DSOF, Ex. U at 1; DSOF ¶¶ 39-40. A reasonable jury could conclude that this pattern reflects a systematically deficient review process rather than four instances of perfectly reasonable force.

39. Admitted. *See* CSOF ¶ 38.

7

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

40.     Admitted that on August 18, *2018* (not "2028" as stated in DSOF), Roy deployed deadly force against a fleeing suspect. Plaintiffs note that the evidence, including video evidence, shows Roy's service weapon was already drawn before he encountered the suspect, and Roy continued firing after the suspect fell to the ground. *See* **Ex. 2** at 96-97, 101; CSOF ¶ 38.

41.     **Controverted.** While Defendants produced training records, the characterization of the training as "extensive" is a legal conclusion unsupported by the cited evidence. The 30(b)(6) testimony of Dennis Orender reveals that, with rare exceptions for "very important" updates, PPD policy updates on use of force typically are communicated merely through written bulletins that officers only need to sign (initially on paper, and now just electronically) acknowledging receipt, no in-person training is usually required. *See* **Ex. 3** at 67:5-70:17. The officers' uniform failure to announce their presence, give warnings, or follow PPD's own de-escalation policies demonstrates that whatever training was provided was grossly inadequate. *See* **Ex. 1** at 11-21.

## II. PLAINTIFFS' ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT

42.     Kirk never fired his weapon during the November 2, 2022, incident. *See* **Ex. 1** at 28, 30-32.

43.     Kirk's firearm was recovered underneath a vehicle approximately ten feet from where Kirk's body came to rest, indicating Kirk discarded the weapon before being shot by Roy and Garza. *See* **Ex. 1** at 20; DSOF, Ex. O at 6.

44.     Sergeant Roy admitted under oath that he did not see a gun in Kirk's hand when he deployed deadly force: "I don't recall seeing a gun. However, his positioning and the way he crouched with his arm extended led me to believe he was armed with a gun, which I had seen him with when he ran between the vehicles." DSOF, Ex. L at 122:23-123:2.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

45. Roy further acknowledged: "I don't recall seeing a gun in his hand" when Kirk was crouched down. DSOF, Ex. L at 123:6-7. Roy's belief that Kirk was armed was based solely on what Kirk's "arm and body position suggested" to him. *Id.* at 123:7.

46. Officer Ravelo, who arrived at the scene with Ladines and was the only non-shooting officer to observe the encounter, testified she did not see Kirk with a gun: "No, I did not see that." *See* DSOF, Ex. M at 28:8-10.  As a result, she also testified that she did not shoot. *See* DSOF, Ex. M at 28:8-16.  In fact, she testified that she saw a person casually sitting at the bus stop in front of the scene. *See* **Ex. 5** at 46:11-20. That person did not leave until he saw Officer Ravelo brandishing a gun. *See* DSOF, Ex. J at 0:25-29.

47. Ravelo was unsure whether Kirk was even the subject of their call because "he did not match the description, and she did not see Leontae with a weapon." *See* **Ex. 4** at 34:24-35:8.

48. After Kirk was shot and officers approached, Ravelo's on-scene statements reflect her uncertainty about whether Kirk had a weapon: "Gun's underneath him?" "I'm not seeing anything." "Boss, I can't see if he has a gun or not." *See* DSOF, Ex. J at 1:40-42, 3:29-32, 3:49-51.

49. Officer Garza did not indicate to Police Investigators that he had any fear for his or others' safety. *See* **Ex. 1** at 20.

50. Officer Ramirez admitted at deposition that he only "perceived" Kirk to be shooting: "Saw what I perceived to be shooting, yes." *See* DSOF, Ex. E at 29:2-8. Ramirez never confirmed actual gunfire – i.e., he never saw muzzle flashes, and could not have heard gunshots from his altitude. *See id.* at 34:21-23; **Ex. 1** at 6-7.

51. Sergeant Howard, the helicopter pilot, told criminal investigators that Kirk "looked to be exchanging gunfire with someone . . . ." **Ex. 1** at 7.  This critical information, which would have alerted ground units that another armed individual was involved, and that Kirk may have been defending himself, was never relayed to responding

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

officers. **Ex. 1** at 7-8 (opining that had the responding Officers known this, it "would have likely changed the manner of response").

52. Surveillance video from the strip mall confirms that Humberto Gonzalez-Rios brandished a pistol at Kirk *first*, and that Kirk drew his weapon in response to Gonzalez-Rios's threat. *See* DSOF, Ex. F 0:52-1:02; **Ex. 1** at 6.

