# EXHIBIT 1

**Police Expert Opinion**
**Retired Phoenix Police Lieutenant Mark R. Hafkey, M. Ed.**

Mills + Woods Law, PLLC
Sean A. Woods, Esq.
5055 N. 12th Street, Suite 101
Phoenix, Arizona 85014

Case No: CV-23-00836-PHX-MTL (CBD) - Leontae Kirk Matter

Dear Mr. Woods:

Pursuant to your request, I have reviewed the below listed information and material relating to the above referenced case, and I have developed opinions related to common police training, practices, policies and procedures, as well as use of force in this matter. The opinions expressed herein I genuinely hold, and I am willing to testify to them in open court, under oath.  My qualifications to express these opinions are revealed in the attached *Curriculum Vitae*, which details my education, law enforcement training, and experience. My opinions are derived from and supported by the below listed case file and research material, case law, law enforcement training and experience, and common police policies, practices, procedures supported by *Best Practices'* guidelines established by the International Association of Chiefs of Police (IACP).


**Experience as an Expert Witness:**

I retired from the Phoenix Police Department in 2012 and made myself available as a police policy, practices, and procedures' expert witness in 2015 after being recommended by former counsel for a specific case.  It is not something I do fulltime.  I occasionally provide my opinion on cases I feel strongly about and work primarily by referral.  To date, I have

provided opinion(s) on a handful of cases, in support of both Plaintiffs and Defendants, relating to vehicular homicide, use of force, and traffic matters.   Finally, I understand that discovery is an ongoing process and could reveal yet other information relevant to the formulation of my opinions in this matter.   I have also been informed that there is still outstanding discovery and that disputes have arisen regarding production of certain documents and, therefore, I reserve the right to modify or supplement my opinions upon receipt of further documentation produced in this matter.

**Case Material Reviewed:**

- Plaintiff's Complaint
- Phoenix Police Department Incident Report 20220000 1649094
- Security Surveillance Videos from Strip Mall
- Radio / Dispatch Audio Recording
- Police Body Cam Videos of Sergeant Roy, Officer Garza and Officer Ravelo
- PPD Critical Incident Debriefing Video
- Training Records for Shooter Officers
- Deposition Transcripts for Sergeant Roy, Officer Ravelo, Officer Ladinas, Officer Ramirez, and Sergeant Howard
- Professional Standard's Investigation of Sergeant Roy and Officers Ravelo and Ladines SH22-0022

**Research Material:**

- Limited Phoenix Police Department Operations Orders
- Cases:
  - Graham v Connor, 490 US 386 (1989)
  - Deorle v Rutherford, 272 F3d 1272 (9th Cir 2001)
  - Tennessee v Garner, 471 US 1 (1985)
  - Brosseau v Haugen, 543 US 194 (2004)
  - Kisela v Hughes, 138 S Ct 1148 (2018)
  - Harris v Roderick, et al, 126 F2d 1189 (1997)
  - Gonzalez v Anaheim, 747 F3d 789 (9th Cir 2014)

      o      Young v County of Los Angeles, 655 F3d 1156 (9th Cir 2011)
      o      Nelson v Davis, 685 F3d 867 (9th Cir 2012)
      o      White v Pauly, 580 US (2017)

**Opinion(s):**

1. It is my opinion that the fatal shooting of Leontae Kirk by Phoenix Police Officers on November 2, 2022, was unreasonable under the Fourth Amendment.   A series of Phoenix police officer errors led to the wrongful death of Leontae Kirk.  The errors included, but are not limited to, miscommunication, erroneous communication, reckless and poor tactics, violations of police policy, practices & procedures, and the use of excessive force.

2. It is my opinion that the Phoenix Police Officers' actions in failing to provide immediate life-saving measures such as compressions, wound seals, or CPR was unreasonable and violated Leontae Kirk's rights by making the conscious decision to not provide timely needed and potential life-saving medical care. Instead, they shot him with 40mm rounds, saw he was non-responsive, and still failed to approach him for approximately four minutes. Additionally, the Fire Department was not told to come to the scene for another nine minutes despite waiting in a staging area nearby. Fire finally arrived on scene from their staging location close to sixteen minutes after Kirk was last shot.

3. The Phoenix Police Department's Professional Standards Bureau written investigation was subpar, i.e., it contained prejudicial references toward Leontae Kirk, it contained assertions not supported by the facts, it failed to address critical issues, and it omitted material evidence.

**My Opinions regarding the Actions of Helicopter Flight Officer Ramirez:**

It is my opinion that Officer Ramirez failed to communicate his observations accurately, which changed the mindset of responding ground units and set into motion an erroneous tactical response leading to the wrongful death of Leontae Kirk.

**Discussion:**

Officer Ramirez was working as the air-unit observer during the incident and arrived first at the scene (overhead) with the pilot – Sergeant Howard.  As the observer, Officer Ramirez located a subject possibly matching the description on the call, i.e., Leontae Kirk, and reported that he was "pointing a gun" and then that he was "pointing a gun at more people." Officer Ramirez misinterpreted what he was seeing and incorrectly stated over the radio "he's shooting at people in the front of the store."  This inaccurate statement caused dispatch to immediately initiate "active-shooter" procedures which then set into motion a chain of events leading to the wrongful death of Leontae Kirk.

