# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Kashane Kirk, as Personal Representative and on behalf of the Estate of Leontae Kirk; et al., | ) ) ) ) |
| | ) No.: |
| Plaintiffs, | ) CV-23-00836-PHX-MTL ) (CBD) |
| vs. | ) ) |
| City of Phoenix, a governmental entity; et al., | ) ) ) |
| Defendants. | ) |
| _____ | ) |

DEPOSITION OF SERGEANT ERIC ROY

VIDEOTAPED

Phoenix, Arizona
January 16, 2025

Prepared by:

Jody L. Lenschow, RMR, CRR
Certified Court Reporter
Certification No. 50192

**CERTIFIED TRANSCRIPT**

Coash Court Reporting & Video, LLC
staff@coashcrv.com                          602-258-1440
www.CoashCourtReportingandVideo.com

Kashane Kirk vs. City of Phoenix
Sergeant Eric Roy

CV-23-00836-PHX-MTL

January 16, 2025

2..5

---

**Page 2**

INDEX TO EXAMINATIONS

WITNESS                                          PAGE

SERGEANT ERIC ROY
    EXAMINATION BY MR. WOODS                       6


INDEX TO EXHIBITS

NO.           DESCRIPTION                   IDENTIFIED

Exhibit 1     Academy Training Record            32
              PPD-ROY 1-29
Exhibit 2     3/10/2008 Loyalty Oath             48
              PPD-ROY 47
Exhibit 3     2/8/2014 Written Reprimand         49
              PPD-ROY 54
Exhibit 4     2/16/2017 Discipline Notice        52
              PPD-ROY 39-41
Exhibit 5     1/21/2014 Performance              58
              Management Guide
              PPD-ROY 63-66
Exhibit 6     1/21/2017 Performance              61
              Management Guide
              PPD-ROY 74-78
Exhibit 7     1/21/2019 Performance              63
              Management Guide
              PPD-ROY82-86
Exhibit 8     Operations Order 1.5 Response to   68
              Resistance Rev 07/22
              PPD-POLICIES 1-13
Exhibit 9     8/18/2018 Incident Report          76
              KIRK_1586-1633
Exhibit 10    Photo of Taser on the Ground       83
Exhibit 11    Photo of Taser Close-up            87
Exhibit 12    Photo of Taser on the Ground       88

---

**Page 4**

VIDEOTAPED DEPOSITION OF SERGEANT ERIC ROY was taken on January 16, 2025, commencing at 10:04 a.m., at the offices of Coash Court Reporting & Video, 1802 N. 7th Street, Phoenix, Arizona, before Jody L. Lenschow, RMR, CRR, Certified Reporter No. 50192 for the State of Arizona.

                    *    *    *

APPEARANCES:

    For the Plaintiffs:
        MILLS + WOODS LAW, P.L.L.C.
        By:  Mr. Sean A. Woods
             Mr. Robert T. Mills
             5055 N. 12th Street
             Suite 101
             Phoenix, Arizona  85014
             480-999-4556
             rmills@millsandwoods.com
             swoods@millsandwoods.com

    For the Defendants:
        BROENING, OBERG, WOODS & WILSON, P.C.
        By:  Ms. Sarah L. Barnes
             2800 N. Central Avenue
             Suite 1600
             Phoenix, Arizona  85004
             602-271-7700
             slb@bowlaw.com


    ALSO PRESENT:  Mr. Jimmie Sullivan, Videographer

---

**Page 3**

INDEX TO EXHIBITS CONTINUED

NO.           DESCRIPTION                   IDENTIFIED

Exhibit 13    8/18/2018 Camera 4, Side Yard      93
              Surveillance Video of Homeowner

Exhibit 14    11/2/2022 CAD/MDC Report          103
              PPD-ROY-MDT 1-2
Exhibit 15    Roy Body Cam Footage              125
Exhibit 16    Ravelo Body Cam Footage           151
Exhibit 17    Garza Body Cam Footage            157

---

**Page 5**

THE VIDEOGRAPHER:  Good morning.  We are on the record.  Time on the monitor is 10:04.  Here begins Volume 1, Media No. 1 in the deposition of Sergeant Eric Roy in the matter of Kashane Kirk versus City of Phoenix in the United States District Court, District of Arizona, Case No. CV-23-00836-PHX-MTL (CDB).

