# EXHIBIT 3

Case 2:23-cv-00836-MTL-CDB    Document 122-3    Filed 04/13/26    Page 2 of 21

Kashane Kirk vs. City of Phoenix -                                          February 27, 2025
30(b)(6) City Of Phoenix - Dennis Orender                                                  1

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Kashane Kirk, as Personal            )
Representative and on behalf of the  )
Estate of Leontae Kirk; Sharon Roberts,)
individually; Brittnie Turner, on    )
behalf of and as legal guardian and  )
parent of her minor child, MC,       )
                                     )
                    Plaintiffs,      )
                                     )
vs.                                  )No.:CV-23-00836-
                                     )    PHX-MTL(CBD)
                                     )
City of Phoenix, a governmental entity;)
Michael Sullivan, Chief of the Phoenix )
Police Department; Autumn Ladines and  )
John Doe Ladines; husband and wife;    )
Officer Antonio Garza and Jane Doe     )
Garza, husband and wife; Sergeant Eric )
Roy and Jane Doe Roy, husband and wife;)
Jaclyn Ravelo and John Doe Ravelo,     )
husband and wife; Steven Ramirez and   )
Jane Doe Ramirez, husband and wife,    )
and; Jonathan Howard and Jane Doe      )
Howard, husband and wife,              )
                                     )
                    Defendants.      )
_____)

VIDEOCONFERENCE RULE 30(b)(6) DEPOSITION OF
CITY OF PHOENIX
By and Through Dennis Orender

Phoenix, Arizona
February 27, 2025
1:03 p.m.

Prepared by:

Courtney C. Vanderwalker, RPR
Certified Reporter
Certification No. 50597

CERTIFIED
TRANSCRIPT

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
2..5

**Page 2**

VIDEOCONFERENCE RULE 30(b)(6) DEPOSITION OF CITY OF PHOENIX, by and through Dennis Orender, taken on February 27, 2025, commencing at 1:03 p.m., with the witness appearing via Zoom; with all other participants also appearing via Zoom from their respective locations, before COURTNEY C. VANDERWALKER, a Certified Reporter in the State of Arizona.

APPEARANCES:

    For the Plaintiffs:
    MILLS & WOODS LAW, PLLC
    BY:  Sean A. Woods
       5055 North 12th Street, Suite 101
       Phoenix, Arizona  85014
       swoods@millsandwoods.com

    For the Defendants City of Phoenix, Sullivan,
       Ladines, Garza, Roy, Makic, Ravelo,
       Ramirez, Howard, Traylor, and Reddy:
    BROENING OBERG WOODS & WILSON, P.C.
    BY:  Jeremiah M. Sullivan
       Robert T. Sullivan
       2800 North Central Avenue, Suite 1600
       Phoenix, Arizona 85004
       jms@bowwlaw.com

**Page 3**

I N D E X

DENNIS ORENDER                                 PAGE
  EXAMINATION BY MR. WOODS                 4

      *   *   *
E X H I B I T S

| EXHIBIT | DESCRIPTION | REFERRED |
|---|---|---|
| 1 | 2022-2023 Phoenix Summary Budget (217 pgs) | 20 |
| 2 | KIRK_0001465 | 29 |
| 3 | 2023-2024 Phoenix Detal Budget (566 pgs) | 55 |
| 4 | XXXXXXXXXXXXXXXXXXXX | 81 |
| 5 | OIS Media Advisory (1 pg) | 87 |
| 6 | XXXXXXXXXXXXXXX | 94 |
| 7 | The Phoenix Police Department - The Road To Reform (53 pgs) | 98 |
| 8 | XXXXXXXXXXXXXX | 115 |
| 9 | Phoenix New Times - November 3, 2023 (1 pg) | 128 |
| 10 | Defendants' Answers to Plaintiffs' First Set of Interrogatories (6 pgs) | 135 |

**Page 4**

DENNIS ORENDER, a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. WOODS:

Q.   Good afternoon, Mr. Orender.  Is that correct?

A.   Yes, sir.

Q.   Okay.  And what's your position with the -- with the City?

A.   I am the executive assistant chief for the Phoenix Police Department so I work directly for the police chief.

Q.   Okay.  Will you state your full name for the record, please?

A.   Dennis Orender, last name is spelled O-R-E-N-D-E-R.

Q.   Do you mind if I call you Dennis or would you like me --

A.   Dennis is much better.

Q.   Okay.  Cool.

Okay.  So have you ever had your deposition taken before?

**Page 5**

A.   I believe so, yeah, several years ago in a civil lawsuit.

Q.   Okay.  Have you ever had your deposition taken before as a 30(b)(6) witness?

A.   I don't believe so, but I'm not one hundred percent.

Q.   Do you understand what testifying in a 30(b)(6) capacity means?

A.   Somewhat.  I'm somewhat familiar with it.

Q.   Okay.  When you're testifying as -- in a 30(b)(6), you're the person that your counsel has put forth to be able to answer questions as if the City itself was answering questions.  Do you understand that?

A.   Yes.

Q.   Okay.  So when you answer a question today, I am going to assume that you understood the question and that the answer is on behalf of the City unless I ask it otherwise.  Is that fair?

A.   Yes.

Q.   Okay.  You've been deposed before so I'll just be real quick.  We want to be able to give a good record to the court reporter, so we don't want to talk over each other and we need actual verbal responses.  Okay?

A.   Sure.

Q.   And if you need to take a break, just let me

Case 2:23-cv-00836-MTL-CDB    Document 122-3    Filed 04/13/26    Page 4 of 21

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
34..37

**Page 34**

investigations unit might get assigned to a different division. It just depends on who the assistant chief is, workload, a lot of movement within management technical services, support services. We added a new division, the organizational professional development division. So one might think that professional standards, because it's an investigative entity, would fall under investigations, which it did not. It would fall under the organizational professional development division. So without going back to that org chart at that time to look at each one of these divisions, I couldn't tell you with one hundred percent certainty which ones fell under those divisions.

Q. I'm sorry, my -- you said under the organizational professional development, some sort of investigation unit would be under that?

A. Yes, so at the time, because -- I know this because I was in the professional standards bureau.

Q. When -- when you say "at the time," what was the time?

A. This was 2022 we are looking at.

Q. Yeah, I just want to make sure we are all on the same page. Go ahead.

A. So like in 2022 the professional standards bureau, although to the outsider they would say that --

**Page 35**

they do investigations on employees, right, it's internal affairs; some people would believe that, well, maybe that means they fall under investigations. Well, they didn't. They fell under organizational and professional development division, I believe at the time, so my point just being that I can't with one hundred percent accuracy tell you that these were the bureaus that fell under management services, these were the bureaus that fell under technical and support services, without looking at the org chart from 2022.

Q. Okay.

A. Just giving examples of what could fall under there.

Q. Gotcha. What -- those org charts are available. Right?

A. I'm sure we have historical org charts, yes. I might even have a copy of one from 2022.

Q. What is -- do you know what the -- what the City's fiscal year is? Does it run from June to June? Is it --

A. July 1 to June 30.

Q. So that's why we get the two year splits on each of the different budget years?

A. Right.

Q. So '21, '22 estimate on this, you know, we are

**Page 36**

not saying that was actual, but that's what this document shows, that would run from July 1, '21, to June 30, '22?

A. Yes. That's how I understand it, yes.

Q. And the same thing so on for each previous year?

A. Correct.

Q. Again, we don't have the org chart up on the screen, but can you tell me what patrol operations, to the best of your ability, encompasses?

A. Right now or back then?

Q. Back then.

A. Yeah, that would be -- that would just be all of our patrol precincts, the seven patrol precincts we have in the city.

Q. Would that be salaries? What would be included in that budget?

A. I'm sorry, what would the -- those dollar amounts equal to? Yeah, it would be personnel costs. They probably have equipment. They probably have commodities. Anything that the precinct may need, each one of those precincts would have their budget and it would all total up and be under patrol operations.

Q. Okay.

A. But, yes, salaries, personnel costs,

**Page 37**

commodities, equipment. There could be some building maintenance in there if it's not covered by a public works. Benefits, which, you know, would fall into personnel I think, personnel costs.

