# EXHIBIT 6

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| KASHANE KIRK, et al., | ) |
| | ) Case No. |
| | ) CV 23-00836-MTL(CDB) |
| Plaintiffs, | ) |
| | ) |
| V. | ) |
| | ) |
| CITY OF PHOENIX, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**DEPOSITION OF MARK R. HAFKEY**

Phoenix, Arizona
February 13, 2026
10:15 a.m.



REPORTED BY:
HD REPORTING, LLC
JERI F. BARBIN, RPR
Certified Court Reporter
AZ-CR No. 50693

Page 2

DEPOSITION OF MARK R. HAFKEY was taken at 10:15 a.m. on February 13, 2026, at BROENING OBERG WOODS & WILSON PC, 2800 North Central Avenue, Suite 1600, Phoenix, Arizona 85004, before JERI F. BARBIN, Certified Reporter No. 50693, in and for the State of Arizona.

APPEARANCES:

     For the Plaintiffs:

          MIILS + WOODS LAW, PLLC
          By:  Sean A. Woods, Esq.
          5055 North 12th Street, Suite 101
          Phoenix, Arizona 85014
          swoods@millsandwoods.com

     For the Defendant:
          BROENING OBERG WOODS & WILSON, PC
          By:  Jeremiah M. Sullivan, Esq.
          2800 North Central Avenue, Suite 1600
          Phoenix, Arizona 85004
          jms@bowwlaw.com

Page 3

I N D E X

WITNESS                                                    PAGE

MARK R. HAFKEY

          EXAMINATION BY MR. SULLIVAN                4

          EXAMINATION BY MR. WOODS                 115

          FURTHER EXAMINATION BY MR. SULLIVAN       170

          FURTHER EXAMINATION BY MR. WOODS          173

          FURTHER EXAMINATION BY MR. SULLIVAN       174

               *     *     *

          E X H I B I T S

          (No Exhibits Offered.)

               *     *     *

Page 4

MARK R. HAFKEY, a witness herein, having been first duly sworn by the certified reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. SULLIVAN:

Q.  Can you state your full name for the record, please.

A.  Mark Richard Hafkey.

Q.  Do you prefer Mark, Mr. Hafkey?

A.  Mark is fine.

Q.  Okay.  I'm just going to go over some general ground rules so we're on the same page.  Please give verbal, out loud answers, not "uh-huh" or "huh-uh," just so that we have a clear record.  If I hear you say "uh-huh" or "huh-uh" I might just say, "Is that a yes or is that no."  I'm not trying to be pushy, just making sure we have a clear record.  Is that fair?

A.  Yes.

Q.  When I ask a question I just ask that you wait for me to finish asking the question and then I'll extend the same courtesy to you.  I know sometimes in conversation we can cut each other off or we might anticipate what someone is gonna ask and jump in and give an answer.  Just try to wait just to make sure that we have that clear record.

Page 5

Fair?

A.  I understand.

Q.  If you don't understand a question or the way I ask it just let me know and I will do my best to make it make sense.  Is that fair?

A.  Yes.

Q.  That said, if you do answer a question and you didn't ask me to clarify I'm going to assume you understood it.  Is that fair?

A.  Yes.

Q.  If you want to take a break at any time just let me know.  The only thing is if there's a pending question I would just ask that you answer the pending question before we go on a break.  Fair?

A.  Yes.

Q.  And then you might hear objections from time to time so that Sean can get it on the record.  And to the extent he doesn't instruct you not to answer then you can go ahead and answer the questions.  Is that fair?

A.  Yes.

Q.  Is there any reason to think that you wouldn't be

Page 26

consider the severity of the crime, or should consider the severity of the crime in determining the level of force that they use.

Q. Just so I understand. The more severe the crime that would lend itself towards using a heightened level of force potentially; right?

A. That's correct.

Q. Would you agree with the following statement: You definitely want to treat suspects as if they're a danger at all times to protect yourself?

A. Yes. And I believe that's what I was trying to describe earlier in the mindset of responding to these situations. You try to expect the worst to help protect yourself and the public.

Q. When you're evaluating the reasonableness of an officer's conduct you want to look at the totality of the circumstances; right?

A. Yes, you do.

Q. Would you agree that an officer who responds to an active shooter scenario and sees a suspect armed with a gun is not required to wait and see if the suspect will shoot at officers or an innocent bystander before deploying deadly force?

A. Not necessarily. It's very general. Can you -- it would really call for me to speculate in general. I

Page 27

would really need to have more of a factual scenario to give you a better answer.

