LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL, 16TH FLOOR
PHOENIX, AZ 85004
(602) 271-7700
Sarah L. Barnes /Bar No. 020362
Kelley M. Jancaitis /Bar No. 025555
Jeremiah M. Sullivan/Bar No. 038569
E-mail:slb@bowwlaw.com
kel@bowwlaw.com
kmj@bowwlaw.com
jms@bowwlaw.com

*Attorneys for Defendants City of Phoenix,*
*Sullivan, Ladines, Garza, and Roy*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kashane Kirk, *et al.*, | Case No.: CV 23-00836-MTL (CDB) |
| Plaintiffs, | |
| vs. | **REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| City of Phoenix, *et al.*, | |
| Defendants. | |

Defendants Roy, Garza, Ladines, the City of Phoenix (the "City") and Sullivan (hereinafter collectively referred to as "Defendants"), by and through undersigned counsel, hereby file their Reply in support of Defendants' Motion for Summary Judgment (Doc. 109). For the reasons below, Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Response") (Doc. 124), Response to Defendants' Statement of Facts ("PRSOF") and Separate Statement of Facts ("PSOF") (Doc. 122), fail to establish any triable issues of material fact as to Plaintiffs' various federal and state law claims, and, thus, summary judgment in favor of Defendants is warranted.

/ / /

## I.      The Individual Officers Used Constitutionally Permissible Force

Plaintiffs correctly identify the *Graham* factors and recognize that the key factor is whether the suspect posed an immediate threat.[1] (Doc. 124, at 6.) Here, the undisputed facts establish that the Defendants Roy, Garza, and Ladines (the "Individual Officers") reasonably believed that Kirk posed an immediate threat to the safety of the officers and innocent bystanders. It is undisputed that a witness called 9-1-1, identified Kirk, and told dispatch that Kirk stated he "has one (1) in the chamber" and that he was "not afraid to use it." (SOF ¶¶ 1-2; PRSOF ¶¶ 1-2.) It is further undisputed that a helicopter unit was dispatched and that the helicopter spotter observed Kirk pointing a gun around a strip mall parking lot. (SOF ¶¶ 3-4; PRSOF ¶¶ 3-4.)  Plaintiffs further admit that the Individual Officers responded to dispatch's report of an "active shooter" and that video footage depicts Kirk waving a gun around in the public strip-mall parking lot. (SOF ¶¶ 6-7; PRSOF ¶¶ 6-7.) Importantly, Plaintiffs do not dispute that the helicopter unit observed Kirk with a gun and perceived him to be shooting, the Individual Officers observed Kirk armed with a gun in the parking lot when they arrived at the scene, the Individual Officers observed Kirk flee between two (2) vehicles in the parking lot, *while still armed*, and "Kirk discarded his firearm *outside of the officers' view*[.]" (SOF ¶¶ 4-5, 16-19; PRSOF ¶¶ 4-5, 16-19.) These undisputed facts establish that the Individual Officers reasonably deployed deadly force to neutralize what they reasonably believed to be a serious, deadly threat, an active shooter.  Yet, despite the above undisputed facts, Plaintiffs advance numerous arguments, which ignore well-established precedent, in a futile attempt to survive summary judgment.

First, Plaintiffs argue that "Kirk was unarmed when shot by Roy and Garza" and that

---

[1] Plaintiffs seemingly ignore the first factor, severity of the crime at issue, and third factor, whether the suspect was actively resisting arrest or attempting to evade arrest, because both factors favor Defendants. *See* n.3, *infra* (explaining that the severity of the crime factor assesses the crime at issue, not whether a suspect may have been a victim). It is undisputed that Defendants believed they were responding to an active shooter scenario, and that Kirk was observed fleeing between two (2) vehicles after officers arrived at the scene.

he was "in a surrendering position when shot." (Doc. 124, at 7-8.) As a preliminary matter, this argument is immaterial to whether Defendant Ladines' use of force was reasonable because Kirk was armed when she deployed lethal force. (SOF ¶¶ 7, 16, 19; PRSOF ¶¶ 7, 16, 19.)[2] Defendants do not dispute that Kirk discarded his firearm after he took cover between two (2) vehicles. The relevant fact is that he discarded the firearm outside of the Individual Officers' view. Therefore, the legal issue is whether it was reasonable for Defendants Roy and Garza to believe that Kirk was still armed and dangerous when they decided to deploy lethal force. Based on the undisputed material facts, Defendants thought Kirk was an active shooter and observed him armed with a firearm. When Defendants Roy and Garza deployed lethal force, they reasonably believed Kirk was still armed and dangerous, and thus the use of lethal force was constitutionally permissible. Critically, Plaintiffs admit that "Kirk discarded his firearm outside of the officers' view[.]" (PRSOF ¶ 19.)

Had the Individual Officers known Kirk discarded the firearm, the events on November 2, 2022, might have played out differently. But Plaintiffs have introduced no evidence to establish that Defendants Roy and Garza were actually aware that Kirk discarded his firearm, nor can they based on their own admissions. The controlling precedent is clear: "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989). The fact that Kirk discarded his firearm prior to being shot by Roy or Garza is immaterial. Instead, the issue is whether Defendants Roy and Garza reasonably believed that Kirk was still armed when they deployed

---

[2] As an additional point, Plaintiffs' reliance on Officer Ravelo's testimony that she did not see a gun, *see* (doc. 124, at 7:13-15), is immaterial to whether Defendants Roy, Garza, and Ladines's use of force was constitutionally permissible. One officer's testimony that she did not see a firearm does not controvert reality. Defendants Roy, Garza, and Ladines all saw Kirk with a firearm, and Kirk being armed is confirmed by video footage and the fact that his firearm was found under a vehicle right after the incident.

lethal force. Because Plaintiffs admit Kirk discarded the gun outside of the Individual Officers' view, and that Kirk was observed by the Individual Officers wielding a gun, Roy and Garza reasonably believed that Kirk was still armed and dangerous before using lethal force.

Second, Plaintiffs argue that the "active shooter" designation was erroneous and that a reasonable jury could find that the Individual Officers knew or should have known that Kirk was not firing a weapon.[3] (Doc. 124, at 8.) Candidly, the latter part of this argument is nonsensical. Just because Kirk was not actively shooting when the Individual Officers arrived does not negate their reasonable belief that they were dealing with an active shooter, who looked to be shooting, had been shooting or could be at any second. This is especially so considering the undisputed fact that Kirk was still armed when they arrived at the scene and was viewed by multiple officers to be engaged in movements with the gun that looked like someone shooting a gun. Significantly, Plaintiffs' police practices expert, Mark Hafkey, testified that if dispatch reports an active shooter his "interpretation is they've actually fired their weapon and presumably at innocent bystanders." Hafkey Dep. 20:14-16, Feb. 13, 2026, **Exhibit AA.**[4]

---

[3] Throughout the Response, Plaintiffs maintain that Kirk drew his weapon in self-defense. Plaintiffs seemingly raise this argument to suggest that Kirk was not committing a crime when lethal force was used. To the extent Plaintiffs believe this factual distinction is relevant to the "severity of the crime at issue" prong, they are mistaken. The following passage from the United States District Court for the Northern District of California is instructive:

> Active shooters in a public, heavily trafficked area are a cause of grave concern. Officers enter dangerous situations while others flee. They are not required to know the originating details of every evolving, dangerous situation. *The fact that [a suspect] may have been a victim does not alter that the crime at issue was severe.*

*Banks-Reed v. Bay Area Rapid Transit*, 18-CV-05755-YGR, 2019 WL 6050753, at *5 (N.D. Cal. Nov. 15, 2019) (emphasis added), *aff'd sub nom. Banks-Reed v. Mateu*, 19-17444, 2022 WL 486607 (9th Cir. Feb. 17, 2022). In other words, the fact that Kirk may have been acting in self-defense is immaterial to the issue of the "severity of the crime" analysis.

