**WO** JL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Kashane Kirk, et al.,
Plaintiffs,
v.
City of Phoenix, et al.,
Defendants.

No. CV-23-00836-PHX-MTL (CDB)

**ORDER**

Plaintiffs, who are represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 as personal representative and on behalf of the estate of Leontae Kirk, who was shot and killed by Phoenix Police Department (PPD) officers. Defendants City of Phoenix, PPD Chief Michael Sullivan, Sergeant Eric Roy, and Officers Antonio Garza and Autumn Ladines move for summary judgment on the merits of Plaintiffs' § 1983 claims for excessive force and *Monell*[1] liability and state-law claims for wrongful death, gross negligence, and negligent training. (Doc. 109.) The individual Defendants also move for summary judgment as to the § 1983 excessive force claim on qualified immunity grounds. (*Id.*) The Motion is fully briefed. (Docs. 121, 132.)

The Court will grant the Motion for Summary Judgment.

## I. Background

In the operative Third Amended Complaint (TAC), Plaintiffs sue the City of Phoenix, PPD Chief Sullivan in his official capacity, Sergeant Roy, and Officers Ladines,

---

[1] *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).

Garza, Ravelo, Ramirez, and Howard. (Doc. 63 at 4.) Plaintiffs assert a wrongful death and survival claim in Count I against Defendants City of Phoenix and Sullivan; a claim for excessive force in violation of the Fourth and Fourteenth Amendments in Count II against Defendants Ladines, Garza, and Roy; a *Monell* claim in Count III against Defendants City of Phoenix and Sullivan; a claim for "duty and failure to intervene" in Count IV against Defendants Roy, Ladines, Garza, Ravelo, Ramirez, and Howard; a gross negligence claim in Count V against the City of Phoenix; and a claim for negligent hiring, supervision, retention, and/or training in Count VI against Defendants City of Phoenix and Sullivan. (*Id.* at 39-48.) Plaintiffs seek compensatory, general, and special damages; all other non-pecuniary damages; and punitive and exemplary damages, among other relief. (*Id.* at 48.)

In a July 16, 2025 Order, the Court granted Defendants' Motion to Dismiss in part and denied it in part. (Doc. 93.) The Court dismissed the claim for "duty and failure to intervene" in Count IV. (*Id.* at 15.) Although the Court noted in the body of the Order that it was dismissing Count IV—the only claim against Defendants Ravelo, Ramirez, and Howard—the Court did not order Defendants Ravelo, Ramirez, and Howard's dismissal. The Court will now amend the July 16, 2025 Order to reflect that Defendants Ravelo, Ramirez, and Howard were dismissed. (*Id.*) The Court also dismissed Plaintiffs' request for punitive damages against Defendants City of Phoenix and Sullivan. (*Id.*) The Court noted that the remaining claims were Count I (wrongful death claim against Defendants City of Phoenix and Sullivan); Count II (Fourth and Fourteenth Amendment excessive force claim against Defendants Ladines, Garza, and Roy); Count III (*Monell* claim against Defendants City of Phoenix and Sullivan); Count V (gross negligence claim against the City of Phoenix); and Count VI (negligent hiring, supervision, retention, and/or training claim against Defendants City of Phoenix and Sullivan). (*Id.* at 15-16.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The

movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Facts[2]

### A. November 2, 2022 Shooting

At 4:22 p.m. on November 2, 2022, an individual called 911 and reported a black male with a red hoodie and black hat with a "NY" logo pointing a gun. (Defs.' Statement of Facts (DSOF), Doc. 104 at 1 ¶ 1; Doc. 104-6 at 5.) The caller told the dispatcher that

---

[2] The facts are undisputed except as noted.

the man, later identified as Leontae, stated that he "ha[d] one (1) in the chamber" and that he was "not afraid to use it." (DSOF ¶ 2.) The information provided by the 911 caller was relayed over dispatch. (*Id.* ¶ 3.) A helicopter unit with Officer Ramirez as the "spotter" and Officer Howard as the operator was dispatched to the location of the 911 call, at the intersection of 37th Drive and McDowell Road. (*Id.* ¶¶ 3, 14.) From approximately 500 feet above the scene, Officer Ramirez spotted Leontae and observed him pointing a gun around in a strip mall parking lot. (*Id.* ¶ 4.) Officer Ramirez reported to the dispatcher that Leontae was "shooting at people." (*Id.* ¶ 5.) Dispatch requested that units be deployed to the scene and reported, "we have an active shooter." (*Id.* ¶ 6.)

Defendants Roy, Garza, and Ladines and Officer Ravelo, in three separate vehicles, responded to the scene. (*Id.* ¶ 11.) Defendant Ladines and Officer Ravelo were in the first vehicle, Defendant Garza was in the second vehicle, and Defendant Roy was in the third vehicle. (*Id.* ¶ 13.) All three vehicles were parked at or near the intersection at 37th Drive and McDowell, directly southwest of the strip-mall parking lot. (*Id.* ¶ 14.)

Defendant Ladines and Officer Ravelo's vehicle arrived at 4:29:44 p.m. (*Id.* ¶ 15.) Defendant Ladines exited her vehicle and immediately fired four successive rounds from her service weapon at Leontae's back over two seconds. (*Id.* ¶ 16; Pls.' Statement of Facts (PSOF), Doc. 122 ¶ 16.) Leontae ran between a silver pickup truck and a silver sedan in the parking lot and discarded his firearm. (DSOF ¶¶ 18-19.)

Defendant Garza arrived at 4:29:47 p.m. (*Id.* ¶ 27.) Defendant Garza heard gunshots, exited his vehicle, and moved east to position himself behind a pony wall south of Leontae's position. (*Id.* ¶¶ 28-29.) At 4:30:01, Defendant Garza said, "where is he?" (*Id.* ¶ 30.) Within two seconds, Leontae came into Defendant Garza's field of vision. (*Id.* ¶ 31.) Defendant Garza fired three rounds with his service weapon at Leontae within three seconds. (*Id.* ¶¶ 32-33.)

Defendant Roy arrived at 4:29:50 and observed Leontae with a firearm when he initially approached the scene. (*Id.* ¶ 21; PSOF ¶ 21.) Defendant Roy exited his police vehicle and "paralleled" Leontae, who had just disappeared between the two parked

vehicles. (DSOF ¶ 22.) Defendant Roy took position at the west end of the strip mall at the sidewalk that ran immediately in front of the storefronts. (*Id.* ¶ 23.) At 4:30:00 p.m., Leontae, facing south, emerged from between the two vehicles. (*Id.* ¶ 24.) One second later, Defendant Roy fired 17 successive rounds with his service weapon. (*Id.* ¶ 25.)

Defendants Ladines, Garza, and Roy collectively fired 24 rounds at Leontae, striking him numerous times in his upper and lower torso, back, and upper and lower extremities.[3] (Doc. 104-6 at 8.) Less than 30 seconds elapsed between when the officers first began to exit their vehicles at 4:29:44 and when the last round was fired at 4:30:07 p.m. (DSOF ¶ 34.) At 4:34:10, officers begin lifesaving attempts. (*Id.*) At 4:43:13, "[f]ire was told to come on scene." (PSOF ¶ 62.) Although "[f]ire had been waiting in a staging area nearby," "[f]ire did not arrive" until 4:45:51 p.m. (*Id.*) Phoenix Fire Department personnel pronounced Leontae dead at the scene. (Doc. 104-6 at 8.)

Leontae did not fire his weapon during the incident. (PSOF ¶ 42.) Leontae's firearm was recovered underneath a vehicle approximately ten feet from where his body came to rest. (*Id.* ¶ 43.)

**B. Professional Standards Bureau Investigation**

Shortly after the shooting, Defendants Ladines, Garza, and Roy met with Professional Standards Bureau (PSB) investigators. The PSB investigation was conducted by Lieutenant Gregory D. Hernandez, Sergeant Christopher Jansen, and Sergeant Stewart Vanderloo. (Doc. 104-6 at 2.) The report of the investigation was transmitted by Commander Aimee L. Smith to Interim Chief Michael G. Sullivan on December 4, 2023, and states that the "investigation will be forwarded to the Critical Incident Review Board for review." (*Id.* at 2, 16.)

According to the PSB report, Defendant Ladines told investigators that she saw Leontae fire his weapon "into a perceived occupied storefront" and six seconds later, at 4:29:50 p.m., "reacted . . . by firing four (4) rounds from her duty weapon at him." (*Id.* at

---

[3] The parties have not presented evidence regarding which officers' bullets struck Leontae or which bullet(s) were fatal.

