**WO** JL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kashane Kirk,<br>Plaintiff,<br>v.<br>City of Phoenix, et al.,<br>Defendants. | No. CV-23-00836-PHX-MTL (CDB)<br><br>**ORDER** |

Pending before the Court is Plaintiffs' Motion to Alter or Amend the Judgment (Doc. 137). The Court will deny the Motion.

**I. Background**

Plaintiffs brought this civil rights action pursuant to 42 U.S.C. § 1983 as personal representative and on behalf of the estate of Leontae Kirk, who was shot and killed by Phoenix Police Department ("PPD") officers. Defendants City of Phoenix, PPD Chief Michael Sullivan, PPD Sergeant Eric Roy, and PPD Officers Antonio Garza and Autumn Ladines moved for summary judgment on the merits of Plaintiffs' § 1983 claims for excessive force and state-law claims for wrongful death, gross negligence, and negligent training. (Doc. 109.) The individual Defendants also moved for summary judgment as to the § 1983 excessive force claim on qualified immunity grounds. (*Id.*) In a September 14, 2026 Order, the Court granted Defendants' Motion for Summary Judgment and dismissed this matter with prejudice. (Doc. 135.)

Plaintiffs filed their Motion to Alter or Amend the Judgment on September 28, 2026.

In an October 5, 2026 Order, the Court gave Defendants 14 days to file a response to the Motion. (Doc. 138.) Subsequently, the Court granted Defendants' Motion for Extension of Time to file a Response and gave them until November 6, 2026 to file their response. (Docs. 139, 140.) On November 6, 2026, Defendants filed a Response to Plaintiffs' Motion. (Doc. 141.)

## II. Governing Standard

The Court has discretion to reconsider and vacate a prior order. *Barber v. Hawaii*, 42 F.3d 1185, 1198 (9th Cir. 1994); *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 396 (9th Cir. 1992). The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence." LRCiv 7.2(g)(1). Any motion for reconsideration must specifically identify the matters that were overlooked or misapprehended by the Court. *Id.* If any new matters are being brought to the Court's attention for the first time, the movant must identify the reasons they were not presented earlier, and any specific modifications being sought in the Court's Order. *Id.* No motion for reconsideration of an Order may repeat any oral or written argument made in support of or in opposition to the motion that resulted in the Order. *Id.* "Absent good cause shown, any motion for reconsideration shall be filed no later than fourteen (14) days after the date of the filing of the Order that is the subject of the motion." LRCiv 7.2(g)(2). Plaintiffs timely filed their Motion 14 days after the Court granted Defendants' Motion for Summary Judgment.

A "timely filed motion for reconsideration under a local rule is a motion to alter or amend a judgment" under Rule 59(e) of the Federal Rules of Civil Procedure. *Schroeder v. McDonald*, 55 F.3d 454, 459 (9th Cir. 1995) (citation omitted). "[A] Rule 59(e) motion is an 'extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources.'" *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (per curiam) (quoting *Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)); *see also McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999) (a Rule 59(e)

motion should not be granted "absent highly unusual circumstances"). The Court enjoys "considerable discretion in granting or denying [a motion to amend or alter a judgment]." *Allstate Ins. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (internal quotation marks and citation omitted).

"Amendment or alteration is appropriate under Rule 59(e) if (1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001) (citing *School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)). A Rule 59(e) motion "'may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009) (quoting *Kona Enters.*, 229 F.3d at 890); *see also 389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999) ("Raising the argument . . . in [a] motion for reconsideration was simply too little, too late."). "Nor is reconsideration to be used to ask the Court to rethink what it has already thought." *See Motorola, Inc. v. J.B. Rodgers Mechanical Contractors*, 215 F.R.D. 581, 582 (D. Ariz. 2003) (quoting *United States v. Rezzonico*, 32 F. Supp. 2d 1112, 1116 (D. Ariz. 1998)).