53. Not a single shooting officer gave a warning or announced police presence before deploying lethal force. **Ex. 1** at 11-12. Roy claimed he "didn't have time" to give warnings. *See* **Ex. 2** at 144:4-9. Garza gave no announcement before firing. **Ex. 1** at 19.

54. Roy's claim that he lacked time for warnings is contradicted by his own testimony that he had sufficient time to observe Kirk's movements, watch Kirk crouch down, and see Kirk slide backwards on his buttocks. *See* **Ex. 2** at 144:10-12, 158:14-159:10.

55. Kirk was essentially surrounded by officers on three sides and up against a building. **Ex. 1** at 11. He was not a flight risk. *See id.* Officers had access to ample cover including the pony wall running north and south, parked vehicles, and the side wall of the strip mall. *See* **Ex. 1** at 17.

56. Video evidence and testimony show Kirk ended up in a seated position on the ground, sliding backwards on his buttocks with his hands on the ground in a defensive posture, not advancing toward officers or pointing a weapon. *See* DSOF, Ex. H at 0:31-41; DSOF, Ex. I at 0:59-1:27; DSOF, Ex. L at 120:11-122:15; **Ex. 1** at 16, 19.

57. After Roy began firing, he never saw Kirk raise a weapon at anyone. *See* DSOF, Ex. H at 0:32-1:03, 3:30-55.

58. Officer Ladines fired at Kirk from behind, aiming at "center mass at Mr. Kirk's back." DSOF, Ex. N at 25:7-10. Kirk was facing away from Ladines when she fired. **Ex. 1** at 10.

59. PPD training primarily instructs officers to "shoot a few rounds center mass and then assess the threat before continuing to fire . . . ." **Ex. 1** at 16. Roy's decision to fire seventeen consecutive rounds, his entire magazine, without pause or assessment violated this training principle. *See* **Ex. 1** at 16-17. In addition, Hafkey testified PPD has specific training on the issue of "contagious fire" – training them that "each officer has an individual duty to assess the imminent threat that's presented to them and not rely upon another officer shooting and make an assumption that he's being shot because of a threat." *See* **Ex. 6** at 171:24-172:3. This directly undermines Garza's justification for opening fire after hearing Roy shoot.

60. The officers' bullets endangered nearby civilians and businesses. As Hafkey opines, "evidence shows at least one ricochet strike off the cement, at least one bullet strike into a mirror located within the Grand Stop business itself, one bullet strike on the glass window of the Grand Stop-2, and two wall strikes on the exterior wall of JR's Cellular near Leontae Kirk's body." **Ex. 1** at 17. At least two parked vehicles were struck by officers' bullets. **Ex. 1** at 14, 30. Multiple occupied businesses with glass windows and doors were in the officers' backdrop. *See* **Ex. 1** at 29-30. "Officer Garza's rounds passed just one parking stall's width from an occupied vehicle . . . ." **Ex. 1** at 30.

61. "Video evidence shows that the last bullet shot at Leontae occurred at approximately 16:30:06 hours. It was not until approximately 16:34:10 hours [a four minute delay] that any lifesaving attempts were made." **Ex. 1** at 21. "It was not until approximately 16:43:13 hours that Fire was told to come on scene, despite the fact that Fire had been waiting in a staging area nearby. Fire did not arrive until 16:45:51 hours. This was almost 16 minutes after the last bullet hit Leontae." *Id.*

62. During the delay in providing medical aid, Officer Ladines shot Kirk with a 40mm less-lethal round, despite Kirk being visibly limp, non-responsive, and surely dying. **Ex. 1** at 18, 21; *see also* DSOF, Ex. K at 0:21-30.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

11

63. Officer Garza ordered Officer Ravelo, who had approached Kirk to provide aid, away from Kirk's body. *See* **Ex. 1** at 21.