### Active-Shooter Background:

Various forms of Active-Shooter protocols, aka "Active Response," "Quick Response" and "Rapid Response" were developed in 1999 following the Columbine High School Massacre, as well as many other mass murders involving suspects shooting people indiscriminately.  At the time, many police agencies lacked adequate training, policies, procedures or the proper equipment necessary for their initial responders to rapidly neutralize suspects actively engaged in a shooting.  Existing policies required initial police responders to essentially slow things down via containment techniques, such as perimeters and barricades, and to stand by for specialized units to assess, negotiate and engage the threat.  Unfortunately, in the case of Columbine,

KIRK_002063

the lack of a quicker police response led to the death of many additional innocents and significant public outcry.

Law enforcement agencies, under pressure from public and political scrutiny, responded by developing what became dubbed "active-shooter" protocols for their ill-equipped first responders. Changes included, but were not limited to, streamlined versions of SWAT and/or Hostage Rescue Team tactical and dynamic entry training, specialized equipment, and radio-dispatch protocols. The ultimate objective was to enable first responders to engage and neutralize active shooters as quickly as possible to prevent further loss of life. Active-shooter response policies and procedures were based upon confirmation of an actual and ongoing shooting. Although Columbine was perhaps the most prominent mass shooting case to bring attention to law enforcement deficiencies, there have been many others. The so called "active-shooter" cases have increased substantially over the last two decades and continue to challenge law enforcement today. Some of the many challenges for police agencies to implement active-shooter protocols have been the lack of funding and staffing. Another significant challenge has been to provide comprehensive training to address not only the tactical elements or mechanics of using deadly force, but also to address an officer's mindset and understanding of the constitutional limitations when responding to active-shooter scenes. For example, although the objective is to quickly neutralize an active shooter, constitutional law must still be followed. In other words, the old adage of shooting first and asking questions later simply does not apply. Officers must evaluate each shooting threat individually and adhere to constitutional limitations before utilizing deadly force.

KIRK_002064

Like many agencies responding to the active-shooter challenge, the Phoenix Police Department recognized its deficiencies within its Patrol Divisions and implemented better tactical training in active-shooter scenarios including things like dynamic entry, use of less than lethal force, and spontaneous-shooter response, as well as policies and procedures for not only officers, but also police dispatchers. Active-shooter incidents are handled at the highest priority. Dispatchers essentially stop routine radio traffic, put out a priority-one tone over adjacent precinct channels and announce "active shooter." All available units then respond to the scene to neutralize the shooter(s).

**Discussion Continued:**

In light of the Active Shooter protocol, Officer Ramirez's definitive statement that Leontae Kirk was "shooting at people" caused the police dispatcher to immediately broadcast "Active Shooter" to multiple police precincts. The dispatcher's broadcast created a higher-level urgency and assumption that there was an active shooter presumably firing at innocents indiscriminately. However, the evidence in this case indicates that Leontae Kirk had been interacting casually with other patrons at the strip mall immediately prior to the incident, had not discharged his weapon and was brandishing his gun in response to subject Gonzalez-Rios threatening him with a gun first. This is evidenced by strip-mall security camera footage.

Helicopter observers are required to accurately and precisely report their observations to support ground unit response. Since the noise from the helicopter and its altitude in orbit,

Officer Ramirez could not have heard shots being fired. Officer Ramirez based his assertion that Leontae Kirk was actually shooting a gun primarily upon "duck and dodge" body movements. He told the investigators that Leontae Kirk "...began to duck and dodge like he was involved in a shooting. The male's motions looked like he was shooting or was being shot at." He did not describe a shooting stance, any movements likely caused by a weapon's kick, or any gun flashes. Officer Ramirez told the criminal investigators that he saw Leontae Kirk "pointing the gun at the strip mall..." as opposed to pointing at an actual person or persons as he had broadcast to dispatch, and he did not report seeing anybody actually get shot or go down.

There was information that Leontae Kirk had been verbally threatening with a weapon at previous locations, which initiated the initial 911 call(s), but no information that Leontae Kirk was shooting until the air unit arrived and erroneously reported that he was shooting at people.

The helicopter pilot, Sergeant Howard, told criminal investigators that "The suspect looked to be exchanging gunfire with someone..." confirming what Officer Ramirez was actually seeing. However, this critical information was not relayed to dispatch by Sergeant Howard or Officer Ramirez. Officer Ramirez assumed that Leontae Kirk was "shooting at people" and failed to relay anything about Leontae Kirk possibly being involved in a shoot-out or the possibility of another armed suspect. This information would have been critical for ground units to understand that there may be other threats causing Leontae Kirk to take cover and/or defend himself, as opposed to him being an active-shooter suspect "shooting at people" as Officer Ramirez claimed. This distinction would have likely changed the

KIRK_002066

manner of response.   And at no time did either Officer Ramirez or the pilot announce their presence or give any commands via their helicopter's public address (PA) system. Active-shooter protocol is based upon confirmation that there is a suspect or suspects actually firing a gun at innocents and not simply wielding a weapon.  It is my opinion that Officer Ramirez should not have speculated and jumped to such a definitive conclusion, but rather had stated his observations specifically and indicating suspicion rather than fact. Instead, Officer Ramirez made assumptions and misinterpreted what he was actually seeing and then withheld critical information from responding units.  In doing so, he unwittingly changed the mindset of every responding officer from an investigation of a subject threatening with a gun to that of an active shooter.  Responding units would have been amped up and looking to quickly neutralize an active shooter, which is evidenced by their stealthy response to the scene and approach on foot so as to not alert the alleged shooter of their presence.  Unfortunately, Officer Ramirez's actions set into motion an active-shooter response which had deadly consequences.