Today's date is January 16th, 2025.  Our court reporter is Jody Lenschow.  I am Jimmie Sullivan, certified legal videographer representing Coash Court Reporting & Video.  This deposition is taking place at 1802 North Seventh Street, Phoenix, Arizona.

Would counsel please identify themselves.

MR. WOODS:  Sean Woods and Robert Mills from Mills + Woods Law on behalf of the plaintiffs.

MS. BARNES:  Sarah Barnes, Broening, Oberg Woods & Wilson, on behalf of the defendants.

THE VIDEOGRAPHER:  Would the court reporter please swear in the witness.

SERGEANT ERIC ROY, called as a witness herein, having been first duly sworn by the Certified Court Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

---

Kashane Kirk vs. City of Phoenix                                          CV-23-00836-PHX-MTL
Sergeant Eric Roy                          January 16, 2025                               6..9

**Page 6**

THE VIDEOGRAPHER:  You my proceed.

EXAMINATION

BY MR. WOODS:

Q.    Morning.

A.    Morning.

Q.    Please state your full name for the record, please.

A.    My name is Eric Charles Roy.

Q.    Thank you.

Are you still a sergeant with the Phoenix Police Department?

A.    I am.

Q.    Okay.  Do you want me to call you Sergeant Roy or is Eric okay?

A.    Eric is fine, thanks.

Q.    Okay.  Have you been -- have you had a deposition before?

A.    One for a traffic collision quite a while ago.

Q.    Okay.

A.    It was very informal.

Q.    It was informal?

A.    Yeah.

Q.    Okay.  Was there a court reporter?

A.    Not that I recall.

**Page 7**

Q.    Okay.  So maybe it was more of just kind of interview?

A.    Possibly.

Q.    So when we're doing the deposition, especially with a court reporter and a videographer, there's some ground rules.  Some of the ground rules are you've got to give a yes or no or some sort of word-based answer, instead of uh-huhs or head nods and things like that because the court reporter can't take down body motions or the uh-huhs or that kind of stuff.  Do you understand that?

A.    Yes, I do.

Q.    Okay.  This is not intended to, you know, force you to sit in your seat forever.  If you need to take a break, just let me know.  If there's a question pending, go ahead and answer that question before we take a break, and then we can take breaks.  I expect -- I expect breaks probably every hour.  You know, if you need something other than that, just let me know, okay?

A.    Sounds good.

Q.    And then, finally, let's not talk over each other.  I do it a lot.  So I'll do my best not to talk over you or start asking a question if you're still making an answer.  Just do your best not to do the same. And I'm sure that your attorney told you a couple of

**Page 8**

different things.  There may be some objections from your attorney.  Just if there is an objection, answer the question, if you can, unless your attorney tells you not to.  Okay?

A.    Okay.

Q.    What did you do to prepare for this deposition?

A.    I read portions of the report.  I looked over your complaint.  I talked with my attorney.  I reviewed body cam footage.

Q.    Anything else?

A.    I believe that's about it.

Q.    Okay.  I assume, and I don't want to know what you and your attorney talked about, but I assume you met with your attorney to discuss this case, to prepare?

A.    We did not meet in person.  We talked over the phone.

Q.    Okay.  And do you know about how many times you talked to your attorney about this deposition?

A.    I believe three times total over the course of the past whatever time it was.

Q.    Okay.  And about how long did you guys talk?

A.    On average, maybe 20 minutes a phone call, half an hour.

Q.    So total, give or take, an hour?

A.    Roughly.

**Page 9**

Q.    Okay.  Did you talk with anybody else in preparation for this deposition?

A.    No, not in preparation for this.

Q.    Did you talk with any of your fellow officers that are involved in this case?

A.    Jaclyn Ravelo texted me asking if she had to do the deposition.  I told her that she needed to contact the attorney to discuss that.