Q. Then there's one for community affairs and oversight. You were -- you were in the coms department for a while, does that encompass that?

A. No. Again, I would have to go back and I can try to pull up and see if I have that org chart, but community affairs, I would say would -- was probably at the time our community relations bureau. Communications probably fell under either technical and support services or management services.

Q. What, again to the best of your ability, what is strategic and tactical services?

A. That would be our units such as our bureaus like our swat team, our K-9s, airport bureau, yeah, K-9, airport, swat, our FAID unit, which is our fugitive apprehension detail, much -- kind of like SAU, all your tactical-type bureaus.

Q. Outside of at that time, what you said, internal affairs was underneath the organizational and professional development. Do I have that right?

A. I believe it was, yes.

Q. What -- what else fell under that that you

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
62..65

**Page 62**

A.   I would have to look.  I am not a hundred percent sure.  I know they were seen by a Sergeant Jared Perkins.  I don't know what their staffing looks like today.  I could -- I could look it up if you'd like.

BY MR. WOODS:

Q.   Sure.

A.   I am looking up the ones who are assigned to Sergeant Perkins unless they have different call signs and that's possible.  At least nine that are assigned to him.  And I am not one hundred percent, but he's one who is overseeing our body worn camera unit, so I look up the employees that are assigned to him and he's got eight assigned, so nine counting him.

Q.   Nine counting him?

A.   Yeah.  I just -- the way we have our staffing broken down in this database, I can verify directly with him though too, but it looks like eight.  Let me just verify.

Q.   Are you sending him a message?

A.   I am.  I asked him how many employees are assigned to the body worn camera unit.

Q.   Okay.

A.   He is usually very good about getting back right away, so I'll let you know when he responds back.

BY MR. WOODS:

**Page 63**

Q.   All right.  I'll let you know when my daughter responds back too.

Body worn cameras are important.  Right?

A.   Yes.

Q.   And why are they important?

A.   In my opinion, I believe they obviously increase transparency to the public.  Oftentimes we utilize them to prove or disprove any type of misconduct.  But it really allows the public to see what is it that we do and increases transparency and ultimately trust, I think, with our community members.

Q.   Okay.  You answered in your opinion, but does the City have a position on whether or not body worn cameras are important?

A.   Yes.  We believe they are important for those reasons; otherwise, I would say we probably wouldn't have them.

Q.   You used the term prove, slash, disprove.  I am going to ask a couple of questions related to that.  The body worn camera evidence helps determine whether use of force was within or without policy.  Correct?

MR. SULLIVAN:  Form.  Foundation.

BY MR. WOODS:

Q.   You can answer if you can.

A.   Yeah.  So the question was it helps prove or

**Page 64**

disprove whether it was excessive force, is that what you said?

Q.   Well, what I said was it -- it's used to support whether or not a final decision was made as to whether the officer's use of force was in or out of policy?

A.   Yes, it could be used -- it's one piece of the story.  It's not the entire story, but it's certainly one piece that could be used to determine whether someone believes that a use of force is in or out of policy or if any misconduct occurred.  Again, one piece, it's not -- it doesn't tell the whole story.

Q.   Right.  What is OIS?

A.   That is our acronym for officer involved shooting.

Q.   Okay.  When we were looking at that Exhibit 3 and 2 when we were talking about the organizational and professional development row, I am going to ask a question.  Does -- is that organizational area responsible for providing use of force training to Phoenix police officers?

A.   Yeah, so that would be the academy at the time, yes.  They were responsible for training our employees.  And then as I mentioned earlier, our organizational integrity bureau, there's a unit now

**Page 65**

within that bureau that also assists in training.  They are the use of force experts.  But the academy is the ultimate -- when it comes to training, the academy is those who are ultimately responsible for training including use of force training.

Q.   We talked earlier when Chief Sullivan came in he was keen on introducing deescalation training, but he also revised the use of force policy that was enforced at that time.  Correct?

MR. SULLIVAN:  Form.  Foundation.

A.   He --

BY MR. WOODS:

Q.   Go ahead.

A.   Go ahead and answer?

Q.   Yeah, go ahead.  I'm sorry.

A.   Yes, he came in and he asked us to look at our use of force policy and put together a working group with his input on rewriting -- not rewriting, but just kind of updating our use of force policy, again, based on what he's seen around the country and with his expertise.

Q.   Were you part of that group that helped rewrite it or revise it?

A.   I was not.

Q.   How big was that group?

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
66..69

**Page 66**

MR. SULLIVAN:  Foundation.

BY MR. WOODS:

Q.   If you know?

A.   I don't know.

Q.   He ultimately did revise the policy, though, correct?

MR. SULLIVAN:  Form.

A.   Yes, it's possible.

BY MR. WOODS:

Q.   The policy was revised after Chief Sullivan took office, correct, or took his position?

A.   Yes.

Q.   When that new policy or that new operations order -- take another step back here.  That is known as op order 1.5.  Correct?

A.   Yes.

Q.   So when 1.5 was revised, were officers sent to updated training on use of force?

A.   Yes.  They were sent down to the academy for in-person training on the new policy.

Q.   Okay.  And was that every officer?

A.   Yes.

Q.   And when I say officer, I'm just -- I -- maybe I should say sworn.  Is that every sworn employee or was it just certain types of officers?

**Page 67**

A.   Every sworn employee.  In addition I think we even had some of our civilian staff such as those police assistants who may be forward facing out there on the street, but certainly all those sworn.

Q.   Op order 1.5 has been change throughout the years that you have been a part of the Phoenix Police Department.  Correct?

A.   Yes.

Q.   When that op order has been -- when that op order was revised prior to Sullivan coming in as the chief, were -- was every sworn employee required to go to a new use of force training?

A.   No.  Typically whenever there's an update to a policy, not just use of force, it's evolved over the years.  Initially it used to come out in written form and you had to sign for it to acknowledge the policy change, but now we have moved to electronic acknowledgment, so now the updates go out electronically.  But this was something that was very important so it was an in-person training.  But typically they would acknowledge that through electronic acknowledgment that you received it and you've read it and you understand it.

Q.   Okay.  So a revision comes out to an op order, it comes to someone's e-mail, an employee's e-mail, and

**Page 68**

they open it up and then they acknowledge they have read it?

A.   There's actually a PowerDMS, you have to go into PowerDMS and it gives you the list of updated policies.  If you don't acknowledge you do get an e-mail saying, hey, you need to sign in and acknowledge these policies.  But then you go into PowerDMS to acknowledge those.

Q.   Okay.  But when the policy was revised -- just to be clear, op order 1.5 was revised after Chief Sullivan took office, every sworn employee went to an actual training on that new op order?

A.   Yes, sir, in-person training.

Q.   And you said it was very important.  Right?

A.   Yes.

MR. SULLIVAN:  Objection to form.

BY MR. WOODS:

Q.   Why was it very important?

A.   I would say with any policy it's important.  But use of force, you know, obviously very important to the public, very important to our employees.  We don't want people getting injured.  It wasn't like an administrative paper change, this was a -- an update to a -- an important topic throughout the police department.  Use of force, like I said, people get

**Page 69**

injured.  Officers get injured.  Citizens get injured.  We want to make sure everybody understood not just the policy itself but the reporting components of that policy because the reporting components also changed.

Q.   And it was an in-person training?

A.   Yes, sir.

Q.   How many hours?

A.   I want to say it was a two-day training, 16, 20 hours.  I can't remember if it was 8-hour days or 10-hour days.

Q.   And the whole focus of the training was on the new use of force operations order.  Is that right?

A.   Correct.  And the reporting requirements.

Q.   Okay.  But previous -- we just went over this.  Previous updates to that use of force policy did not require people to come in person to one or two-day training on.  Correct?