Q. So dispatch says there's an active shooter. Say they're running around a school.

A. Yeah.

Q. Police officers show up, they see -- they know it's during school hours, they see the person armed with a gun; right? Are you following there?

A. I'm following.

Q. Do you agree that they don't have to wait for that person to fire off another round before utilizing deadly force?

A. I don't agree with that, the way you asked that question.

Q. What don't you agree with?

A. That to apply deadly force the officers are required to have an imminent threat to themselves or somebody else before they can apply deadly force.

Q. What's your understanding of imminent?

A. Imminent threat to me is an articulable threat that is clearly in front of the officer, as one sort of the prong. And that the officer can definitively articulate a particular person is under threat or they are particularly under threat by that individual.

Q. So for example, like on one end of the spectrum,

Page 28

officers get a report of an active shooter in the middle of the desert, they show up, clearly there's nobody around. Then in that particular instance it's probably not justified to use deadly force if they're not aiming the gun at the officers or doing anything else.

MR. WOODS: Form, foundation.

BY MR. SULLIVAN:

Q. Right?

A. Essentially that is what I'm trying to describe. The fact that you have a weapon in your possession, in your hand is not enough to apply deadly force because you have the ability -- the suspect has the ability to apply that force. There needs to be more articulable facts that a particular person is under threat or the officer himself is under threat. That's what I define as imminent force.

Q. So that would include like what I think the courts described as furtive movements; right?

A. It could.

Q. Going back to the active shooter reported at a school. So in a scenario where the officers show up, they see the individual armed with a gun, they know it's during school hours and the person is aiming the gun into a school classroom. Do they have to wait for him to fire into the classroom before applying deadly force?

MR. WOODS: Form; foundation?

Page 29

THE WITNESS: There again, it's too speculative for me to answer affirmatively without knowing -- I mean, pointing a weapon into a building or at a building is not sufficient in my mind. Is there someone standing right there at the doorway of that building that's under threat? People carry guns, especially in a state like Arizona, they hold guns, they pull out their guns for different reasons. Sometimes it's victims when the police respond.

Often times burglaries, for example, prowler calls, and the officers get there and the homeowner himself is holding a gun and waving it around. And the officer -- that doesn't mean the officer can just use lethal force. That's when you consider the totality of the circumstances, what you know, and you look at who is at threat. There's a lot of judgment that goes into that from intoxication, in dealing with intoxicated individuals who may be wielding a weapon, to mentally ill people that may be wielding a weapon.

I've had cases I could tell you about involving people in which I literally probably had very legal justification to use deadly force but my judgment and conscience as a police officer told me I should not and I did not.

To go back to one of your very first questions you asked me, that's what I was trying to explain at that point.

Page 86

to fire at other officers, they have a reason to believe that, would that be an example of a potential immediate threat to other officers?

MR. WOODS: Form.

THE WITNESS: How I answered before, that in some cases you have -- well, in all cases you really look at the means, the ability. And in the case of an officer believing someone's going to fire at somebody else is not sufficient enough unless they can back it up with imminent factors that support that belief.

For example, did the person have a gun. If there's no gun in their hand, a belief that somebody is not sufficient in my mind. There's no means there.

Q. Okay.

A. And so no, I don't think that's sufficient enough, just a belief.

Q. So I was going to ask about means. They obviously have a gun. With ability, would that be more is the gun in their hand?

A. Yes.

Q. So the third factor is the resisting or evading arrest by flight; right?

A. Yeah. For Graham v Connor, yes.

Q. For Graham, yes. How do you define resisting arrest?

Page 87

A. It's another great question. Resisting arrest has different meanings depending on the circumstances and the court. We have policies that address resisting arrest, but there's also court cases that define it.

But I would define it as somebody who understands they're under arrest and is actively resisting that arrest either physically, and in some cases verbally.

Q. Okay. And what about evading arrest? Can you --

A. Evading arrest is of course preventing the officers from executing that arrest. And in general, making an arrest involves containment and control, physically containing and controlling somebody. So evading their ability to physically control and contain you.

Q. Just so that it's clear to me. So resisting, you have the containment, you have the control, and they're just, whether it be verbal or physical, they're not going along with what you're trying to do.

Where evading there's not necessarily the containment or control elements.