[4] Additional portions of Hafkey's deposition transcript are included with this Reply because

It is reasonable for officers to rely on the information relayed to them by dispatch and verify that information upon arrival at the scene. Contrary to Plaintiffs' argument, there are several explanations for why an armed suspect might not be actively shooting when officers arrive at the scene, such as, a momentary lapse in gunfire or attempting to locate another victim. Officers who observe an armed suspect and reasonably believe that he was actively shooting—and could resume shooting—are justified in deploying deadly force. The standard that Plaintiffs seek to impose on the Individual Officers—namely, that officers are not entitled to deploy deadly force when an armed suspect is not actively shooting in front of officers—is an untenable, unrealistic, and ignores well established precedent. Police officers repeatedly face rapidly evolving scenarios, and they need to be able to make split-second decisions without worrying that they may later be found liable for their reasonable decision to deploy deadly force. *See Graham*, 490 U.S. at 396–97, 109 S. Ct. at 1872 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

Third, Plaintiffs maintain that the Individual Officers failed to give warnings. (Doc. 124, at 8-9.) To support this argument, Plaintiffs cite to *Deorle v. Rutherford* for the proposition that "such warnings should be given, when feasible, if the use of force may result in serious injury[.]" 272 F.3d 1272, 1283–84 (9th Cir. 2001). But Plaintiffs' application of *Deorle* to the facts of this case ignores a critical component of Ninth Circuit precedent, namely, that warnings are only necessary "when feasible." *Id.* Here, warnings were not feasible for a number of reasons. The Individual Officers reasonably believed they were

Plaintiffs relied on excerpts of his testimony in their Response. Moreover, the parties agreed that Defendants could include relevant portions of Hafkey's deposition transcript, which was obtained after Defendants filed their Motion for Summary Judgment, in their Reply, as opposed to supplementing their Motion for Summary Judgment. The relevant portions of Hafkey's deposition transcript are thus attached as a continuing exhibit using Defendants exhibit designations in its Motion for Summary Judgment.

responding to an active shooter situation. They observed Kirk wielding a pistol in a busy strip mall parking lot. Had officers given warnings, they would have signaled their position, thus losing a tactical advantage for neutralizing what they perceived to be a grave threat to themselves, their fellow officers, and innocent bystanders. Moreover, Plaintiffs' belief that warnings would have changed the outcome is based on pure speculation. It is reasonable for an officer to forego warnings when responding to dispatch's report of an active shooter, especially when the individual officers see the suspect armed and waving a gun in public.[5]

Fourth, Plaintiffs argue that Defendant Roy's decision to fire 17 rounds over a matter of seconds was excessive. (Doc. 124, at 9-10.) Plaintiffs cite no case law to support this argument. Sergeant Roy fired 17 successive shots over a matter of seconds with no intervening change in circumstances. Because he was justified in utilizing deadly force, he was permitted to shoot until the perceived threat was neutralized. In fact, Plaintiffs' own expert testified that the proper protocol for responding to an active shooter scenario is to "eliminate the threat[,]" which according to him means "respond and present whatever force is warranted to get that threat to stop." Hafkey Dep. 19:11-19, **Ex. AA**.

Fifth and lastly, Plaintiffs confusingly argue that the officers created a danger to bystanders. (Doc. 124, at 10.) This argument is not relevant to Plaintiffs' claims. No innocent bystander is a plaintiff in this matter, and Plaintiffs lack standing to maintain a claim on behalf of any bystander who was present during the incident. Moreover, this argument actually supports Defendants' position. By advancing this argument, Plaintiffs concede that the incident occurred in a "busy strip mall parking lot[.]" (Doc. 124, at 10:4.) This concession is fatal to Plaintiffs' excessive force claim because it is well established that officers are justified

---

[5] It is worth noting that a helicopter unit was circling above the scene and that police sirens were blaring as the Individual Officers approached the scene. *See* Hafkey Dep. 130, **Ex. AA** (testifying that based on the video footage that the police cruisers approached with their lights on, and that sirens could be heard). Plaintiffs attempt to paint Kirk as a helpless victim who did not know officers were approaching is disingenuous.

6

in using deadly force to protect themselves, their fellow officers, and innocent bystanders from serious physical injury.

When asked if the Individual Officers were "put in an unmeasurably difficult situation[,]" Mr. Hafkey responded, "[a]bsolutely." Hafkey Dep. 123:10-12, **Ex. AA**. Also, Mr. Hafkey agreed that the incident involving Kirk was "[v]ery difficult" because the Individual Officers thought Kirk was firing a gun and saw him with a gun. *Id.* at 123:12-16.

## II.    The Individual Officer Are Entitled to Qualified Immunity

To combat Defendants' qualified immunity argument, Plaintiffs attempt to engage in a slow-motion replay of a hectic incident involving Mr. Kirk. In reality, once the Individual Officers arrived at the scene after dispatch's report of an active shooter, events unfolded over a matter of seconds. (*See* SOF ¶ 34; PRSOF ¶ 34.)

### A.    It Was Not Clearly Established at the Time of the Incident Involving Kirk, that the Individual Officers' Conducted Violated the Fourth Amendment

Plaintiffs argue that at the time of the incident involving Kirk, Ninth Circuit case law clearly established the following: (1) "officers may not use deadly force against an individual who does not pose an immediate threat"; (2) "officers should give warning before using deadly force when feasible"; and (3) "the use of deadly force against a suspect who has discarded his weapon and is in a defensive posture is unreasonable[.]" (Doc. 124, at 10:23-11:2.) But Plaintiffs merely reference case law at a high level of generality, which the Supreme Court of the United States has warned against. *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6, 142 S. Ct. 4, 8 (2021). By engaging in a detailed analysis of the case law cited by Plaintiffs, the Individual Officers' entitlement to qualified immunity is clear.

In the first case cited by Plaintiffs, *Tennessee v. Garner*, an unarmed suspect, who was reportedly burglarizing homes in the late evening, was shot by a police officer when the suspect attempted to flee over a chain link fence in a yard. 471 U.S. 1, 3-4, 105 S. Ct. 1694, 1697 (1985). Importantly, as recognized by the Ninth Circuit in *Duvall v. City of Santa*

7

*Monica*, a key fact in *Garner* was the officers "used deadly force to prevent the escape of a suspect **known to be unarmed**." 42 F.3d 1399 (9th Cir. 1994) (emphasis added). That was undisputedly not the case for the incident involving Kirk. Moreover, "[t]he Supreme Court has since noted that *Garner*'s 'standards are cast at a high level of generality' and cautioned against using it to clearly establish the law in factually distinguishable situations." *Seidner v. de Vries*, 39 F.4th 591, 603 (9th Cir. 2022) (quoting *Rivas-Villegas*, 595 U.S. at 6, 142 S. Ct. at 8); *see also Scott v. Harris*, 550 U.S. 372, 382, 127 S. Ct. 1769, 1777, 167 L. Ed. 2d 686 (2007) ("*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'").