3, 5.) Ladines shot Leontae in the back; she told investigators that she did so because Leontae was "facing away from [her] and shooting at community members." (*Id.* at 10.) Ladines stated that she believed Leontae pointed his gun at her and "started shooting at the officers." (*Id.*) Ladines further told investigators that she "ran towards [Leontae] to close the distance between her and him; however, he remained actively shooting his firearm," and when she was approximately 15 to 20 yards behind him, she shot him. (*Id.*) Ladines also stated that she was 62 feet away from Leontae when she shot him. (*Id.* at 6.)

Defendant Garza told investigators that when he arrived at the scene, he witnessed Leontae "standing in the middle of the parking lot holding his gun in one hand, pointing and shooting his weapon toward the occupied businesses." (*Id.* at 12.) Garza "recalled [Leontae] walking in the parking lot holding his gun sideways in his right hand while shooting towards the northeast, targeting the laundry mat or the cell phone store." (*Id.*) "When asked how he knew [Leontae] was shooting his gun," Garza answered, "I heard gunshots from inside of my Tahoe and . . . the motion of the recoil of the gun was . . . the motion of his hands . . . of his hand . . . was consistent to, as if the gun was cycling and recoiling as he was walking." (*Id.*) Garza told investigators that he saw Leontae run eastbound while holding his gun and duck behind the parked cars near the occupied businesses, which caused Garza to briefly lose sight of Leontae. (*Id.*) Garza stated that he followed and ran eastbound, and while he was running along the sidewalk, Garza "heard more gunfire." (*Id.*) Garza told investigators that when he stopped running, he watched Leontae "emerge from behind the parked cars and crouch down on the concrete sidewalk in front the brick wall storefront." (*Id.*) Garza "said he believed [Leontae] intended to continue to flee from officers, which caused him to discharge three (3) rounds from his patrol rifle at [Leontae]." (*Id.*)

Defendant Roy told investigators that he witnessed Leontae "pointing his gun in a northeast direction at the front entrances of the barber shop and liquor store" and Roy "clearly saw the gun pointing in that direction towards the stores." (*Id.* at 14.) Roy told investigators that he "believed the other officers on the scene gave [Leontae] verbal

commands and challenged him, which resulted in [Leontae] running between two cars parked in front of the cellular store." (*Id.*) Defendant Roy estimated the distance between him and Leontae as 40 to 50 yards and stated that "he recalled seeing marked patrol units near the parking lot" but did "not see any officers running after" Leontae. (*Id.*) Roy told investigators that while he stood on the west end of the strip mall, Leontae emerged between the parked cars near the storefront," "crouched down," and "appeared to take cover between the parked cars." (*Id.*) Roy stated that he "interpreted [Leontae's] positioning to use the parked vehicles to his tactical advantage to engage the officers to the south," and Leontae's "actions caused Sergeant Roy to discharge his service weapon." (*Id.*) "When asked if he could see [Leontae] holding his gun when he made visual contact with him near the storefront," Roy stated, "I can't see that . . . he is, but the way his body language is I assumed that he was still armed." (*Id.* at 15.) Roy "continued to say that when he arrived on the scene, he witnessed [Leontae] with a gun in his hand; however, he did not see [Leontae] discharge his firearm." (*Id.*) Defendant Roy stated, "It appeared to me that he was trying to get into a position where he could engage the officers without being shot at by using the vehicles as cover and when I saw that I shot at him." (*Id.* at 10.) Defendant Roy told investigators that he was both 79 feet and "forty (40) to fifty (50) yards"—or 120 to 150 feet—from Leontae when he shot Leontae. (*Id.* at 7, 14.)

## IV. Audio and Video Evidence

Defendants filed audio and video evidence in support of their Motion for Summary Judgment, including the 911 call, audio from the dispatcher and helicopter unit, Ring camera footage from stores in the strip mall, and four of the officers' body worn camera footage. The Court has reviewed the evidence, which show the following:

### A. Dispatch Recordings

The dispatch recording begins with a man saying something unintelligible and a dispatcher saying, "Hello?" (DSOF Ex. A at 00:03.) The caller says, "Hi, I have an emergency. Someone's pulling out a gun on me." (*Id.* at 00:04-00:09.) The caller tells the dispatcher that he was at his uncle's house, and the person with the gun was not

someone he knew and was "just a homeless person." (*Id.* at 00:29, 00:40-00:43.) The caller describes the man with the gun as black and "wearing a red hoodie and with a[n] LA hat." (*Id.* at 00:46-00:52.) The caller says the man was walking around the neighborhood when he "came out of nowhere just pointing out a gun" and tried to walk through the yard of the uncle's house until the caller stopped him. (*Id.* at 01:14, 03:11-03:59.) The caller says the man is "just one of those drug addicts around the neighborhood." (*Id.* at 01:14-01:23.) The caller says the man was yelling and said to the caller that "he has one in the chamber and he's [unintelligible] to use it." (*Id.* at 01:55.)

The caller tells the dispatcher that the man walked away heading west and that his uncle took video of the incident. (*Id.* at 04:10-04:20.) The caller says the man is wearing a sweater with an LA hat, a hoodie over his head, and "dark" shorts. (*Id.* at 04:30-04:44.) The caller apparently tries to find the man and tells the officer the man is inside the "Grand Stop, the corner store right here." (*Id.* at 4:45-05:06.) The dispatcher tells the caller to let her know if the man comes out and when the caller sees the officers. (*Id.* at 05:27-05:30.) About fifty seconds later, the caller says the man just came out of the store, and the caller tells the dispatcher that he is going to walk away and get into his car. (*Id.* at 06:20.) The dispatcher tells the caller that "PD should be pulling up." (*Id.* at 07:02.) Seven minutes and 18 seconds into the call, the caller says, "Look he just shot, he just shot, he just shot, he just let out guns, he let out guns, he let out shots. He let out shots, ma'am." (*Id.* at 07:18-07:26.) The caller repeats, "He's letting out shots, ma'am, he's letting out shots." (*Id.* at 07:29.) The dispatcher says she is letting the officers know. (*Id.* at 07:33.) The dispatcher asks the caller if he knows what the man was shooting at, and the caller says, "No, I was already by my car, yeah, I just heard the shots." (*Id.* at 08:22-08:27.)

In the audio recording from Phoenix Police Dispatch to the helicopter unit, the dispatcher relays information she receives from the 911 caller to the helicopter unit. The dispatcher requests a response to the address the 911 caller gave. (DSOF Ex. C at 00:20-00:29.) The dispatcher says, "It's a black male, LA hat, and red hoodie pulled a gun out on the complainant." (*Id.* at 00:43-00:52.) The dispatcher relays the complainant

reported the black male said, "he has one in the chamber and is not afraid to use it." (*Id.* at 01:02-01:03.) One minute and 45 seconds into the recording, Officer Ramirez tells the dispatcher, "We're overhead." (*Id.* at 01:45.) Forty-five seconds later, the dispatcher relays that Leontae is at the Grand Stop convenience store. (*Id.* at 02:30.) Officer Ramirez relays that they found the store. (*Id.* at 02:50-03:00.) About 30 seconds later, Officer Ramirez says, "[W]e're overhead. Not seeing the suspect." (*Id.* at 03:26-03:29.) Just over four minutes into the recording, the dispatcher asks, "What's the 20 on the store?" (*Id.* at 04:03.) Officer Ramirez says, "We got a guy in orange that was just come out the door, I'm not sure if that was supposed to be the red hoodie." (*Id.* at 04:07-04:11.) Officer Ramirez says, "And yeah, he's uhh . . . came out the store and it looks like he's pointing a gun, and he is – yeah, he's pointing a gun running westbound pointing a gun [unintelligible] right in front of the store." (*Id.* at 04:11-04:25.) Officer Ramirez says, "All right, he's shooting at people in the front of the store." (*Id.* at 04:28-04:29.) The dispatcher radios for more units to respond to the scene and says, "We have an active shooter . . . Switch over to Charlie 8 16:29 hours." (*Id.* at 04:35-04:41.) Officer Ramirez says, "I've got someone running northbound [unintelligible] the back of the store." (*Id.* at 04:55-04:58.) Someone says, "998, 998."[4] (*Id.* at 05:05-05:07.) Multiple voices talk over each other. The dispatcher relays, "998 switch over to Charlie 8 at 16:30 hours." (*Id.* at 05:29.)

**B. Body Worn Camera Footage**

Officer Ravelo's body worn camera footage shows her sitting in the passenger seat of a patrol vehicle with Defendant Ladines driving. (DSOF Ex. J at 00:00-00:12.) There is no audio at first. At 16:29:44, Officer Ravelo exits the passenger side holding her service weapon and walks toward the strip mall. (*Id.* at 00:12-00:18.) At first, her view of the strip mall is partially obscured by a bus stop. (*Id.* at 00:23-00:25.) Ravelo runs on the sidewalk along the pony wall. (*Id.* at 00:25-00:29.) Twenty-nine seconds into the video,

---

[4] According to the Phoenix Police Department's list of radio codes, 998 refers to an officer-involved shooting. *See* https://www.phoenix.gov/content/dam/phoenix/policesite/mediaassets/Radio%20Codes%20Numerical%20Alphabetical.pdf (last visited Sept. 4, 2026).