**III. September 14, 2026 Order**

Plaintiffs' claims arose from the shooting death of Leontae by the individual Defendants on November 2, 2022. In the September 14, 2026 Order, the Court first set forth the undisputed facts regarding the shooting. (Doc. 135 at 3-5.) Next, the Court described the interviews the individual Defendants had with PPD's Professional Standards Bureau shortly after the shooting. (*Id.* at 5-7.) The Court then reviewed the audio and video evidence, particularly the officers' body worn camera footage. (*Id.* at 7-14.) As relevant here, the Court noted the following with respect to the body worn camera footage:

> Defendant Garza's body-worn camera footage shows him stop his vehicle at 16:29:50 and immediately exit the driver's side door holding his service

> weapon. . . . At 16:30:03, Leontae appears from between two vehicles that are parked in front of the cell phone repair store. Leontae is on his backside on the sidewalk in front of the store and appears to have his hands in the air. Leontae does not appear to have anything in his hands. Garza shoots Leontae several times as Leontae covers his head with his hands.
>
> Defendant Roy's body worn camera footage shows him stop his vehicle at 16:29:50 and immediately exit the driver's side door holding his service weapon. . . . At 16:30:00, Leontae is seen in the distance emerging from between two vehicles seated on the ground and then slides backward on the ground toward the storefronts. Roy immediately shoots Leontae and continues shooting for six seconds, firing seventeen shots in all. It is impossible to tell from Roy's body worn camera footage whether Leontae had an arm outstretched or had anything in his hands before Roy shot him.

(*Id.* at 11) (citations to video timestamps omitted).

With respect to Plaintiff's Fourth Amendment excessive force claim, the Court concluded, "Considering the totality of the circumstances, the force used was objectively reasonable." (*Id.* at 26.) The Court first determined that the nature and degree of force used—deadly force—implicated the highest level of Fourth Amendment interests. (*Id.* at 16.) Next, the Court analyzed the *Graham*[1] factors. (*Id.* at 17.) The Court determined that the severity of the crime at issue—aggravated assault—weighed in favor of Defendants. (*Id.* at 17-18.)

The Court then considered, at length, the "most important" *Graham* factor: whether Leontae "posed an immediate threat to the safety of the officers or others." (*Id.* at 18-23) (citation omitted). The Court noted that although it was undisputed that Leontae never fired his weapon and that he was unarmed when Defendants Garza and Roy shot him, the second *Graham* factor examines what officers reasonably perceived at the time they employed deadly force. (*Id.* at 21.) The Court observed that Defendants Ladines, Garza, and Roy each reported that when they arrived at the scene, they saw Leontae with a firearm in his hand, and that Defendants Garza and Roy reported to investigators that when they

---

[1] *Graham v. Connor*, 490 U.S. 386, 395 (1989).

shot Leontae, he had run between two parked vehicles and emerged crouched down and sliding backward on his backside. (*Id.*) The Court determined that from Defendants' perspective, a reasonable officer could have concluded that Leontae was still armed when he emerged from between the parked cars. (*Id.*) In reaching that determination, the Court did not rely on the body worn camera footage.

With respect to the third *Graham* factor, the Court determined that a reasonable officer in the circumstances could conclude that Leontae was attempting to evade arrest rather than surrender, and that this factor weighed in favor of Defendants. (*Id.* at 24.) As the Ninth Circuit instructs, the Court also considered other factors in determining whether the force used was reasonable, including whether the suspect was given proper warnings before deadly force was used, and whether officers identified themselves as law enforcement officers. (*Id.*) The Court observed that it was undisputed that Leontae was not given any warnings before force was used but also noted that "warnings are not necessarily constitutionally required," and ultimately determined that, "[g]iven the rapidity at which the events unfolded, a reasonable jury could conclude that warnings were not "'feasible' or 'practicable.'" (*Id.* at 25.)

Balancing the totality of the circumstances, the Court noted that it was "'undisputed that the officers were placed in a high-stress, rapidly developing situation' involving a person who was armed and reportedly actively shooting in a strip mall parking lot." (*Id.*) (citation omitted). The Court concluded that the force used was objectively reasonable in the circumstances. (*Id.* at 26.)