64. Plaintiffs' expert Mark Hafkey, a retired Phoenix Police Lieutenant, opines that the Professional Standards Bureau investigation of the Kirk shooting was "subpar," prejudicial, and fundamentally flawed. *See* **Ex. 1** at 3, 26-27, 33. Specifically, the investigation: included prejudicial references to Kirk being "a known drug user and on felony probation" (information the officers did not have), something irrelevant to the use of force analysis and an apparent "attempt to prejudice the intended readers, i.e., CIRB members," *see* **Ex. 1** at 27-28; falsely asserted Kirk "fire[d] his handgun northbound at an occupied store" when physical evidence confirmed he never fired, *see* **Ex. 1** at 28, 31; completely ignored "one of the most critical aspects of th[e] case," the officers' failure to announce their presence before using lethal force, **Ex. 1** at 32; failed to interview key witnesses including Officer Ravelo and the helicopter crew, *see* **Ex. 1** at 28-29, 32; and provided the CIRB with "a completely distorted internal investigation seeming to justify the actions of all officers involved by omitting critical material/evidence," **Ex. 1** at 31-32. Hafkey opines that Phoenix police training has been particularly inadequate because "the constitutional law training has virtually been eliminated in Phoenix since about 2013, and so they're not getting the same constitutional law training that was supported in a partnership prior to that day." *See* **Ex. 6** at 92:22-93:7.

65. PPD's 40-hour annual in-person training module was discontinued around 2018–2019 and was not restarted until February 2026. At the time of the Kirk shooting in November 2022, there was no annual in-person use of force training module in existence. Instead, officers were only required to electronically acknowledge policy updates through a system called PowerDMS, with no in-person instruction, scenario-based training, or assessment of comprehension. *See* **Ex. 3** at 65-71. After Interim Chief Sullivan, hired specifically because the City Manager "sought someone with experience dealing with DOJ pattern-or-practice investigations and

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

the reform process," *see* **Ex. 3** at 105:9–13, revised Operations Order 1.5, the Department implemented a mandatory 16–20 hour in-person use of force training module beginning in February 2024, over fourteen months after Kirk's death, *see* **Ex. 3** at 70-75.

66. In 2022, the Professional Standards Bureau, which investigates officer misconduct, was placed under "Organizational Professional Development" rather than under an independent investigations division. *See* **Ex. 3** at 34:4-35:10.

67. Including Leontae Kirk's killing, Sergeant Roy has been involved in four officer-involved shootings during his career with the Phoenix Police Department. *See* DSOF, Ex. U at 1; DSOF ¶¶ 39-40. All four resulted in the death of the subject, and all four were found to be "within policy." *See* DSOF, Ex. U at 1; DSOF ¶¶ 39-40.

68. Roy's disciplinary history includes a written reprimand for losing a city-issued Colt AR-15 patrol rifle that was stolen from his vehicle and never recovered, **Ex. 2** at 50:3-22, and an 8-hour suspension for driving 120 miles per hour on SR-51 with his children in the vehicle, **Ex. 2** at 52:8-53:16, 55:22-56:20.

69. Plaintiffs' expert Hafkey opines that the "active shooter" protocol does not supersede the Fourth Amendment, **Ex. 1** at 10, and states that "[a]lthough the objective is to quickly neutralize an active shooter, constitutional law must still be followed. In other words, the old adage of shooting first and asking questions later simply does not apply," **Ex. 1** at 5.

70. Hafkey further opines that "an announcement may have prevented this tragedy," **Ex. 1** at 32, and that "there was absolutely no reason" for officers not to announce police presence and warn Kirk to drop any weapon, *see* **Ex. 1** at 12, given the ample time, distance, cover, and backup available, *see* **Ex. 1** at 12, 17.

71. Evidence suggests Kirk may not have even been aware that police had arrived behind him when the shooting began. *See* **Ex. 1** at 17.

72. Officer Ladines claimed in her deposition that after exiting her vehicle she observed Kirk "with a gun in his hand pointed out towards the northeast and what appeared

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

to be firing it multiple times," DSOF, Ex. N at 14:18-21, even though in reality Kirk never fired his gun, *see* **Ex. 1** at 28, 30-32.

73. PPD policy prohibits the use of firearms "under circumstances in which a substantial and unjustifiable risk of injury or death to bystanders exists." **Ex. 1** at 14.

74. In body cam footage about ten minutes after his shooting of Kirk, Roy stated "I think I've calmed down now" while chuckling. *See* DSOF, Ex. H at 10:50-10:56.

75. Hafkey opines that the responding Officers' failure to take any steps whatsoever to verify the purported threat or give warnings before deploying lethal force show that such force was excessive and/or unreasonable. *See* **Ex. 1** at 11, 12, 17.

76. PPD policy states that "life is the highest priority" and requires officers to provide medical care "as soon as reasonably practicable." *See* **Ex. 1** at 13.

77. The City of Phoenix still provides public facing information regarding the DOJ investigation. *See* https://dojrecords.phoenix.gov

78. City of Phoenix Mayor Kate Gallego, prompted by the police shooting and killing of another individual in September 2022, to whose family the City paid a $5.5 million settlement, stated that "[t]he problem was at a policy level. We did not have the right policies guiding how to respond, so we have dramatically changed what we would do today," **Ex. 3** at 131:18-23. The City's designated representative verified these statements during its 30(b)(6) deposition. *See* **Ex. 3** at 131:18-23.