Leontae Kirk's movements, e.g., retreating from the store, taking cover behind vehicles, ducking and dodging, and pointing back toward the area he had come from is more indicative of someone fleeing from and/or responding to a threat himself.  Strip-mall security camera footage confirms this interpretation as well.

**Investigation and Deposition Inconsistencies – Officer Ramirez:**

According to criminal investigators, Officer Ramirez indicated that he had observed Leontae Kirk exit the store "through the binoculars holding a gun in his hand."  Officer Ramirez later stated in deposition that he had observed Leontae Kirk "…in some kind of

communication with somebody else inside the store, wasn't walking out normally…"  He also confirmed that what he told investigators was accurate and that he could actually see Leontae Kirk through binoculars holding a gun before walking west.  (transcript page 22) Officer Ramirez further indicated in deposition that he "didn't see anybody else with a gun." but that Leontae Kirk's ducking movements seem to indicate that someone else was shooting at him.  (page 33)  As stated above, however, this critical observation was not relayed to dispatch.  Responding units focused in on a single shooter that they assumed had been shooting indiscriminately at innocent bystanders.

Moreover, surveillance videos do not support that Leontae Kirk had exited the store abnormally or with a gun in his hand as Officer Ramirez stated.  In fact, surveillance video shows Leontae Kirk casually holding the liquor store door open for another patron exiting with him while he (Kirk) was holding a drink and cigarette in one hand – not a gun!  That unknown patron casually walked west from the liquor store without any sign of duress. Furthermore, Officer Ramirez seems to have embellished that when the air unit arrived, "…there was crowds of normal foot traffic,…" and that Leontae Kirk was pointing a gun "…in the direction of the crowd of people…"  Surveillance video does not support crowds of people at any time but rather just <u>one</u> subject that Leontae Kirk appears to be pointing his gun toward – the subject who had pulled and pointed a gun at him **<u>first</u>**, which was <u>after</u> the air unit had arrived.  Although Officer Ramirez indicated that he did not observe another person holding a gun, surveillance video clearly depicts that person (Gonzalez-Rios) not only pointing his gun at Leontae Kirk first but also that he was the only person in Leontae Kirk's direct line of fire.

**My Opinions Regarding the Use of Force used and Failure to Provide Medical Care by Officer Ladines:**

In my opinion, Officer Ladines should have announced her presence and warned Leontae Kirk to drop his weapon before utilizing deadly force and shooting at him.  Irrespective of the fact that she was responding to an inaccurate report of an "active shooter," The United States Supreme Court and the 9th Circuit has made it abundantly clear that officers can only use deadly force if the person against whom the deadly force is exercised represents an imminent threat of deadly force or serious bodily injury to the officer or someone else.  There is sufficient evidence that Leontae Kirk never fired his weapon and that no shots were actually fired before Officer Ladines discharged her weapon.  Leontae Kirk was facing away from Officer Ladines when she approached him from behind and fired at him without announcement or warning, and there was no other person(s) specifically identified by her as being under an imminent threat by Leontae Kirk.  Threats cannot be mere speculation (Brosseau v Haugen) and if given time, officers must allow suspects to surrender.

**Discussion:**

Active-shooter protocol does not supersede the 4th Amendment of the Constitution.  In the landmark case of Tennessee v Garner, the Court of Appeals specifically stated that the use of deadly force is only justified if the officer has probable cause to believe that a suspect poses an imminent threat of serious physical harm to the officer or others.  The Supreme Court further stated that for purposes of civil liability, seizures must be tested under the 4th Amendment standard, i.e., was the seizure "reasonable" (Graham v Connor).  The Supreme Court suggested several factors for courts and juries to consider when determining whether the officer used excessive or unreasonable force, i.e., the severity of the crime,

whether the person against whom the force was used presented an immediate threat, and whether the person against whom the force was used was resisting arrest or trying to escape.  Leontae Kirk was clearly seized under the 4th Amendment, and deadly force may not have been necessary if responding officers had simply announced their presence and given him a warning of imminent force.  Police officers should know that it is objectively unreasonable to shoot a person who has not been given a warning of imminent force, poses no risk of flight or presents no objectively reasonable threat to the safety of the officer or other individuals (Deorle v Rutherford).  In this case, Leontae Kirk was essentially surrounded by officers on three sides and up against a building, and none of the shooting officers advised Leontae Kirk to comply or surrender before they fired.   Note, the investigation did not indicate whether patrons inside any of the store-front businesses had secured their doors after the shooting began.  The Ninth Circuit has also made it abundantly clear in numerous cases the importance of providing warnings to suspects before implementing force.  In accordance with constitutional law, Phoenix Police Officers are specifically trained to announce their presence, give clear commands/warnings to suspects in order to gain compliance, and to use only that force necessary (reasonable) to execute a lawful seizure/arrest.  Officers must make every attempt to preserve life, including the life of suspects, while apprehending persons who commit unlawful acts.  Phoenix Police Department (PPD) policies, procedures and training are consistent with these basic principles.  Phoenix officers are required to follow police policies and review all legal and constitutional law bulletins distributed regularly to stay updated on current law.   In this case, none of the shooting officers announced their presence or gave warning to

Leontae Kirk before shooting at him, and none of them observed a single citizen directly under imminent threat.  In other words, Leontae Kirk was not given an opportunity to comply or surrender.  Deadly force must only be used as a last resort to stop an active or immediate threat to the officer or to a specific third person (Kisela v Hughes, Harris v Roderick, Gonzalez v Anaheim, Young v County of Los Angeles, Nelson v Davis, and White v Pauly).