Q.    Okay.  And that was the extent of that communication?

A.    Yeah.  We did not discuss any of the details.

Q.    Okay.  I'm going to ask a little bit about your history.  Where are you from?

A.    What do you mean?

Q.    Where were you born?

A.    I was born in Cleveland, Ohio.

Q.    How long did you live in Cleveland?

A.    I lived in -- well, Cleveland, I think till I was five.

Q.    Okay.  And then where did you go?

A.    We moved to the East Side of Cleveland in a small town.  I grew up in Ohio.  So I left when I was 19.

Q.    Okay.  So you went to high school in Ohio?

A.    Yes.

Coash Court Reporting & Video, LLC
staff@coashcrv.com

602-258-1440
www.CoashCourtReportingandVideo.com

**Page 50**

Reprimand." Is that correct?

A. That is correct.

Q. Do you recall this written reprimand?

A. Yes.

Q. And it says, "On February 8th, 2014, you secured your city issued patrol rifle inside the passenger compartment of an unmarked city vehicle instead of using the lockable trunk." Is that correct?

A. Yes.

Q. And you did do that?

A. Yes.

Q. Was the rifle stolen?

A. Yes.

Q. And it says it has not been located. Was it ever located; do you know?

MS. BARNES: Form. Form and foundation.

THE WITNESS: I do not know.

BY MR. WOODS:

Q. Okay. What kind of rifle was it?

A. It was a department-issued rifle.

Q. What type?

A. It was a Colt AR-15.

Q. When you -- on that date, when you locked your vehicle with the AR-15, where was that vehicle parked?

A. In a hotel parking lot.

**Page 51**

Q. Were you on duty at the time?

A. Yes.

Q. Were you responding to some sort of call at the hotel?

A. No.

Q. What were you doing at the hotel?

A. Eating.

Q. What hotel was it?

A. I don't recall the name, but it was at 93rd Avenue and McDowell on the north side.

Q. Did they have a restaurant attached to it?

A. Yes.

Q. Okay.

MS. BARNES: No, he just went into the -- went into the kitchen.

MR. WOODS: Thank you for the commentary.

MS. BARNES: Just a joke.

MR. WOODS: Appreciate it.

MS. BARNES: Just a little levity.

MR. WOODS: No, I do, I appreciate it. Okay.

BY MR. WOODS:

Q. Other discipline, do you recall being disciplined on other occasions?

A. One other occasion.

**Page 52**

Q. Okay.

(Deposition Exhibit 4 was marked for identification.)

BY MR. WOODS:

Q. So this is -- at the bottom right it's number 39. Do you see that?

A. Yes.

Q. Okay. And at the top it says "Discipline Notice (Classified Employee.)" Is that right?

A. Yes.

Q. Okay. Now, looking at this, is this the other discipline that you can recall?

A. Yes.

Q. Were you suspended?

A. Yes.

Q. For, it looks like, for 8 hours, correct?

A. Correct.

Q. That means -- did that mean just like one day kind of thing?

A. It's the majority of a shift.

Q. What happened that caused this discipline?

MS. BARNES: Form.

THE WITNESS: I was pulled over by DPS.

BY MR. WOODS:

Q. Do you recall what freeway it was?

**Page 53**

A. Yes.

Q. Okay. And if you turn to the third page of this document, which is marked 41, there's a narrative on this document discussing what rules you violated. Do you see that in the top paragraph?

A. Yes.

Q. Okay. And then there's a narrative of what happened as you go through this page, correct?

A. Correct.

Q. And it says that you were driving at 120 miles per hour; is that correct?

MS. BARNES: Form.

THE WITNESS: That's what it says.

BY MR. WOODS:

Q. Okay. And you were written a ticket for this?

A. Correct.

Q. And the ticket was -- what was the ticket for?

A. That I don't recall.

Q. If you look at the third paragraph on this page, last part of that paragraph, it says "Arizona Revised Statutes 28-702.01C, Waste of Finite Resource." Do you see that?

A. I do.

Q. Have you ever issued speeding tickets in your career as a police officer?

**Page 54**

A.   I think maybe one, but I don't know if it was me or my partner.

Q.   Okay.  So as a patrol officer, you weren't typically looking for speeders --

A.   No.

Q.   -- is that correct?

A.   That's correct.

Q.   Do you know -- earlier -- this is Arizona -- sorry.

This is Arizona Revised Statutes Title 28, correct?