A.   Correct.  I don't recall any of those, like, two-day trainings for a minor policy change to use of force.

Q.   Okay.  And what would a minor policy change be?

A.   Well, I mean, I would say some that would say minor, I mean, every policy change is important, but in one example I would give would be -- one policy change

Case 2:23-cv-00836-MTL-CDB    Document 122-3    Filed 04/13/26    Page 7 of 21

Kashane Kirk vs. City of Phoenix -                                    February 27, 2025
30(b)(6) City Of Phoenix - Dennis Orender                                        70..73

**Page 70**

that I can remember, I think, was the carotid control technique, which was moved to deadly force.  You can only use it during a deadly force type encounter.  We didn't send everybody down to the academy to tell them, hey, the carotid control technique is now moved into a level three type deadly force encounter, you can only use it in these instances.  So in something like that we wouldn't bring the entire department down there and take a year and a half, we would put that information out either through, like, an e-mail to the entire department and then also update the policy and make sure people went in there to acknowledge it.  It's still important.

Q.  Sure.

A.  Every policy change is important, but not necessary to, you know, spend the time and the money when we can get that information out quicker through a policy change and acknowledgement.

Q.  Did it take one and a half years to get everybody trained on the new use of force policy?

MR. SULLIVAN:  Form.  Foundation.

BY MR. WOODS:

Q.  Just when you were talking a second ago, you were saying that, like, for the carotid control one, you know, we could send it out for the acknowledgement, hey, guys, this is super important, but it wouldn't take us

**Page 71**

one and a half years to get them through that -- that type of update.  And you said earlier that everybody -- all sworn employees went to this new use of force training, and so I just caught that one and a half year statement that you said about the carotid control, we didn't want to take one and a half years to train; so my question is where did that one and a half years come from?

A.  So if you map out a 40-hour module, as I understand it, if you map out a 40-hour module, that would take about a year and a half to get everybody through.  The use of force training was a 20 -- if I remember, 16 or 20-hour training, so half of that time, so it wouldn't take us 18 months.  And I believe they did that, I want to say in 10 to 12 month's time.  I think we started in February of '24 and finished by January 31, I believe is when we finished that, so it's 20 hours versus 40 hours, so you can imagine it takes half the time of 18 months, but I think they did it in about, I want to say if I recall, it was about 10 to 12 months to get everybody through it.

Q.  So we are on the same page, the use of force training started in February of '24 on the new policy?

A.  I believe it was around February of '24, yes.  Sean, to follow up on that body worn camera

**Page 72**

question you had earlier, I reached out to their division chief, Director Hood -- or I'm sorry, Director Wolf.  She says there's 23 positions in the body worn camera unit and then we also have three additional that are in public records, so.

Q.  So 23 in the body worn and 3 in public records?

A.  Correct.

Q.  Okay.  And my assumption would be the 23 in the body worn are the ones doing the redactions and -- and -- and things like that.  Is that right?

A.  Yeah, or sending those to public records and then public records body worn camera people are responsible for doing the proper redactions on it.

Q.  Okay.  So let me -- I'm sorry, I am trying to get my head wrapped around that.  So there are three public records employees that are responsible for body worn camera in that area?

A.  In public records I'm told, yes, three in public records.

Q.  And 23 in what's classified as the body worn camera bureau?

A.  Correct.

Q.  Does that include -- that then would include, like, Sergeant Perkins and I'm assuming maybe there's a

**Page 73**

couple other officers?

A.  I would have to ask, but I would assume that counts him as well.  So there's 20 filled positions, 3 of those are currently vacant, so there's 20 assigned there, but we have three vacancies.

Q.  So right now there's 20 actual live bodies in BWC?

A.  Yes, sir.

Q.  And so I am clear and the record is clear, do those 20 actually do redactions or do they send them to public records for the three people there to do the redactions?

MR. SULLIVAN:  Objection: form.

A.  I'm not a hundred percent sure on that one.

BY MR. WOODS:

Q.  I am just wondering.  What was -- what was so different about the policy, the use of force policy, in place in '22 and the new use of force policy that was revised in '23 that required so much training?

MR. SULLIVAN:  Form.

A.  I wasn't part of those conversations as to what Chief Sullivan was looking for at the time.  I can just speak to what the policy focused on, the new policy focused on.  But I don't know what his conversations were, what he thought should be changed or shouldn't be

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
74..77

**Page 74**

changed, or what concerns or issues he had with it. I just know what he focused on a little bit in the new policy more so than we had in the past, I think.

BY MR. WOODS:

Q. Okay. And can you tell me those things?

A. I know they focused a lot on deescalation, more deescalation, which is always, from what I remember, been in our policy but more focused on deescalation. He wanted, if I remember correctly, I know he wanted the word "proportional" -- so reasonable, necessary, and proportional was a big change to our policy. Duty to intervene, again, had been there. And then officer created jeopardy, we didn't want officers to put themselves in bad positions, that was another focus of the new policy. Those are the higher ones that I can remember. And then obviously reporting of force was -- reporting and how we report force was a major change because we had created the force evaluation review unit so that was a -- that was a major change for us.

Q. Talk to me about the reporting. What -- what was the major change related to the reporting?

A. So in the past whenever you had a use of force incident occur, a lower level, I'm not saying lower level, but not a -- not an officer-involved shooting

**Page 75**

type use of force, let's say it was a case where maybe you used a taser on an individual or you used a fist strike or a hand strike against someone, in the past that use of force would be reviewed by the employee's supervisor in patrol, if it was a patrol officer that used it, and would go up through the employee chain of command to the bureau commander. And they would sign off as either this use of force is in policy or it's not in policy. And then they would deal with it how it needed to be dealt with.

The change was we now created a force evaluation -- force evaluation and review unit, so now there's certain criteria that if you use a certain type of force, those levels of force go to this force evaluation review unit completely outside of the employee chain of command for review, so it takes the review out of the employee's direct chain of command, gets another set of eyes on it and that chain of command looks at it. Those employees who work in the force evaluation review unit are what we would deem our subject matter experts in use of force. They do a lot of the training at the academy when it comes to use of force. They assisted in that use of force training that I talked about. But the reporting of that would now -- now routes

**Page 76**

through them for a final disposition through their bureau commander and not the employee chain of command bureau commander.

Q. You mentioned something about the change to the policy, officers putting themselves in bad positions. What did that mean?

MR. SULLIVAN: Form.

A. I guess to give an example, I don't want -- you know, say you've got an officer that's maybe looking at investigating a stolen vehicle report and they find the stolen vehicle, I don't want them jumping in front of a moving vehicle and creating a deadly force encounter that did not need to be created. That's -- you can't create your own jeopardy, so to speak. And we had seen that happen around the country in videos. In fact, I think we may have even showed some videos in that use of force training about that.

And my body worn camera guy just got back to me. He said the same thing, 20 filled positions in his unit.

BY MR. WOODS:

Q. Thank you. What is -- what is duty to intervene?

MR. SULLIVAN: Form, foundation.

BY MR. WOODS:

**Page 77**

Q. You -- you mentioned that -- or your testified that it was added -- it was in the policy before but it was expanded on in the updated policy. Do I have that right?

A. Yeah, I'm not sure how it was written in the policy before; but we have always expected our employees to intervene whenever they see, you know, an employee who may be using unnecessary force. And it kind of goes back to our ABLE training, the active bystandership training, whether it's misconduct in the form of use of force or any other form of misconduct, we expect our employees to intervene and step up and say something or do something if they see something egregious being committed by another employee. It's always been our policy, but we really wanted to focus on that and make sure everybody understood that, hey, these are the principles of -- and this is also what we have taught in ABLE, you know, step up and step in if you see somebody doing something wrong.

Q. Was there any -- anything specific about the -- the module training that was given to every sworn officer in -- in the context of duty to intervene that was different in previous trainings?

MR. SULLIVAN: Form. Foundation.

BY MR. WOODS:

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
78..81

**Page 78**

Q.   Let me -- let me ask you this: Did you take that new training for the new use of force policy?

A.   I did.

Q.   Okay.  So you actually had to go through that module.  Correct?

A.   Correct.

Q.   And there was a use of force -- I mean, it was use of force, but there was a duty to intervene component to that training.  Correct?