A. Yes. And there's levels of resistance that have been defined by the court. For example, there's a passive resistance where you're not actively trying to harm the officer but you're not cooperating. And we see that a lot in protest cases where the protesters throw themself on the ground and they're resisting their attempts to arrest these

Page 88

people by non-cooperation but they're not physically resisting the officer. But in some cases they're verbally resisting and some cases they're not.

So to answer that question, there's different levels of resistance and it has to rise to a certain level for prosecution purposes, and there's a level of resistance for what the officer is trying to accomplish by arresting them, but that may not be sufficient for purposes of court prosecution.

So even in our police policies we address the different levels of resistance from passively resisting to non-passive resistance. They actually are defined in policies, and the officers try to use those definitions to apply their ability to use what level of force. Because certain types of resistance doesn't justify an intermediate or deadly force, but it does qualify for a criminal charge and an arrest.

Q. I think you'll agree with this, but if you disagree it's --

A. All right.

Q. It sounds like resisting and evading is on a spectrum; right?

MR. WOODS: Form.

THE WITNESS: Resisting is on a spectrum. Evading arrest I would say, yeah, there's different levels of

Page 89

evading arrest also.

BY MR. SULLIVAN:

Q. So there's various degrees of severity?

A. That's right.

Q. So you can have one guy that's just saying you're never gonna catch me but he's just standing there; whereas you have someone that's actively running away?

A. That's correct.

Q. On that spectrum, so ignoring or not complying with an officer's command, where does that fall in the spectrum of resisting or evading?

A. That would depend on the command, I suppose. Because if the command is not a lawful command there's an issue. If it is a lawful command, something as harmless as show me your proof of driver's license, insurance, and registration and people say no. So there's a level, and that's a very early level. But not following the officer's command doesn't necessarily mean there's a violation of law, or at least a prosecutable violation of law. So yeah, that's sort of the first level.

And then there's other commands that have to do with drop your gun, for example, and there's a threat and they're refusing to drop their gun. So that rises to a much higher level of force that could be appropriate in that case, in that scenario.

Page 90

Q.  Would you agree that not surrendering falls on the spectrum of resisting and evading?

MR. WOODS:  Form.

THE WITNESS:  I would agree it could, yes.

BY MR. SULLIVAN:

Q.  What if a suspect is actively fleeing?

MR. WOODS:  Form.

THE WITNESS:  So I understand the question.  A suspect is actively fleeing from a lawful arrest situation?  Is that what you're asking me?

BY MR. SULLIVAN:

Q.  Let's go to the -- in the Kirk scenario.  If an officer sees someone -- they show up, they respond to -- an officer responds to the active shooter call, they show up and they see the suspect run away from them.

A.  Okay.

Q.  Would you agree that that's fleeing?

A.  I could see that as fleeing.  And also in Kirk's case taking cover because he's being shot at and defending himself by taking cover.  In his case he dove between cars after he had been shot at, probably hit by Officer Ladines, and he spun around and dove between two cars.  That in and of itself I wouldn't necessarily call fleeing because I think it could be just taking cover because he had just been fired at.

Page 91

But after that moment, leaving the cars, up against a wall, to me that's not fleeing.  That's surrendering.

Q.  You said probably hit by Ladines.  I just want to understand.  Did you see anything that indicated to you that Ladines actually -- that her bullets actually struck Mr. Kirk?

A.  I saw the medical examiner's report that showed a posterior shot or two.  At least one, if I recall.  It's been a long time since I looked at that.  But at least one, maybe two shots posteriorly.

Q.  And the reason I'm asking is earlier we talked about, you know, forensic ballistic reports, and you said that you interpret those reports -- you're able to interpret the reports.

Did you review a forensic ballistics reports in this case?

A.  No.  Well, let me clarify that.  I recall reading the medical examiner's information about the posterior shots.  But forensically, no, I haven't seen anything that linked the round -- a particular round, with a particular weapon, a particular size of that round with that weapon, because officers have different size rounds, different calibers, et cetera.

I came to what I consider a logical conclusion

Page 92

that it was Ladines' round that caused the posterior wounds -- wound or wounds because of the video evidence, and the positioning, and the lack of that same positioning with Officer Garza or Sergeant Roy.  They had different angles on the subject.  And the only logical conclusion was it was Ladines' rounds that hit posteriorly, and that's what I interpreted from the medical examiner's report.

Q.  Okay.  Would you agree with me that a -- like a forensic ballistics expert would be the best person to determine conclusively whose rounds hit Mr. Kirk?