The second case cited by Plaintiffs, *Deorle v. Rutherford*, involved a police officer who shot an unarmed man in the face, without warning, even though the officer had a clear line of retreat; there were no bystanders nearby; the man had been "physically compliant and generally followed all the officers' instructions"; and he had been under police observation for roughly 40 minutes. 272 F.3d, at 1276, 1281–1282. The rationale that undergirded the opinion in *Deorle* is, again, that warnings are required, but only "*if feasible*." *Id.* at 1284. Here, warnings were not feasible and these facts are completely distinguishable from the situation facing Defendants. Further, in *Kisela v. Hughes*, the United States Supreme Court again reminded the Ninth Circuit to not rely on cases at a high level of generality when analyzing qualified immunity. In *Kisela*, a suspect was "armed with a large knife; was within striking distance of [the officer]; ignored the officers' orders to drop the weapon; and the situation unfolded in less than a minute." 584 U.S. 100, 106, 138 S. Ct. 1148, 1154 (2018) (alterations in original). The United States Supreme Court reversed the Ninth Circuit and held that the officers were entitled to qualified immunity. *Id.* at 107-08, 138 S. Ct. 1154-55.

The third case cited by Plaintiffs, *Glenn v. Washington County*, involved an intoxicated teenager, who held a pocketknife to his neck and threatened to kill himself. 673 F.3d 864, 866-69 (9th Cir. 2011). Police officers were dispatched to the teenager's home when his

8

mother called 911 and reported that he threatened to kill himself if police came. *Id.* An officer arrived with a beanbag shotgun and a taser and was immediately ordered to "beanbag him." *Id.* at 869. The officer yelled "beanbag, beanbag" and opened fire on the teenager; he took a couple steps, and two (2) officers then fired their semiautomatic weapons at him, killing him. *Id.* The Ninth Circuit observed that although other officers had given warnings, they were given before another officer arrived with the beanbag shotgun, and it appeared that the only warning given immediately before the beanbag shotgun was fired was when the officer yelled "beanbag, beanbag." *Id.* The Ninth Circuit reasoned that the decedent possibly "did not know what this statement meant, or perhaps even what a beanbag shotgun was." *Id.* These facts are once again wholly distinguishable from the facts in this case and do not credibly refute Defendants' entitlement to qualified immunity.

Indeed, Plaintiffs rely upon *Garner*, *Deorle*, and *Glenn*, at far too high a level of generality. Upon even just a slightly closer examination, the cases are easily distinguishable from the incident involving Kirk for multiple reasons. First, unlike the crimes at issue in the foregoing cases—an unarmed robbery and a welfare check for an apparently mentally disturbed individual threatening to harm himself—the Individual Officers believed Kirk was an active shooter in a busy public place. Moreover, as quoted above, "[t]he fact that [a suspect] may have been a victim does not alter that the crime at issue was severe." *See* n. 3, *supra*.

Second, unlike the suspects in the cases cited by Plaintiffs, who were either unarmed, temporarily armed with a knife or unloaded crossbow, or armed with a pocketknife, Kirk was observed wielding a gun in a manner that appeared to be aiming/shooting in a public place near innocent bystanders, which was confirmed by the helicopter unit and the Individual Officers when they arrived on the scene. Moreover, the video footage confirms that Kirk was waiving the gun around, sometimes in the direction of innocent bystanders, and that some innocent bystanders were fleeing from the scene.

Third, the time and location of the incident is materially different in Kirk's case.

*Garner*, *Deorle*, and *Glenn* involved scenarios at or immediately outside of a private home. Whereas, here, the location of the incident was a public strip-mall parking lot. In *Garner*, the events transpired in the late evening hours. In *Glenn*, officer responded to a 9-1-1 call around 3:00 a.m. Conversely, Kirk was waving a gun around in broad daylight.

Fourth, unlike the events in *Doerle* and *Glenn*, which occurred over minutes, Plaintiffs admit the incident involving Kirk transpired over 20 seconds. (SOF ¶ 34; PRSOF ¶ 34.) Importantly, Plaintiffs admit: ***Kirk was armed when Ladines fired***, (*see* (SOF ¶¶ 7, 16, 19; PRSOF ¶¶ 7, 16, 19); Kirk fled on foot, still armed (PRSOF ¶ 19); *1 second* elapsed between when Kirk emerged from between the vehicles and Roy fired, (*see* SOF ¶ 32; PRSOF ¶ 32).); and *1 second* elapsed between when Kirk first came into Garza's field of vision and when Garza decided to deploy lethal force (SOF ¶¶ 30-32; PRSOF ¶¶ 30-32.)

Fifth and lastly, unlike *Garner* and *Doerle*, which did not involve threats to innocent bystanders at the time force was used, and *Glenn*, where the suspect wielding a pocketknife was shot after taking just one (1) or two (2) steps towards a house where his parents were located, the Individual Officers reasonably believed that Kirk had the means and ability to injure innocent bystanders, themselves, or their fellow officers without being in close proximity to them. In fact, Mr. Hafkey agreed that Kirk had the "means and ability to shoot innocent bystanders" during the incident. Hakey Dep. 119:20-25, **Ex. AA**.

At the time of the incident involving Kirk, it was not clearly established that the Individual Officers' decision to deploy lethal force violated the Constitution when they responded to dispatch's report of an active shooter, observed Kirk wielding a gun in a public during business hours, and did not see Kirk discard the firearm after he fled between vehicles. And there is nothing in *Garner*, *Doerle* or *Glenn* that clearly establishes no reasonable officer would have acted as Defendants did in this situation. *See e.g., Tubar v. Clift*, 286 Fed. Appx. 348, 351 (9th Cir. 2008) (recognizing that to strip an officer of qualified immunity requires a conclusion that "no reasonable officer could have thought that the use of deadly force was

10

reasonable under the circumstances."). In today's climate, where active shooter scenarios are unfortunately becoming increasingly common, a rule that strips officers of qualified immunity in a rapidly evolving active shooter scenario is untenable. When events like the one involving Kirk transpire, officers should not have to pause and wonder if they will be stripped of qualified immunity; they must act quickly to protect innocent bystanders by neutralizing the threat. *See Estate of Parker v. Mississippi Dep't of Pub. Safety*, 140 F.4th 226 (5th Cir. 2025) (granting qualified immunity when police responded to an active shooter situation); *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1172-74 (10th Cir. 2020) (granting qualified immunity to police officers who used deadly force to neutralize a suspect believed to be an active shooter, even though the suspect ended up not being the active shooter); *Salaam v. Wolfe*, 806 Fed. Appx. 90, 92-95 (3d Cir. 2020) (granting qualified immunity to officers who responded to a report of an active shooter and fired multiple, successive rounds at a suspect who was observed wielding a gun).