Ravelo turns on the audio on her body worn camera. (*Id.* at 00:29.) She runs into the parking lot from the right side and raises her service weapon but does not fire it. (*Id.* at 00:29-00:31.) Ravelo yells, "Stop!" and one second later, numerous gunshots can be heard. (*Id.* at 00:31-00:35.) As the gunshots are being fired, Ravelo yells, "Stop! Stop! Stop! Phoenix Police!" and runs toward the storefronts where vehicles are parked. (*Id.* at 00:34-00:38.) At 16:30:08, Leontae can be seen lying on the sidewalk in front of the cell phone repair store. (*Id.* at 00:39.) Ravelo yells, "Phoenix Police! Put your hands up now! Phoenix Police! Put your hands up now!" (*Id.* at 00:42-00:45.)

Ravelo walks back to the pony wall, where two officers are standing, one in front of the pony wall, and one behind it, pointing their service weapons toward Leontae. (*Id.* at 00:45-00:52.) Ravelo asks the officers, "Did you shoot?" (*Id.* at 00:52.) Almost one minute into the video, while Leontae is lying on the sidewalk in front of the store, Ravelo yells, "Hey! Drop the gun! Phoenix Police, drop the gun!" (*Id.* at 00:59-01:00.) Ravelo crouches behind the pony wall and yells again, "Drop the gun!" (*Id.* at 01:07.) Five seconds later Ravelo yells, "Phoenix Police, drop the gun!" (*Id.* at 1:12.) One of the other officers asks, "[unintelligible] happened?" and she responds, "I don't know, I don't know, I can't see [unintelligible] . . . He's moving on him and he's moving and I do not see if he still has a gun." (*Id.* at 01:12-01:22.) Ravelo yells, "Phoenix Police, drop the gun!" (*Id.* at 01:25.) Ravelo stands up, and Leontae can be seen still lying in the same position. (*Id.* at 01:39.) Ravelo yells again, "Drop the gun and put your hands up!" (*Id.*) Ravelo says, "Boss, I can't see if he has a gun or not. . . . Yeah, I can't see if he has a gun." (*Id.* at 01:41-01:47.) Ravelo yells, "Put your hands up!" (*Id.* at 01:49.) Leontae does not move.

Defendant Garza's body-worn camera footage shows him stop his vehicle at 16:29:50 and immediately exit the driver's side door holding his service weapon. (Ex. I at 00:43.) As he exits, three gunshots can be heard. (*Id.* at 00:48.) Garza runs toward the sidewalk on the front side of the strip mall in front of the pony wall. (*Id.* at 00:46-00:52.) Defendant Ladines is standing on the sidewalk pointing her weapon into the parking lot and then climbs over the pony wall. (*Id.* at 00:48.) Garza runs up to the pony wall but

stays behind it. (*Id.* at 00:48-00:55.) Garza then runs along the pony wall in the opposite direction. (*Id.* at 00:56.) Officer Ravelo can be heard yelling, "Stop!" as numerous gunshots are fired. (*Id.* at 00:56-00:59.) At 16:30:03, Leontae appears from between two vehicles that are parked in front of the cell phone repair store. (*Id.* at 00:57-01:00.) Leontae is on his backside on the sidewalk in front of the store and appears to have his hands in the air. (*Id.*) Leontae does not appear to have anything in his hands. (*Id.* at 01:01.) Garza shoots Leontae several times as Leontae covers his head with his hands. (*Id.* at 01:01-01:02.) Garza yells, "Hey Jackie, come over here!" (*Id.* at 01:09.) Garza says, "Hey Jackie, come with us." (*Id.* at 01:16.) Officer Ravelo can be heard repeatedly yelling, "Phoenix Police, drop the gun!" (*Id.* at 01:16-01:39.) Garza asks Officer Ravelo, "Does he still have it with him?" (*Id.* at 01:39.) Another person says, "I'm not sure where the gun is." (*Id.* at 02:11.) Someone asks, "Where's the gun?" (*Id.* at 02:54.) Garza responds, "We can't see it." (*Id.*) Fifty seconds later, several officers walk from behind the pony wall into the parking lot to where Leontae is lying. (*Id.* at 03:44-04:10.)

Defendant Roy's body worn camera footage shows him stop his vehicle at 16:29:50 and immediately exit the driver's side door holding his service weapon. (Ex. H at 00:23.) Roy runs on the sidewalk, which is separated from the pony wall by an area of dirt and gravel. (*Id.* at 00:23-00:28.) Defendant Roy runs into the parking lot and stops on the sidewalk at the far end of the strip mall. (*Id.* at 00:31.) At 16:30:00, Leontae is seen in the distance emerging from between two vehicles seated on the ground and then slides backward on the ground toward the storefronts. (*Id.* at 0:31-00:33.) Roy immediately shoots Leontae and continues shooting for six seconds, firing seventeen shots in all. (*Id.* at 00:33-00:39.) It is impossible to tell from Roy's body worn camera footage whether Leontae had an arm outstretched or had anything in his hands before Roy shot him.

Roy puts another clip in his firearm and kept it aimed toward where Leontae was lying on the ground. (*Id.* at 00:50.) Roy walks into the parking lot around the parked vehicles and then walks backward toward the pony wall and climbs over it. (*Id.* at 00:50-01:17.) Roy walks over to where the other officers are standing behind the pony

wall. (*Id.* at 01:17-01:26.) Roy reports over his radio "Subject's down in front of the cellular store." (*Id.* at 01:33.) Officer Ravelo is then heard yelling, "Drop the gun and put your hands up!" (*Id.* at 01:42.) Someone says, "not sure where the gun is," and Roy responds, "I can't hear." (*Id.* at 01:49.) A few seconds later, Officer Ravelo is heard yelling, "Put your hands up!" Roy and several other officers walk into the parking lot to where Leontae is lying on the ground. (03:26-03:59.) One of the officers searches Leontae's pockets. (*Id.*)

Defendant Ladines did not activate her body worn camera until after she and Defendants Roy and Garza deployed deadly force. (DSOF ¶ 12.) Her body worn camera footage begins at 16:31:05. (Ex. K at 00:00.) Ladines is standing behind the pony wall aiming a weapon at Leontae, who is lying on the ground in front of the cell phone repair store. (*Id.*) There is no audio for the first 29 seconds of the video. One of the other officers asks, "Hey, where's the gun?" (*Id.* at 00:51.) Several officers respond at once. (*Id.* at 00:51-00:58.) One says, "We don't know," and another says, "parking lot." (*Id.*) Defendant Ladines says, "So there's another shooter?" (*Id.* at 01:04.) Ladines walks with several of the officers into the parking lot to where Leontae is lying. (*Id.* at 01:48.) Ladines crouches down and looks underneath the parked vehicles and says, "Oh, it's right here." (*Id.* at 02:41.) Ladines walks over to a silver sedan and says, "Gun's right here, under this car." (*Id.* at 02:46.) Ladines stands next to the driver's side and remains there. (*Id.* at 02:46-03:04.) At around three minutes into the video, it appears that two officers start performing CPR on Leontae. (*Id.* at 2:58.) The officers continue to perform CPR, and Defendant Ladines notices someone inside a parked truck next to her. (*Id.* at 02:58-04:15.) Ladines asks the person to unlock the doors, opens a passenger side door, and asks the person inside if they are okay. (*Id.* at 04:15-04:21.)