The Court further concluded that even if it found a Fourth Amendment violation, the individual Defendants were entitled to qualified immunity. (*Id.*) The Court emphasized that Plaintiffs bore the "burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful" and that there is "no analogous burden on § 1983 defendants to find factually on-point cases clearly establishing the lawfulness of an officer's actions." (*Id.* at 27) (citations omitted). The Court observed that in their Motion for Summary Judgment,

Defendants did not discuss the right at issue and relied on precedent involving a Fourteenth Amendment due process claim for loss of companionship, rather than a Fourth Amendment excessive force claim, in their qualified immunity argument. (*Id.* at 27-30.)

The Court then discussed the precedent that Plaintiffs had cited and concluded that none of the cases "squarely govern[ed]" this case. (*Id.* at 30-32.) The Court determined that Plaintiffs had not identified "a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation under similar circumstances." (*Id.* at 32) (internal quotation marks and citations omitted). Although the Court could have ended its qualified immunity analysis there and granted qualified immunity based on Plaintiffs' failure to meet their burden, the Court undertook its own analysis and concluded that the individual Defendants were entitled to qualified immunity. (*Id.*) After noting that "liability may not be imposed based on a team effort theory that would allow[ ] the jury to lump all the defendants together," the Court undertook an individualized assessment as to whether Defendants, Ladines, Garza, and Roy were entitled to qualified immunity. (*Id.*) (citations omitted).

The Court noted that in the Ninth Circuit, "the relevant question for purposes of qualified immunity" is not whether a suspect actually threatened the officers, but whether the officers "could reasonably have believed that [he] posed such a threat." *Id.* (citation omitted). The Court discussed *Long v. City and County of Honolulu*, 511 F.3d 901 (9th Cir. 2007), and described *Long* as like this case "in almost every relevant respect." (*Id.* at 32-33.) The Court reasoned,

> Defendants had probable cause to believe that Leontae posed an immediate danger to the officers and bystanders. *Defendants' accounts are internally consistent with one another and are not contradicted by the video evidence*. From the perspective of a reasonable officer, whether Leontae had discarded his firearm before Defendants Garza and Roy shot him is "immaterial." Less than 30 seconds elapsed from when Defendant Ladines arrived at the scene and the last shot was fired.

(*Id.* at 33) (emphasis added). This was the Court's first and only reference to the body worn camera footage in its analysis of the excessive force claim.

The Court observed that as the Ninth Circuit has emphasized, its precedent "embod[ies] allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (*Id.*) And because the evidence showed that each Defendant "engaged in the same conduct: shooting a suspect whom they knew had been armed with a gun seconds earlier, whom they had been told was an 'active shooter,' and whom they reasonably believed was still armed," the Court reasoned that "for purposes of qualified immunity, there [wa]s no meaningful distinction between Defendants Ladines, Garza, and Roy's conduct." (*Id.*) For the latter proposition, the Court cited Judge Bumatay's partial dissent in *Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) (en banc). (*Id.*) The Court concluded that Defendants Ladines, Garza, and Roy were entitled to qualified immunity. (*Id.* at 34.)

Based on its conclusion that Defendants did not violate Leontae's Fourth Amendment rights, the Court determined that the City of Phoenix could not be held liable under *Monell* and granted Defendants' Motion for Summary Judgment as to the § 1983 claim against the City of Phoenix. (*Id.* at 35.)

The Court also granted Defendants' Motion for Summary Judgment as to Plaintiffs' state-law claims. (*Id.* at 35-39.) As relevant here, the Court granted Defendants' Motion for Summary Judgment as to Plaintiffs' gross negligence claim in Count V. (*Id.* at 35.) Plaintiffs contended that their gross negligence claim was "not limited to the use of force itself" and encompasse[d] . . . the Officers' failure to provide medical care." (*Id.*) (citation omitted). The Court discussed Arizona law regarding gross negligence, particularly as it relates to claims regarding intentional acts, such as the intentional shooting of a suspect. Citing *Ryan v. Napier*, 425 P.3d 230 (Ariz. 2018), the Court observed that the Arizona Supreme Court held that "negligence and intent are mutually exclusive grounds for liability," and a plaintiff "cannot assert a negligence claim based solely on an officer's intentional use of physical force." (*Id.* at 35-36.) With respect to the failure to obtain medical aid for Leontae, the Court reasoned that "the need for medical aid only arose

because of the intentional shooting; Plaintiffs would not have a viable gross negligence claim if the shooting had not occurred." (*Id.* at 36-37.) "In other words," the Court wrote, "whatever conduct Defendants Ladines, Garza, and Roy engaged in is inextricably linked with the intentional shooting and cannot support a gross negligence claim." (*Id.* at 37.)