79. Hafkey opined that if he were in the officers' shoes, he would have acted differently. First, he would have arrived with lights and sirens. **Ex. 6** at 165:14. If he saw someone with a gun, he at first would have stayed in his car behind his engine block and used his PA to announce the presence of police and order him to drop the weapon. *See* **Ex. 6** at 165:16-23. If he had exited his vehicle like Garza and Ladines, he would have taken a position behind cover and kept issuing warnings, in order to give the suspect the opportunity to surrender. *See* **Ex. 6** at 163:24-164:9.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

80. When asked directly whether Roy had enough time to decide *not* to shoot Kirk, Hafkey's answer was unequivocal: "***All those officers had plenty of time***." *See* **Ex. 6** at 169:8-12 (emphasis added).

81. Hafkey testified repeatedly that simply having a gun, or even the belief someone has a gun, is insufficient to justify deadly force. He stated "the fact that you have a weapon in your possession, in your hand is not enough to apply deadly force because you have the ability, the suspect has the ability to apply that force. There needs to be more articulable facts that a particular person is under threat or the officer himself is under threat." **Ex. 6** at 28:9-15. And even more directly, "if there's no gun in their hand, a belief that somebody is [armed] is not sufficient in my mind. There's no means there." **Ex. 6** at 86:11–13.

82. The Critical Incident Review Team ("CIRT") that now investigates officer-involved shootings did not exist in November 2022 when Kirk was killed. *See* **Ex. 3** at 110:2–4. The performance review boards described in the City's "Road to Reform" document submitted to the DOJ, boards that would include community representation, labor unions, rank-and-file officers, training, legal, and the Office of Accountability and Transparency, have never been implemented. *See* **Ex. 3** at 114:15–23.

83. The Office of Accountability and Transparency ("OAT"), the City's civilian oversight entity, has no enforcement power. OAT can only make recommendations; the police chief unilaterally decides whether to accept or reject them, and OAT "cannot change" any investigation. *See* **Ex. 3** at 107:12–108:7.

84. The City was under investigation by the Department of Justice at the time of the Kirk shooting in November 2022. The DOJ subsequently found "reasonable cause to believe that the City of Phoenix and the Phoenix Police Department engage in a pattern or practice of conduct that deprives people of their rights under the constitution and federal law," including "excessive force including unjustified deadly force." *See* **Ex. 3** at 119:9–120:22. While the DOJ report has since been

rescinded, the City never formally agreed or disagreed with its findings. *See* **Ex. 3** at 121:8–12.

85.    In 2022, the year Kirk was killed, Phoenix had 24 officer-involved shootings, of which 10 were fatal (41%). *See* **Ex. 3** at 125:7-21.

86.    Sullivan's revision of Operations Order 1.5 added requirements for "proportional" force, a de-escalation mandate, a duty to intervene, the concept of officer-created jeopardy, and an independent Force Evaluation Review Unit outside the chain of command, none of which existed in the policy at the time of Kirk's death. *See* **Ex. 3** at 70–78.

87.    The City's media advisory for the Kirk shooting stated that officers found "multiple people with guns in the parking lot" and "the officer saw one of the men shooting his gun at others." Orender acknowledged the importance of accurate public information and that inaccurate information "could erode trust." *See* **Ex. 3** at 90:10–92:22.

**RESPECTFULLY SUBMITTED** this 13th day of April 2026.

                                                  **MILLS + WOODS LAW, PLLC**

                                  By    */s/ Sean A. Woods*
                                          Robert T. Mills
                                          Sean A. Woods
                                          5055 North 12th Street, Suite 101
                                          Phoenix, AZ 85014
                                          *Attorneys for Plaintiffs*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Sarah L. Barnes
slb@bowwlaw.com
Jeremiah M. Sullivan
jms@bowwlaw.com
**BROENING OBERG WOODS & WILSON, P.C.**
kel@bowwlaw.com
szb@bowwlaw.com
rla@bowwlaw.com
2800 N Central, 16th Floor
Phoenix, AZ 85004
*Attorney for Defendants City of Phoenix, Sullivan, Ladines, Garza, Roy, Makic, Ravelo, Ramirez, Howard, Traylor, and Reddy*


        */s/ Ben Dangerfield*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix., AZ 85014
480.999.4556