Officer Ladines stated in her interview, conducted many hours after the shooting, that she "thought she told the subject to stop and heard officer Ravelo yell something to the effect of "stop police.""  Whether or not a warning was given is an objective test and believing that a warning was given is not sufficient.  Furthermore, body-cam video and eye-witness testimony contradict her account of actually giving a warning, and confirm that Officer Ravelo gave warnings after Leontae Kirk had already been shot.  Although there is evidence that Leontae Kirk had been threatening with a gun at previous locations prior to Officer Ladines arriving on scene, officers must still observe an articulable and imminent threat when deciding to use deadly force.

Evidence confirms that Officer Ladines arrived from the west and stopped her vehicle southwest of the strip mall.  Her vehicle sirens were not activated as she arrived and exited her patrol car, and she approached Leontae Kirk quickly and stealthily on foot from behind. Despite ample time, distance, cover and backup to safely announce a police presence and provide warnings while approaching Leontae Kirk, she remained mute.  In my mind, there was absolutely no reason for Officer Ladines not to announce police or warn Leontae Kirk to drop the gun.  Officer Ladines disregarded cover via a concrete pony wall, took aim and fired her pistol at Leontae Kirk while he was turned away from her.

KIRK_002071

It is incumbent upon officers to provide life-saving attempts to an injured suspect. These include chest compressions, sealing bullet wounds, and CPR. It is policy that life is the highest priority. It must be provided as soon as reasonably practicable. Ladines failed to do so. Video evidence shows that the last bullet shot at Leontae occurred at approximately 16:30:06 hours. It was not until approximately 16:34:10 hours that *any* life-saving attempts were made. During that four minutes, Ladines shot Leontae with a 40mm round despite seeing that Leontae's body was limp, and that Leontae was surely dying in front of her.

**Interview Inconsistencies**

Officer Ladines had neglected to activate her body camera pursuant to police policy but reported seeing Leontae Kirk "pointing a dark colored gun in a north and east direction…and swinging it around." She did not specifically observe anybody that Leontae Kirk was pointing his gun at but speculated that a building on the other side of 37th Avenue may have been occupied. Officer Ladines then shot at Leontae Kirk multiple times, at which time he darted between two parked vehicles. She then assisted other responding officers by obtaining and shooting multiple less-than-lethal 40mm launcher rounds at Leontae Kirk while he lay on the ground where he had been fatally wounded.

Officer Ladines indicated that Leontae Kirk was "actively shooting in the direction of an occupied building…" However, evidence does not support that Leontae had fired his gun or was about to fire upon any specific person, and there is no evidence that the cinderblock building across 37th Avenue, a distance of well over 200 feet, was actually occupied at the time of the incident.

Officers are responsible for every round that they fire, i.e., they must not only have justification to use deadly force pursuant to constitutional law, but also to know their

backdrop so that they can fire safely and prevent unintended consequences.  PPD policy specifically states that firearms will not be used under circumstances in which a substantial and unjustifiable risk of injury or death to bystanders exist.  Officer Ladines' backdrop consisted of vehicles parked in front of the strip mall, one of which was occupied by Diana Flores Ochoa, as well as multiple occupied businesses faced with glass windows and doors.  The evidence indicates that two of the vehicles were struck by her rounds.  Furthermore, one eye witness, Sherry Fanning, reported that at least one round went through the window of JR Cellular as she was about to leave.  Suffice it to say, Officer Ladines backdrop was clearly questionable.  If an officer cannot safely take a shot, then they should not, especially when there is sufficient cover and manpower available to secure the suspect.

**My Opinions regarding Use of Force used and Failure to Provide Life-saving Measures by Sergeant Roy:**

It is my opinion that Sergeant Roy's use of lethal force was unreasonable and his failure to provide life-saving measures, direct his subordinates to provide life-saving measures, and his failure to inform Fire or direct subordinates to inform Fire that they were needed in a timely fashion was unreasonable.

**Discussion:**

There is evidence that that Sergeant Roy arrived on scene without sirens just after Officer Ladines had arrived and at approximately the same time as Officer Garza.  He too arrived from the west.  He had activated his body cam which helped capture his actions.  Sergeant Roy was also interviewed by criminal investigators and gave an account of what occurred. He indicated to investigators that he saw Leontae Kirk pointing a gun northeast toward businesses.  He knew that the other officers were taking up positions to the south of the suspect and assumed that they had "challenged" Leontae Kirk because he "ran" north between two vehicles.  Video evidence confirms that the other officers were in fact taking up positions behind a concrete pony wall south of Leontae Kirk.   Sergeant Roy did not announce his presence to the other officers or attempt to direct the scene.  He quickly exited his vehicle and hurried on foot directly north to engage Leontae Kirk by taking up essentially a left flanking position and pointing his handgun east along the sidewalk that runs in front of the store fronts in anticipation of Leontae Kirk emerging from between the parked vehicles, which is exactly what happened.