A.   Yes.

Q.   And earlier we talked about one training class where you had a Title 28 update.  Do you recall that?

A.   Yeah, you brought it to my attention.

Q.   Okay.  So you know what Title 28 is?

A.   I know what it encompasses, yes.

Q.   Okay.  And it encompasses the rules for driving on the roadways as part of it; is that correct?

A.   Yes, rules that we all violate every day.

Q.   Like making a U-turn where there's a no U-turn sign?

A.   (Witness nodded.)

Q.   Do you under -- do you have an understanding of what waste of finite resources means?

**Page 55**

A.   I do not know what that law -- what the intention behind that law was.

Q.   Did you ever go to court related to this incident?

A.   No.

Q.   But you were cited?

A.   Yes.

Q.   Did you -- did they give you a court date on that citation?

A.   Yes.

Q.   And why didn't you go to court?

A.   Because I was eligible to go to driving school.

Q.   And you took driving school?

A.   Yes.

Q.   Okay.  Do you know -- you know, I'm just going to ask you if you know.  Do you know what the threshold is between civil speeding and criminal speeding?

A.   Offhand?

Q.   Yeah.

A.   I believe it is over 20 miles an hour over the posted speed limit.

Q.   Do you recall what the posted speed limit was on the SR 51 at that time?

A.   No.

Q.   Do you know what it is now?

**Page 56**

A.   Yes.

Q.   What is it?

A.   Different parts have different speeds.

Q.   And what are those?

A.   65 and --

MS. BARNES:  Can you put your hand down, just because it's...

Thank you.

THE WITNESS:  And 55.

BY MR. WOODS:

Q.   And the patrol officer in this, the DPS, estimated you were going 120 miles an hour; is that correct?

MS. BARNES:  Form.

THE WITNESS:  That's what he said.

BY MR. WOODS:

Q.   What do you say?

A.   I don't know.

Q.   Were your kids in the car?

A.   They were.

Q.   What kind of car were you driving?

A.   A sedan.

Q.   Do you recall the make and model?

A.   Yes.

Q.   What was it?

**Page 57**

A.   It was a Dodge Charger.

Q.   Is there -- was there a submodel related to that Dodge Charger, like an SRT, like a 392?

A.   It was a 392.

Q.   Okay.

MR. WOODS:  Why don't we take a five-minute break since we've been going for a little over an hour.

MS. BARNES:  Okay.

MR. WOODS:  Is that cool?

THE VIDEOGRAPHER:  We are off the record.  Time on the monitor is 11:07.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record.  Time on the monitor is 11:20.

BY MR. WOODS:

Q.   As an officer or a sergeant with the City, you're issued performance reviews every year; is that right?

A.   Yes.

Q.   Do you give performance reviews of officers that are below you in rank?

A.   Yes.

Q.   Let me mark this one.

(Deposition Exhibit 5 was marked for

Kashane Kirk vs. City of Phoenix
Sergeant Eric Roy                            January 16, 2025

CV-23-00836-PHX-MTL
94..97

**Page 94**

Okay.  Before we start playing this video, is, to your recollection, that the side yard, is that the side yard that you ran down that Andres was running down?

A.    Yes.

Q.    Okay.  We'll go ahead and just play this.

MS. BARNES:  Can you identify this whole video?

MR. WOODS:  Yeah, and I'll actually do another supplemental, because I cut the video a little bit shorter than the one I disclosed.

BY MR. WOODS:

Q.    This is the side -- Camera 4, Side Yard Surveillance Video of the Homeowner, and you can see a side yard kind of almost the size of an alley with an individual in a black sweatshirt running towards a fence or a gate.

MS. BARNES:  August 18th, 2018?

MR. WOODS:  I'm getting there.

MS. BARNES:  Okay.  I'm sorry.

BY MR. WOODS:

Q.    August 18th, 2018, and this is the -- when you look at this, Mr. Roy, this is the same date that this incident report that we've been looking at is, correct?