A.   I believe they talked about it.  I don't know if it was an actual component, but they talked about -- I believe they talked about it.  I don't recall any videos that were shown where -- there could have been -- where they may have had agency videos where somebody was doing something where somebody should have stepped in and did or did not.  I don't remember specifically any video material being shown; but they covered the 1.5 policy and I believe that was part of some of the discussion.

Q.   What is a critical incident briefing?

A.   So whenever we have a -- a critical incident, you know, an officer-involved shooting, I mean, in custody death or something where detectives will come out, there's a transitional briefing that happens from the patrol officer sergeant, the patrol sergeant who's

**Page 79**

responsible for that scene.  Detectives will come out and either the patrol sergeant on the scene can give the briefing or if there's someone from our violent crimes bureau like our night detective sergeant, if it's at nighttime, would come out, they would give the briefing to homicide if there's a -- somebody who is deceased on scene.  So it's a briefing between some of the first responders who were responsible for securing the scene and our detective bureaus to provide them the details as they know them at the time.  And then that's kind of like the handoff to the investigations unit for them to take over the case.

Q.   Are there policies that govern how critical incident briefings are supposed to be done?

A.   There are some policies, I believe, in our critical incident protocol.  I would have to look them up.  I don't have them memorized.  There's also probably some policies in the investigations bureau manual that we talked about earlier.  But I could look up the policy and tell you exactly what it says if it's there.

Q.   Okay.  That's fine.  What is the critical incident transparency protocol?

A.   So that is something that in an effort for us to be more transparent with the public that whenever we have a critical incident occur, again, it could be an

**Page 80**

officer-involved shooting, it could be an incident where one of our officers is seriously injured or a community member is seriously injured, we pull the -- our public affairs bureau puts together a video.  They pull up the body worn camera video from the body worn camera unit and they put together a transparency video.  We shoot for 14 days as our limit to get that information out to the public just to -- just to show them what we have at the time and what we know at the time.  Obviously things are subject to change.  It talks a little bit about the officers involved, like how much time they have on, and then they explain the body worn camera, how that works.  They show various clips of the video.  They will show or play some of the portions of the 911 calls or radio calls that come in.  And then they explain towards the end of that video that, you know, in this case if warrants will go to the county attorney's office for a review.  And then usually now the Department of Public Safety has taken over our investigations when it comes to officer-involved shootings.  So just to -- just to be -- an effort to be more transparent with the public, this is what happened as we know it today and this is the next steps that's going to happen.

Q.   Okay.  When an incident occurs that would trigger the critical incident process or protocol

**Page 81**

what -- you said you want to get a briefing out to the public within 14 days, the City would like that to happen within that amount of time.  Correct?

A.   Yes, sir.

Q.   So behind the scenes there's things that have to be done by -- by investigators or detectives or whatever.  Correct?

MR. SULLIVAN:  Foundation.

A.   Yes.

BY MR. WOODS:

Q.   Back to sharing.  I am showing what we'll mark as Exhibit 4.

This is a document that was produced as PPD-EMAIL 000539 through 550.

MR. SULLIVAN:  Sean, I'm sorry, just to interject.  It looks like the document is marked as confidential pursuant to the court order, so I didn't know if, I guess, on the back end we could mark this portion of the deposition as confidential or if there's a way to mark it now.

MR. WOODS:  That's -- I'm totally fine with that if we need to insert something before I start talking.

MR. SULLIVAN:  Yeah, that way it'll just be easier now that we have confidential on the record I

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
90..93

**Page 90**

information to the public affairs bureau?

A. Yes, sir.

Q. And it's important to provide accurate information to the public in these documents. Correct?

MR. SULLIVAN: Form.

BY MR. WOODS:

Q. You can answer.

A. Yes it's important.

Q. Okay.

So, for instance, when it says, "When the officers got there they found multiple people with guns in the parking lot of a strip mall," that's an important detail. Correct?

MR. SULLIVAN: Form.

A. I would say it's all important. Again, this -- these advisories and these videos that we put out 14 -- up to 14 days later are as we know them.

BY MR. WOODS:

Q. If investigators that had arrived on scene after the officer-involved shooting had collected surveillance video and had reviewed them and provided information to the public affairs bureau, it would be important for the information provided to the public affairs bureau to be accurate. Correct?

MR. SULLIVAN: Form. Foundation.

**Page 91**

BY MR. WOODS:

Q. Any time he objects, you can answer if you know.

A. Can you repeat that question? I want to make sure I understand it.

Q. The information given to the public affairs bureau, it's important for that information to be accurate. Correct?

A. Yes.

Q. The City doesn't want to tell the public that something happened when it didn't actually happen. Correct?

MR. SULLIVAN: Form.

BY MR. WOODS:

Q. So if this sentence was untrue, would it be important to correct that to the public?

MR. SULLIVAN: Form.

A. I could see where it would be; but, again, this -- this media advisory goes out before the transparency video goes out, you know, there's more to the transparency video; but, yeah, I could see where you can make an argument for that.

BY MR. WOODS:

Q. And then the next sentence, "The officer saw one of the men shooting his gun at others and this is

**Page 92**

when the officer-involved shooting occurred."

If that was inaccurate, do you think that that would be important for the City to correct?

MR. SULLIVAN: Form.

A. Again, I don't know at the time when this was drafted what information they had; but if something was incorrect and we did put out something that was misinformation, my hope is that we would correct it, you know, through the transparency video or through any other questions that we got from -- through media we could put out.

BY MR. WOODS:

Q. Is public trust important to the City?

A. Yes.

Q. When the City puts out information that's inaccurate, can that erode public trust?

MR. SULLIVAN: Form.

A. I think that it could. However, I would also say that if it was inadvertent or if it was intentional makes a big difference. But certainly any time you put out bad information in any business or environment, you could erode trust with your customers or your public. But, again, I would also look at was -- what was the mental state? Was it intentional or was it inadvertent or was it just bad information that we may have

**Page 93**

received?

BY MR. WOODS:

Q. Do you know if in your time in your -- in your role and your previous roles being the acting chief if -- bad question.

Have you ever seen a directive or an order to correct a media advisory?

A. I can't think of any offhand but it's probably happened.

Q. Do you know if there are any policies or procedures regarding the media advisories?

A. I don't know offhand, but if there were, they would probably be in their, like I mentioned earlier, their bureau manual because that's specific to the public affairs bureau.

MR. WOODS: Let's go ahead and take another five-minute break, if that works.

MR. SULLIVAN: Yeah.

(Recess taken from 3:23 p.m. to 3:33 p.m.)

BY MR. WOODS:

XX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
102..105

**Page 102**

A.   Correct.  It -- yeah, it still goes through a lieutenant commander but it goes to the lieutenant and commander in that FERU unit versus your traditional chain of command that you report to.

Q.   Okay.  And now every -- all of that's contained in the OIB?

A.   Correct.

Q.   Okay.  In this paragraph on page -- what's marked 27 in the document, it says that the OIB will also work with the Continuous Improvement Unit to drive policy making.  Do I have that right?

A.   Yes.

Q.   What does that mean?

MR. SULLIVAN:  Foundation.

A.   The Continuous Improvement Unit now falls under OIB, so I'm not sure if that -- I don't quite understand how it's written that way.  I don't know where continuous improvement at the time of this document rested.  It may have rested somewhere else.  But now it resides in OIB, so it basically just means that the continuous improvement unit, like I mentioned earlier, will look at national best practices across the country or locally and draft policies or recommend draft policies or change to policy, and that gets routed up through the chain of command obviously to see if we want

**Page 103**

to make any policy changes.

BY MR. WOODS:

Q.   Okay.  And it says, "PPD is in the process of substantially expanding the policy group to identify best practices and support reform efforts."

Do I have that right?

A.   Yes.

Q.   It says, "Support reform efforts," there and the title is "The Road to Reform."  What -- what -- what does the City mean by reform?

A.   So I would refer to what my definition of reform is and it's change.  Whether we're going to change policies, change how we are going to do business in certain areas, to reform means to change or improve.

Q.   When policy changes are suggested, who at the City -- and that's a wide question, I -- I -- I recognize that, and so let's narrow it back down.  Let's talk about the use of force policy.  When -- when that policy is being redrafted, who does the first draft?