A.  Yes.

Q.  Do you recall earlier we were talking about the issue was that you think these officers acted outside of policy, not necessarily -- you're not necessarily offering an opinion on the policies themselves.

Do you remember that?

A.  Yes, because I haven't read those policies.

Q.  Okay.

A.  To render an opinion I really need to look at some of the specific policies as they're written today regarding that issue.

Q.  And the reason I ask is that similarly on the training -- and correct me if I'm wrong -- but your opinion is more that they didn't act in accordance with their training, not necessarily that the training was inadequate;

Page 93

right?

A.  That's correct.  Except on one issue.

Q.  Sure.  Go ahead.

A.  The constitutional law training has virtually been eliminated in Phoenix since about 2013, and so they're not getting the same constitutional law training that was supported in a partnership prior to that day.

Q.  When did you retire from the police force?

A.  2012.

Q.  Are you aware of the current training methods that they use?

A.  That's another thing that I requested to try to get, all their current training to actually review it, and that's not been provided to me.  So no, I'm not completely aware, except through other means to try to determine if the same type of training was provided pre-2012.  And I was told in no uncertain terms that it is not provided anymore.  And that was primarily the constitutional law training.

Q.  Just so I understand.  What you know is that it was eliminated in 2013, but you would need some additional information to know whether or not they're currently receiving some form of constitutional law training?

A.  That is correct.

MR. SULLIVAN:  Do you want to do 10 more minutes?

MR. WOODS:  Sure.

Page 154

A. Both. You work with normally the quickest response to the scene and position the helicopter accordingly. But if you're in downtown Phoenix you're close to the airport, there's a lot of restrictions around that airport so you gotta focus on all those things, and you also have to -- you're focusing on several other things while you're piloting.

So to answer your question, it goes both. There's occasions where the pilot is gonna be on the altitude to his vantage, and there's gonna be times where he puts the observer at the best advantage. I would say more so for the observer than the pilot.

Q. And the last section of your report starting on Page 26, this is about the internal investigation?

A. Yes.

Q. And I know that you rendered some opinions on issues that you've highlighted within the investigation, or things that were done that you take issue with.

A. Uh-huh.

Q. Would you agree with me that when you're assessing an individual officer's use of force, what you're looking at is what the officer did in that incident; right?

A. Yes.

Q. And so I guess the point I'm getting at is when you're talking about post-incident investigations, that's

Page 155

more fact gathering and trying to figure out what exactly happened; right?

A. Yes.

Q. Okay.

A. But there's more. They investigate the timeframe before the critical incident and the timeframe through the critical incident.

Q. Was there anything from an evidentiary standpoint that you think was missed that would have captured what happened as the shooting was occurring?

And if that doesn't make sense, just let me know.

A. I guess for the most part, no. I think it was fairly thorough in the criminal investigation to the facts that we see.

Q. And I know that obviously -- and I agree with you, there are inaccuracies where something happens in the body cam footage that there's a report that it doesn't seem to gel at all.

That goes back to what we were talking about earlier; right? Where you really want to look at that objective evidence because that's the best source of gathering the information for what happened?

A. That's correct. I'm not saying there's not a lot of other things that I would have done to investigate this case, and I think they could have done more in some areas,

Page 156

and I can tell you about those if you want, or not.

But for the most part they covered -- they did a pretty good criminal investigation.

Q. Would you agree that -- the same with practicing law and handling cases -- there's always a little bit more you can do?

A. There's more you can do, yes.

Q. It never ends; right?

A. Yes.

Q. All right. Just a few brief questions. On your supplemental report, I skimmed through it, I take most of your primary opinions to be fully elaborated upon in your initial report and that the rebuttal is mostly addressing what our expert is saying?

A. Yes, the subjectivity versus objectivity, yeah.

Q. In your prior work as an expert have you provided opinions -- I'm sorry, strike that.

Has any court or tribunal ever excluded your testimony or opinion in a case involving use of force?

A. No

Q. All right. I don't have any further questions.

MR. WOODS: Just a couple. I'll keep it real brief.

Page 157

EXAMINATION

BY MR. WOODS:

Q. In your review of this case, and the documents in this case, and the videos, and the police reports, was there an active shooter on scene?

A. No.

Q. You mentioned earlier that you saw someone -- you watched that video that Jeremiah was asking you some questions about people running, like a crowd running.

Do you remember seeing that video?

A. Yes.

Q. You had said that there was somebody that wasn't running.

Do you recall that?