> **B.**     **The Individual Officers' Mistaken Belief that Kirk Was Still Armed and Dangerous Was Reasonable**

Plaintiffs engage in a tortured reading of *Valderas v. City of Lubbock*, 937 F.3d 384 (5th Cir. 2019), and *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015), to combat Defendants' "mistaken belief" argument; however, Plaintiffs' arguments actually support Defendants' position. Specifically, Plaintiffs argue that the pivotal language from the *Valderas* opinion is that "events transpired in a matter of seconds" and the officers had "little time to realize" the suspect discarded the firearm. (Doc. 124, at 11-12); *Valderas*, 937 F.3d at 390-91. Like *Valderas*, Plaintiffs concede that events transpired in a matter of 20 seconds. (PRSOF ¶ 34.) Significantly, Plaintiffs admit that Roy and Garza had little time, no more than one (1) second, to realize that Kirk discarded his firearm. Plaintiffs concede: "*Kirk discarded his firearm outside of the officers' view before Sergeant Roy and Officer Garza deployed deadly force*." (PRSOF ¶ 19 (emphasis added).) Plaintiffs also concede that *one (1) second* elapsed between

when Kirk emerged from the vehicles to when Roy began firing, (*see* SOF ¶¶ 24-25; PRSOF ¶¶ 24-25); and *one (1) second* elapsed between when Kirk came into Garza's field of vision to when Garza began firing. (*See* SOF ¶ 32; PRSOF ¶ 32). Plaintiffs' concessions are fatal to their argument. There is no credible dispute that Roy and Garza reasonably believed Kirk was still armed and dangerous.

Next, Plaintiffs argue that Kirk was unarmed, surrendering, and attempting to de-escalate the situation. (Doc. 124, at 12.) But as the Sixth Circuit recognized in *Mullins v. Cyranek*, "[t]he fact that [a suspect] was actually unarmed when he was shot is irrelevant to the reasonableness inquiry" regarding a mistaken belief that the suspect was still armed. 805 F.3d 760, 767–68 (6th Cir. 2015). Even if the Court accepts Plaintiffs' version of events as true, the Individual Officers are entitled to qualified immunity.

### C.    **Plaintiffs Have Not Credibly Discredited the "Purpose to Harm" Standard**

Plaintiffs' argument that the "purpose to harm" standard does not apply ignores recent Arizona precedent. *See Johnson v. State of Arizona*, 1 CA-CV 25-0271, 2026 WL 218669, at *3 (App. Jan. 28, 2026) (recognizing that "an officer loses the qualified immunity shield" if he "acted with a purpose to harm the decedent for reasons unrelated to legitimate law enforcement objectives"; and that the "purpose to harm" standard applies to fast pace scenarios). Nonetheless, Plaintiffs proceed to argue that even if the "purpose to harm" standard applies, "the officers acted with deliberate indifference to Kirk's rights…." (Doc. 124, at 12-13.) According to Plaintiffs, the Individual Officers made no "effort to confirm the threat[,]" gave no warnings, fired at Kirk while he was retreating and unarmed, and that Kirk brandished a weapon in self-defense. *Id*. As argued above, the Individual Officers responded to dispatch's report of an active shooter, observed Kirk armed and waving a gun around in the strip mall parking lot. Warnings were not feasible. Plaintiffs' attempt to characterize Kirk as retreating, unarmed, and only brandishing a weapon in self-defense ignores the Individual Officers' reasonable perception of events as they rapidly unfolded. Therefore, the undisputed

material facts do not support that the individual officers acted with deliberate indifference, and, thus, Plaintiffs cannot demonstrate a "purpose to harm." As a final point, Plaintiffs argue that whether the purpose to harm standard applies presents "fact questions for the jury"; however, the issue of qualified immunity presents a legal question for the Court to decide. *See Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945 (9th Cir. 2010) (recognizing that qualified immunity presents a "pure question of law"). In short, Plaintiffs do not credibly demonstrate that the purpose to harm standard does not apply here; and even if Plaintiffs could prove a purpose to harm, the Individual Officers are still entitled to qualified immunity because it was not clearly established that their conduct was objectively unreasonable at the time of the incident.

**D.    Recent Ninth Circuit Precedent Further Establishes the Individual Officers Are Entitled to Qualified Immunity**

On May 7, 2026, the Ninth Circuit issued its written opinion in *Fuhr v. City of Seattle*, ____ F.4th ____, 24-5618, 2026 WL 1252331 (9th Cir. May 7, 2026). In that case, officers responded to reports of a suspect, who fired a gun in the park at his baby's mother, took the baby, and led the police on a chase. *Id.* at *2-*3. After some time, an officer encountered the suspect when he emerged from behind bushes in an alley beside a multi-story home and advanced toward the officer. *Id.* at *2. Within two (2) seconds of encountering the suspect, the officer fired. *Id.* The officer testified in his deposition that he believed the suspect was still armed when he fired, "although he did not see the weapon." *Id.* at *3. After the incident, it was discovered that the suspect "did not have a firearm on him when he was shot" and the "gun was recovered in the vicinity." *Id.* The Ninth Circuit held that the officer, who believed that the suspect was still armed, posed a threat to the officers and the baby, and "made a split-second decision to fire" without warning, was entitled to qualified immunity because "no case clearly established a Fourth Amendment right violated by" the officer. *Id.* at *4.

Here, like the officer in *Fuhr*, who believed the suspect was still armed, posed a threat,

13

and made a split-second decision to fire without warning, the Individual Officers believed Kirk was an active shooter, thus posing a threat to themselves and innocent bystanders, and they decided to deploy deadly force in a matter of seconds to end the perceived threat. In fact, an even stronger argument for qualified immunity exists here because unlike the police officer in *Fuhr*, who never saw a gun before using lethal force, the Individual Officers actually saw Kirk wielding a gun prior to using deadly force. *Fuhr* certainly further supports the conclusion that Roy and Garza acted reasonably, even though Kirk, like the suspect in *Fuhr*, was unarmed after he ducked between the cars. As argued above, Plaintiffs agree that Kirk discarded the gun outside of Roy and Garza's view, and that both officers made the split-second decision to shoot in no more than one (1) second.

**III.    Plaintiffs' *Monell* Claim Fails**

Plaintiffs' Response identifies what they purport to be multiple theories of potential *Monell* liability: "(1) an official policy; (2) an established custom; (3) a failure to adequately train employees; or (4) a decision or ratification by a final policymaker." (Doc. 124, at 13.) Because there was no underlying constitutional violation, the *Monell* claim fails as a matter of law. Nonetheless, each of the theories advanced by Plaintiffs also fails to establish a *Monell* claim as a matter of law.

**A.    <u>Plaintiffs Fail to Establish the Existence of a Custom or Practice</u>**

Plaintiffs highlight multiple pieces of evidence that purportedly support the existence of a "custom or practice of deploying excessive force without consequences." (Doc. 124, at 13-14.) First, Plaintiffs maintain that in 2022, Phoenix had 24 officer-involved shootings, 10 fatal." (PSSOF ¶ 85.) This general factual assertion – a statistic only, is insufficient to establish the existence of a custom or practice. *See Andrich v. Kostas*, 470 F. Supp. 3d 1048 (D. Ariz. 2020), *aff'd*, 22-16226, 2023 WL 6157407 (9th Cir. Sept. 21, 2023) (concluding that "[t]he raw number of policy shootings" does not establish "that [the Phoenix Police Department] had notice of a pattern of 'similar constitutional violations'" and was not

sufficient to establish that "the other shootings" were sufficiently related to the incident involved in that case); *see also Johnson v. City of Vallejo*, 99 F. Supp. 3d 1212, 1222 (E.D. Cal. 2015) (rejecting Monell claim founded on evidence of other officer-involved shootings because "there is insufficient evidence that any of the other shootings by police resulted in constitutional violations").