**C. Ring Camera Footage**

Footage from a Ring camera video from a store in the strip mall begins with a man exiting the convenience store. (DSOF Ex. F at 00:07.) There are several other people in the strip mall parking lot. (*Id.*) One man—whom the parties identify as Humberto

Gonzalez-Rios—is sitting on a motorcycle in the parking lot, almost out of frame at the bottom left of the footage. (*Id.* at 00:07-00:33.) The man remains there throughout the footage. Leontae opens the door from inside the convenience store and stands in the doorway holding the door open. (*Id.* at 00:23.) He appears to be looking at his cell phone as he stands in the doorway. (*Id.* at 00:23-00:34.) As he stands in the doorway, two people walk toward the convenience store. (*Id.* at 00:34.) Leontae holds the door open for the two individuals as they enter the convenience store. (*Id.* at 00:34-00:39.) Leontae appears to be speaking to someone inside the convenience store. (*Id.* at 00:39.) Leontae walks back through the door of the store, holding the door open with his right hand, and then holds the door open for another man as he leaves the store. (*Id.* at 00:39-00:48.) Leontae is holding a can in his left hand and nothing in his right hand. (*Id.* at 00:48-00:53.) Leontae walks a short distance and sees the man sitting on the motorcycle. (*Id.* at 00:55.) Only part of the man's left upper body and face are visible in the footage. (*Id.* at 00:56.) The man says something to Leontae, and Leontae walks toward him and says, "What? What you say?" (*Id.*) Leontae turns around and starts to run into the parking lot. (*Id.* at 00:56.) Leontae appears to pull a firearm from his waistband or a pocket as he runs. (*Id.* at 00:56-00:57.) The man gets off the motorcycle, and Leontae and the man aim their firearms at each other. (*Id.* at 00:57-00:59.) The man brings his firearm down to his side as Leontae runs through the parking lot with his firearm above his head. (*Id.* at 00:59-01:01.) Another man who was in the parking lot runs behind an SUV that was parked in the parking lot, and Leontae appears to wave his firearm at the SUV. (*Id.* at 01:01-01:03.) Leontae also appears to point his firearm at two other people who were on the sidewalk in front of the stores and then raises his firearm above his head as the footage ends. (*Id.* at 01:03-01:04.) No shots are fired.

Footage from inside a cell phone repair store shows an employee and two customers in the store. (DSOF Ex. Q at 00:01-0:12.) There is no audio. There is a person in the parking lot between two parked vehicles. (*Id.* at 0:12.) Leontae runs past the front of the store, around another parked vehicle, then reemerges and walks back in the opposite

direction. (*Id.* at 00:19.) Leontae is seen walking backward with his right arm outstretched. (*Id.* at 00:020-00:32.) Leontae can be seen standing behind a parked vehicle just in front of the cell phone repair store. (*Id.*) He then walks out of view for several seconds and is seen running between two parked cars toward the sidewalk in front of the store. (*Id.* at 00:32-00:36.) Leontae crouches down in front of one of the vehicles and then sits down just outside the door of the store with his back to the door. (*Id.* at 00:38-43.) Leontae slides backward toward the front wall while in a seated position. (*Id.* at 00:43-00:48.) Two officers can be seen standing in the parking lot. (*Id.* at 01:00.) A third officer runs up to the other officers. (*Id.* at 01:14.) One of the officers runs away from the other two, disappears, then runs back to the officers. (*Id.* at 01:14-01:40.)

## V. Section 1983 Claims

### A. Excessive Force

#### 1. Legal Standard

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.* To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involve factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396-97, and *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers

are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Only information known to an officer at the time of the officer's conduct is relevant to the analysis. *County of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017).

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc). Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and County of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted). "[S]ummary judgment should be granted sparingly in excessive force cases, particularly "where the only witness other than the officers was killed during the encounter." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc).

At summary judgment, where the evidence includes video footage, the Court considers the facts in the light depicted by the video but still draws all inferences from the video in the plaintiff's favor. *See Scott*, 550 U.S. at 380-81 (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court

will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)). However, if a party's asserted facts clearly differ from the facts in the video, the Court must consider the facts as depicted by the video. *See Scott*, 550 U.S. at 380 ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

**2. Analysis**

**a. Nature and Degree of Force Used**

The Court must first evaluate "the type and amount of force inflicted." *Espinosa*, 598 F.3d at 537 (quotation omitted). Generally, "quantifying a particular use of force requires consideration of the 'specific factual circumstances' surrounding the event." *Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022) (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017) (en banc)).

Defendants Garza, Ladines, and Roy used deadly force against Leontae. *See Tennessee v. Garner*, 471 U.S. 1, 9 (1985) (recognizing that shooting a suspect constitutes deadly force); *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 950 (9th Cir. 2017) (same). "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9). Accordingly, the Court's inquiry "reduces to 'whether the governmental interests at stake were sufficient to justify it.'" *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024) (quoting *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018)).

. . . .

. . . .

**b. *Graham* Factors**

Next, the Court considers the *Graham* factors: the severity of the crime at issue, whether Leontae posed an immediate threat to the safety of the officers or others, and whether Leontae was actively resisting arrest or attempting to escape. "[T]hese factors are not exclusive; they must be considered under the totality of circumstances, including whether 'less intrusive alternatives' were available to law enforcement and whether the suspect was given 'proper warnings' before force was used." *Sabbe v. Wash. County Bd. of Comm'r*s, 84 F.4th 807, 822 (9th Cir. 2023) (quoting *Seidner*, 39 F.4th at 599). A court may also consider whether an officer failed to identify himself as a law enforcement officer. *See Nehad v. Browder*, 929 F.3d 1125, 1138 (9th Cir. 2019).

**(1) Severity of the Crime**

"The character of the offense is often an important consideration in determining whether the use of force was justified." *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001). An officer's use of force is evaluated in light of the crime that he was investigating. *Gabriel v. County of Sonoma*, 725 F. Supp. 3d 1062, 1073 (N.D. Cal. 2024) (citing *Rice v. Morehouse*, 989 F.3d 1112, 1123 (9th Cir. 2021)). "The government has an undeniable legitimate interest in apprehending criminal suspects, and that interest is even stronger when the criminal is . . . suspected of a felony, which is by definition a crime deemed serious by the state." *Miller*, 340 F.3d at 964 (internal citation omitted).

The Ninth Circuit has "applied [the severity of crime] factor in two slightly different ways." *Nehad*, 929 F.3d at 1136. First, the Ninth Circuit has concluded that "a particular use of force would be more reasonable, all other things being equal, when applied against a felony suspect than when applied against a person suspected of only a misdemeanor." *Id.* Second, courts "use[ ] the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied." *Id.*

In their Motion for Summary Judgment, Defendants argue that Defendants Roy, Garza, and Ladines reasonably believed Leontae was committing aggravated assault. (Doc. 109 at 6.) Defendants assert that whether Leontae brandished his firearm in self-

defense or Officer Ramirez inaccurately reported that Leontae was firing his weapon is "immaterial" because the key issue is "what criminal activity" Defendants "reasonably believed they were responding to." (*Id.* at 7.) Plaintiffs do not address the first *Graham* factor in their Response.

It is undisputed that dispatch relayed that a 911 caller reported that a man pulled a gun out on the caller and said he had one "in the chamber" and was "not afraid to use it." Plaintiffs do not dispute that the man described in the 911 call was Leontae. The evidence demonstrates that Defendants Garza, Ladines, and Roy reasonably believed Leontae committed aggravated assault. *See* Ariz. Rev. Stat. § 13-1203(A)(2) (a person commits assault by intentionally placing another person in reasonable apprehension of imminent physical injury); Ariz. Rev. Stat. § 13-1204(A)(2) (a person commits aggravated assault if the person commits assault and uses a deadly weapon or dangerous instrument). Moreover, because Defendants Garza, Ladines, and Roy had been informed that Leontae was armed, the suspected crime suggested that Leontae continued to pose a danger to members of the community. The first *Graham* factor weighs in favor of Defendants.

**(2) Immediate Threat to Safety**

Next, the Court examines the "most important Graham factor": whether Leontae "posed an immediate threat to the safety of the officers or others." *C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016). A suspect may pose a threat of serious physical harm "if 'there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm,' or if the suspect threatens the officer or others with a weapon capable of inflicting such harm." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (quoting *Garner*, 471 U.S. at 11).

"[G]eneralized" safety concerns, "standing alone, cannot justify the use of force." *Winterrowd v. Nelson*, 480 F.3d 1181, 1185 (9th Cir. 2007). "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citation and quotation omitted). But the Fourth Amendment does not require a

police officer to be "omniscien[t], and absolute certainty of harm need not precede [an officer's] act of self-protection." *Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010) (citation and internal question mark omitted). The inquiry is not what an officer perceived; in other words, the objective reasonableness of Defendants' response is not dependent upon their subjective perceptions. *Nehad*, 929 F.3d at 1133 & n.5 (citing *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011)). "The key question, then, is whether [officers] had an objectively reasonable basis for believing that [a suspect] posed a threat of serious physical harm, either to [officers] or to others." *Orn*, 949 F.3d at 1174 (citing *Ryburn v. Huff*, 565 U.S. 469, 474 (2012) (per curiam)).