## IV. Discussion

In their Motion to Alter or Amend Judgment, Plaintiffs identify "five matters the Order overlooked or misapprehended," new authority that was not presented previously, the reason the new authority was not presented earlier, and the "specific modifications sought." (Doc. 137 at 2.) Plaintiffs do not present newly discovered evidence or identify an intervening change in controlling law. Accordingly, the Court construes Plaintiffs' Motion as asserting that the Court committed clear error or that the initial decision was manifestly unjust. A court commits "clear error" when "the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Smith v. Clark County Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013).

### A. Body Camera Footage

Plaintiffs contend that the Court "improperly found that Plaintiffs' account" of the shooting "was contradicted by the video." (*Id.* at 3.) Plaintiffs argue that the Court's conclusion that Defendants' accounts were "internally consistent with one another" and were "not contradicted by the video evidence" and that "each Defendant engaged in the same conduct: shooting a suspect . . . whom they reasonably believed was still armed" "misapprehends the facts and the Order's own findings in two respects." (*Id.* at 3-4.) Plaintiffs assert that Defendant Garza's account "is contradicted by the video as the Court described it," since Garza "told investigators that he fired because he believed [Leontae] 'intended to continue to flee.'" (*Id.* at 4.) Plaintiffs note that Garza told investigators that he could not see Leontae's hands, and the Court found that Garza's body worn camera footage "shows a seated man with his hands in the air and nothing in them, covering his head as the rounds struck him." (*Id.*) Plaintiffs contend that "a reasonable jury viewing that footage could find that [Leontae] posed no immediate threat when Garza fired," which

is a genuine dispute of material fact, and it is "dispositive of Garza's motion." (*Id.*)

Plaintiffs maintain that the Court's finding that Defendant Roy's footage makes it "impossible to tell" whether Leontae "had anything in his hands is a finding of ambiguity," and under Rule 56 and the Court's "statement of the standard, ambiguity in the video is resolved for the nonmovant." (*Id.*) Plaintiffs argue that the Court "instead resolved it for Roy, crediting his report that [Leontae] 'emerged crouched down and sliding backward" and "treating that posture as a basis for a reasonable belief that [Leontae] was armed." (*Id.*) Plaintiffs contend that Roy "testified that he did not see a gun when he fired and that his belief rested on 'positioning' and 'body language' alone." (*Id.* at 4-5.)

Plaintiffs further assert that the Court "overlooked evidence that bears directly on whether the officers' accounts are 'consistent with other known facts,'" specifically, that Officer Ravelo arrived in the same vehicle as Defendant Ladines and that Ravelo testified that she never saw Leontae with a gun and did not fire for that reason. (*Id.* at 5.) Plaintiffs argue that the Court cited but did not apply the rule that "where the officers' account is contradicted by circumstantial evidence, a jury may disbelieve it." (*Id.*)

Plaintiffs' first contention—that the Court "improperly found that Plaintiffs' account" of the shooting "was contradicted by the video"—is demonstrably untrue. As noted, the Court made a single reference to the body worn camera footage in its discussion of the excessive force claim. For good reason; the relevant legal standard, as recounted by the Court requires a court to "consider[] the facts in the light depicted by the video but still draw[] all inferences from the video in the plaintiff's favor." (*Id.* at 15.) "[I]f if a party's asserted facts *clearly differ* from the facts in the video, the Court must consider the facts as depicted by the video." (*Id.*)