When Sergeant Roy observed Leontae Kirk emerge from the two vehicles, he immediately fired 17 rounds at Leontae Kirk in quick succession without announcing his presence or giving warnings. He then reloaded tactically. Sergeant Roy later stated that the subject "crouched down" and turned towards the officers. Although he did not observe Leontae Kirk with a weapon, he indicated that he believed the subject was getting into a position to engage the officers in a "gunfight."

The officers' uniform camera, the strip mall surveillance camera and the security camera footage from inside JR's Cellular contradicts Sergeant Roy's statements of Leontae Kirk's movements. Leontae Kirk quickly slid backwards across the sidewalk and up against the wall trying to distance himself from his discarded weapon to surrender. I saw no weapon and did not interpret Leontae Kirk's movements as an attempt to get into any sort of shooting stance or to engage the officers in a gunfight. Leontae Kirk raised his hands and arms to cover his head and face in what looked like a defensive reaction to being shot simultaneously by both Sergeant Roy and Officer Garza. There was no weapon visible in or around Leontae Kirk when he was being shot by Sgt Roy and Officer Garza.

The Phoenix Police Department (PPD) primarily trains officers to shoot a few rounds center mass and then assess the threat before continuing to fire, e.g., did the officer hit his target, was the threat neutralized, is the suspect still armed, is the suspect complying with police orders, etc. In some cases, officers are taught to shoot two to the body and one to the head when body armor is suspected. The PPD does not train officers to completely empty their guns into suspects unless absolutely necessary to stop a continuing imminent threat. Continuing to fire would effectively negate an officer's ability to assess a continuing imminent threat.

Sergeant Roy's decision to completely empty his gun into Leontae Kirk without announcing his presence or giving a warning is not common police practice and was simply not reasonable or necessary under the totality of the circumstances. Furthermore, shooting so many rounds across the front of multiple businesses faced with glass doors and windows, as well as numerous vehicles, one of which was confirmed to be occupied at the time, created an undue risk potential for patrons to be struck by projectiles. In fact, evidence shows at least one ricochet strike off the cement, at least one bullet strike into a mirror located within the Grand Stop business itself, one bullet strike on the glass window of the Grand Stop-2, and two wall strikes on the exterior wall of JR's Cellular near Leontae Kirk's body.

A reasonable officer would have taken up a cover position, announce and provide warnings for Leontae Kirk to surrender, and assess the situation while maintaining a perimeter. There were ample locations that would have provided sufficient cover, including the pony wall running north and south, parked vehicles and the side wall of the strip mall itself, as well as ample officers on scene and eyes in the sky. The evidence confirmed that Leontae Kirk was not armed while being shot by Sergeant Roy nor actively threatening officers. Evidence also suggests that Leontae Kirk may not have even been aware that police had arrived behind him when they did and he had not tried to enter any of the stores.

It is incumbent upon officers to provide life-saving attempts to an injured suspect. These include chest compressions, sealing bullet wounds, and CPR. It is policy that life is the highest priority. These measures must be provided as soon as reasonably practicable. Roy failed to do so. Roy, as a scene supervisor also failed to direct officers or subordinates to do so in a timely fashion. As the scene supervisor Roy also failed to properly advise Fire to

arrive in a timely fashion. Video evidence shows that the last bullet shot at Leontae occurred at approximately 16:30:06 hours. It was not until approximately 16:34:10 hours that any life-saving attempts were made. During that four minutes, Roy had Ladines shoot Leontae with a 40mm round despite seeing that Leontae's body was limp, and that Leontae was surely dying. It was not until approximately 16:43:13 hours that Fire was told to come on scene, despite the fact that Fire had been waiting in a staging area nearby. Fire did not arrive until 16:45:51 hours. This was almost 16 minutes after the last bullet hit Leontae. These failures were unreasonable.

Page **19** of **17**

**My Opinions regarding Use of Force used and Failure to Provide Life-saving Measures by Officer Garza:**

It is my opinion that Officer Garza's use of lethal force by firing three rifle rounds into an unarmed person without announcing or warning, was unreasonable.  It is also my opinion that his failure to provide life-saving measures in a timely fashion was unreasonable.

**Discussion:**

Officer Garza also arrived on scene at approximately the same time as the other ground units.  He had activated his body cam, which is clear and speaks for itself.  There does not appear to be any citizens in front of any of the strip mall businesses.  As Officer Garza exited his patrol car with his rifle in hand, Officer Ladines can be seen and heard shooting at Leontae Kirk, who then darted out of site between two vehicles.  Officer Garza quickly took up a position of cover behind the concrete pony wall and directly in front of JR's Cellular.  While he was being shot repeatedly by Sergeant Roy, Leontae Kirk is clearly visible sitting on the sidewalk with his back against the wall and his hands up in front of his face and head, in what appears to be a defensive posture.  Leontae Kirk was surrounded and trapped.  While Sergeant Roy was still shooting, Officer Garza quickly sighted Leontae Kirk in on his rifle, which was equipped with a scope, and fired three rapid shots to the body without warning.  Officer Garza's view of Leontae Kirk was clear and unobstructed and there was no weapon visible.