A.    Yes.

**Page 95**

Q.    Okay.  And do you recognize this scene?

A.    Yes.

Q.    Okay.  And have you seen the video before?

A.    Yes.

Q.    Okay.  Did you see it at the time of the investigator report?

A.    No.

Q.    Did you see it after that?

A.    When you talk about the investigator report, are you talking about this one here?

Q.    Yeah, the interview.

A.    Yeah, it was well after that.

Q.    It was after that?

A.    Yes.

Q.    All right.  So that's Andres running to the gate, correct?

So after watching that video, does that sort of refresh your recollection as to what happened that day?

MS. BARNES:  Form.

THE WITNESS:  It depicts what happened that day.

BY MR. WOODS:

Q.    Okay.  We're going to scroll back a little bit on the video and then forward.  At the bottom of the video, do you see it has a timestamp?

**Page 96**

A.    Yes.

Q.    Okay.  And the timestamp says 4:43 with 33 seconds p.m.; is that correct?

A.    Yes.

Q.    Okay.  And then if we go forward -- I don't know why it's lagging.  I apologize.

Okay.  And when you turn away from Andres, the timestamp is 4:43 and 53 seconds; is that correct?

A.    Yes.

Q.    Okay.  When you were running to chase Andres, did you have your taser in your left hand?

Do you see your left hand swinging out there?

A.    Yes.

Q.    Is your taser in your hand?

A.    Doesn't appear.

Q.    Is your right hand on your service weapon?

A.    It appears so.

Q.    And your service weapon is drawn right there at 4:43 and 40 seconds; is that correct?

A.    It appears that way, yes.

Q.    So your service weapon was out.  Your left hand, can you tell if you have your taser in there at all?

A.    I can't tell.

Q.    Does it look like your taser is in your left

**Page 97**

hand?

A.    It doesn't appear so.

Q.    So your service weapon was out first; is that right?

A.    Looks that way.

Q.    And then you ran up to Mr. -- or to -- I think it's Arteaga, Andres Arteaga, and here we are at 4:43 and 40 seconds, correct?

MS. BARNES:  Form.

BY MR. WOODS:

Q.    At the very bottom of the screen it says 4:43 and 40 seconds; is that correct?

A.    Yes.

Q.    And if we play it, you started shooting him and he went down, correct?

MS. BARNES:  Form.

BY MR. WOODS:

Q.    Based on the video, that's the first muzzle flash I can see.  Do you see that at 4:43 and 44 seconds?

MS. BARNES:  Form.

THE WITNESS:  I deployed my taser first.

BY MR. WOODS:

Q.    You deployed your taser?

A.    Yes.

Kashane Kirk vs. City of Phoenix  
Sergeant Eric Roy                              January 16, 2025

CV-23-00836-PHX-MTL  
98..101

**Page 98**

Q. When we looked at those photos earlier, when you deploy a taser, do the prongs stay attached to the taser cartridge?

A. Say again?

Q. When you deploy a taser --

A. Yeah.

Q. -- do the prongs stay attached to the cartridge?

MS. BARNES: Form.

THE WITNESS: No, the prongs fire out.

BY MR. WOODS:

Q. Do the ends of the prongs still stay attached to the taser? Not the prongs that actually hit something, but the wires that are attached to the prong, where do those go?

A. Usually they're attached to the taser, but they --

Q. Okay.

A. -- they have a tendency to break quite often.

Q. Okay. So they -- so if they had deployed and broken off the taser at the crime scene, would that be something that would be photographed?

A. I'm not a crime scene tech. I don't know if they would photograph that or not.

Q. Would they move it --

**Page 99**

MS. BARNES: Form.

BY MR. WOODS:

Q. -- based on your experience?

MS. BARNES: Form and foundation.

THE WITNESS: Would they move what?

BY MR. WOODS:

Q. You testified earlier that at a crime scene, when the crime scene's been established, nothing should be moved; is that correct?

A. Correct. Right.

Q. So if the electrical discharge, you know, the -- like I said, the wavy, you know, lines that come out of the cartridge that are attached to the prongs, those would be somewhere, wouldn't they?