A.   So any employee can recommend a change to policy, anywhere from the line level officer on third shift up to the police chief.  Typically what happens is if a line level employee believes that we should change a policy on whatever it be, maybe it's use of force, they can submit a memo through their chain of command.

**Page 104**

Ultimately it will go to the organizational integrity bureau.  They will look at it.  They will usually compare that to national best practices.  And if it's something that makes sense or if it's something that falls in line with the national best practices, there's a recommendation obviously from OIB up through their chain of command to the police chief.  And the police chief, you know, ultimately has the final say as to whether or not we are going to move in that direction and change that particular policy.

Q.   And then when does it -- when does it actually go to the city council?

A.   So I think I mentioned earlier that all policy changes don't go to city council for a vote or anything like that.  What will normally happen is if it's something of significance, like I said it could be a word change which doesn't really require much, but if it's something that's of significance or importance to any particular group or person, then the police chief will oftentimes have conversations with his boss, the assistant city manager Lori Bays.  At times there may be conversations with city council in meetings to say, hey, we are looking at changing this policy, just letting you know, do you have any input.  Sometimes they do.  Sometimes they don't.  It just depends on the policy

**Page 105**

change, but not every policy change goes to city council.

Q.   Go to page 11 of Exhibit 7 there's a Roman numeral four section, it says, "The hiring of interim chief Michael G. Sullivan."

Do you see that?

A.   I do.

Q.   There's a paragraph here that says, "In selecting a replacement to serve as interim chief of the Phoenix Police Department, City Manager Jeffrey Barton specifically sought someone with experience dealing with DOJ pattern-or-practice investigations and the reform process with the police departments."

Do I have that right?

A.   Yes.

Q.   Do we know why the City wanted someone that had experience dealing with DOJ pattern-or-practice investigations?

A.   I don't know why.  I would only be speculating, but I don't know why.

Q.   The City of Phoenix at the time this was released was under investigation by the DOJ.  Correct?

A.   At the time he was selected?

Q.   Yeah.

A.   Yes.

Case 2:23-cv-00836-MTL-CDB    Document 122-3    Filed 04/13/26    Page 12 of 21

Kashane Kirk vs. City of Phoenix -                                    February 27, 2025
30(b)(6) City Of Phoenix - Dennis Orender                                    106..109

**Page 106**

Q.   And they were under investigation for pattern and practice issues.  Correct?

MR. SULLIVAN:  Form.

A.   Yes, allegations of pattern and practice.

BY MR. WOODS:

Q.   Okay.  And the City -- the City, based on this paragraph and based on what we have seen historically, the City did hire interim Chief Michael G. Sullivan at the time.  Correct?

A.   Yes, sir.

Q.   And during his time as interim chief, he -- we talked about this earlier, he implemented changes to the use of force policies, for instance.  Correct?

A.   Correct.

Q.   We talked earlier about the OAT, the Offices of Accountability and Transparency.  Right?

A.   Yes.

Q.   That still exists to this day.  Right?  The OAT still exists?

A.   Yes, sir.

Q.   How does the OAT interface with the police department?

MR. SULLIVAN:  Form.  Foundation.

BY MR. WOODS:

Q.   The OAT is a separate city department than the

**Page 107**

police department.  Do I have that right?

A.   Yes.

Q.   Okay.  And the OAT works with the police department from time to time.  Correct?

A.   Describe what you mean by works with.

Q.   I mean --

(Simultaneous cross-talk)

A.   -- their job or what their role is as it relates --

Q.   You tell me.

(Simultaneous cross-talk)

A.   -- critical incidents.  So they are a separate city department much like, you know, Streets Department, Public Works Department, made up of civilian personnel headed up by Director Shannon Johanni, so their job when it comes to critical incidents or PSB investigations is to review -- once that investigation is complete is to review that investigation and make recommendations on how they believe the investigation could be -- could have been improved.  They cannot change that investigation.  They can review that investigation and make recommendations on, like I said, how to improve investigations, and they kind of look at it and decide if a report -- or a report or a PSB report is thorough and complete.  And if it's not, offer their input as to

**Page 108**

why they don't believe that it is.  And then they provide that information to the police chief.  And the police chief will review that and decide to either agree with those recommendations and implement those recommendations going forward, again, not for that specific investigation, or not agree with those recommendations.

Q.   So the OAT doesn't have power to tell the police what they have to do, it just provides recommendations?

A.   That's correct.

Q.   Okay.  I just wanted to get that straight.  Have you read the Department of Justice's investigation into the City of Phoenix Police Department?

A.   I have.

Q.   Okay.  We were talking about the critical incident stuff before.  We are not going to talk about anything that's been marked confidential.  This document I've put on your screen is called the Phoenix Police Department Critical Incident Transparency Protocol.  Do you see that?

A.   I do.

Q.   Okay.  And a lot of these questions or a lot of the information on here answers some of the questions that we asked earlier.  It defines what critical

**Page 109**

incident is.  Correct?

A.   Yes.

Q.   Okay.  And one of those is the use of force resulting in death or serious bodily injury requiring hospitalization.  Correct?

A.   Yes.

Q.   And to confirm, the department's goal is to release a critical incident briefing video and related public records within 14 days.  Is that right?

A.   Yes.

Q.   Okay.  Have you seen this document before?

A.   I probably have.  I don't recall specifically but I probably have.

Q.   Okay.  So far the things that I've read are accurate as to what you understand needs to be done when a critical incident occurs.  Correct?

MR. SULLIVAN:  Form.

A.   Yes.

BY MR. WOODS:

Q.   Okay.  It's just one page.  It's downloadable from the Phoenix website so.  What's the CIRT?

A.   That is the Critical Incident Review Team, so whenever we have a critical incident occur, it's really a group of individuals within our professional standards bureau that we have designated to do specific

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
110..113

**Page 110**

investigations such as officer-involved shootings.

Q.   That didn't exist in November of 2022.  Did it?

A.   It did not.

Q.   When did it start?

A.   We've had discussions about that over the years.  Even not to my knowledge I don't know that it is a specific set which we just have identified -- as I understand it, we have identified certain people within PSB to do officer-involved shootings, so it's not like a separate team that works somewhere else.  They are, like, the subject matter experts, I guess is the best phrase to use when it comes to documenting and reporting officer-involved shootings within PSB, so certain investigators within PSB.

Q.   Okay.  So going back to Exhibit 7 on page 28 of the document marked, there's a section here that says "Critical Incident Response Team."  I am not going to read the whole thing, but it just says, "CIRT will investigate all level three uses of force and where appropriate respond to the scene."

Do I have that right?

A.   Correct.  And those are PSB investigators.

Q.   Okay.  And then down at the bottom it says, last sentence of that section, "The CIRT is currently

**Page 111**

being developed and PPD expects it will be operating by the third quarter of 2024."

Do I have that right?

A.   Yes.

Q.   So it's -- you said it's the PSB.  Is there a separate bureau called the Critical Incident Response Team or how is that handled?

A.   There is not a separate bureau.  That is made up of folks from PSB and FERU, so that's where we have identified, you know, two or three investigators or however many they have identified within PSB, and then the folks with FERU are the force experts.  That makes up your CIRT team.

Q.   Okay.

A.   They are part of both of those bureaus is how I understand it was developed.

Q.   Okay.  So when it says that it expects it's going to be operating by the third quarter of 2024, is that just a policy or process that was -- by this document would be implemented by the third quarter of 2024, because what I am hearing from you is CIRT is not its own bureau, it's just an amalgamation?

A.   Correct, it's not its own bureau.

Q.   So is there a policy or a process now that's in place that defines what CIRT is, who is part of CIRT,

**Page 112**

how CIRT acts?

A.   I would have to look at their bureau manual, which I can pull up real quick.  I am not sure it is spelled out in their bureau manual, but that is the -- that's what we are operating under is these folks are CIRT-trained individuals or force experts and our investigators who will go out and do officer-involved shootings.  I would have to look at the two bureau manuals to see -- probably in the PSB manual to actually see if it's spelled out in there what they are supposed to be doing.