A. Yes, there were a couple of people not running.

Q. You've seen the body cams that were produced in this case; correct?

A. Yes.

Q. Do you recall Officer Ravelo running parallel to McDowell Road in her video?

A. Yeah, along the pony wall by a bus stop.

Q. When she passed the bus stop was there anybody sitting at the bus stop?

A. Yeah, I recall at least one person.

Q. Do you recall her telling that person to move?

Page 158

A. Yes.

Q. Prior to that that person wasn't moving, though; correct?

A. I didn't see any movement at all in any of the surveillance videos or the officer body cams until Ravelo's contact.

Q. There was a question about Officer Garza and him potentially saying "where is he."

Do you recall that question?

A. Yes.

Q. At that point Jeremiah mentioned that Garza started shooting following that question.

Do you recall that line of questioning?

A. Yes.

Q. You've seen Officer Garza's body cam; correct?

A. Yes.

Q. Did he have a direct line of sight on Leontae Kirk?

A. Yes.

Q. What kind of weapon, if you can remember, was Officer Garza using?

A. He was shooting a rifle. I don't recall the exact model of that, but a high-powered rifle.

Q. Do you recall whether or not he had a scope on that?

Page 159

A. He did, yes.

Q. Do you recall about how far he was from Leontae when he fired at Leontae?

A. He was on the McDowell side of the pony wall, and the pony wall is about a little under 50 feet from the storefront.

Q. When you reviewed Garza's video, what was Leontae's position when Garza started firing?

A. On his backside, on his butt against the wall. There's a brick wall about three foot or so high with glass above that. He had his back against that wall. He was on his butt with his legs fairly flat and his hands in different locations in front of his body.

Q. He wasn't standing, was he?

A. No.

Q. Was he running away?

A. No.

Q. Okay.

A. Well, he slid backwards at one point. But what I recall when I first looked at Garza's video he had pretty much finished that slide back by the time Garza actually was able to have that direct line of sight. He didn't have a direct line of sight for him on the entire approach.

Q. You reviewed Sergeant Roy's body cam footage in this case; correct?

Page 160

A. Yes.

Q. When Sergeant Roy began firing do you recall where Leontae Kirk's body was?

A. Yeah, he was at that same position in front of the store on his backside on the sidewalk. And so Sergeant Roy's vantage would have been of his right side essentially south of him.

Q. And again, Leontae was sitting on the ground at that point -- or I'm sorry. I take that back.

He was falling backwards to the ground at that point?

A. Well, he slid backwards. It looked to me that he -- and I looked at it from multiple vantages. From the surveillance on the store, and also Roy's body cam. And he slid backwards from between the two cars almost entirely on his backside to get up against the wall.

Q. You mentioned earlier that you felt for these officers; correct?

A. Yes.

Q. Do you excuse the officers' actions because of your feelings?

A. No.

Q. Do you believe that the officers' actions were objectively unreasonable?

MR. SULLIVAN: Form, foundation.

Page 161

BY MR. WOODS:

Q. You can answer.

A. I don't think I answered your last question completely. I don't excuse their actions when it comes to the training that we give, their reaction to what I didn't consider imminent threat, lack of warning, and a whole number of issues that I spell out in my report. I did not see it as criminal in terms of excusing their behavior.

I did not see it rising to the level of criminal charges. That's a more complete response I guess to what you're asking me.

BY MR. WOODS:

Q. Okay.

A. I don't excuse their actions in terms of reasonable force and what the constitution says, and how those officers have been trained to address those situations.

Q. Would you agree with me that before an officer fires their lethal weapon that they should ensure the safety of bystanders?

A. Yes.

Q. Would it be reasonable for me to say that in a parking lot full of cars an officer should ensure that individuals are not inside those cars before they start firing towards those cars?

Page 162

MR. SULLIVAN: Form, foundation.

THE WITNESS: If they have the ability and time to do so, absolutely. In fact, that's exactly what we do when we set up perimeters, is we try to get noncombatants out of the area and get them safe, and continue securing that -- or containing that suspect at any location that we respond to.

BY MR. WOODS:

Q. You know that in this case there actually was at least one person in a vehicle when the shooting occurred.

A. Yes.

Q. Did you review where -- strike that.

In the reports there are descriptions of the different cars in the different parking spaces.

Do you recall that?