Second, Plaintiffs reference Roy's prior officer involved shootings and argue that a jury could conclude that these prior shootings "evidence that the Department's review process is a rubber stamp that fails to hold officers accountable for the use of lethal force." (Doc. 124, at 13.) Defendants already addressed these prior incidents in their Motion for Summary Judgment and thoroughly explained why they do not establish the existence of a custom or practice for purposes of this case. (Doc. 103, at 18:14-19:10.) Plaintiffs' argument that the review process for these prior cases was improper is argumentative, speculative, and lacks adequate factual support. Indeed, two (2) of the incidents involved suspects actively shooting at police. (SOF ¶¶ 38-39.) Moreover, Plaintiffs completely ignore Defendants' argument that one (1) or two (2) incidents are insufficient to establish the existence of a custom or practice under *Monell*. As a final point, Plaintiffs have no evidence that these other incidents involving Defendant Roy were unconstitutional. In other words, Plaintiffs have no evidence of prior constitutional violations by the Individual Officers to support their custom/practice theory.

Last, Plaintiffs rely upon their own expert's opinion that the post-incident review of the incident involving Kirk was deficient. (Doc. 124, at 13.) As a preliminary matter, post-incident reviews are limited to specific incidents and focus on a particular event rather than demonstrating a pattern of similar violations. Moreover, Plaintiffs only identify the post-incident investigation of the Kirk matter and thus fail to introduce evidence of any other inadequate post-incident reviews, which is necessary to establish a custom or practice regarding the post-incident review process. In other words, the review process is a response mechanism to a specific incident; it is not evidence of a supposed underlying custom that

caused an alleged constitutional violation. Further, Plaintiffs do not adequately demonstrate how an alleged inadequate post-incident review of Kirk's claim was the moving force behind the alleged use of excessive force, as that is obviously improperly putting the cart before the horse. How the City of Phoenix responded to the shooting *after* the shooting certainly had zero bearing on the officers' actions *during* the shooting.

### B.    <u>The Rescinded DOJ Report Does Not Establish a Custom or Practice</u>

Seemingly aware of the lack of evidence of a custom or practice, Plaintiffs cling to the rescinded DOJ report to attempt to support their *Monell* claim. (Doc. 124, at 14-15.) Plaintiffs maintain that the Trump administration's decision to retract the report "was a political decision;" however, the same could be argued for Biden administration's decision to investigate the Phoenix Police Department. Regardless of the political underpinnings of the DOJ report, let alone the speculative political underpinnings, Plaintiffs fail to identify specific, related incidents referenced in the DOJ report, which essentially never existed, that establish the existence of longstanding customs or practices that are related to the Kirk incident.

Plaintiffs must reference specific portions of the DOJ report that are related to the subject matter of this litigation. *See, e.g., Gerow v. U.S. Dep't of Just.*, No. CV-23-01059-PHX-DGC, 2024 WL 4528167, at *4 (D. Ariz. Oct. 17, 2024) (dismissing claim founded on DOJ report findings that did not relate to subject matter of complaint); *Frank v. City of Ville Platte*, No. 6:17-CV-01351, 2019 WL 1064261, at *5 (W.D. La. Mar. 6, 2019) (DOJ report had "no persuasive authority" related to plaintiff's claims where "[t]he situation presented [was] substantially different from the focus of the DOJ's investigation"). Here, Plaintiffs make sweeping assertions about the DOJ report's findings; however, such assertions are insufficient to establish a custom or practice. While Plaintiffs' Separate Statement of Facts generally states that "[t]he City of Phoenix still provides public facing information regarding the DOJ investigation" (*see* Doc 122, at 14, ¶ 77), Plaintiffs fail to cite specific findings from the 126-page DOJ now-rescinded report that discuss any specific instances of conduct related to the

Kirk incident. Because Plaintiffs fail to cite specific instances of related conduct, Defendants cannot adequately reply to Plaintiffs' broad assertions regarding the hearsay DOJ report. Indeed, Plaintiffs neither included the rescinded DOJ report as an exhibit to their Response, nor referenced any specific findings from the report. Because of these deficiencies in the Response, Plaintiffs fail to tie the specific instances from the DOJ report to Kirk's incident.

Next, Plaintiffs reference statements made by the Mayor made in relation to another officer-involved shooting in September of 2022. (Doc. 124, at 15.) These statements were made in relation to another case involving Ali Osman, which is a case, like all other cases on which Plaintiffs rely, that involved a completely different set of fact and context than the incident involving Kirk. For reference, the Osman incident involved police officers' use of deadly force on a suspect who was throwing pebbles. *See* *https://www.phoenixnewtimes.com/news/phoenix-to-pay-55-million-to-family-of-man-killed-by-police-17469685/*. The active shooter incident involving Kirk is not remotely close to the facts of the Osman incident, and thus, Plaintiffs' reliance on the mayor's statements about policy issues arising from a completely unrelated case does not establish a custom or practice.

### C. Plaintiffs' Failure to Train Theory Fails to Establish *Monell* Liability

Plaintiffs, relying on the legal principles espoused in *City of Canton v. Harris*, argue that *Monell* liability may be established based on a failure to train theory. (Doc. 124, at 15-16.) "To be actionable, the failure to train or supervise must amount to deliberate indifference to the rights of persons with whom those employees are likely to come into contact." *Leibel v. City of Buckeye*, 364 F. Supp. 3d 1027, 1039 (D. Ariz. 2019) (internal quotations omitted), *aff'd sub nom. Leibel v. Grossman*, 798 Fed. Appx. 1015 (9th Cir. 2020). Moreover, "[t]here must be a 'direct causal link' between the failure to train or supervise and the injury suffered by the plaintiff. *Id.* (quoting *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006)).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v.*

17

*Thompson*, 563 U.S. 51, 62, 131 S.Ct. 1350 (2011) (citation omitted) (emphasis added). In *Leibel v. City of Buckeye*, this Court dismissed a failure to train claim, which was based on individual police officers mistreating a disabled individual, because the claimant failed to identify specific related instances of similar constitutional violations by the same officers or a pre-existing pattern of similar violations by the city. 364 F. Supp. 3d at 1039.

Here, Plaintiffs argue that the City discontinued a "40-hour in-person training module" around 2018, did not provide "annual in-person use of force training" at the time of the Kirk incident, and Chief Sullivan re-instituted in-person training in 2024. These allegations are insufficient, as a matter of law, to maintain a failure to train claim. The necessary evidence to maintain a failure to train claim is a pattern of similar constitutional violations. As argued above, Defendants Ladines and Garza have no prior incidents where they used lethal force, and Defendant Roy's prior instances do not establish a pattern of similar constitutional violations. Additionally, Plaintiffs' mere disagreement with the training officers received or belief that more training was necessary is insufficient to demonstrate deliberate indifference for purposes of failure to train. *See generally Stickney v. City of Phoenix, CV2001401PHXSMBDCB*, 2023 WL 2976943 (D. Ariz. Mar. 17, 2023) (recognizing that a mere "difference of opinion in the best way to investigate, track, and respond to various uses of force" did not amount to deliberate indifference).