"[T]he mere fact alone 'that the suspect was armed with a deadly weapon does not render the officers' response per se reasonable under the Fourth Amendment.'" *Napouk v. Las Vegas Metropolitan Police Dep't*, 123 F.4th 906, 915 (9th Cir. 2024) (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)); *see also Calonge v. City of San Jose*, 104 F.4th 39, 46 (9th Cir. 2024) (holding that the decedent's "mere possession of a gun did not justify the use of deadly force"). "[W]hen a suspect points a gun in an officer's direction, 'the Constitution undoubtedly entitles the officer to respond with deadly force.'" *Est. of Strickland v. Nevada County*, 69 F.4th 614, 620 (9th Cir. 2023) (quoting *George*, 736 F.3d at 838). Thus, it is "well-settled that lethal force is justified if an officer has probable cause to believe that [a] suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* (citation omitted). And "[w]hen a suspect 'is armed—or reasonably suspected of being armed,' even 'a furtive movement' can 'create an immediate threat' sufficient to justify the use of deadly force." *Sabbe*, 84 F.4th at 828 (quoting *George*, 736 F.3d at 838). Nevertheless, "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" *Scott*, 550 U.S. at 382. And the Court cannot "'simply accept what may be a self-serving account by the police officer.'" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). "Because the person most likely to rebut the officers' version of events—the one killed—can't testify," the

Court "'must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Id.* (quoting *Henrich*, 39 F.3d at 915). This includes "'circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" *Id.* (quoting *Henrich*, 39 F.3d at 915).

"'Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of an immediate threat, and in those situations courts will not hold that they have violated the Constitution.'" *Napouk*, 123 F.4th at 915 (quoting *Est. of Strickland*, 69 F.4th at 621). "'When an officer's use of force is based on a mistake of fact,'" the Court asks "'whether a reasonable officer would have or *should* have accurately perceived that fact.'" *Id.* at 915-16 (quoting *Est. of Strickland*, 69 F.4th at 621). "Whether the mistake was an honest one is not the concern, only whether it was a reasonable one." *Nehad*, 929 F.3d at 1133 (citation modified) (quoting *Torres*, 648 F.3d at 1127).

Defendants contend that Leontae posed an immediate threat to the officers and bystanders, and they reasonably believed Leontae was armed when they shot him. (Doc. 109 at 7.) Defendants assert that all three shooting officers "responded to dispatch's report of an active shooter, saw a gun in Leontae's outstretched arm, and witnessed [Leontae] flee between two vehicles while armed." (*Id.* at 9-10.) Defendants maintain that "[t]he fact that Leontae discarded his weapon outside of Defendants Roy, Garza, and Ladines's view and never fired his weapon [is] immaterial to whether the officers' use of deadly force was reasonable." (*Id.* at 10.) Defendants argue that the Court "need not entertain [the] factual fiction" that Defendants "did not actually see a firearm in [Leontae's] hand" because Officer Ramirez "observed the gun and contemporaneous video footage from the parking lot depicts [Leontae] wa[]ving a gun around." (*Id.*)

In response, Plaintiffs assert that the "central factual dispute" is "whether [Leontae] posed an immediate threat at the moment Roy, Ladines, and Garza deployed deadly force." (Doc. 121 at 7.) Plaintiffs contend that Leontae was "in a surrendering posture when shot" because he was "seated or crouching, sliding backwards on his buttocks with his hands visible *up in the air*." (*Id.*) (emphasis in original). Plaintiffs assert that Leontae was not

advancing toward officers or pointing a weapon; rather, he was retreating and surrendering. (*Id.* at 7-8.) Plaintiffs also contend it is undisputed that Leontae discarded his firearm before Roy and Garza fired. (*Id.*)

In their Reply, Defendants argue that the "relevant fact" is that Leontae discarded his firearm outside of Defendants Ladines, Garza, and Roy's view, and "the legal issue is whether it was reasonable for Defendants Roy and Garza to believe that [Leontae] was still armed and dangerous when they decided to deploy lethal force." (Doc. 132 at 3.) Defendants assert that Plaintiffs "have introduced no evidence to establish that Defendants Roy and Garza were actually aware that [Leontae] discarded his firearm, nor can they based on their own admissions." (*Id.*)

As Plaintiffs point out, it is undisputed that Leontae never fired his weapon and that he was unarmed when Defendants Garza and Roy shot him. But the second *Graham* factor examines what officers reasonably perceived at the time they employed deadly force. *See Orn*, 949 F.3d at 1174. Defendants Ladines, Garza, and Roy each reported that when they arrived at the scene, they saw Leontae with a firearm in his hand. Defendants Garza and Roy reported that when they shot Leontae, he had run between two parked vehicles and emerged crouched down and sliding backward on his backside. From Defendants' perspective, a reasonable officer could have concluded that Leontae was still armed when he emerged from between the parked cars.

Plaintiffs maintain that "Defendants' entire justification for the use of lethal force rests on the officers' response to an 'active shooter' call," but "the record establishes that this designation was based on an unverified perception, not confirmed fact." (Doc. 121 at 8.) Plaintiffs argue that "[a] reasonable jury could conclude that the erroneous 'active shooter' label was the product of reckless miscommunication from the helicopter unit, and that the officers on the ground acted on unreliable information without taking any steps to verify the threat before deploying lethal force." (*Id.*) Plaintiffs contend that a jury could find that Defendants Ladines, Garza, and Roy knew or should have known the "active

shooter" designation was erroneous and was "the product of reckless miscommunication from the helicopter unit." (*Id.*)

Plaintiffs' assertion relies on evidence that was not known to the dispatcher or Defendants at the time of the shooting. Officer Ramirez relayed to the dispatcher, that the suspect "came out the store" and "it look[ed] like [he was] pointing a gun." Officer Ramirez relayed that the suspect was "pointing a gun running . . . right in front of the store." Officer Ramirez then relayed, "All right, he's shooting at people in the front of the store." The dispatcher then relayed that there was an "active shooter."

"[L]aw enforcement officers are generally entitled to rely on information obtained from fellow law enforcement officers." *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) (en banc), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc). Although "[a]ll officers . . . have an ongoing duty to make appropriate inquiries regarding the facts received or to further investigate if sufficient details are relayed," *id.*, "[w]here an officer has an objectively reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be held liable if the information supplied by other officers turns out to be erroneous," *id.* at 1082. "The lynchpin is whether the officer's reliance on the information was objectively reasonable." *Id.*

Defendants Ladines, Garza, and Roy were not at the scene when they received the dispatcher's report and had no reason to doubt the veracity of the report. In those circumstances, it was reasonable for Defendants to rely on the dispatcher's report that there was an "active shooter." From the perspective of Defendants, a reasonable officer could have concluded that the subject of the call was armed and actively shooting and therefore posed an immediate threat to safety. Furthermore, Defendants each reported that when they arrived at the scene, they saw Leontae with a firearm in his hand. Defendants Ladines, Garza, and Roy therefore had probable cause to believe that at the time of the shooting, Leontae posed "a significant threat of death or serious physical injury to the officer or others." *Est. of Strickland*, 69 F.4th at 620.

On this record, a reasonable officer in the circumstances could conclude that Leontae posed an immediate threat of serious physical harm.

**(3) Resisting or Attempting Escape**

The Ninth Circuit has "long distinguished between passive and active resistance." *Rice*, 989 F.3d at 1123. Resistance "should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830. "[T]he level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.* "[P]urely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.* A "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012).

Defendants assert that Defendants Roy, Garza, and Ladines reasonably believed Leontae was either resisting or evading arrest. (Doc. 109 at 10.) Defendants contend that when Defendant Ladines fired four shots, Leontae "had neither surrendered nor dropped his weapon," and he "then fled between two vehicles and was outside of Defendants Roy and Garza's view." (*Id.*) Defendants argue that it was "reasonable for Defendants to believe that [Leontae], who was armed, pointing/wa[]ving his weapon in a public parking lot and could have still been armed, was attempting to resist arrest and/or flee, at a minimum." (*Id.* at 11.) In response, Plaintiffs assert that Leontae "was essentially surrounded by officers on three sides and up against a building" and was not a flight risk, and "[o]fficers had access to ample cover." (Doc. 121 at 9.)

It is undisputed that Leontae did not surrender to the officers when they arrived on the scene, and when Defendant Ladines fired her service weapon, Leontae ran between two parked vehicles. A reasonable officer in the circumstances could conclude that Leontae

was attempting to evade arrest rather than surrender. The third *Graham* factor weighs in favor of Defendants.

**c. Other Factors**

As noted, the Ninth Circuit has identified other factors that courts should consider in determining whether the force used was reasonable, including whether the suspect was given proper warnings before deadly force was used, and whether officers identified themselves as law enforcement officers. *Sabbe*, 84 F.4th at 822; *Nehad*, 929 F.3d at 1138. The Ninth Circuit has recognized that an officer generally "must give a warning before using deadly force 'whenever practicable,'" *Gonzalez*, 747 F.3d at 794, and "[t]he officers' failure to warn or provide direction" before using deadly force "weighs against them," *Sabbe*, 84 F.4th at 825. Although a Fourth Amendment violation "cannot be established based merely on bad tactics that result in a deadly confrontation that could have been avoided, the events leading up to the shooting, including the officers['] tactics, are encompassed in the facts and circumstances for the reasonableness analysis." *Vos*, 892 F.3d at 1034 (internal quotation marks and citations omitted).