Neither party's asserted facts clearly differed from the video footage. The Court observed that it was impossible to tell from Defendant Roy's body worn camera footage whether Leontae had an arm outstretched or had anything in his hands before Roy shot him. But all that demonstrates is that Defendant Roy's account that he believed Leontae was still armed did not *clearly differ* from the video footage. And as discussed at length in

the Order, the threat to safety factor requires the Court to "'carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other *known* facts.'" (*Id.* at 20) (citation omitted). It was not *known* from the body worn camera footage whether Leontae was still armed when Defendants began shooting. That it was impossible to tell whether Leontae had an arm outstretched or had anything in his hands before Roy shot him does not allow an inference that Leontae did not have an arm outstretched or did not have anything in his hands; that portion of the video could equally support and contradict each party's version of events, and the Court therefore did not accept either interpretation of the video as true.

With respect to Officer Ravelo's testimony, her account that she did not see Leontae with a gun and did not shoot for that reason is not evidence that bears directly on whether the officers' accounts are "consistent with other known facts." In its analysis of the immediate threat to safety *Graham* factor, the Court discussed precedent regarding the reasonableness of the use of deadly force when a suspect is armed with a deadly weapon. (Doc. 135 at 19.) The Court observed that it "cannot simply accept what may be a self-serving account by the police officer" and "must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts. . . . This includes circumstantial evidence that, if believed, would tend to discredit the police officer's story." (*Id.* at 19-20) (internal quotation marks and citations omitted). Even if the Court accepts as true Officer Ravelo's testimony that *she* did not see Leontae with a gun, that is not evidence that the individual Defendants did not see Leontae with a gun, nor does Officer Ravelo's perspective amount to a "known fact" that none of the individual Defendants saw Leontae with a gun.

The Court did not err in finding that a reasonable jury could conclude that Leontae posed an immediate threat to the safety of the officers before they started shooting.

**B. Warnings**

Plaintiffs next assert that the Court "applied an inverted summary judgment standard to the warning question and overlooked the evidence that a warning was feasible." (*Id.* at

6.) Plaintiffs maintain that "[w]hether a reasonable jury could find for the movants is not the Rule 56 inquiry. The inquiry is whether a reasonable jury could find for Plaintiffs, and if so the question goes to the jury." (*Id.*) Plaintiffs argue that "[o]n that question," the Court overlooked the record, in particular, Plaintiffs' police practices expert, who testified that "[a]ll those officers had plenty of time" to warn "and opined that 'there was absolutely no reason' not to announce and warn given the 'time, distance, cover, and backup available.'" (*Id.*) Plaintiffs observe that the Order "does not mention the expert's opinions on feasibility or on any other point." (*Id.*)

Assuming without deciding that Plaintiffs are correct that the issue is whether a reasonable jury could conclude that warnings *were* feasible, that distinction makes no difference to the outcome of the Court's Fourth Amendment analysis. The Court determined that almost all the *Graham* factors—including the most important *Graham* factor, whether Leontae posed an immediate threat to the safety of the officers—weighed in Defendants' favor. Even if the Court had found that a reasonable jury could conclude that warnings were feasible, it would not have changed the Court's analysis of the totality of the circumstances in Plaintiffs' favor.

**C. Qualified Immunity**

Plaintiffs contend that "[t]he qualified immunity analysis was not conducted officer by officer, and the controlling precedent the Court was obligated to consider was not applied." (*Id.* at 7.) Plaintiffs assert that the Court "treat[ed] the three officers as one" and "impute[d] Ladines's observation of a gun" to both Garza, "who fired at . . . a man the Court found had nothing in his hands," and Roy, "who admitted he saw no gun." (*Id.*) Plaintiffs further argue that the Court's reliance on the partial dissent in *Gonzalez* "misapprehends that decision." (*Id.* at 8.) Plaintiffs maintain that the Court "did not consider controlling precedent that resolves the clearly established prong." (*Id.*)[2]

---

[2] According to Plaintiffs, the relevant, analogous cases they did not cite in their Response to Defendants' Motion for Summary Judgment—and that they contend the Court should have analyzed notwithstanding their failure to cite them—include *Curnow v.*