During his interview with criminal investigators, Officer Garza reported seeing Leontae Kirk pointing a black handgun "at people in front of the business."  He described the subject shooting the handgun in a northeast direction one or two times.  However, he then admitted

KIRK_002078

that he did not actually see any civilians, but believed that there may have been some because it was "busy" due to the time of the day. Officer Garza did not indicate to investigators that he was in fear for his safety or for the safety of others. He did say, however, that after seeing Leontae Kirk run to the front of parked vehicles toward businesses, he wanted to keep him from entering any of them. There was no indication in the investigation if the business doors had been locked by patrons after the shooting began. As previously discussed, there were no specifically identified innocent civilians visible in front of any of the strip mall businesses or in the line of fire of Leontae Kirk when the ground units arrived. Officer Garza confirmed that Leontae Kirk was facing away from the responding officers and pointing a handgun in a northeasterly direction, which was the direction in which Humberto Gonzalez-Rios had been when he pulled a gun on Leontae Kirk. Since Gonzalez-Rios had already fled, Leontae Kirk's line of fire was toward parked vehicles and store front businesses when Officer Ladines fired at him.

Evidence suggests that after Leontae Kirk darted between the two vehicles, he ditched his gun underneath one of the vehicles (the Volkswagen Jetta) and then quickly distanced himself from it by getting to the sidewalk. Body cam videos show Leontae Kirk spinning around while being shot at by Officer Ladines, which further suggests that he may not have realized that the police had just arrived. This is further evidenced by him tossing the gun away, distancing himself from it and appearing to surrender.

There was a civilian sitting at the bus stop south of JR's Cellular who quickly left after ground units arrived and began firing at Leontae Kirk. This is further evidence that neither Humberto Gonzalez-Rios nor Leontae Kirk had actually fired their respective guns, as he would most likely would have fled or taken cover earlier.

It is incumbent upon officers to provide life-saving attempts to an injured suspect. These include chest compressions, sealing bullet wounds, and CPR. It is policy that life is the highest priority. These measures must be provided as soon as reasonably practicable. Garza not only failed to do so but also ordered Officer Ravelo away from Leontae Kirk after she had already reached him. Video evidence shows that the last bullet shot at Leontae occurred at approximately 16:30:06 hours. It was not until approximately 16:34:10 hours that any lifesaving attempts were made. During that four minutes, officer Garza watched Ladines shoot Leontae with a 40mm round despite seeing that Leontae's body was limp, and that Leontae was surely dying. It was not until approximately 16:43:13 hours that Fire was told to come on scene, despite the fact that Fire had been waiting in a staging area nearby. Fire did not arrive until 16:45:51 hours. This was almost 16 minutes after the last bullet hit Leontae.

These failures were unreasonable.

KIRK_002080

**My Opinions regarding Use of Force used and Failure to Provide Life-saving Measures by Officer Ravelo:**

In my opinion, Officer Ravelo's actions were reasonable under a Use of Force Analysis. It is also my opinion that her failure to provide life-saving measures in a timely fashion was unreasonable.

**Discussion:**

After Officer Ravelo arrived on scene with Officer Ladines, she activated her body cam pursuant to police policy and moved east searching for the suspect, who was originally described as a H/M in a red-hooded sweatshirt. She told criminal investigators that she saw Leontae Kirk taking cover behind vehicles but did not see him with a weapon. She also indicated that Leontae Kirk did not match the description of the suspect. She did not report hearing any warnings by officers before hearing gun shots. She was unsure who had actually fired their weapon(s) but believed that Officer Ladines and Garza must have since their weapons were out.

Officer Ravelo continued looking for the suspect and essentially worked her way around to the right of where Leontae Kirk was laying. She told investigators that although she did not see Leontae Kirk with a gun, she proceeded to give him "standard" orders to drop his weapon before being called away by officer Garza.

It is incumbent upon officers to provide life-saving attempts to an injured suspect. These include chest compressions, sealing bullet wounds, and CPR. It is policy that life is the highest priority. These measures must be provided as soon as reasonably practicable. Garza failed to do so. Video evidence shows that the last bullet shot at Leontae occurred at

approximately 16:30:06 hours. It was not until approximately 16:34:10 hours that any lifesaving attempts were made. During that four minutes, officer Ravelo watched Ladines shoot Leontae with a 40mm round despite seeing that Leontae's body was limp, and that Leontae was surely dying. It was not until approximately 16:43:13 hours that Fire was told to come on scene, despite the fact that Fire had been waiting in a staging area nearby. Fire did not arrive until 16:45:51 hours. This was almost 16 minutes after the last bullet hit Leontae. These failures were unreasonable.

KIRK_002082

**My Opinions regarding Use of Force/Deviation from Proper Procedure/Reckless Actions employed by Sergeant Howard**

It is my opinion that as a supervisor and pilot in control of the air unit, Sergeant Howard should have ensured that Officer Ramirez relayed accurate and critical information to responding ground units.  This failure to supervise enabled Officer Ramirez to set into motion the erroneous tactical response which led to the wrongful death of Leontae Kirk.

**Discussion:**

Phoenix Police Department policy indicates that all Phoenix Police supervisors are responsible for the proper performance of employees under their supervision.  They are required to actively direct and supervise subordinates to ensure that they perform their assigned duties properly.  They are also tasked with monitoring the situations in which subordinates are involved to ensure that proper actions are taken.   This being said, Sergeant Howard failed in his duties.