MS. BARNES: Form.

THE WITNESS: Those would be somewhere.

BY MR. WOODS:

Q. On the ground somewhere, maybe attached to the body of the person you shot?

MS. BARNES: Form and foundation.

THE WITNESS: Possibly.

BY MR. WOODS:

Q. Okay. So --

A. Now --

Q. Well, I don't have a question.

**Page 100**

MS. BARNES: Wait till a question is pending.

BY MR. WOODS:

Q. We talked a second ago about the first muzzle flash that it looks like; do you see that, the cloud around your hand there?

MS. BARNES: Form.

THE WITNESS: Okay.

BY MR. WOODS:

Q. Is that typical, a muzzle flash that you -- you know, when you shoot, like is it typical to have a little bit of a burst like that?

A. It's -- it depends.

Q. Okay. So you would agree with me that at that point Andres had been shot at?

A. I would not agree that that is the first round that was fired.

Q. You think there was a round prior to that?

A. Yes.

Q. Maybe two?

A. I don't know.

Q. Is Andres falling to the ground right there?

A. It looks like he's -- he's doing that, yes.

Q. Okay. So once that happens, did you continue firing your weapon?

**Page 101**

A. Once what? State it --

Q. Once Andres was on the ground, did you continue firing your weapon?

A. I don't recall.

Q. If you watch these next few seconds, which I'm going to play right now for you, let's pay attention to it, please.

So based on what you just saw, did it look like to you that you continued to fire while Andres was on the ground?

A. It appears, yes.

Q. And earlier we looked at the report on the weapons, and it said there were 11 bullets missing. Do you recall that?

A. Yes.

Q. Okay. Are you trained on this type of situation, where you have to fire your weapon, are you given training on how to use your duty weapon; like are you supposed to shoot -- how many times are you supposed to shoot? Are you supposed to shoot in a certain area? Are you supposed to shoot a certain number of bullets?

MS. BARNES: Form.

THE WITNESS: I'm not quite sure what you're asking me.

Coash Court Reporting & Video, LLC  
staff@coashcrv.com

602-258-1440  
www.CoashCourtReportingandVideo.com

Kashane Kirk vs. City of Phoenix
Sergeant Eric Roy                    January 16, 2025

CV-23-00836-PHX-MTL
142..145

**Page 142**

second.

BY MR. WOODS:

Q.    Okay.  So we're going to press play.

Oh, my God, why is this doing this?  Let's get there.  We're just going to press play.

There he is.  Oh, look he's moving back, right?

He was moving backwards, right?

MS. BARNES:  Form.

THE WITNESS:  According to that video, yes.

BY MR. WOODS:

Q.    Okay.  And he was on his buttocks, correct?

I'm sorry, I moved to the next video.

A.    Yes.

Q.    Okay.  And his hands were on the ground?

MS. BARNES:  Form.

BY MR. WOODS:

Q.    Pushing himself backwards, correct?

A.    I'd have to watch the video again to see that.

Q.    That's the wrong video.  Back to the right one, please.

Let's go back just a little bit here.  All right, watch the video.

Is he propelling himself backwards?

MS. BARNES:  Form.

**Page 143**

THE WITNESS:  He could have been.

BY MR. WOODS:

Q.    I mean what did you see on the video right there?  Was he crouching forward with his arm out?

Watch it.

A.    You --

Q.    Watch the whole thing for like 45 seconds.

Tell me what you see.

A.    He crouches, falls on his butt and pushes back.

Q.    Okay.  And did you see a weapon in his hand when you were there?

MS. BARNES:  Form.

THE WITNESS:  No.

BY MR. WOODS:

Q.    Okay.  And you shot all 17 of your bullets?

MS. BARNES:  Form.

BY MR. WOODS:

Q.    You shot your entire magazine?

A.    I did.

MR. WOODS:  Okay.  Let's go ahead and take a break.

THE VIDEOGRAPHER:  We are off the record.  Time on the monitor is 1:17.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the

**Page 144**

record.  Time on the monitor is 11 -- or, I'm sorry, time on the monitor is 1:29.