Q.   So this -- that CIRT subsection, which was subsection 2, is under subsection B called Robust Investigation into Use of Force Incidents.  Do I have that right?

A.   Yes.

Q.   And then it says, "PPD's investigation of use of force incidents is among the most substantial reforms in this area.  Many of these reforms are already being implemented with the rest to be implemented in 2024."  And then following that we have the FET, the Force Evaluation Team.  Do you guys have -- I mean, does that exist?

A.   So that was the initial -- in its infancy that that's what FERU was when it first started.  It was

**Page 113**

called FET and then it evolved into FERU.  So FET was a little bit different.  It was a little bit different makeup of individuals who reviewed use of force incidents and it eventually evolved into FERU.

Q.   Okay.  And we talked about CIRT and then performance review boards.  What -- what are the performance review boards?

A.   Let me read this real quick.

Q.   If you need me to scroll, let me know.

A.   I'm not familiar with those.

Q.   So would you be familiar with what the command level performance review boards are?

A.   Yeah, I am not.  I'm not familiar with those boards.

Q.   Okay.  It says that those command level performance review boards are anticipated to review a sampling of level 2 use of force incidents from the previous 30 days.  Do I have that right?

A.   Yes.

Q.   But you are not familiar with the command level performance review board that does that?

A.   No.  To my knowledge we don't -- that's not in existence right now.

Q.   The next sentence says, "These boards will be chaired by three commanders and will similarly include

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
114..117

**Page 114**

representation from the community, labor unions, PPD rank-and-file, training, legal, and the Office of Accountability and Transparency."

But you're not familiar with any board that includes those different types of people?

A.   I am not.

Q.   Okay.  Then it finally says, "Consistent with DOJ recommendations in other cities, this additional layer of review assures consistent accountability and transparency."

Do I have that right?

A.   Yes.

Q.   But there really -- the City has not done this?

A.   I -- I don't know that to be.  I've never heard of performance review board in existence.  We did have something similar that we called our tactical review committee.  It was made up of rank and file, police chief's office, I think OAT might have been at times a part of that, labor; but I don't know it to be called performance review boards.

Q.   Okay.

A.   And just to go back, Sean, the CIRT team that we were talking about, it is in the PSB manual.  It's PSB investigators and FERU, in a cojoint response to an

**Page 115**

office-involved or critical incident.

Q.   So the Critical Incident Response Team?

A.   Correct.

Q.   Is there -- based on that are there people that are -- that's their sole job is to be a member of a Critical Incident Response Team?

A.   No, it's not just their sole job.

Q.   Okay.  But people are designated as part of CIRT?

A.   Correct.

Q.   Okay.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXX
XX   XXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXX

**Page 116**

XX   XXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXX
XX   XXXXX
XX   XXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**Page 117**

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXX
XXXXXXXXXX   XXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXX
XXXXXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXX   XXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXX

Coash Court Reporting & Video, LLC
staff@coashcrv.com

602-258-1440
www.CoashCourtReportingandVideo.com

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
118..121

**Page 118**

XX   XXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXNo more confidential.

BY MR. WOODS:

Q.   Let's see, I put the Department of Justice Investigation of the City of Phoenix and the Phoenix Police Department up on the screen.  Do you see that?

A.   I do.

Q.   And you've read this before?

A.   I have.

Q.   Okay.  At the time of Leontae Kirk's shooting in November of 2022, we've established already, but I just, again, the City of Phoenix was under investigation by the Department of Justice.  Correct?

A.   Correct.

Q.   Okay.  And the Department of Justice issued their findings on June 13, 2024.  Correct?

A.   Correct.

Q.   Okay.  And that was at -- obviously as of that time.  Since then we have had some political changes and the Department of Justice investigations being closed, for lack of a better term, and the City of Phoenix investigation was closed.  Correct?

**Page 119**

MR. SULLIVAN:  Form.

BY MR. WOODS:

Q.   Put it another way, that the Phoenix Police Department is no longer under investigation by the Department of Justice.  Correct?

A.   Correct.  As I understand, that report has been rescinded fully.

Q.   Okay.  On page 4 of this report, the Department of Justice said that they had, under their findings section there's a little blue table there, "They have reasonable cause to believe that the City of Phoenix and the Phoenix Police Department engage in a pattern or practice of conduct that deprives people of their rights under the constitution and federal law."

Do I have that right?

A.   Yes, that's what it says.

Q.   Okay.  And then -- and then one of the -- the first bullet point says, "Phoenix PD uses excessive force including unjustified deadly force and other types of force."

Do I have that right?

A.   Yes, that's what it says.

Q.   And the City -- again, the City of Phoenix received this at the time that it was sent?

A.   We did.

**Page 120**

Q.   In fact, we were looking at the City of Phoenix preemptively submitted a document titled "The Phoenix Police Department The Road to Reform" before getting the Department of Justice's findings.  Correct?

MR. SULLIVAN:  Form.

BY MR. WOODS:

Q.   The date on this is January 2024.  Correct?

A.   Yes.

Q.   And the date on the Department of Justice report is June 13, 2024.  Correct?

A.   Yes.

Q.   So the City had already started to implement changes and reform before the Department of Justice final findings came out.  Correct?

MR. SULLIVAN:  Form.

BY MR. WOODS:

Q.   Correct?

A.   Yeah, we've always -- in my career we've always looked to, I don't want to say just reform, look at national best practices, hence the reason we've always had operations orders that are always changed, so.  But, yes, this report appears January 2024.  This DOJ report was June 2024.

Q.   Okay.  What is the City's position on the Department of Justice investigation?

**Page 121**

MR. SULLIVAN:  Form.  Foundation.  And I am going to instruct not to answer to the extent any information is based on attorney-client privilege or work product.

To the extent you have any knowledge that's not privileged or work product, you can answer.

A.   To my knowledge, the City never took a formal position to agree or disagree with this report.  I don't think it was a formal position.  To my knowledge, there was no formal position put out that the City agree or disagreed with it.

BY MR. WOODS:

Q.   I'm looking back at Exhibit 7, The Road to Reform.  The City felt it was necessary to issue some sort of report in January of 2024.  Correct?

MR. SULLIVAN:  Form.

A.   I don't know.  I can't answer that.

BY MR. WOODS:

Q.   Does the City put things on their website that are not authorized by the City?

A.   Do they put things on their -- on the City website that they're not authorized to put on the City website?

Q.   Yeah.  Like is the City of Phoenix website

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
122..125

**Page 122**

open to the public to add whatever they want to the website?

A. I don't know that the public can add to our website. I don't think I understand the question.

Q. The documents on the City of Phoenix website are documents that the City of Phoenix has authorized to be placed on their website. Correct?

A. Yes. I would assume so, yes.

Q. So they're public facing. Correct?

A. Correct.

Q. And back to my question, the City issued a document titled "The Phoenix Police Department The Road to Reform" in January of 2024 that's publicly available on the Phoenix's website. Right?

A. I would have to look. If -- I don't know if it's on the website. It may be. I don't know if it's on the website or not. I don't recall when it was issued. I don't know. I know it says January 2024 but as I stated earlier, I don't know when it was issued or given to the Department of Justice. And I don't know if it's on our website. It very well could be.

Q. This is not going to be an exhibit, but --

MR. SULLIVAN: We'll stipulate to it being on the website.

MR. WOODS: Thank you.

**Page 123**

BY MR. WOODS:

Q. This is -- this website, just very quickly because I have a couple other questions, it's called DOJRecords.Phoenix.gov. Do you see that?

A. I do. And I'll rephrase my answer now. Yes, we did put that up there. So now I am familiar with this website.

Q. So we have the DOJ investigation report incidents. Correct?

A. Correct.

Q. All right. And then down below there are a list of incidents listed by categories, dates, report page, the PPD administrative review, and those types of things. Correct?

A. Yes, sir.

Q. And each one of these incidents are tied to a report page in the Department of Justice findings from their investigation. Correct?

A. Correct.

Q. Up above there are a couple of different clickable colored links and one of them is Phoenix Police Department Road To Reform. Correct?