A. Yes.

Q. Do you recall that many of those vehicles were hit by bullets during the shooting?

A. I believe at least two of the vehicles were struck by projectiles.

Q. And multiple projectiles; correct?

A. Yes.

Q. When you were asked questions about Leontae on that video, was he running from Humberto?

A. That's what it appeared to me, yes.

Q. Are you familiar with the term "fight or flight"?

Page 163

A. Yes.

Q. What do you think Leontae was doing when he was running?

MR. SULLIVAN: Form, foundation.

THE WITNESS: I would speculate that he was fleeing from what he considered a lethal threat to himself.

BY MR. WOODS:

Q. What would you have done if you had arrived on scene first?

MR. SULLIVAN: Foundation.

THE WITNESS: As a responding officer?

BY MR. WOODS:

Q. Yes.

A. I would have responded lights and sirens. If I'm an officer versus a supervisor I guess I'd have to put myself in each officer's shoes. In that scenario, if I saw the subject with the gun I would have -- as soon as I arrived I probably would have used my PA to announce: Police, drop the weapon, while I was still behind my engine block in my car if I pulled up straight, which is what I believe the officers all did. So you have that engine block for protection, open your car door, get on the PA and start giving warnings: Drop your gun, police, et cetera.

If I had exited the vehicle I would have taken up a position behind cover, which in that case clearly the pony

Page 164

wall, a very heavy wall, I would have taken a position to protect myself while giving warnings: Police, drop the gun, et cetera.

I would have done that if I was Ladines. I would have done that if I was Garza. I would have done that if I was Ravelo. In all of those scenarios you position yourself behind cover so you can be of use and not sacrifice yourself if you really think there's a threat there. And I would have given him an opportunity to surrender. If I was a sergeant, my answer would be a little bit different.

Q. Do you recall if the helicopter pilot said that it looked like Leontae was firing back and forth with somebody else?

A. Yeah. Howard in his statements indicated that that's exactly what it appeared to him. That it looked like he was in a shootout with somebody I believe is what he described. And Officer Ramirez to a certain extent also. But that came later.

So both of them had the feeling that he might have been in some kind of gun battle or shootout, or that there was a threat that had caused him to run out the way he did and take cover and start what they described as duck and dodge motions. So all that led me to believe that -- or led them to believe that he was under some kind of potential threat.

Page 165

Q. Do you recall seeing anything about the officers arriving on scene and looking for Humberto?

A. No, because they didn't have that presented to them through dispatch, that there was potentially another shooter, and so there was nobody to look for.

Q. Talk to me -- there was some questions about your job history. You became a flight attendant at some point; right?

A. Yes.

Q. Why did you become a flight attendant?

A. A couple of reasons. One is my grandparents live in another state and their health was failing and I needed to be there for them because they were there for me when I was a kid. It's a long story. But they helped raise me. And so I needed to be able to go and spend time with them while their health was failing to help take care of them in another state.

And a flight attendant, being a crew member was an opportunity to be able to travel back and forth and help take care of them, and it was the only way I could afford to do it as well because I didn't make a lot of money and I needed to fly or drive a long ways to help take care of them. So that was one reason.

The other reason is I was looking to have a job that had more flexible hours. And being a crew member with

Page 166

an airline offered the ability to work fewer days a week, have more flexibility in your schedule, and have those flight benefits to be able to travel.

And becoming a flight attendant on an airline, airlines were actually reaching out to law enforcement to try and bring in trained people -- ever since 911 they wanted to bring in more trained people who can handle aggressive passengers, violent passengers, issues that occur on airplanes. And so there was actually some recruiting done to bring in retirees from law enforcement, even active law enforcement. There was recruitment even in the military ranks. And I can list a whole bunch of my fellow officers that actually went and became flight attendants, you know, after they retired because it was sort of a logical step. You can go and kind of be a cop on a plane, assist the airline.

All those reasons caused me to go ahead and retire early and become a flight attendant, and I did exactly what I wanted to do. I flew back and forth to take care of my grandparents using my benefits. And once they passed I decided to stay and, you know, stick it out for -- I had to work 10 years to get lifetime flight benefits, and I figured I'd start traveling, et cetera.

So the schedule worked, the convenience worked, the travel worked. Put it altogether it was just a logical

Page 167

step after retiring, and also a lot less stressful than doing what I was doing on the police department.

Q. In your preparation for your expert report did you review Sergeant Roy's deposition transcript?

A. Yes.

Q. Did you look at the --

A. Well, I haven't reviewed it recently. But I reviewed it as part of my opinion. You bet.

Q. Did you review the exhibits to that deposition?

A. Yeah, I reviewed the one involving policy, because there was a reference in a deposition regarding, you know, response to use of force. And I saw that so I looked at that particular policy that was presented in deposition just so I knew which policy he had been reviewing.