The evidence Plaintiffs rely upon is insufficient to create a material fact dispute on the failure to train issue. Plaintiffs do not tie the three (3) alleged issues (discontinuation of the 40-hour module, alleged lack of training at the time of the Kirk incident, and re-institution of training after the Kirk incident) to the specific conduct at issue here, namely, the use of lethal force to neutralize an armed individual believed to be an active shooter. Moreover, one (1) of the issues, the discontinued training module, (*see* PSOF ¶ 65), is merely a regurgitation of prior training that is not directly tied to the issues in this case. Additionally, Plaintiffs seemingly disagree with, but fail to raise a meaningful factual dispute, that the evidence

provided by Defendants shows the Individual Officers were trained on numerous issues on multiple occasions. (*See* SOF ¶¶ 41.) While Plaintiffs argue that the training was inadequate and generally dispute Defendants' evidence and corresponding factual assertion as calling for a legal conclusion, (*see* PRSOF ¶ 41), Plaintiffs fail to identify what additional training, if any, was necessary or how the specific training the Individual Officers received was deficient. As Plaintiffs' own expert Mr. Hafkey testified, the issues in this case are not really related to a failure to train, but rather, the Individual Officers' conduct during the incident involving Kirk. *See* Hafkey Dep. 75:5-17, **Ex. AA**.

### D. Plaintiffs' Ratification by Final Policymaker Theory Fails to Establish *Monell* Liability

Plaintiffs' ratification argument makes no sense. (Doc. 124, at 16-17.) To maintain a *Monell* claim based on ratification, an official must have "adopted and expressly approved of the acts of others who caused the constitutional violation." *Saenz v. Lane,* CV-22-00047-TUC-JAS, 2026 WL 1295816, at *20 (D. Ariz. Mar. 20, 2026). Plaintiffs argue that the Mayor publicly stated in November of 2023 that there was a policy issue in relation to the Osman case. (Doc. 124, at 16-17.) Plaintiffs do not, though, introduce any evidence that Mayor Gallego ratified the Individual Officers acts in this case. And again, as argued above, the Osman case is not even remotely similar to the incident involving Kirk. Plaintiffs' attempt to suggest the two (2) cases are similar is disingenuous and improper, but, more importantly, has no bearing on any ratification basis to support the *Monell* claim here. Lastly, Plaintiffs neither cite nor include as an exhibit the allegedly deficient policy at issue, nor the revised policy.

### D. Use of Force Policy Changes Cannot Support a *Monell* Claim

Plaintiffs concede that post-incident policy changes cannot be used to establish negligence or culpable conduct pursuant to Rule 407 of the Federal Rules of Evidence. (Doc. 124, at 17.) Nonetheless, Plaintiffs argue that the changes are admissible to show that the policy changes were feasible. (*Id.*) This argument is immaterial. The fact that changes were

feasible does not establish liability pursuant to *Monell*. As the Ninth Circuit recognized in *Gordon v. County of Orange*, post-incident evidence of corrective action, which in that case involved "changes to operating procedures" at a jail, is insufficient to establish a custom for purposes of municipal liability. 6 F.4th 961, 974 (9th Cir. 2021) Also, as mentioned above, Plaintiffs do not include the prior or revised policies as exhibits to support their position.

## IV. Plaintiffs' Gross Negligence Claim (Count V) Fails

In effect, Plaintiffs concede that their gross negligence claim cannot rest upon a "negligent use of intentionally inflicted force." (*See* Doc. 124, at 17:17-18.) To survive summary judgment, Plaintiffs pivot to an unpled theory of liability, namely, that the gross negligence claim is based on an alleged failure to: "adequately train, supervise, and discipline officers" and "assess the scene prior to utilizing force[.]" (*Id.* at 17:21-24.) These theories are unpled in Plaintiffs' operative Third Amended Complaint. (*See* Doc. 63, at 44-46, ¶¶ 360-381.) Indeed, Plaintiffs' specific allegations in support of the gross negligence claim rest upon the alleged use of excessive force and a failure to intervene. The only theory pled in the Third Amended Complaint that Plaintiffs identify in their Response is the alleged failure to render medical aid. (*Id.* at 46, ¶ 375.) Nonetheless, as argued below, Plaintiffs have no evidence that the earlier administration of medical aid would have saved Kirk's life. Moreover, even if the Court considered the unpled theories regarding an alleged failure to train or adequately assess the scene now advanced by Plaintiffs, for the reasons argued below and above, those theories fail. *See* Section III.C, *supra*; Section V, *infra*; Section VII, *infra*.

## V. Plaintiffs' Negligent Training Claim (Count VI) Fails

To state a negligent training claim against the City and Chief Sullivan, Plaintiffs "must also have evidence that the employees the City allegedly failed to sufficiently train committed a tort." *Sanchez v. City of Tucson*, CV1401903TUCRMJMR, 2016 WL 8669901, at *7 (D. Ariz. Sept. 30, 2016) (citing *Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004)). In other words, if the Individual Officers did not commit a tort, Plaintiffs' negligent training

claim fails as a matter of law. Arizona case law is clear; there is no such thing as "negligent use of intentionally inflicted force." *Ryan v. Napier*, 245 Ariz. 54, 60, 425 P.3d 230, 237 (2018). Therefore, since Plaintiffs' negligent training claim rests upon the alleged intentional use of excessive force, there is no viable underlying state law tort committed by the Individual Officers. There can then likewise be no negligent training claim. Notwithstanding, the excessive force claim also fails, for the reasons argued above, which further defeats any purported negligent training claim.

Plaintiffs must also demonstrate that the City and Chief Sullivan "knew or should have known" that the Individual Officers "were unfit or incompetent to perform their duties," and that "the City's failure to train [the Individual Officers] caused Plaintiff[s] injury." *Sanchez,* 2016 WL 8669901, at *7. Here, Plaintiffs again reference only general issues regarding the training; however, they fail to tie any purported failures to the Individual Officers. Moreover, Plaintiffs' own police practices expert testified that his own opinions, on which Plaintiffs try to rely to defeat summary judgment, were not about training or policy issues, but rather focused only on the Individual Officers' conduct during the incident. *See* Hafkey Dep. 75:5-17, **Ex. AA**. Plaintiffs' belief that additional training may have resulted in a different outcome rests upon nothing more than pure speculation. Moreover, Plaintiffs' reference to post-incident statements made by the Mayor regarding policy issues for a completely unrelated and factually distinguishable case does not establish a training issue. The Individual Officers responded to a report of an active shooter and observed Kirk armed with a gun, waving/aiming it in a busy public parking lot in broad daylight. Because their decision to deploy deadly force was objectively reasonable, or, at a minimum, subject to qualified immunity, Plaintiffs' negligent training claim fails as a matter of law.

As a final point, Plaintiffs' Response seemingly ignores Defendants' argument that "Plaintiff's negligent hiring, supervision, retention, and/or training claim fails to allege gross

21

negligence….” (Doc. 20, at 17.) This failure provides yet another basis to grant summary judgment on Plaintiffs' negligent training claim.