Plaintiffs assert that no warnings were given to Leontae before deadly force was used, and "not a single shooting officer announced their presence as police or gave [Leontae] any opportunity to comply." (Doc. 121 at 8-9.) Defendants maintain that warnings were not feasible in the circumstances. (Doc. 132 at 5-6.)

It is undisputed that Leontae was not given any warnings before force was used and that the officers did not identify themselves as law enforcement. But warnings are not necessarily constitutionally required. *See Smith v. Agdeppa*, 81 F.4th 994, 1006 (9th Cir. 2023). The Ninth Circuit has emphasized that its "very framing of the 'warning' principle itself presupposes that it is not a one-size-fits-all proposition that applies in every case or context." *Id.* Rather, the Ninth Circuit has "stated only that the rule applies '[i]n general,' 'whenever practicable.'" *Id.* (quoting *Gonzalez*, 747 F.3d at 794). In addition, "[t]he absence of a warning does not necessarily mean that [an officer's] use of deadly force was unreasonable." *Gonzalez*, 747 F.3d at 797. "The flexibility built into [the] 'warning' rule

makes it more difficult for that rule, standing alone, to clearly establish a constitutional violation in any given case." *Smith*, 81 F.4th at 1006. Thus, the "general warning principle . . . does not, on its own, invariably indicate when a warning is required." *Id.* at 1007.

Given the rapidity at which the events unfolded, a reasonable jury could conclude that warnings were not "feasible" or "practicable." As noted, less than 30 seconds elapsed from when Defendant Ladines arrived on the scene and when the last shot was fired.

**d. Totality of the Circumstances**

Finally, the Court must balance the force used against the need for such force to determine whether the force used was "greater than reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)). "Underlying *Graham*'s objective-reasonableness test is the clear principle that the force used to make an arrest 'must be balanced against the need for force: it is the *need* for force which is at the heart of the *Graham* factors.'" *Blankenhorn*, 485 F.3d at 480 (quoting *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)). "Determining whether the force used to effect a particular seizure is 'reasonable'" requires balancing of the individual's Fourth Amendment interests against the relevant government interests." *Mendez*, 581 U.S. at 427 (citation omitted). "The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" *Id.* at 427-28 (quoting *Garner*, 471 U.S. at 8-9). The reasonableness inquiry "is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." *Id.* at 428.

"In this case, it is undisputed that the officers were placed in a high-stress, rapidly developing situation" involving a person who was armed and reportedly actively shooting in a strip mall parking lot. *See Smith*, 81 F.4th at 1004; *see also Ames v. King County*, 846 F.3d 340, 349 (9th Cir. 2017) (explaining that courts should "focus [their] inquiry . . . on the serious—indeed, life-threatening—situation that was unfolding at the time").

Considering the totality of the circumstances, the force used was objectively reasonable. But even if the Court found a Fourth Amendment violation, as discussed below, Defendants Ladines, Garza, and Roy are entitled to qualified immunity.

**3. Qualified Immunity**

**a. Legal Standard**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Stanton v. Sims*, 571 U.S. 3, 4-5 (2013) (per curiam) (quoting *Pearson*, 555 U.S. at 231). The doctrine is designed to balance "two important, competing interests: the need to hold public officials accountable for irresponsible actions, and the need to shield them from liability when they make reasonable mistakes." *Morales v. Fry*, 873 F.3d 817, 822 (9th Cir. 2017).

In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson*, 555 U.S. at 230-32, 235-36 (courts may address either prong first depending on the circumstances in the particular case). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This standard "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743. The qualified immunity analysis "is limited to the facts that were knowable to the defendant officers at the time they engaged in the conduct in question." *Spencer v. Pew*, 117 F.4th 1130, 1139 (9th Cir. 2024) (quoting *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017)) (internal quotation marks omitted). The Court must "view the facts as an officer would have encountered them [at the time of the arrest], not as an ex post facto critic dissecting every potential variance under a magnifying glass." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1157 (9th Cir. 2020).

"The plaintiff bears the burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful." *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018); *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) ("Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies in *this* case that *their particular conduct* was unlawful.") (emphasis in original). "There is no analogous burden on § 1983 defendants to find factually on-point cases clearly establishing the lawfulness of an officer's actions. Nor must § 1983 defendants come forward with precedent showing that the unlawfulness of their conduct was not clearly established." *Hopson v. Alexander*, 71 F.4th 692, 708 (9th Cir. 2023).

Although "a case directly on point" is not required "for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate," and must "squarely govern[ ] the specific facts at issue." *Kisela*, 584 U.S. at 104 (internal quotation marks and citations omitted). The prior precedent must be "controlling"—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a "consensus" of courts outside the relevant jurisdiction. *Sharp*, 871 F.3d at 911.

"[C]learly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). An officer cannot "have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela*, 584 U.S. at 105 (citation omitted). "Cases cast at a high level of generality are unlikely to establish rights with the requisite specificity." *Waid*, 87 F.4th at 388 (internal quotation marks and omitted). "While a case addressing general principles may clearly establish a right in an obvious case, such obvious cases are rare." *Id.* (citations and quotation marks omitted). "Plaintiff[] must either explain why [his] case is obvious under existing general principles or, more commonly, show specific cases that control or reflect a consensus of non-binding authorities in similar

situations." *Id.* (citing *Hopson*, 71 F.4th at 697). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* at 387 (citation modified) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

**b. Parties' Arguments**

**(1) Defendants' Motion**

In their Motion for Summary Judgment, Defendants do not discuss the right at issue. Rather, they argue that on November 2, 2022, it was "well established in the Ninth Circuit that officers need not wait for a suspect to fire his or her weapon before responding with deadly force to neutralize a threat." (Doc. 109 at 12.) Defendants contend that "an officer who fired his weapon because he reasonably, but mistakenly, believed that a suspect was exchanging gunfire with another officer is entitled to qualified immunity," and "case law from across the country plainly recognizes that an officer who deploys deadly force to neutralize a perceived threat armed with a gun acts reasonably, even if the officer was mistaken about whether the suspect was still armed or whether the suspect fired a weapon." (*Id.* at 13.) Defendants also assert that qualified immunity "is viewed through two legal lenses depending on the circumstances surrounding the use of deadly force: (1) the 'deliberate indifference' test; or (2) the "purpose-to-harm" test.'" (*Id.*) Citing a recent Arizona Court of Appeals decision, *Johnson v. Arizona*, No. 1 CA-CV- 25-0271, 2026 WL 218669 (Ariz Ct. App. Jan. 28, 2026), Defendants maintain that under the "deliberate indifference" test "an officer loses the shield of qualified immunity if he acts with deliberate indifference to another's rights by disregarding 'a known or obvious consequence of his action.'" (*Id.*) Defendants argue that under the "purpose-to-harm" test, "an officer loses the qualified immunity shield if he 'acted with a purpose to harm the decedent for reasons unrelated to legitimate law enforcement objectives.'" (*Id.*)

Defendants argue that in this case, the "purpose to harm" test applies because the November 2, 2022, incident "rapidly evolved over approximately 20 seconds." (*Id.* at 14.)

Defendants assert that "[u]nder this standard, Plaintiffs must demonstrate that Roy, Garza, and Ladines['s] actions were not related to a legitimate law enforcement objective." (*Id.*) Defendants contend that "[w]hen officers are told there is an active shooter and witness a suspect waving a gun around in public, they should not be required to stop and worry that they will not be afforded immunity." (*Id.* at 14-15.)

**(2) Plaintiffs' Response**

In their Response, Plaintiffs contend that by November 2022, "it was clearly established in the Ninth Circuit that: (1) officers may not use deadly force against an individual who does not pose an immediate threat, (2) officers should give a warning before using deadly force when feasible, and (3) the use of deadly force against a suspect who has discarded his weapon and is in a defensive posture is unreasonable." (Doc. 121 at 10-11.) Plaintiffs cite *Garner*, *Deorle*, and *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), respectively, as the relevant clearly established law. (*Id.* at 10-11.)

Plaintiffs assert that Defendants' cases are distinguishable because they "involved truly split-second decisions where officers had no time to assess the threat," whereas here, "viewing the facts in the light most favorable to Plaintiffs, the officers had time and opportunity to observe [Leontae's] movements, assess his position, and determine whether he was actually armed, and they failed to do any of this." (*Id.* at 11.) Plaintiffs also argue that Defendants' cases do not address the officers' failure to announce their presence or give any warnings. (*Id.*)

Plaintiffs further maintain that the "purpose to harm" standard does not apply, but even if it did, the record supports an inference that the officers acted with deliberate indifference to Leontae's rights. (*Id.* at 12.)