First, Plaintiffs misstate the evidence and misrepresent the Court's findings in the September 14, 2026 Order. Plaintiffs contend that the Court improperly "impute[d] Ladines's observation of a gun . . . to Garza." (Doc. 137 at 8.) But Defendant Garza told investigators that when he arrived at the scene, he saw Leontae with a firearm in his hand. As for Plaintiff's assertion regarding a finding that Leontae "had nothing in his hands," no such finding was made. As discussed above, the Court noted in its Order that from the perspective of Defendant Roy's body worn camera, it was "impossible to tell" whether Leontae had an arm outstretched or had anything in his hands before Roy shot him; accordingly, the Court made no findings of fact based on the body worn camera footage and did not find that Leontae "had nothing in his hands."

Plaintiffs also contend that Defendant Roy "admitted he saw no gun." (*Id.*) But the evidence does not support this assertion. On the contrary, Roy told investigators that he witnessed Leontae "pointing his gun in a northeast direction at the front entrances of the barber shop and liquor store" and Roy "clearly saw the gun pointing in that direction towards the stores." (Doc. 135 at 6) (quoting Doc. 104-6 at 14)). And as the Court noted, "When asked if he could see [Leontae] holding his gun when he made visual contact with him near the storefront," Roy stated, 'I can't see that . . . he is, but the way his body language is I assumed that he was still armed. Roy 'continued to say that when he arrived on the scene, he witnessed [Leontae] with a gun in his hand.'" (*Id.* at 7) (quoting Doc. 104-6 at 14-15).

With respect to Plaintiffs' assertion that the Court failed to conduct the requisite individualized assessment, Plaintiffs misstate—or misunderstand—the Court's qualified

---

*Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991); *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997); *George v. Morris*, 736 F.3d 829 (9th Cir. 2013); *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014); *Estate of Lopez v. Gelhaus* 871 F.3d 998 (9th Cir. 2017); *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017); and *Peck v. Montoya*, 51 F.4th 877 (9th Cir. 2022).

In the September 14, 2026 Order, the Court discussed *George* in its threat-to-safety analysis and *Cruz* and *Peck* in its qualified immunity analysis. (Doc. 135 at 19, 32.)

immunity analysis. The Court observed, "[L]iability may not be imposed based on a team effort theory that would allow[ ] the jury to lump all the defendants together, rather than require it to base each individual's liability on his own conduct." (Doc. 135 at 32) (citation omitted). The Court therefore "under[took] an individualized assessment as to whether" Defendants, Ladines, Garza, and Roy were entitled to qualified immunity. (*Id.*) The Court noted that in the Ninth Circuit, "the relevant question for purposes of qualified immunity is not whether a suspect actually threatened the officers, but whether the officers could reasonably have believed that [he] posed such a threat. Thus, what matters is what reasonable officers in [Defendants'] positions would have, or should have, perceived." (*Id.*) (internal quotation marks and citations omitted). The Court found that "each Defendant engaged in the same conduct: shooting a suspect whom they knew had been armed with a gun seconds earlier, whom they had been told was an 'active shooter,' and whom they reasonably believed was still armed," and for purposes of qualified immunity, there was "no meaningful distinction between Defendants Ladines, Garza, and Roy's conduct." (*Id.* at 33.) That the Defendants engaged in the same conduct does not mean the Court failed to separately consider each Defendant's conduct.

Plaintiffs also overstate the Court's reliance on the partial dissent in *Gonzalez*. The Court parenthetically noted that Judge Bumatay's partial dissent analyzed the qualified immunity of officers who merely drove a car a short distance with an improperly restrained suspect separately from officers who placed the suspect in a RIPP restraint, carried him to the backseat of a police vehicle, and placed him face-down over a hard plastic console with his hands cuffed and his legs curled up. (*Id.* at 33-34.) In citing the dissent, the Court was merely contrasting the circumstances of this case from a situation in which one set of officers' conduct clearly differed from another set of officers' conduct and therefore, in Judge Bumatay's view, separate qualified immunity analyses were necessary.