Officer Ramirez inaccurately stated over the radio that Leontae Kirk was "...shooting at people in the front of the store."  The evidence shows that this statement was erroneous.  There is no evidence that Sergeant Howard made any attempt to verify this critical information or to clarify observations with communications.   Furthermore, during Sergeant Howard's interview with criminal detectives, he told them that he observed that the suspect looked to be exchanging gunfire with someone, yet he did not disseminate that critical information to ground units.  The information would have let ground units know that there may be other threats causing Leontae Kirk to take cover and/or defend himself, as opposed to being suspected of "...shooting at people in the front of the store" as Officer

Ramirez had reported.  As discussed above, the miscommunication also caused dispatch to initiate active-shooter protocol, which completely changed the mindset of responding units.

KIRK_002084

**Professional Standards' Internal Investigation**

The Phoenix Police Department's Professional Standards Bureau written investigation in this matter was subpar, i.e., it contained prejudicial references toward Leontae Kirk not relevant to the investigation, it contained assertions in the *Summary* and *Details of Investigation* not supported by the facts, and it failed to address critical issues, and it omitted material evidence.

**Phoenix Police Department Investigation Protocol:**

Following a Phoenix police shooting, there are two investigations conducted concurrently – a criminal and an internal.  The criminal investigation makes its way through the chain of command and is eventually submitted to the County Attorney's Office for review.  In this case, the County Attorney's Office declined criminal prosecution. The internal investigation, on the other hand, is conducted by Professional Standards (AKA Internal Affairs) to determine whether any police misconduct or policy violations occurred.

The internal investigation focusses on the conduct of the police employees as opposed to the conduct of the complainant or the decedent in this matter.  The investigation must stand on its own and is not shared with criminal investigators due to Garrity issues.  Professional Standards has its own bureau within the Phoenix Police Department (PPD) known as the Professional Standards Bureau (PSB), which reports directly and confidentially to the chief of police.

Note, the Phoenix Police Department utilizes a labor-management-negotiated policy which provides sworn employees and their employee-association representative an opportunity to sit down with the PSB investigators to review the investigation before it is finalized to

"approve" (sign off on) the investigation, e.g., the facts, completeness, verbiage, etc. Internal investigations are often edited after the sit down, sometimes significantly, to get the employees to agree and sign off on the investigation in order to avoid a labor management / Civil Service Board dispute. In this case, on Page 15, under Closing, you'll see "This investigation was complete and was reviewed and approved by the involved employee/s." You will also see that the investigation indicates "FINAL" on each page. Once the investigation is finalized, it gets reviewed by the Chief and is submitted to the Shooting Review Board, which is officially called the Critical Incident Review Board (CIRB). The makeup of the Board includes two non-police civilian representatives, as well as sworn police employees. The Board reviews the investigation and can ask questions of the investigator(s). The Board decides whether the shooting was in or out of policy and can recommend remedial and/or disciplinary action. The civilian representatives are usually City employees or community volunteers. This being said, the Board is limited to only the information presented to them, which in this case was a one-sided, incomplete and flawed investigation. It was my experience that the Board rarely reviewed the entire case file of the presumably cut-and-dry shootings. In other words, they would simply review the written investigative report submitted by the Professional Standards Bureau unless the report implied questionable circumstances.

I reviewed the written investigation and made the following observations:

**Observation 1: Prejudicial Indicators**

- In what appears to be an attempt to prejudice the intended readers, i.e., CIRB members, the investigation Summary begins by stating that "Kirk was a known drug

user and on felony probation" without confirmation or indication that this information was known by the officers or had any bearing on their decisions. The report also documented Leontae Kirk's positive postmortem toxicology screening and the Maricopa County Attorney's Office decision not to prosecute. Neither of these factors were germane to the internal investigation.

- The statements in the Summary that "Criminal investigators identified eleven (11) adult and juvenile victims of this incident" and "The stores surveillance video captured the aggravated assault witnessed by the Air Unit" are not accurate and were not verified. PSB investigators apparently failed to interview the victims, document their locations during the incident to substantiate an aggravated assault charge, or verify their statements and other evidence via surveillance video evidence. I believe that the subject on the motorcycle (Gonzalez-Rios) is also included in the count of victims when he was actually captured on surveillance video pointing his weapon at Leontae Kirk first. He should not have been relayed as a victim.

- Since the PSB Summary states definitively (as fact) that officers observed "Mr. Kirk fire his handgun northbound at an occupied store…" and that "The store's surveillance video captured the aggravated assault witnessed by the Air Unit…" Not only did the investigators fail to go into any details required to substantiate an aggravated assault charge, the video evidence contradicts the findings of the fact finders. Physical evidence indicates that Leontae Kirk had not fired his weapon and was not seen pointing his weapon at any specific person at the strip mall except for Gonzalez-Rios.

- The statement on page 6 that investigators recovered a "loaded pistol…" "near where Mr. Kirk fell to the ground" is not transparent.  The weapon was recovered <u>fully</u> loaded (loaded to capacity), underneath the driver's side of a parked vehicle and not within a lunging distance from where Leontae Kirk was shot by both Sergeant Roy and Officer Garza.

- The PSB investigation states that investigators "interviewed the involved police officers."  However, it appears that they either did not interview or failed to provide interview statements from Officer Ravelo or the air unit officers in the internal report.  Officer Ravelo arrived first on the scene with Officer Ladines and was clearly a material witness to the shooting.  She should have been interviewed even though her statements contradict some of the testimony provided by Officer Ladines and Officer Garza.  The air unit officers were also material witnesses to the shooting and should have been interviewed.