BY MR. WOODS:

Q.    You testified earlier that you didn't give any warnings before you started firing your weapon; do you remember that?

A.    Yes.

Q.    Why didn't you give any warnings?

A.    I didn't have time.

Q.    You had time enough to see him crouching and then move back towards the store, correct?

A.    I did.

Q.    Okay.  And at the time you saw him moving back to the store, his hands were on the ground pushing himself back, correct?

MS. BARNES:  Form.

THE WITNESS:  Say that again?

BY MR. WOODS:

Q.    From the video you saw him with his hands on the ground pushing himself back.  We just went over that.

Is that right?

MS. BARNES:  Form.

THE WITNESS:  It -- he does -- it's difficult for me to see in the video.

**Page 145**

BY MR. WOODS:

Q.    Come on.  Come on, device.  There we go.

All right.  So you're saying that when you watch this, you can't see him pushing himself back?

A.    It's difficult for me to tell.

Q.    It's difficult for you to tell?

A.    Yes.  But it's...

Q.    So instead of giving a warning, shooting 17 times was your best course of action, in your opinion?

MS. BARNES:  Form.

THE WITNESS:  At that time, stopping a potential threat, yes.

BY MR. WOODS:

Q.    Okay.  Shooting your weapon 17 times?

A.    Shooting until there was no longer a threat.  If that re -- that required 17 times.

Q.    Did you see him after you started shooting raise his weapon towards you?  Did you see him after shooting raise his weapon at anybody?

A.    No.

Q.    So after you started firing, you never saw him raise a weapon at anybody?

MS. BARNES:  Form.

BY MR. WOODS:

Q.    After the first shot, did you see him pick up a

**Page 158**

car?

A.    Yes.

Q.    Okay.  But from this angle, he's actually between the silver car and that SUV to the east of it, correct?

A.    Yeah.

Q.    Okay.  So somehow from your vantage point you were able to see between those two vehicles that Leontae was crouching and pointing his hand at your officers; that's your testimony?

A.    He emerged from between the two cars, turned toward my officers, crouched down with an extended arm; that is my testimony.

Q.    Okay.  But you were able to see him turn around from a crouching position, raise his arm, point it at the officers that were where, at the pony wall?

A.    South, yes.

MS. BARNES:  Form.

BY MR. WOODS:

Q.    So at the pony wall?

A.    I don't -- yes.

MS. BARNES:  Same objection.

BY MR. WOODS:

Q.    Okay.  So you were able to see him turn around, point his hand at the officers at the pony wall or to

**Page 159**

the south, and then somehow he gets down to his buttocks and pushes himself back; you saw all that?

MS. BARNES:  Form.

THE WITNESS:  You're asking me if I saw all that?

BY MR. WOODS:

Q.    Yeah.

A.    I recall him emerging from the vehicles, turning to face my officers, crouching down, and that's when I began to engage him.

Q.    After the first couple shots, why did you feel it necessary to continue shooting?

MS. BARNES:  Form.

THE WITNESS:  I am trained to stop a threat.  When he crouched and raised his arm toward my officers, I began to engage him, but I know that from a seated position a person is still able to fire a gun, so I fired until he was no longer in a position where I felt like he could engage my officers.

BY MR. WOODS:

Q.    Okay.  So Ladines, Ravelo, Garza were all on scene, correct?

A.    That is correct.

Q.    There were additional officers on scene as well, correct?

**Page 160**

A.    At what time?

Q.    At the time of the shooting.

MS. BARNES:  Form.

THE WITNESS:  I don't recall that.

BY MR. WOODS:

Q.    You don't recall that?

A.    No.

Q.    You think there was only Ladines, Ravelo and Garza?

A.    Actually, I didn't know how many --

MS. BARNES:  You've got to -- you've got to wait until he finishes his question.

THE WITNESS:  Okay.

MS. BARNES:  And then you answer.

THE WITNESS:  Okay.

I wasn't sure how many officers were on scene at that time, but I knew there were officers on scene.

BY MR. WOODS:

Q.    You didn't hear any gunshots prior to you shooting, correct?

A.    That is correct.

Q.    Okay.  When you fire your weapon at targets for target practice, are you a hundred percent accurate?

MS. BARNES:  Form.