A. Yes.

Q. Okay. That's still publicly available. Right?

**Page 124**

A. I believe that website is still up and running and I have to click on that to see if it's still available, but I would assume that it is. Yes.

Q. It's still publicly available?

A. It appears that way.

Q. Okay. Why did the City create this web page?

MR. SULLIVAN: Foundation.

A. Answer?

BY MR. WOODS:

Q. If you can.

A. It was our effort to be even more transparent and add additional details to each one of those incidents that was mentioned in the DOJ report so that anybody who looked at this report and looked at this website would have a more full picture of each one of those incidents, again, in an effort to be more transparent and show that there's more to each one of those incidents than what was just posted in the DOJ report.

Q. We are almost through. Do you know how many officer-involved shootings happened in 2024 with the City of Phoenix?

A. 20 -- 22 maybe.

Q. 24?

A. 24, I was close.

**Page 125**

Q. I'm sorry, I apologize. I think we had -- I asked for 2024 and I think you responded 22. Is that right?

A. So are you asking how many we had in 2022 or 2024?

Q. 2024. I think we are clear.

A. I'm going to say we averaged 22. I can't -- I don't have the number right off the top of my head. I can certainly tell you. 20 in 2024.

Q. 20 total?

A. According to the dashboard, 20.

Q. How many were fatal?

A. According to dashboard, 14, so 70 percent.

Q. How many shootings did you have -- officer-involved shootings did you have in 2022?

A. That was the 24.

Q. Okay. And how many were fatal?

A. In '22?

Q. Yeah.

A. It would have been, according to the dashboard, 10, so 41 -- just over 41 percent.

MR. WOODS: Let's take a five-minute break. I don't think I have much of anything left.

(Recess taken from 4:24 p.m. to 4:30 p.m.)

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
126..129

**Page 126**

BY MR. WOODS:

Q. I only have about five or ten minutes left. So we are back on this DOJ investigation report incidents website. Do you see that?

A. I do.

Q. It says up here that the DOJ -- in the report the DOJ describes approximately 132 events that supports allegations. Do I have that right?

A. Yes.

Q. And then it says, "DOJ did not provide City of Phoenix identifying information such as incident numbers or specific date; however, City staff were able to identify many of the incidents described."

Do I have that right?

A. Yes.

Q. Okay. So each one of these incidents that are in this table or in the database behind this website were incidents that the City of Phoenix were able to cross-reference and definitively state, hey, this is the incident on, say, page 17 of the report. Is that correct?

A. Correct.

Q. Okay. So each one of these, and then they are, again, categorized as Use of Force, we have Homelessness, Discriminatory Policing, Protected Speech,

**Page 127**

Behavioral Health, Youth, Contributing Causes, those are all incidents that the City of Phoenix was able to research and tie to the Department of Justice report. Correct?

A. Yes.

Q. And all of these incidents are served to the public for the public to look at the information. Correct?

A. Correct.

Q. If I click on the additional information, for instance, on this first use of force, it'll take me to another page that shows me critical incident review results, incident documents like the incident report. If I click on that I actually get the incident report from that incident. Correct?

A. Correct.

Q. Okay. So if I were to rely on any of these documents as being a use of force document, it's because the City of Phoenix has labeled it as such. Correct?

MR. SULLIVAN: Form. Foundation.

BY MR. WOODS:

Q. I didn't type in "use of force" there, did I?

A. I think the purpose of that was to tie it to the section in the DOJ report. If I remember, it was to tie it to the section in the DOJ report that they are

**Page 128**

saying this incident is tied to a use of force incident.

Q. Okay. One last thing. We are going to mark this as Exhibit 9.

It's a New Times article. Have you seen this article?

A. I may have. If I didn't see it here, I probably read it somewhere else or heard about it. I don't know if I actually read the New Times article.

Q. So if a payout goes to a family, a man killed by police, it says Phoenix pays. Who authorizes that payout?

MR. SULLIVAN: Form. Foundation.

BY MR. WOODS:

Q. The first sentence of the article says, "Phoenix City Council voted Wednesday to pay a $5.5 million settlement to the family of Ali Osman, a 34-year-old man who was shot and killed by police in September 2022."

Do I have that right?

A. Yes.

Q. Ultimately if the City pays out a settlement to anyone for any reason, who authorizes that settlement?

MR. SULLIVAN: Same objections.

BY MR. WOODS:

**Page 129**

Q. Can the mayor just write checks to people?

MR. SULLIVAN: Form. Foundation.

BY MR. WOODS:

Q. If I wrote the mayor and said that I demand a million dollars because a police officer looked at me wrong, can the mayor write me a check from the City of Phoenix for a million dollars just on her own?

MR. SULLIVAN: Form. Foundation.

MR. WOODS: This is a 30(b)(6), Jeremiah.

MR. SULLIVAN: He can answer. I am just preserving my objections.

MR. WOODS: I know. I am just trying to get some encouragement here so we can be done.

A. My understanding is it's the Phoenix council who votes on that. It's not the mayor who says this is what I am going to do. I'm not saying she can't do that, but I'm pretty sure in my experience it's taken a vote of city council.

BY MR. WOODS:

Q. Okay. Do you recall this incident that's the subject of this article?

MR. SULLIVAN: I am going to instruct him not to answer to the extent any of the information he has about this incident is based on anything from attorney-client privilege to or work product.

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
130..133

Page 130

MR. WOODS: That's fine.

BY MR. WOODS:

Q. This incident is on the DOJ -- or on your website related to the DOJ stuff, you know, and obviously it's public record that a settlement was paid. The gentleman, apparently, was throwing pebbles at the squad cars and the officers responded with deadly force. Do you recall that incident happening? Again, you don't have to tell me, you know, whatever is attorney-client privilege, but do you recall this incident?

A. I do recall this incident. But as I look at this article, this is not the officers -- I am trying to think. Can you scroll down a little bit on this article? What does that say? And go back up to the top.

BY MR. WOODS:

Q. All the way to the top?

A. Yeah. Scroll back down. If this is the one I am thinking of, I don't believe those were the two officers.

Q. It's this guy.

A. Yeah, but I'm looking at the officers' names.

(Simultaneous cross-talk)

A. Those are not correct. I believe Olachea is correct. I don't believe Jared Gibson is correct. If

Page 131

this is the case I am thinking of. If you want to give me ten seconds, I can look it up and tell you if that's the right ones.

Q. Go for it.

Was the officer Jesse Johnson and Brennan Olachea?

A. Yes, that's correct. So the officer's name is -- the first officer is not correct. That's why it threw me off. It didn't look right.

Q. At the very end of this article there are some quotes from Mayor Kate Gallego who called Osman's death a tragic loss. Do you see that?

MR. SULLIVAN: Form.

A. I do.

BY MR. WOODS:

Q. The next quote says, "It, the settlement, does not bring him back, but that lesson learned will save lives to come." And there is a further quote, "The problem was at a policy level. We did not have the right policies guiding how to respond, so we have dramatically changed what we would do today."

Do I have that right?

A. Yes.

Q. Okay. You know we asked for the mayor's deposition, but, you know, we met some resistance to

Page 132

some of that, so I agreed to do a 30(b)(6) to have a representative of the City to be able to answer on behalf of the City. The mayor is the head of the City. Correct?

A. Yes.

Q. Underneath the mayor, I think we talked about this, is there a deputy mayor or a vice mayor or is it just city manager?

A. Below -- I'm sorry, below who?

Q. Below the mayor, who -- what's next?

A. Vice mayor, elected officials, city manager, assistant city manager, police chief.

Q. So, again, at the very top is mayor. Correct?

A. Yes.

Q. And the mayor has the ability to speak on behalf of the different departments that she oversees. Correct?

A. Yes.

Q. She said that the problem was at a policy level. "We did not have the right policies guiding how to respond." What policies did the City think weren't right?

MR. SULLIVAN: Form. Foundation.

A. I would have to refer back to what Chief Sullivan thought was the policy that wasn't followed at

Page 133

the time, if he believed there was a policy violation, which I believe he did; otherwise, Jesse Johnson would not have been terminated for this incident.