Q. And I know there was some questions earlier, and I'm trying to remember the answer. When you were an officer, or sergeant, or lieutenant, did you ever respond to active shooter situations?

A. Yes.

Q. And I think you mentioned that you never discharged your weapon in those situations; is that correct?

A. That's correct. Let me clarify. When I said I responded to active shooter situations, they weren't necessarily put out the way active shooter was announced in the Kirk matter.

Page 168

I responded -- a lot of times the dispatchers, based on a number of factors, it's an active shooter situation but it doesn't come out like that. So when I say I responded, in all those cases it wasn't necessarily defined as an active shooter by dispatch definition. But I responded to people actively firing, actively trying to kill people with weapons. Those types of scenarios.

Q. In those type of scenarios did you -- you did testify that you never discharged your weapon.

A. Yes.

Q. In those scenarios where people were actively shooting were you ever able to apprehend that shooter?

A. Yes.

Q. Without death?

A. Yes.

Q. There was a lot of hypotheticals about school shootings. There have been times that you've seen in the news where school shooters have killed people but have also been apprehended without killing them; correct?

A. Yes.

Q. So it's possible in a tense situation to diffuse that situation and apprehend a subject or suspect without killing them.

MR. SULLIVAN: Form.

THE WITNESS: It happens all the time. The news

Page 169

doesn't necessarily call that news unless somebody dies or gets shot. But in law enforcement it happens all the time where we're able to get to scenes and diffuse them in such a way that no one is actually injured or killed, and that's really not news that the public hears about, but it happens all the time.

BY MR. WOODS:

Q. Do you think that Sergeant Roy had enough time to decide not to shoot Leontae Kirk?

MR. SULLIVAN: Form, foundation.

THE WITNESS: All those officers had plenty of time.

BY MR. WOODS:

Q. It's your understanding that Sergeant Roy, Officer Garza, Officer Ladines, and Officer Ravelo responded to the scene first?

A. Yes.

Q. And that's four officers; correct?

A. Yes.

Q. But there were only three shooting police officers; is that right?

A. Yes.

Q. Ravelo didn't shoot.

A. No.

Q. You reviewed the incident reports, the interviews

Page 170

with Ravelo. Have you reviewed those things?
   A. Yes.
   Q. Okay. And is it your understanding that Ravelo said she didn't see anybody with a gun?
   A. Yes.
   Q. And she didn't actually pull her weapon and shoot; correct?
   A. I don't know if she actually -- yeah, I believe she did pull the weapon when she approached but she did not fire her weapon.
       MR. WOODS: I don't have anything further.
          FURTHER EXAMINATION
BY MR. SULLIVAN:
   Q. Just very briefly. So you responded to incidents where officers have used deadly force by firing their weapons; right?
   A. Yes.
   Q. When officers are positioned at different locations -- and obviously we can apply it to this specific scenario -- but you're at a strip mall parking lot and you hear gunfire. Can it be hard to determine where the gunfire is coming from at times?
   A. Yes.
   Q. So in Officer Garza's scenario he's moving behind that pony wall; right?

Page 171

   A. Yes.
   Q. And you watched the video footage. And once Kirk comes into vision he fires the three rounds.
   A. Yes.
   Q. Do you know what happened right before Officer Garza took position behind the pony wall and Kirk comes into vision?
   A. Yes.
   Q. That's when Sergeant Roy had started firing; right?
   A. Correct.
   Q. So Officer Garza's mindset at that time is I hear bullets firing, I saw this guy with a gun, I'm getting in position and then he responds accordingly; is that fair?
       MR. WOODS: Foundation.
       THE WITNESS: That's fair. And the issue is what we call in law enforcement contagious fire. And we put out a ton of training on how to avoid contagious fire. We have designated shooter policies, less than lethal, one person shoots, one doesn't, et cetera, et cetera.
       And hearing another officer shoot or anyone shoot occurs quite often but we do apply training to keep other officers from shooting merely because they're hearing another officer engaging with their gun. And each officer has an individual duty to assess the imminent threat that's

Page 172

presented to them and not rely upon another officer shooting and make an assumption that he's being shot because of a threat.
   Q. Okay.
   A. It's a long way to answer your question. But we specifically address those issues in our training because these kinds of situations occur where there's contagious fire that we try to avoid.
   Q. And then similarly, like you have Officer Roy, he's obviously -- I think in his deposition he says he parallels Kirk as Kirk goes between the cars. And I believe that he said he heard gunfire. We obviously know Kirk didn't fire his gun at this point. But he could hear Ladines firing her gun; right?
       MR. WOODS: Foundation.
       THE WITNESS: When he exited he may or may not have actually heard Ladines fire.
BY MR. SULLIVAN:
   Q. Okay.
   A. He arrived just after her. He was in the process of exiting, and he believed they were engaging, is what he stated. So I don't know if that answers the question. But I'm not sure if he actually physically heard -- in fact, I believe he said he didn't hear shots when he responded.
   Q. Okay.