## VI.    Plaintiffs' Wrongful Death, Survivor, and Punitive Damages Claims Fail

Plaintiffs argue that there is sufficient evidence to allow the wrongful death, survivor, and punitive damages claims to be heard by a jury. (Doc. 124, at 18:17-19:12.) Because the excessive force claim against the Individual Officers fails, whether based on objective reasonableness or qualified immunity grounds, the punitive damages claim against them also fails. Moreover, because the *Monell* claim fails, whether based on the fact that the underlying constitutional claim fails or that there is no evidence of a custom, policy, or practice that was the moving force behind the alleged constitutional violation, the wrongful death and survivor claims against the City and Chief Sullivan fail as a matter of law.[6]

## VII.   Plaintiffs' Failure to Provide Medical Aid Theory Fails

Plaintiffs argue that a fact dispute exists regarding their failure to provide medical aid theory (Doc. 124, at 19); however, Plaintiffs do not have the requisite medical expert testimony to establish that the earlier administration of medical aid would have saved Kirk's life. In fact, Mr. Hafkey is not qualified to opine on whether the earlier administration of aid would have made a difference: he is only trained in basic first aid, has no medical background, and he agreed that “besides the basic first aid training . . . [he] is not qualified to render a medical opinion.” Hafkey Dep. 10-11, **Ex. AA**. Mr. Hafkey further agreed that he is “not qualified to render a causation opinion regarding whether the earlier administration of medical aid would have saved Mr. Kirk's life[.]” *Id.* at 12. Plaintiffs do not have a medical expert to testify that an earlier administration of medical aid would have made a difference. Absent such testimony, a jury would be left to speculate on this issue. *See*, *e.g., McGiboney v.*

---

[6] Plaintiffs agree punitive damages against the City/Sullivan is not allowed. (Doc. 67, 8:1-8.)

*Corizon*, 2021 WL 1092222, at \*16 (D. Idaho Mar. 22, 2021).[7] Therefore, Plaintiffs' failure to render medical aid claim fails as a matter of law.

## VIII.  Plaintiffs' Right to Familial Relations Claim Fails

Finally, Plaintiffs argue that their right to a familial relations claim survives summary judgment because the Individual Officers' conduct "clearly fails" the deliberate indifference test. (Doc. 124, at 20.) To support this argument, Plaintiffs regurgitate many of the arguments addressed above, namely, that Kirk was unarmed, no warnings were issued, that Roy fired 17 rounds, and there was a delay in rendering medical aid. (*Id.*) For the reasons argued above, these arguments fail to establish a genuine issue of material fact and do not satisfy the requisite deliberate indifference test necessary to establish a right to familial relations claim. Roy and Garza reasonably believed Kirk was still armed and dangerous, warnings were not required, and Roy's conduct was not objectively unreasonable. *See* Section I, *supra*. Moreover, the failure to render medical aid theory fails. *See* Section VII, *supra*. Accordingly, Plaintiffs' right to familial relations claim fails as a matter of law.

## IX.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss all of Plaintiffs' remaining claims with prejudice and award Defendants their costs and fees.

RESPECTFULLY SUBMITTED this 22nd day of May, 2026.

BROENING OBERG WOODS & WILSON, P.C.

By *s/ Jeremiah M. Sullivan*
Sarah L. Barnes
Jeremiah M. Sullivan
*Attorneys for Defendants City of Phoenix,
Sullivan, Ladines, Garza, and Roy*

---

[7] Agreeing with *Shields v. Cannon*, 2015 WL 1258536, at \*15 (E.D. Cal. March 18, 2015), *subsequently aff'd Shields v. Jones*, 719 Fed. Appx. 545 (9th Cir. 2017) (holding that while expert testimony is not always required to support a claim for deliberate indifference based on medical care, "in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert testimony will almost always be necessary to establish causation and/or the necessary level of deliberate indifference").

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2026, I electronically filed the foregoing with the Clerk's Office using the CM/ECF system for filing, and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Sean A. Woods
Robert T. Mills
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

/s/ *J. Sullivan*

24

EXHIBIT AA

Mark R. Hafkey on February 13, 2026

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

KASHANE KIRK, et al.,                )
                                     ) Case No.
                                     ) CV 23-00836-MTL(CDB)
            Plaintiffs,              )
                                     )
V.                                   )
                                     )
CITY OF PHOENIX, et al.,             )
                                     )
            Defendants.              )
_____)

DEPOSITION OF MARK R. HAFKEY

Phoenix, Arizona
February 13, 2026
10:15 a.m.



REPORTED BY:
HD REPORTING, LLC
JERI F. BARBIN, RPR
Certified Court Reporter
AZ-CR No. 50693

DEPOSITION OF MARK R. HAFKEY was taken at 10:15 a.m. on February 13, 2026, at BROENING OBERG WOODS & WILSON PC, 2800 North Central Avenue, Suite 1600, Phoenix, Arizona 85004, before JERI F. BARBIN, Certified Reporter No. 50693, in and for the State of Arizona.


APPEARANCES:


        For the Plaintiffs:

                MIILS + WOODS LAW, PLLC
                By:  Sean A. Woods, Esq.
                5055 North 12th Street, Suite 101
                Phoenix, Arizona 85014
                swoods@millsandwoods.com


        For the Defendant:

                BROENING OBERG WOODS & WILSON, PC
                By:  Jeremiah M. Sullivan, Esq.
                2800 North Central Avenue, Suite 1600
                Phoenix, Arizona 85004
                jms@bowwlaw.com

I N D E X

WITNESS                                                          PAGE

MARK R. HAFKEY

EXAMINATION BY MR. SULLIVAN                    4

EXAMINATION BY MR. WOODS                     115

FURTHER EXAMINATION BY MR. SULLIVAN          170

FURTHER EXAMINATION BY MR. WOODS             173

FURTHER EXAMINATION BY MR. SULLIVAN          174

*        *        *

E X H I B I T S

(No Exhibits Offered.)

*        *        *

MARK R. HAFKEY,

a witness herein, having been first duly sworn by the certified reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. SULLIVAN:

Q.   Can you state your full name for the record, please.

A.   Mark Richard Hafkey.

Q.   Do you prefer Mark, Mr. Hafkey?

A.   Mark is fine.

Q.   Okay.  I'm just going to go over some general ground rules so we're on the same page.  Please give verbal, out loud answers, not "uh-huh" or "huh-uh," just so that we have a clear record.  If I hear you say "uh-huh" or "huh-uh" I might just say, "Is that a yes or is that no."  I'm not trying to be pushy, just making sure we have a clear record.

Is that fair?

A.   Yes.

Q.   When I ask a question I just ask that you wait for me to finish asking the question and then I'll extend the same courtesy to you.  I know sometimes in conversation we can cut each other off or we might anticipate what someone is gonna ask and jump in and give an answer.  Just try to wait just to make sure that we have that clear record.

hunter had wounded it.

Q.    Okay.

A.    And that started the case.  The animal was ruled to be mine because I made the kill shot, which really pissed off this other hunter who then called in an anonymous --

Q.    Got it.

A.    -- complaint, and it went downhill from there.

Q.    Okay.  My uncle is a huge hunter.  He goes out all the time and does bow hunting.  I haven't had the chance to go out with him yet, but I definitely want to do that soon.

Are you a trained medical professional?

A.    Basic first aid.

Q.    Besides training in basic first aid you don't have any sort of medical background.  Like you didn't go to med school or you're not a licensed nurse practitioner; right?

A.    No.

Q.    Okay.  Besides basic first aid there's not any other medical training that you have?

A.    Well, the basic first aid included more than just CPR.  It included, you know, using AEDs and shock, you know.  Shocking people back.  And it included a whole litany of dealing with emergencies from strokes and seizures to applying first aid to wounds, from knife wounds, gun wounds, to first aid involving subjects that are involved in serious breaks from accidents.

So the first aid was -- when I say basic, it was far more than first aid.  But I never received any formal education beyond the training I received in two different careers in dealing with potential illnesses and injuries associated with those careers.