**c. Discussion**

"The dispositive question is 'whether the violative nature of [the officers'] particular conduct [was] clearly established'" on November 2, 2022. *Isayeva*, 872 F.3d at 947. The Court "must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (citing *Brosseau*

*v. Haugen*, 543 U.S. 194, 195, 189 (2004)) (per curiam).

First, Defendants' reliance on *Johnson* is misplaced. *Johnson* involved a Fourteenth Amendment due process claim for loss of companionship, not a Fourth Amendment excessive force claim, and the "purpose to harm" and "deliberate indifference" tests the court described were specific to whether the defendants were entitled to qualified immunity with respect to the loss of companionship claim. 2026 WL 218669, at *3. The *Johnson* court's discussion of qualified immunity with respect to a Fourteenth Amendment claim has no relevance to whether Defendants are entitled to qualified immunity as to Plaintiffs' Fourth Amendment excessive force claim.

As noted, Plaintiffs cite *Garner*, *Deorle*, and *Glenn* as relevant clearly established law. The Ninth Circuit has recognized that although the standards in *Garner* "are cast at a high level of generality," and ordinarily do not clearly establish rights, in an "obvious case," *Garner*'s general test can "'clearly establish' the answer, even without a body of relevant case law.'" *Isayeva*, 872 F.3d at 951 (quoting *Brosseau*, 543 U.S. at 199). "[I]t is the facts of particular cases that clearly establish what the law is." *Id.* (citing *White*, 580 U.S. at 79).

In *Garner*, the Supreme Court held that it was unreasonable to kill a "young, slight, and unarmed" burglary suspect by shooting him "in the back of the head" while he was running away on foot, and when the officer "could not reasonably have believed that [the suspect] . . . posed any threat," and "never attempted to justify his actions on any basis other than the need to prevent an escape." 471 U.S. at 4, 21. The Supreme Court recognized the general principle that it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead." *Id.* at 11. But since *Garner*, the Supreme Court has observed that "[w]hatever *Garner* said about the factors that might have justified shooting the suspect in that case, such 'preconditions' have scant applicability" in cases that have "vastly different facts." *Scott*, 550 U.S. at 383. "[I]n the end," the Court "must still slosh [its] way through the factbound morass of 'reasonableness.'" *Id.*

In *Deorle*, deputies responded to the home of a mentally disturbed person, Deorle,

who was acting erratically and threatening suicide. 272 F.3d at 1278. Deorle was walking on his own property carrying a bottle or can when, without warning, an officer shot him with a "less lethal" lead-filled, cloth-cased projectile akin to a rubber bullet. *Id.* at 1278-1281. The projectile struck Deorle in the face, lodged in his skull, and caused several cranium fractures and the loss of his left eye. *Id.* at 1281. Under these circumstances, the Ninth Circuit held that "[s]hooting a person who is making a disturbance because he walks in the direction of an officer at a steady gait with a can or bottle in his hand is clearly not objectively reasonable." *Id.* at 1284. The Ninth Circuit stated that the absence of a warning influenced its finding, but it clarified that it "d[id] not hold . . . that warnings are required whenever less than deadly force is employed." *Id.* Instead, it stated, "such warnings should be given, when feasible, if the use of force may result in serious injury, and [] the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Id.* *Deorle* does not "squarely govern" this case because deadly force was not used, and in this case, Leontae was armed with a gun, not a bottle or can. *See Kisela*, 584 U.S. at 104. He was also not mentally disturbed, unlike Deorle.

In *Glenn*, an intoxicated teenager held a pocketknife to his neck and threatened to kill himself. 673 F.3d at 876. Officers were dispatched to the teenager's home when his mother called 911 and reported that he had threatened to kill himself if the police came. *Id.* An officer arrived with a beanbag shotgun and a taser and was immediately ordered to "beanbag him." *Id.* at 869. The officer yelled "beanbag, beanbag" and opened fire on the teenager. *Id.* The teenager took one or two steps, and two officers fired their semiautomatic weapons at him, killing him. *Id.* The Ninth Circuit observed that although other officers had given warnings, they were given before another officer arrived with the beanbag shotgun and it appeared that the only warning given immediately before the beanbag shotgun was fired was when the officer yelled "beanbag, beanbag." *Id.* The Ninth Circuit reasoned that the teenager possibly "did not know what this statement meant, or perhaps even what a beanbag shotgun was." *Id.* *Glenn* is not helpful to the qualified immunity analysis because in this case, it is undisputed that no warnings were given before

the officers shot Leontae. Moreover, the decedent in *Glenn* was only armed with a pocketknife. Plaintiffs have not identified "a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation 'under similar circumstances.'" *Wesby*, 583 U.S. at 582 (quoting *White*, 580 U.S. at 79).

Undertaking its own analysis, the Court concludes Defendants Ladines, Garza, and Roy are entitled to qualified immunity. "Liability requires at least enough individual involvement from each defendant to put him on notice that his conduct might reasonably lead to a constitutional violation." *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022). "[L]iability may not be imposed based on a team effort theory that would allow[ ] the jury to lump all the defendants together, rather than require it to base each individual's liability on his own conduct." *Id.* (internal quotation marks and citation omitted). Accordingly, the Court has undertaken an individualized assessment as to whether each of the remaining Defendants, Ladines, Garza, and Roy, are entitled to qualified immunity. *Gonzalez v. City of Phoenix*, 163 F.4th 1289, 1305 (9th Cir. 2026) (Bumatay, J., concurring in the judgment in part and dissenting in part).

In the Ninth Circuit, "the relevant question for purposes of qualified immunity" is not whether a suspect actually threatened the officers, but whether the officers "could reasonably have believed that [he] posed such a threat." *Sabbe*, 84 F.4th at 827-28 (quoting *A.K.H.*, 837 F.3d at 1011). "Thus, what matters is what reasonable officers in [Defendants'] positions would have, or should have, perceived." *Id.*

In *Long v. City and County of Honolulu*, 511 F.3d 901 (9th Cir. 2007), the Ninth Circuit held that an officer's conduct met the objective reasonableness standard where, before taking the fatal shot, the officer had observed the suspect's "agitated behavior, heard him threaten to shoot the police, observed him carrying a .22 caliber rifle, and knew that he had previously shot at a car full of people and wounded two people in the car earlier that night." *Id.* at 906. The Ninth Circuit reasoned that "[u]nder these circumstances, when fellow officers radioed that [the suspect] was yelling threats at them and then radioed that [the suspect] was shooting at them," the officer "had probable cause to believe that [the

suspect] posed an immediate danger to these officers." *Id.* The Ninth Circuit concluded that "[i]n the exigent circumstances of the night," the officer "acted in an objectively reasonable manner." *Id.* The Ninth Circuit acknowledged that it "must be wary of self-serving accounts by police officers when the only non-police eyewitness is dead" but noted that in the case before it, the court had "the benefit of multiple eye witnesses and a [dispatch] report that fairly accurately recorded the SWAT team's activities on the night of Long's death." *Id.* The Ninth Circuit explained that the plaintiff's claims of factual error in the police accounts did not change its analysis because, "[f]rom the perspective of a reasonable officer" in the officer's position, whether the suspect "actually fired his rifle at these officers" was "immaterial." *Id.*

This case is like *Long* in almost every relevant respect. As discussed above, under the circumstances, Defendants had probable cause to believe that Leontae posed an immediate danger to the officers and bystanders. Defendants' accounts are internally consistent with one another and are not contradicted by the video evidence. From the perspective of a reasonable officer, whether Leontae had discarded his firearm before Defendants Garza and Roy shot him is "immaterial." Less than 30 seconds elapsed from when Defendant Ladines arrived at the scene and the last shot was fired. As the Ninth Circuit has emphasized, its precedent "embod[ies] allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Sabbe*, 84 F.4th at 829 (quoting *Graham*, 490 U.S. at 396-97).

Furthermore, each Defendant engaged in the same conduct: shooting a suspect whom they knew had been armed with a gun seconds earlier, whom they had been told was an "active shooter," and whom they reasonably believed was still armed. For purposes of qualified immunity, there is no meaningful distinction between Defendants Ladines, Garza, and Roy's conduct. *Cf. Gonzalez*, 163 F.4th at 1305 (Bumatay, J.) (analyzing qualified immunity of officers who merely drove a car a short distance with an improperly restrained suspect separately from officers who placed the suspect in a RIPP restraint, carried him to

the backseat of a police vehicle, and placed him face-down over a hard plastic console with his hands cuffed and his legs curled up).

In these circumstances, Defendants Ladines, Garza, and Roy are entitled to qualified immunity.

**4. Conclusion as to Count II**

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to Count II.