Plaintiffs cite *Elder v. Holloway*, 510 U.S. 510, 516 (1994), for the proposition that "[t]he Supreme Court requires a court deciding qualified immunity to use its full knowledge of its own [and other relevant] precedents, because whether a right was clearly

established presents a question of law." (Doc. 137 at 8-9). Plaintiffs contend that in *Calonge v. City of San Jose*, 104 F.4th 39 (9th Cir. 2024), the Ninth Circuit applied *Elder* to hold that a plaintiff who "argued in the district court that the law was clearly established but did not cite analogous cases" was entitled to have the analogous cases considered on appeal, and that the relevant cases "directly controlled" the analysis "without elaboration." 104 F.4th at 48-49. Plaintiffs' argument is misguided for several reasons.

First, *Elder* predates three decades of Supreme Court precedent that has substantively changed the qualified immunity analysis. *See District of Columbia v. Wesby,* 583 U.S. 48 (2018); *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam); *Pearson v. Callahan*, 555 U.S. 223 (2009). The Supreme Court itself has not cited *Elder* in any case since 1997. *See United States v. Lanier*, 520 U.S. 259, 269 (1997) (citing *Elder*, 510 U.S. 510 at 516) (treating Court of Appeals decision as 'relevant authority' that must be considered as part of qualified immunity enquiry). Second, Plaintiffs overstate the relevance of *Elder* and *Calonge*. In *Elder*, the Ninth Circuit had disregarded authority relevant to the clearly established prong of qualified immunity because the authority had not been cited to the district court. 510 U.S. at 514. The Supreme Court reversed, "holding that "appellate review of qualified immunity dispositions is to be conducted in light of all relevant precedents, not simply those cited to, or discovered by, the district court." *Id.* at 512. The Supreme Court "instructed that a court of appeals 'engaging in review of a qualified immunity judgment should . . . use its full knowledge of its own [and other relevant] precedents.'" *Calonge*, 104 F.4th at 48 (quoting *Elder*, 510 U.S. at 516). In *Calonge*, the defendant officer contended that the plaintiff "forfeited any argument that the clearly established prong of the qualified immunity analysis was satisfied because she failed to 'fully develop' her argument before the district court by citing analogous cases." *Id.* at 47. On appeal, the plaintiff continued to argue that the law was clearly established, and she cited analogous cases. The Ninth Circuit concluded that under *Elder*, it was required to consider those cases and any other relevant law. *Id.* at 48.

In the September 14, 2026 Order, the Court thoroughly discussed the landscape of

qualified immunity law, particularly as relevant to Fourth Amendment excessive force cases. As noted, Plaintiffs did meet their burden to cite analogous cases in their qualified immunity argument. Plaintiffs cited *Tennessee v. Garner*, 471 U.S. 1, 9 (1985); *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001); and *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), each of which the Court distinguished on its facts. (*See* Doc. 135 at 30-32.) And even if the Court had an obligation under *Elder* and *Calonge* to consider analogous cases that Plaintiffs did not cite, it did so by considering and distinguishing *Long*. Plaintiffs' contention that the Court misapplied *Long* is simply a disagreement with the Court's decision. *Elder* and *Calonge* do not stand for the proposition that a plaintiff who simply fails to support his qualified immunity argument with relevant, clearly established precedent may do so after the fact and then blame his failure to prevail on that argument on the Court. The Court did not err in concluding that the individual Defendants were entitled to qualified immunity.

**D. Citation to *Motley v. Parks***

Plaintiffs point to the Court's citation to *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) (en banc), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc), in its discussion of whether Leontae posed an immediate threat to the safety of the officers. (Doc. 135 at 11.) Plaintiffs note that Defendants did not cite *Motley* in their Motion for Summary Judgment, and in the September 14, 2026 Order, the Court "raised" *Motley* to hold that Defendants Ladines, Garza, and Roy "were entitled to rely on the dispatch report of an 'active shooter.'" (*Id.*) Plaintiffs purport to "address [*Motley*] now for the first time because they had no earlier opportunity." (*Id.*)

Plaintiffs contend that "[n]othing in *Motley* holds that a dispatch report authorizes an officer to disregard what is in front of him when he decides to fire" and that the "the Ninth Circuit's rule is the opposite in that an officer is charged with the facts relayed to him and with what he could see, and no more." (*Id.* at 12.)