- The PSB investigation had very little detail or follow-up questions relating to exactly what each shooter officer had observed and what specific threats caused them to fire.  Investigators detailed the officers' individual recollections but failed to detail inherent contradictions presented by video and other recovered evidence as discussed above.

- The investigators were not transparent with their questions or descriptions relating to the officers' shooting backdrops, positions of cover or property damage caused by officer rounds.  Officers are responsible for every round that they fire and investigators are responsible for detailing this information.  The evidence indicates that at least one occupied vehicle (a Silver Dodge Ram) was in the officers' line of

KIRK_002088

fire, as well as occupied businesses with glass windows.  The physical evidence indicates the following damage caused by officer rounds:

- o Two vehicles were struck by rounds - a Gold Honda Pilot and a Gray Volkswagen Jetta

- o Two businesses were struck by rounds - the Grand Stop-2 (south facing window and an interior mirror) and JR's Cellular (south facing wall).

- o PSB investigators stated emphatically in their report that Leontae Kirk had fired at "occupied businesses" (which he had not), but also neglected to point out actual damage caused by police officer rounds.

- PSB Investigators referred to Officer Ladines backdrop as an "unoccupied gray hatchback car..." but failed to mention that there was an occupied car parked next to it.  Conversely, there was no evidence of sustained damage to any of the store fronts or vehicles parked in Leontae Kirk's line of fire but that information was omitted. There were also 1-2 vehicles between Leontae Kirk and the store fronts which were not referenced by investigators as his backdrop.  This information is further evidence that Leontae Kirk had not fired his gun and was material to the investigation.

- PSB investigators referred to Officer Garza's line of fire as a "storefront's brick wall and the concrete sidewalk."  They did not mention that Officer Garza's rounds passed just one parking stall's width from an occupied vehicle or that he shot Leontae Kirk while he was seated under two glass store-front windows of an occupied business.

These inaccurate statements would have clearly prejudiced the CIRB rendering its decision.

**Observation 2:  Assertions Contained in the Investigative Summary and Details of Investigation Not Supported by the Facts**

As discussed above, the *Summary* <u>definitively</u> states that "officer Ladines and Officer Garza observed Mr. Kirk fire his handgun northbound at an occupied store…" when the physical evidence proved that Leontae Kirk had not actually fired his weapon.

The *Summary* also states that "The store's surveillance video captured the aggravated assault witnessed by the Air Unit…" As discussed above, the air unit assumed incorrectly that an aggravated assault was occurring, and the store's surveillance video captured the subject on a motorcycle (Gonzales-Rios) threatening Leontae Kirk with a weapon and Leontae's Kirk's response to that threat.

The Investigative *Details of Investigation* states that "PSB investigators determined the following…" and then states as fact a narrative containing the following untruths:

1. "Officer Ladines then witnessed Mr. Kirk fire his handgun…"

2. Officer Garza observed Leontae Kirk "…shooting his weapon toward the occupied businesses."

3. "…investigators determined Mr. Kirk pointed his gun at eleven community members, including (8) adults and three (3) juveniles during the incident."

4. Referring to Mr. Gonzalez-Rios, "When Mr. Kirk exited the store, Mr. Kirk pulled out his gun and pointed it at him."  "Criminal investigators located surveillance footage, which supported Mr. Gonazlez-Rios's recollection of events."

The above assertions presented in the narrative as fact by the authors of the internal investigation were not only disproved by physical evidence, but would have also greatly influenced the CIRB's decision in this matter.  In other words, the CIRB was provided a

completely distorted internal investigation seeming to justify the actions of all officers involved by omitting critical material/evidence.

**Observation 3:  Critical Issues Not Investigated or were Omitted by PSB**

In my mind, one of the most critical aspects of this case is the officers not announcing their presence prior to using lethal force, a violation of constitutional law and police policy, as well as a principal of police firearms and use-of-force training.  Indeed, an announcement may have prevented this tragedy.  Clearly, PSB should have addressed this issue but instead chose to completely ignore it in the final report.

Another critical issue was whether the officers were justified in using lethal force.  Every officer is trained in the justifications for using deadly force.  The PSB investigators readily accepted and documented the officers' explanations for why they used lethal force while omitting contradictory evidence, e.g., the fact that Leontae Kirk had not fired his weapon, that the air unit had misinterpreted an active-shooter situation, that Leontae Kirk had brandished his weapon in response to a threat, that none of the officers could identify a specific person under imminent threat, that video evidence depicts Leontae Kirk unarmed and in a defensive posture while being shot, etc.  PSB investigators should have been transparent in their investigation to the CIRB by documenting all of the evidence irrespective of its implications or consequences.

Finally, PSB did not personally interview Mr. Humberto Gonzalez-Rios or reference his criminal history as they did with the decedent.  PSB apparently did not review the store's surveillance camera footage either.  Instead, they relied upon the criminal investigator's interview and subsequent misinterpretation of the surveillance video footage, which clearly

contradicts Gonzalez-Rios' statement that that Leontae Kirk pulled a gun on him first.

Criminal investigators have different goals and objectives than PSB investigators and both were working off a flawed hypothesis of what actually occurred.  PSB investigators should have conducted their own interviews of material witnesses and reviewed all the evidence for themselves.

Respectfully given May 12, 2025

_____

Ret. Lt. Mark R. Hafkey, M. Ed.

KIRK_002092