**Page 161**

THE WITNESS:  I wish.

BY MR. WOODS:

Q.    I mean it's almost impossible to be; is that right?

A.    That's correct.

Q.    Why?

A.    Because we're human.

Q.    Our hands might move slightly?

A.    It's possible.

Q.    Is it possible that the trajectory of the bullet sometimes doesn't come out perfectly from the end of the barrel?

MS. BARNES:  Form and foundation.

THE WITNESS:  That's possible.

BY MR. WOODS:

Q.    Do you know if any of your bullets missed Leontae?

A.    No.

Q.    Do you think they all hit him?

A.    I don't know.

Q.    But it's possible that some could have missed his body from your vantage point?

A.    I don't know.

Q.    It's possible, right?

MS. BARNES:  Form.

**Page 174**

BY MR. WOODS:

Q.    Because we don't hear audio yet.

That was at 19 seconds, right, 16:30:19?

MS. BARNES:  Form.

BY MR. WOODS:

Q.    From watching the video?

A.    I thought it was closer to 20, but we'll give you 19.

Q.    19, 20, that's fine.

Okay.  So you just reported 998?

A.    Okay.

Q.    Okay.  Did you know that from that point it took another 13 minutes and 27 seconds before Fire was told that the scene was secure?

A.    Okay.

Q.    And as we saw, it was about 4 or 5 minutes after the shooting that police officers started giving medical care?

A.    Okay.

MS. BARNES:  Form.

BY MR. WOODS:

Q.    So it was another 8 or 9 minutes before Fire was told the scene was secure.

My question is, when your officers start giving medical treatment, isn't the scene secure at that point?

**Page 175**

MS. BARNES:  Form.

THE WITNESS:  Well, you're saying that Fire was told the scene was secure.

BY MR. WOODS:

Q.    Not for 13, 14 minutes after the shooting.

A.    But when was the request for Fire made?

Q.    It was made earlier.

A.    Because there are times where we request Fire and then clarify information as such as the scene is secure after they've already been requested to respond. That doesn't mean they don't -- aren't en route.

Q.    Oh, I'm not saying -- you know, I'm not --

A.    I don't know when they were --

Q.    I'm not saying it's Fire, because we know they were en route, but Fire didn't show up because they hadn't been told that the scene was secure.

And my question to you is, when your officers have already handcuffed a suspect and have started chest compressions, isn't the scene secure?

MS. BARNES:  Form.

THE WITNESS:  Typically, yes.

MR. WOODS:  Okay.  I don't have anything further.

MS. BARNES:  I have no questions.  We'll read and sign.

**Page 176**

MR. WOODS:  Thank you.

THE VIDEOGRAPHER:  We are off the record. Time on the monitor is 2:16.  This ends Volume 1, Media No. 3 of the deposition of Sergeant Eric Roy.

THE COURT REPORTER:  Sarah, I'm assuming you're going to order a copy?

MS. BARNES:  Yeah.  Yeah, we're going to read and sign, so I have to have it to do that, and I just need a condensed PDF and no exhibits.

(The videotaped deposition concluded at 2:16 p.m.)

(Deposition Exhibit 13, Deposition Exhibit 15, Deposition Exhibit 16 and Deposition Exhibit 17 were digitally marked for identification.)

_____

SERGEANT ERIC ROY

**Page 177**

STATE OF ARIZONA    )
                    ) ss.
COUNTY OF MARICOPA  )

BE IT KNOWN that the foregoing deposition was taken before me, JODY L. LENSCHOW, RMR, CRR, Certified Reporter No. 50192 for the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed under my direction; that a review of the transcript by the witness was requested; that the foregoing pages contain a full, true, and accurate transcript of all proceedings and testimony had, all to the best of my skill and ability.

I FURTHER CERTIFY that I am not related to nor employed by any of the parties hereto and have no interest in the outcome thereof.

DATED at Phoenix, Arizona, this 21st day of December, 2025.

_____
JODY L. LENSCHOW, RMR, CRR
Certified Reporter
Certificate No. 50192