But I can't speak on what policy she says was not right. I would have to, you know, look back and see if that's documented as to why he was terminated for his actions.

BY MR. WOODS:

Q. She didn't say that the problem was the officer that violated policy. Right?

A. It doesn't appear that way in this statement.

Q. What she did say is, "The problem was at a policy level, we did not have the right policies guiding how to respond." That's what she said. Right?

A. That's what she said, yes.

Q. So we have dramatically changed what we would do today. That's also what she said. Correct?

MR. SULLIVAN: Form.

A. That's what it says here, yes.

BY MR. WOODS:

Q. Okay. And she's speaking as the mayor and we've established the mayor is the top of the food chain when it comes to the City. What was dramatically changed?

MR. SULLIVAN: Form.

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
134..137

**Page 134**

A.   I can't speculate as to what she believes was dramatically changed regarding this incident.  I don't know what she was referring to, specific to this statement.  I don't know.

BY MR. WOODS:

Q.   Just as you're here on behalf of the City, she speaks on behalf of the City.  Correct?

MR. SULLIVAN:  Form.

A.   She does.

BY MR. WOODS:

Q.   Okay.  And the City doesn't have a position as to -- as you sit here today, the City can't give me a position as to what policies weren't right?

MR. SULLIVAN:  Form.  Foundation.

BY MR. WOODS:

Q.   Who would I be able to ask about what she said?

A.   Again, I don't know what her -- I guess I don't know what policy she is -- I mean, we have talked about we changed our use of force policies or updated our use of force policies, but I don't know what specific policy she is talking about with regard to this.  She could be talking about our use of force policy.  I don't want to speculate and put words in her mouth on what she is talking about.  I was not part of

**Page 135**

this conversation, so I don't know what policy she is specifically referring to.  It's possibly the use of force policy.

Q.   Did you -- were you informed that during discovery one of the questions that was asked is what policies was Mayor Gallego talking about?

MR. SULLIVAN:  I'm going to instruct him not to answer based on attorney-client privilege.

BY MR. WOODS:

Q.   Have you seen discovery -- our discovery request in this case, Dennis?

A.   Can you repeat that?

Q.   Have you seen the discovery requests that have been issued in this case?

A.   I don't believe so.

Q.   Okay.  So you haven't seen any of the interrogatories?

A.   The only stuff, like I said, that I've looked at was the stuff that I mentioned earlier, the opinions of Mark Hafkey and Mr. Walletine, I think is his name, and -- in the original complaint --

Q.   Up at the top of this document I am showing you on your page, I'll go ahead and mark this.

Those are your attorneys at -- on the heading at the very top left of this page.  Correct?

**Page 136**

A.   Yes.

Q.   Okay.  The City of Phoenix is a party to the case.  Kashane Kirk, et al. Plaintiffs versus City of Phoenix, et al. Defendants.  Do I have that right?

A.   Yes.

Q.   Okay.  And this document is titled Defendant's Answers to Plaintiff's First Set of Interrogatories.  Do you see that?

A.   Yes.

Q.   And you didn't see this document before now?

A.   No.  I think that's what I was -- I am referring to that as the complaint.  That's what I call it.  Wait.  No.  Hold on.  I don't know if I've seen that one.

Q.   Okay.  I am going to scroll down a little bit in this document.  Interrogatory Number 4 there it was sent from my office to Jeremiah's office, stated, "Mayor Kate Gallego who voted in favor of a settlement for the wrongful death of an individual named Ali Osman in or around November 2023 and called Osman's death a 'tragic loss' but according to the Phoenix New Times, said the police department learned from its use of force. Gallego is quoted, 'It (the settlement) does not bring him back, but that lesson learned will save lives to come.'  She further stated that, 'the problem was at a

**Page 137**

policy level.  We did not have the right policies guiding how to respond so we have dramatically changed what he would do today.'"

The next paragraph says, "Accordingly, please identify each and every policy that was determined to be 'the problem' or that failed to guide how City of Phoenix and Phoenix Police Department respond in use of force situations including the title of the policy and the date the policy was instituted or implemented at City of Phoenix and Phoenix Police Department."

Do I have that right?

A.   Yeah, just to go back, I have not seen this document.  This is not what I thought it was.

Q.   Okay.  The answer was, "Objection. Information sought is neither relevant nor proportionate to the needs of this case and is not narrowly tailored to the claims in this case; the claims in this case are also still the subject of a pending motion to dismiss. Without waiving said objection, there is no documentation in the policy historical files that would directly link a policy change to a specific incident."

Did I read that correctly?

A.   Yes.

Q.   So there was no answer even when we asked the

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
138..141

**Page 138**

City, "Hey, Mayor Gallego said these things, please identify the policies"; we didn't get an answer there, did we?

MR. SULLIVAN: Form.

A. I guess not.

BY MR. WOODS:

Q. So when I asked for a 30(b)(6) on -- on the City, I did that hoping that the deponent could tell me a little bit about what those policies were. But as you sit here and as you've answered, you cannot give me the answer to those questions, can you?

MR. SULLIVAN: Form.

A. Can I answer?

BY MR. WOODS:

Q. Sure.

A. I thought you were referring to what was the Mayor referring to. I can't speculate what policies she was referring to. When you asked me what policies is she talking about, I am assuming, like I said, the use of force policies, but I don't know what policy she is talking about in that statement.

Q. Who would know?

A. I guess the mayor would know. I can't answer for what policies she said were violated. You can certainly probably get the PSB report or the CURB

**Page 139**

[phonetic] report may say -- or the Loudermill hearing report that may say why Chief Sullivan terminated this employee.

Q. But that's not the question. Because she didn't say that the officer -- see, we are getting a little bit backwards here. She didn't say the officer violated a policy. What she said was it was at a policy level, we did not have the right policies guiding how to respond. So the question is: What are the policies that were incorrect that didn't guide those officers properly?

MR. SULLIVAN: Form.

A. I don't know what policies she is talking about that didn't guide them correctly. I don't know. I don't know what policies she is talking about.

BY MR. WOODS:

Q. The only person that could answer that would be the mayor then. Correct?

MR. SULLIVAN: Form.

A. I would assume. She is the one who said that, then it would be her to say this is the policy I am referring to. I don't know what policy she was referring to. Again, I can only assume it was use of force because this was a use of force incident, so I am assuming that she's referring to the use of force

**Page 140**

policies at the time.

BY MR. WOODS:

Q. And at that time the department was under the Department of Justice investigation. Correct?

MR. SULLIVAN: Form.

A. Yes, 2022, right?

BY MR. WOODS:

Q. Yeah, it was September of '22.

A. I'm sorry, this is 2023.

Q. Yeah, the article date -- let's go to the top -- was November 3, 2023.

A. 2023.

Q. The DOJ investigative findings didn't come out until June '24. Correct?

A. Correct.

Q. Okay. I have nothing further.

MR. SULLIVAN: I don't have any questions.

MR. WOODS: Are you going to read and sign?

MR. SULLIVAN: Yeah, we'll read and sign.

(Court Reporter copy admonition)

MR. WOODS: I'll do a PDF.

MR. SULLIVAN: We'll do an e-tran.

(Whereupon the deposition concluded at

**Page 141**

4:50 p.m.)

_____

Dennis Orender

Kashane Kirk vs. City of Phoenix -
30(b)(6) City Of Phoenix - Dennis Orender

February 27, 2025
142..143

**Page 142**

STATE OF ARIZONA            )
                           ) SS.
COUNTY OF MARICOPA          )

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

[X]  Review and signature was requested.

[ ]  Review and signature was waived.

[ ]  Review and signature not requested.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206 (F)(3) and ACJA 7-206 (J)(1)(g)(1) and (2).  DATED at Phoenix, Arizona this 12th day of March, 2025.

*Courtney C. Vanderwalker*

COURTNEY C. VANDERWALKER, RPR
Certified Reporter
Arizona CR No. 50597

**Page 143**

I CERTIFY that Coash Court Reporting & Video, LLC, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

COASH COURT REPORTING & VIDEO, LLC
Registered Reporting Firm
Arizona RRF No. R1228