Page 173

   A. So most likely he was still in his car and just didn't have opportunity.
   Q. Okay. And just to clarify one point. Right before Officer Roy fired -- and you watched that body cam footage; right?
   A. Yeah.
   Q. And he begins to fire when Kirk emerges from between the two vehicles. I think there's a little sign out in front of the store; is that correct?
   A. There was something. I can't recall exactly what that was.
   Q. It looked like maybe a little folding sign?
   A. I don't remember exactly what it was, but I do recall seeing something in front of that store.
   Q. Is it fair to say that almost simultaneously with Kirk emerging is when Officer Roy begins to deploy his lethal force?
   A. Yes.
   Q. No further questions.
          FURTHER EXAMINATION
BY MR. WOODS:
   Q. Just one or two quick ones. Did Officer Roy shoot a couple of times?
   A. He shot 17, if I recall.
   Q. He emptied his magazine?

Page 174

A.  Correct.

Q.  Was that reasonable?

A.  No.

MR. SULLIVAN:  Form.

THE WITNESS:  I don't believe it was reasonable, no.

BY MR. WOODS:

Q.  Your opinions, were they expressed to a reasonable degree of scientific certainty or professional certainty?

A.  I believe so.

MR. WOODS:  I have nothing further.  If you have nothing further we'll read and sign.

MR. SULLIVAN:  I have one final question.

FURTHER EXAMINATION

BY MR. SULLIVAN:

Q.  Can you tell me in your report where it says that your opinions are to a reasonable degree of certainty or scientific certainty?

A.  I don't think I wrote that in my opinion at all.

Q.  Okay.

A.  And I hadn't even thought of it in those terms until I was just asked.

Q.  Yeah.

A.  But I want to believe that I'm scientific enough, experienced enough to make an opinion that's based on the

Page 175

physical and objective, you know, scientific investigation that was presented to me.

MR. SULLIVAN:  The only reason I asked is because I knew it wasn't in there.  I'm not gonna let you slip that one in.

MR. WOODS:  You knew I'd I ask.

MR. SULLIVAN:  I don't have any further questions.

MR. WOODS:  We'll read and sign.

THE REPORTER:  Would you like a copy of this transcript, Mr. Woods?

MR. WOODS:  Yes, please.  I'll take a PDF.

(Whereupon the deposition concluded at 3:20 p.m.)

* * * * *

Page 176

SIGNATURE PAGE

I, the undersigned, declare under penalty of perjury, that I have read the foregoing transcript of the testimony taken on February 13, 2026, in the above-referenced matter, and that the foregoing is a true and correct transcript of my testimony contained therein, except for the changes, if any, noted on the attached errata sheet.

_____          _____
MARK HAFKEY                              DATE

Page 177

COURT REPORTER CERTIFICATE

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

[X] [ ] Review and signature was requested.
[ ] [ ] Review and signature was not requested.
[ ] [ ] Review and signature was waived.
[ ] [ ] Review and signature not required.

_Jeri Barbin_
_____
JERI F. BARBIN, RPR
Arizona Certified Reporter No. 50693

Page 178

REGISTERED REPORTING FIRM CERTIFICATE

I CERTIFY that HD Reporting, LLC, a Registered Reporting firm in the State of Arizona, has complied with the ethical obligations set forth in ACJA 7-206 J(1)(g)(1) through (6).

I FURTHER CERTIFY that the foregoing deposition transcript was prepared by the reporter designated herein; that a digital copy of the reporter's transcript was submitted by the reporter to HD Reporting, LLC, for the purposes of preparing electronic and/or paper copies for the parties; that the transcripts have been prepared, distributed and invoiced pursuant to the order on file with HD Reporting, LLC.

DATED at Phoenix, Arizona this 13th day of March 2026.

_____
HD REPORTING, LLC
AZ Registered Reporting Firm No. R1139