Q.   And would those two careers be your career as a police officer and then as a flight attendant?

A.   That's correct.

Q.   Have you received specialized medical training for gunshot wound treatment?

A.   Yes.

Q.   What training?

A.   Essentially to stop bleeding, how to stop bleeding through different sources of pressure and tourniquets. Nothing much beyond that in terms of a gunshot wound.

Q.   And that was received in line with the basic first aid training; right?

A.   That's correct.

Q.   Would you agree that besides the basic first aid training that you have that you're not qualified to render a medical opinion?

A.   I would agree with that.

Q.   And that's because you would have to speculate; right?

A.   I think that would be part of it, yes.

somebody actively harming other people.  There's been many cases involving other types of weapons besides guns.  For example, knives.

Q.   And --

A.   And vehicles.  I'm sorry.

Q.   So dispatch sends out the report of an active shooter; right?

A.   Yes.

Q.   And then you respond to that call; right?

A.   Okay.  Yes.

Q.   And so in those -- in the instances that you're recalling where you were the person responding to the report of an active shooter, what was your mindset when you were responding to that report from dispatch?

A.   To eliminate the threat.  Whether it was an active shooter or someone else actively harming the citizens.

Q.   And what do you mean by "eliminate the threat"?

A.   I mean respond and present whatever force is warranted to get that threat to stop.

Q.   Specifically when you're responding to reports of an active shooter, were you going into that thinking that you have someone who is discharging a firearm in the instances where they're armed with a gun?

A.   Yes.  I can't say that all of those -- the handful of those times I responded to an active shooter that it was

put out exactly as an active shooter.  But we get calls that are put out in different ways and you try to interpret each call individually.

There is an active shooter protocol, but sometimes the report comes in as a subject with a gun, a subject threatening with a gun, and you don't always know if they've actively fired that weapon or used that gun.  So you always respond open-minded is the best way to answer your question, and as safe as possible.

Q.   So you talked about dispatch sends a report out -- that there are various ways that they might send a report out.  If dispatch reports we have an active shooter, how are you interpreting that?

A.   If they put out we have an active shooter my interpretation is they've actually fired their weapon and presumably at innocent bystanders.

Q.   Do you know about how many times you responded to a crime scene or an incident where you personally observed the suspect armed with a gun?

A.   Wow, there's been so many calls having worked some of the highest crime areas in Phoenix, from Maryvale, to south Phoenix, to central Phoenix, and Sunnyslope.  There's too many.  I would say anywhere from 50-plus cases in which I responded, to maybe even more than a hundred times in my career.

issues related to it.

And so yes, I do take issue with polices and procedures in the Kirk case, and I think that's what you're asking me.

Q.   Yeah, I think you touched on it a little bit there when you were talking about the training and that you thought the individual defendants acted contrary to their training and contrary to policy?

A.   Yes.

Q.   The kind of more specific question that I was getting at -- and again, correct me if I'm wrong.  I just want to understand what your opinions are.  To me when I was reading your report it didn't appear that the opinions you were offering were that there was an issue with the policy or training, but rather how these officers acted in this particular instance; is that fair?

A.   That's fair.

Q.   I'm sorry, I'm reading my question and I can't even understand what I'm trying to ask, so I'm just not going to ask it.

So what kind of information when you're rendering your opinions are you looking for?  And by that I mean what kind of data and facts are you trying to gather?

A.   It depends on who I'm working for and what they're looking for, and that changes with the different attorneys

would have canvassed those people running away, I will agree with that part.  Also a portion of the building.

But what I was getting at is it wasn't a specific stance targeting a particular individual.  And I didn't interpret even from that video that he was trying to shoot any one of those people.  But I would agree that people are fleeing and that gun went and at least very quickly canvassed some of those people.

Q.   We talked earlier about one of the concerns being means and ability; right?

A.   That's correct.

Q.   And means, you have the gun.  And ability, actively pointing; right?

MR. WOODS:  Form.

THE WITNESS:  Yeah.  What my opinion is getting at is a focused point at a particular individual with his gun. A waving, wielding person with a gun is different than that. So there's a distinction in my mind in interpreting that.

BY MR. SULLIVAN:

Q.   You think there's a distinction or do you disagree that he had in that moment means and ability to shoot innocent bystanders?

A.   He did.

Q.   He did have means and ability?

A.   Yes.

Mark R. Hafkey on February 13, 2026                    123

because of that mindset to get there and neutralize a threat. And I feel for the officers because that's what they want to do, and they had -- I feel for their good intentions.

Unfortunately, there was erroneous information put out that I believe had that not been put out it would not have led to Mr. Kirk's death. I strongly believe that based on everything I've read, and that's what I tried to portray in my opinion.

Q. Okay. So those responding officers, they're put in an unmeasurably difficult situation; right?

A. Absolutely.

Q. They think someone is firing a gun, they see him with a gun, and they have to face the difficult scenario of how do I respond to this; right?

A. Very difficult.

Q. And that difficulty can be exacerbated by the fact that, you know, this is something that happens very rapidly over a matter of seconds; right?

A. Yes. And because of that, that is why police officers undergo such prolific training to deal with these circumstances. They're trained to deal with that. They're trained to announce and give warning before they shoot somebody. They're trained to do that. And they failed to do that in this case.

(Whereupon, a video recording was played.)

BY MR. SULLIVAN:

Q.    So at the 101 mark you can see -- I can backup so you can look a little closer.  At the 101 mark you can see the police cars, what look like the ones coming in from down the street.  I believe it was on McDowell; right?

A.    Yeah, it's extremely hard to see, but --

Q.    Right here.  And if you can -- if you can't see it, just let me know.  But you see them come into view right here; right?

(Whereupon, a video recording was played.)

THE WITNESS:  That was just brief, the siren.

BY MR. SULLIVAN:

Q.    Yeah.

A.    And you can see the lights slightly, yeah.

Q.    And you don't have any reason to believe that's not the police cruisers coming to the scene of the incident; right?

A.    I think that was probably one of them, yeah.

Q.    And that's at about the 103 mark you can hear a siren going off, albeit momentarily?

A.    Momentarily, briefly, yeah.

Q.    The position of the Ring camera, so that we have it in the transcript, it's filming, is it westward; right?

A.    Yeah.  West on McDowell.

COURT REPORTER CERTIFICATE

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

[X] [ ] Review and signature was requested.
[ ] [ ] Review and signature was not requested.
[ ] [ ] Review and signature was waived.
[ ] [ ] Review and signature not required.

JERI F. BARBIN, RPR
Arizona Certified Reporter No. 50693

REGISTERED REPORTING FIRM CERTIFICATE

I CERTIFY that HD Reporting, LLC, a Registered Reporting firm in the State of Arizona, has complied with the ethical obligations set forth in ACJA 7-206 J(1)(g)(1) through (6).

I FURTHER CERTIFY that the foregoing deposition transcript was prepared by the reporter designated herein; that a digital copy of the reporter's transcript was submitted by the reporter to HD Reporting, LLC, for the purposes of preparing electronic and/or paper copies for the parties; that the transcripts have been prepared, distributed and invoiced pursuant to the order on file with HD Reporting, LLC.

DATED at Phoenix, Arizona this 13th day of March 2026.

_____

HD REPORTING, LLC
AZ Registered Reporting Firm No. R1139