**B. *Monell* Claim**

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690, 694 (1978); *see also Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) ("A municipality may not be sued under § 1983 solely because an injury was inflicted by one of its employees or agents."). To prevail on a *Monell* claim, a plaintiff must show "that the government 'had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation.'" *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) (quoting *Galen v. County of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007)). The plaintiff must also demonstrate that the municipality acted with "deliberate indifference" to his constitutional rights. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc).

The Court has determined that Defendants did not violate Leontae's Fourth Amendment rights. Because there was no underlying constitutional violation, the City of Phoenix cannot be held liable under *Monell*. *See Simmons v. Navajo County*, 609 F.3d 1011, 1021 (9th Cir. 2010) ("Because we hold that there was no underlying constitutional violation, the [plaintiffs] cannot maintain a claim for municipal liability."), *overruled on other grounds by Castro*, 833 F.3d 1060. The Court will grant Defendants' Motion for

Summary Judgment as to Count III.[5]

## VI. State-Law Claims

### A. Gross Negligence

Defendants argue that Plaintiffs' gross negligence claim fails because Arizona "does not recognize a negligent use of intentionally inflicted force theory." (Doc. 109 at 19.) In response, Plaintiffs contend their gross negligence claim "is not limited to the use of force itself – it encompasses the gross negligence of the City and Sullivan in failing to adequately train, supervise, and discipline officers" and "the Officers' failure to provide medical care and . . . to assess the scene prior to utilizing force." (Doc. 122 at 17.)

#### 1. Legal Standards

The Arizona Supreme Court has acknowledged that "defining 'negligence' and 'gross negligence' is, at best, inexact." *Garibay v. Johnson in and for County of Pima*, 565 P.3d 236, 246 (Ariz. 2025) (citation omitted). To establish a negligence claim, the plaintiff must show that the defendant owed a duty that he or she breached, a causal connection between the breach and the resulting injury, and damages. *See Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). "A party is grossly negligent if they know, or have reason to know, facts that would lead a reasonable person to recognize their conduct created an unreasonable risk of bodily harm and involved a high probability of substantial harm." *Garibay*, 565 P.3d at 246 (citing *Noriega v. Town of Miami*, 407 P.3d 92, 100 (Ariz. Ct. App. 2017)). "Gross negligence does not encompass intentional malfeasance"; "[g]ross negligence embodies extreme carelessness, but it falls short of the deliberate wrongdoing required for 'misconduct.'" *Id.*; *see also Badia v. City of Casa Grande*, 988 P.2d 134, 141 (Ariz. Ct. App. 1999) (to establish gross negligence, the plaintiff "essentially must show wanton misconduct that is flagrant and evinces a lawless and destructive spirit"). A negligence claim cannot be based on a law enforcement officer's intentional acts, such as such as the intentional shooting of a suspect. *Ryan v. Napier*, 425 P.3d 230, 236-37 (Ariz.

---

[5] Because the Court will grant summary judgment as to Plaintiffs' § 1983 claims, the Court need not address the parties' arguments regarding punitive damages.

2018). In *Ryan*, the Arizona Supreme Court held that "negligence and intent are mutually exclusive grounds for liability," and a plaintiff "cannot assert a negligence claim based solely on an officer's intentional use of physical force." *Id.* at 236.

**2. Shooting**

Defendants Ladines, Garza, and Roy cannot be liable for gross negligence where they intentionally shot Leontae. Accordingly, Defendants City of Phoenix and Sullivan cannot be held vicariously liable for gross negligence with respect to Leontae's shooting. *See Laurence v. Salt River Project Agric. Improvement & Power Dist.*, 528 P.3d 139, 150 (Ariz. 2023) ("Dismissing a tort claim against an employee because the claim lacks merit requires the court to also dismiss a claim against an employer under the doctrine of respondeat superior.").

**3. Pre-Shooting Conduct**

Plaintiffs also refer to Defendants' "pre-shooting conduct" in failing to assess the scene before using force. The Arizona Court of Appeals has rejected attempts to reframe intentional shooting claims as negligence claims based on "pre-shooting conduct." In *Weber v. City of Kingman*, No. 1 CA-CV 21-0063, 2022 WL 1468246 (Ariz. Ct. App. May 10, 2022), the plaintiff asserted a wrongful death claim based on negligence, alleging that the officer's "pre-shooting conduct, separate and apart from the intentional act of shooting, gave rise to distinct negligence claims that contributed" to her husband's death. *Id.* at *1. The Arizona Court of Appeals held that because "the basis for damages arose from [the officer's] intentional decision to shoot," the plaintiff's challenge to the officer's purportedly "negligent acts and omissions . . . amount to questioning" the officer's "pre-tactical shooting decisions." *Id.* at *2. And in *Ryan*, the Arizona Supreme Court recognized that "[n]o semantic recasting of events" can "alter the fact that the shooting was the immediate cause of [suspect's] death." *Ryan*, 425 P.3d at 237 (quoting *Britton v. City of Crawford*, 803 N.W.2d 508, 518 (Neb. 2011)) (alteration in original).

**4. Medical Aid**

Finally, the need for medical aid only arose because of the intentional shooting;

Plaintiffs would not have a viable gross negligence if the shooting had not occurred. *Cf. id.* at 233 (recognizing that plaintiffs may "base a negligence claim on conduct by [an] officer that is independent of the intentional use of physical force"). In other words, whatever conduct Defendants Ladines, Garza, and Roy engaged in is inextricably linked with the intentional shooting and cannot support a gross negligence claim.

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to Count V.

**B. Negligent Hiring, Retention, or Supervision**

For an employer to be held liable for negligent hiring, retention or supervision, the employee must have committed a tort. *Mulhern v. City of Scottsdale*, 165 Ariz. 395, 398 (Ariz. Ct. App. 1990). "If the theory of the employee's underlying tort fails, an employer cannot be negligent as a matter of law for hiring or retaining the employee." *Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004).

The Court has determined that there are no genuine disputes of material fact regarding whether Defendants Ladines, Garza, and Roy committed gross negligence. Because the underlying tort against Ladines, Garza, and Roy fails, Defendant City of Phoenix and Sullivan cannot be vicariously liable for their conduct.

The Court will grant Defendants' Motion for Summary Judgment as to Count VI.

**C. Wrongful Death**

In Arizona, "[w]hen death of a person is caused by wrongful act, neglect or default, . . . the person who . . . would have been liable if death had not ensued shall be liable to an action for damages." Ariz. Rev. Stat. § 12-611. A prerequisite for recovery under § 12-611 is the ability of the decedent to have maintained an action if death had not ensued. *Summerfield v. Super. Ct. in and for Maricopa Cnty.*, 698 P.2d 712, 720 (Ariz. 1985). A wrongful death claim is not a continuation of the decedent's claim; instead, it compensates statutory beneficiaries for their injuries. *Barragan v. Super. Ct. of Pima Cnty.*, 470 P.2d 722, 724 (Ariz. 1970).

"Generally, a plaintiff may bring a wrongful death claim as an 'independent claim

for damages sustained by the decedent's survivors.'" *McKee v. State*, 388 P.3d 14, 17-18 (Ariz. Ct. App. 2016) (quoting *Diaz v. Magma Copper Co.*, 950 P.2d 1165 (Ariz. Ct. App. 1997)). "However, the right to bring a wrongful death action exists only if the decedent would have been able to maintain an action for damages if death had not ensued." *Id.* at 18. The wrongful death statute does not provide an independent theory of liability; a wrongful death claim therefore must rest on an underlying tort theory.

Arizona's survival statute provides that "[e]very cause of action," with certain exceptions that do not apply here, "shall survive the death of the person entitled thereto or liable therefor . . . provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed." Ariz. Rev. Stat. § 14-3110. A survival statute claim provides for recovery of damages sustained by the decedent from the time of injury until his death and passes from the decedent to the personal representative, becoming an asset of the estate. *See Barragan*, 470 P.2d at 724.

The Court has determined that there are no genuine disputes of material fact as to Plaintiffs' § 1983 claims or their state-law claims. Accordingly, Plaintiffs' wrongful death and survival claims fail as a matter of law. The Court will grant Defendants' Motion for Summary Judgment as to Count I.

**IT IS ORDERED:**

(1) The July 16, 2025 Order (Doc. 93) is **amended as follows:**

(3) Count IV is **dismissed without prejudice**. Defendants Howard, Ramirez, and Ravelo are **dismissed without prejudice**.

(2) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 109).

. . . .

. . . .

. . . .

. . . .

. . . .

(3) Defendants' Motion for Summary Judgment (Doc. 109) is **granted**, and this matter is terminated with prejudice. The Clerk of Court must enter judgment accordingly and close this case.

Dated this 14th day of September, 2026.

Michael T. Liburdi
United States District Judge