In discussing Plaintiffs' argument that a jury could find that Defendants Ladines, Garza, and Roy knew or should have known the "active shooter" designation was

erroneous and was "the product of reckless miscommunication from the helicopter unit," the Court observed that "Plaintiffs' assertion relie[d] on evidence that was not known to the dispatcher or Defendants at the time of the shooting." (*Id.* at 22.) Citing *Motley*, the Court reasoned that law enforcement officers "are generally entitled to rely on information obtained from fellow law enforcement officers." (*Id.*) (citation omitted). The Court further observed that "[a]lthough [a]ll officers . . . have an ongoing duty to make appropriate inquiries regarding the facts received or to further investigate if sufficient details are relayed, [w]here an officer has an objectively reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be held liable if the information supplied by other officers turns out to be erroneous. The lynchpin is whether the officer's reliance on the information was objectively reasonable." (*Id.*) (internal quotation marks and citations omitted). The Court concluded that because Defendants Ladines, Garza, and Roy were not at the scene when they received the dispatcher's report and had no reason to doubt the veracity of the report, it was reasonable for Defendants to rely on the dispatcher's report that there was an "active shooter." (*Id.*)

To the extent that Plaintiffs suggest the Court erred by citing *Motley* where Defendants did not, nothing prohibits this Court from addressing precedent not cited by the parties.[3] Plaintiffs put the reasonableness of Defendants' reliance on the dispatcher's active shooter designation at issue by arguing that their reliance was not reasonable. Thus, precedent speaking to circumstances in which relying on information is reasonable is directly relevant to an issue *Plaintiffs* raised. The Court did not err by citing *Motley*.

**E. Medical Aid**

Lastly, Plaintiffs contend that the Court's "medical aid ruling misread *Ryan v. Napier* and overlooks that the theory rests on omissions after the force ended." (Doc. 137 at 13.) Plaintiffs argue that their "medical aid theory does not challenge the decision to shoot"; instead, it "challenges what the officers did after the last round was fired." (*Id.*)

---

[3] Plaintiffs clearly concur with this principle in part, as they have also faulted the Court for *not* citing independently identified case law.

Plaintiffs assert that the Court erroneously imposed "but-for causation" to their medical aid claim, but that is "not the test" the Arizona Supreme Court adopted in *Ryan*. (*Id.*) According to Plaintiffs, the Court "applie[d] a rule under which no post-force omission could ever be independent, because every such omission follows the force in time." (*Id.*) Plaintiffs cite the decision of another Judge in this District in a police shooting case, *Hernandez v. County of Santa Cruz*, No. CV-24-00353-TUC-SHR (D. Ariz. Aug. 29, 2025). In *Hernandez*, the plaintiffs sought leave to amend to add a separate claim for failure to render medical aid. (Doc. 38 in CV-24-00353.) The District Judge found that the plaintiffs had included factual allegations regarding one of the defendant's actions immediately following the shooting that were sufficient to state a plausible claim for relief. (*Id.*) The Court is not bound by the decision of a sister court. In any event, *Hernandez* was in a different procedural position than this case and is therefore of limited utility to a summary judgment analysis. Moreover, as Defendants note, "Plaintiffs' disagreement with that reading of *Ryan* — including their reliance on an application of *Hernandez*—is the paradigmatic reconsideration argument the Rules forbid: it asks the Court "to rethink what the court had already thought through," and merely repeats an argument previously made." (Doc. 141 at 12.) Plaintiffs' disagreement with the Court's analysis does not amount to clear error or manifest injustice.

## V. Conclusion

For the foregoing reasons, the Court will deny Plaintiffs' Motion to Alter or Amend the Judgment.

**IT IS ORDERED:**

(1) Plaintiffs' Motion to Alter or Amend the Judgment (Doc. 137) is **denied**.

(2) This case must remain **closed**.

Dated this 19th day of November, 2026.

Michael T. Liburdi
United States District Judge